**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. _____**

PLATINUM PROPERTIES INVESTOR
NETWORK, INC.; THE HARTMAN
MEDIA COMPANY, LLC; and JASON
HARTMAN,

          Plaintiffs,

    v.

JOHN DOES 1-2,

          Defendants.

_____/

**JURY TRIAL DEMANDED**

**INJUNCTIVE RELIEF DEMANDED**

**COMPLAINT**

Plaintiffs Platinum Properties Investor Network, Inc. ("Platinum Properties"), The Hartman Media Company, LLC ("HMC"), and Jason Hartman ("Mr. Hartman") (collectively, "Plaintiffs"), by their undersigned attorneys, file this Complaint against two John Doe defendants ("Defendants") whose names are not readily available due to their intentional concealment through technological means for federal service mark counterfeiting, service mark infringement, false designation of origin and unfair competition, dilution, deceptive and unfair trade practices, tortious interference, and civil conspiracy. For Plaintiffs' Complaint against Defendants, Plaintiffs allege the following, based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the infringing website, consultations with experts in the field of information technology, the filing of a

1

proceeding under the Uniform Domain Name Dispute Resolution Policy ("UDRP"), and a review of information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is an action for service mark counterfeiting arising from Defendants' surreptitious creation, use, and promotion of a blackmail hit-site meant to harm Plaintiffs' businesses.

2.      Defendants, self-described industry competitors to Plaintiffs, decided that instead of competing fairly and building their business through hard work and contribution to the marketplace of ideas, they would turn to civil and criminal violations of law to destroy their competitors and profit therefrom.

3.      In an effort to drive business away from Plaintiffs, and to destroy the large market share they have earned through years of education and service to the profession, Defendants, while attempting to conceal their identities, are (1) resorting to criminal impersonation, (2) using Plaintiffs' trademarks to confuse and deceive Plaintiffs' clients and colleagues, and (3) defaming Plaintiffs' businesses by publishing a plethora of false and misleading statements of material fact relating to Plaintiffs' business, financial history, litigation history, commercial dealings, alleged prurient nature, credibility, and trustworthiness.

4.      Defendants have gone above beyond passive misconduct to actively target Plaintiffs' business and clientele.  Defendants have directly approached Plaintiffs' clients and colleagues, and used impersonation and guile to direct them to an infringing domain and website.

5.      Moreover, to conceal their identity and cover their tracks, Defendants are using the newest generation of web tools used by hackers, cyber-pirates, and child-

pornographers to insulate themselves from liability while perpetrating, *inter alia*, criminal impersonation, intellectual property infringement, and unfair competition.

6.     Defendants have succeeded in their efforts; they have caused substantial harm to Plaintiffs' business and reputation, and continue to irreparably harm Plaintiffs. Plaintiffs have frustratingly attempted to stop Defendants' violations of law and prevent further harm, but to no avail.  With each small success, Defendants simply redirect web-traffic, obtain new domain names and email addresses, and skirt law enforcement.

7.     After filing complaints with the U.S. Federal Bureau of Investigation ("FBI"), the Palm Beach County Sheriff's Office, and commencing an international arbitration proceeding under the UDRP, Plaintiffs had no further options but to file this action.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338.

9.     This Court has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367(a), because they form part of the same case and controversy and derive from a common nucleus of operative facts.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 139l(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

11.    This Court has personal jurisdiction over Defendants as they are doing business in Florida, engaging in business activities directed to Florida, committing a pattern of tortious conduct in Florida, using personal property in Florida as a means of perpetrating

that conduct, and purposefully availing themselves of the opportunity to conduct commercial activities in Florida.

## PARTIES

12.     Plaintiff Mr. Hartman is a resident of Palm Beach County, Florida, and has conducted business, through various entities, in Florida for more than twenty years.

13.     Plaintiff Platinum Properties is a California corporation with a registered agent at 4400 N. Scottsdale Road, #9-322, Scottsdale, AZ 85251 and a correspondence address at 401 E. Las Olas Blvd. # 130707, Ft. Lauderdale, FL 33301.

14.     Plaintiff HMC is a Wyoming LLC with a registered agent at 60 E. Simpson Ave, PO Box 2869, Jackson, WY 83001.

15.     Mr. Hartman, directly or indirectly, owns Platinum Properties, HMC, and The Jason Hartman Foundation, a philanthropic organization dedicated to assisting young adults with free financial literacy education, and providing micro lending to help citizens of developing countries become financially self-sustaining (jasonhartmanfoundation.org).

16.     Defendant John Doe #1 is the controller of several infringing websites, including JasonHartmanProperties.com, some of which are technically owned by "1337 Services LLC" dba "Njalla" as an identity concealing agent.

17.     John Doe #2 is the owner, controller, and user of the email addresses JasonHartman@Protonmail.com and HartmanInvestigators@gmail.com.

18.     Plaintiffs are not aware of the true names and capacities of Defendants John Does 1-2.  Upon information and belief, these Defendants are either the same person or have colluded with one another in the unlawful conduct described in this Complaint. Plaintiffs will amend the Complaint to allege the names and capacities of these Defendants when ascertained.

19.     Upon information and belief, John Doe # 2 was the proxy, alter ego, alias, agent, servant, employee, partner, parent, subsidiary, or joint venturer of John Doe # 1 in respect to some or all of the unlawful conduct alleged in this Complaint.

20.     Upon information and belief, the unlawful conduct of John Doe # 2 alleged in this Complaint was in the scope of his relationship with John Doe # 1, and each said Defendant acted with the knowledge, participation, permission, consent and/or authority of John Doe # 1 in respect to some or all of the unlawful conduct alleged in this Complaint.

21.     Upon information and belief, each Defendant aided and abetted the other, and has been aided and abetted by the other, in respect to some or all of the unlawful conduct alleged in this Complaint.

**Relevant Non-Parties**

22.     Non-Party 1337 Services LLC dba Njalla ("Njalla") is not a real LLC but rather a company formed and operating in the Caribbean Islands of St. Kitts and Nevis.  It was created by a notorious copyright thief who was sentenced to prison in Sweden for his creation of The Pirate Bay, Peter Sunde Kolmisoppi (a.k.a Peter Sunde).  Njalla is a self-described middleman that sits "between the domain name registration service and [the actual controller of the domain name], acting as a privacy shield."  As explained by Njalla on its website, "When you purchase a domain name through Njalla [Respondent's 'doing business as' name], we own it for you. However, the agreement between us grants you full usage rights to the domain. Whenever you want to, you can transfer the ownership to yourself or some other party."  *See* https://njal.la.

23.     Non-Party Tucows Inc. ("Tucows") is a Pennsylvania corporation with headquarters located at 96 Mowat Avenue, Toronto, Ontario, Canada M6K 3M1.  Tucows'

common stock is traded on the NASDAQ Capital Market under the symbol "TCX" and on the Toronto Stock Exchange under the symbol "TC".

24.     Non-Party Tucows Domains Inc. ("Tucows Domains") is an Ontario, Canada corporation that is indirectly wholly owned by Tucows.  Specifically, Tucows Domains is wholly owned by Tucows.com Co., a Nova Scotia, Canada corporation, which is wholly owned by Tucows (Delaware) Inc., a Delaware corporation, which in turn is wholly owned by Tucows.

25.     Non-Party Proton Technologies AG ("Proton") is a company based in the Canton of Geneva, Switzerland, with headquarters located at Chemin du Pré-Fleuri, 3 CH-1228 Plan-les-Ouates, Genève, Switzerland.  Proton owns and operates ProtonMail, an end-to-end encrypted email service founded in 2014 that enables users to establish an anonymous email account.  As advertised on the ProtonMail website, "No personal information is required to create your secure email account. By default, we do not keep any IP logs which can be linked to your anonymous email account. Your privacy comes first." Moreover, Proton stores its servers for ProtonMail at two different locations in Switzerland, outside of United States and European Union jurisdiction.  As explained on the ProtonMail website, "ProtonMail is incorporated in Switzerland and all our servers are located in Switzerland. This means all user data is protected by strict Swiss privacy laws." *See* https://protonmail.com.

26.     Non-Party Google LLC ("Google") is a wholly owned subsidiary of Alphabet Inc. with its headquarters located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google offers a free advertising-supported email service known as "Gmail" that has more than one billion monthly active users.

## BACKGROUND

### Plaintiffs' Hard-Earned Reputation and Goodwill

27.     Mr. Hartman grew up in a low-income home in Los Angeles, CA, going to public schools through high school.

28.     At 16, Mr. Hartman saw a television program involving a real estate mogul discussing his success as a real estate investor.  Mr. Hartman bought the mogul's book and had his first introduction to the real estate market.

29.     At 18, at his mother's behest, Mr. Hartman took his first trip to a real estate investment seminar in Anaheim, CA.  Intrigued and inexperienced, two days later, Mr. Hartman began searching for real estate schools.  He enrolled in Century 21®'s Real Estate Course for $99.

30.     By 19, Mr. Hartman received his real estate license and began working as a real estate agent for Century 21 part-time while attending college.

31.     He was a hard worker, and in Mr. Hartman's first full month in the business, he sold five (5) properties.  But instead of using his earnings and savings on a new car, an impressive resistance for any 19-year-old, he invested it in his real estate career, keeping his dreams big.

32.     Mr. Hartman bought his first rental property from a client at age 20, and remained committed to real estate ever since.

33.     Today, Mr. Hartman is a world-renowned industry professional who has been involved in several thousand real estate transactions and has owned income properties in 11 states and 17 cities, including multiple cities in Florida.

34.     His company, Platinum Properties, helps people achieve financial freedom by acquiring prudent income properties in conservative markets nationwide.

35.     Mr. Hartman serves as a guru in his trade and has spent years building his name and reputation. Indeed, his speaking engagements have been attended by tens of thousands of people around the world - his next conference is scheduled for November 3-4, 2018.  His podcasts are equally popular.  Mr. Hartman has interviewed senators, presidential candidates, thought leaders, college professors and economists on his program.

36.     As a result, Plaintiffs collectively earn an annual revenue of more than $3.0 million and have been recognized by INC. Magazine among the INC. 5000 Fastest Growing Private Companies in America.

**The Federally Registered Trademarks**

37.     In recognition of the prominence developed by the Jason Hartman name and brand in the real estate investment industry over the years, the United States Patent and Trademark Office ("PTO") issued two service mark registrations covering Mr. Hartman's name and website domain name.

38.     On March 1, 2013, Plaintiff, through HMC, filed an application to register JASONHARTMAN.COM as a service mark with the PTO.  The JASONHARTMAN.COM service mark was officially registered on October 15, 2013 (Registration No. 4,418,120).  *See* Exhibit ("Ex.") A.

39.     Plaintiffs' first use of the JASONHARTMAN.COM service mark in commerce was on December 29, 1996.  Plaintiff has used the JASONHARTMAN.COM service mark in commerce continuously since that time.

40.     On June 17, 2013, Plaintiff, through HMC, filed an application to register JASON HARTMAN as a service mark with the PTO.  The JASON HARTMAN service mark was officially registered on January 21, 2014 (Registration No. 4,470,582).  Ex. A.

41.     Plaintiffs' first use of the JASON HARTMAN service mark in commerce was in September 1985.  Plaintiff has used the JASON HARTMAN service mark in commerce continuously since that time.

42.     Both JASON HARTMAN and JASONHARTMAN.COM (collectively, the "Service Marks") are federally registered service marks for financial investment in the field of real estate and financial services, namely, real estate note brokerage, in International Class 36 (U.S. Cls. 100, 101 and 102).  *See id.*

43.     In sum, the mark JASON HARTMAN has been federally registered for nearly five years and has been in commercial use for 23 years.  JASONHARTMAN.COM also has been federally registered for nearly five years, and has been in commercial use for nearly 22 years.

**<u>Use of the Service Marks</u>**

44.     Plaintiffs makes extensive use of the Service Marks.

45.     Use of the JASON HARTMAN mark by Plaintiffs currently appears as follows on the home page of Plaintiffs' website at www.jasonhartman.com:



46.     After more than 20 years of substantial and uninterrupted use, combined with extensive advertising of tens of millions of dollars, Plaintiffs' Service Marks have become well known to the public, and are "famous" for all purposes relevant to this Complaint.

47.     Indeed, Plaintiffs expend approximately $1.5 million annually on marketing efforts in connection with the JASON HARTMAN mark.

**The Infringing Domain Name**

48.     John   Doe   #   1   purchased   the   internet   domain   name, JasonHartmanProperties.com (the "Infringing Domain Name"), from Tucows Domains on or around May 17, 2018.[1] *See* Ex. B.

49.     At some point after purchasing the Infringing Domain Name, John Doe # 1 transferred the Infringing Domain Name to Njalla in an effort to conceal his or its identity.

50.     On its face, the Infringing Domain Name (JasonHartmanProperties.com) is identical to and incorporates the Service Marks (JasonHartman and JasonHartman.com), except for the addition of the generic term "properties."

51.     Indeed, the Infringing Domain Name was created intentionally to cause consumer confusion and target the class of services directly covered by the Service Marks, and for which such marks are used.  Seeking to inflict maximal damage to Plaintiffs' business and trademarks, John Doe # 1 intentionally purchased and is using a domain name

---

[1] John Doe # 1 additionally purchased at least six other domain names that, like the Infringing Domain name, incorporate Plaintiffs' trademarks.  These other infringing domain names forward traffic to the Infringing Domain Name.  These other infringing domain names are omitted herein to avoid further damage to Plaintiffs but will be disclosed in an amended pleading.

specific to the real estate market (i.e., adding the real estate descriptor "properties" to "Jason Hartman"), the field in which the Service Marks are used and maintain registered protection.

52.     John Doe # 1 has no right, permission, license or agreement with Plaintiffs authorizing him to use the Service Marks.  Moreover, there is nothing in the available Whois information, the content of the infringing website, or domain name indicating that John Doe # 1 is "commonly known" as Jason Hartman, especially in the field of real estate.

53.     Further, John Doe # 1 does not use the Infringing Domain Name in connection with a *bona fide* offering of goods or services or legitimate noncommercial or fair use.

54.     Instead, as described further below, John Doe # 1's use of the Infringing Domain Name is in bad faith and for commercial gain to misleadingly divert customers and to tarnish the Service Marks.

**The Infringing Website**

55.     The website displayed at the Infringing Domain Name (the "Infringing Website") was tailor-crafted to tarnish the Service Marks, destroy Plaintiffs' business, and defame Mr. Hartman personally.  *See* https://jasonhartmanproperties.com.[2]

---

[2] As of the filing of this Complaint, the Infringing Domain Name redirects visitors to another domain (the "Redirect Domain"), whose domain name is omitted herein to prevent further damage to Plaintiffs' business.  While jasonhartmanproperties.com is currently involved in a UDRP proceeding and Plaintiffs expect the domain name to be transferred within 60 days, Plaintiffs have no recourse with respect to the Redirect Domain absent an Order from this Court.  In any event, Plaintiffs fully expect Defendants to find yet another redirect domain if the Redirect Domain is taken down.  Notably, prior to about July 30, 2018, the date when HMC initiated a proceeding under the UDRP, the Infringing Website was displayed directly on the Infringing Domain, rather than through the Redirect Domain.

56.     The Infringing Website not only utilizes unauthorized copies of the Service Marks and copyrighted works, but attempts to disparage Plaintiffs' business success through false and misleading statements of material fact.  The Infringing Website is overflowing with false statements relating to Plaintiffs' business, financial history, litigation history, commercial dealings, alleged prurient nature, credibility, and trustworthiness.

57.     The most obvious falsity is the representation on the Infringing Website that "Jason Hartman has more than 100 lawsuits filed by, or against him in the last 10 years." Mr. Hartman has been involved in only a fraction of that number of cases in his entire life, let alone the last ten years.

58.     Another related falsity is the claim that Mr. Hartman has been involved in "70 cases in Orange County, CA alone."  To support such a fraudulent representation, John Doe # 1 cunningly uploaded a list of all filed cases in the Orange County (CA) Superior Court involving any "Jason Hartman."  But Plaintiffs' counsel's public records search revealed that there are at least 29 different individuals with the name Jason Hartman in California, and countless more who may have been sued there.  Nevertheless, John Doe # 1 attempts to disparage the one famous Jason Hartman with fraudulent representations.

**Criminal Impersonation Through ProtonMail**

59.     John Doe # 2, possibly the same individual as John Doe #1 but assuredly working in concert with him, targeted Plaintiffs' business clientele and colleagues through an impersonator email address, JasonHartman@protonmail.com (the "Imposter Account").

60.     Baiting the recipients to open a message they were led to believe was from Mr. Hartman, John Doe # 2 directed Plaintiffs' clients to the Infringing Domain.

Specifically, on June 29, 2018 at 11:45 AM ET, John Doe # 2 sent an email from the Imposter Account to Plaintiffs' client, stating the following:

> To Whom It May Concern:
>
> As somebody we know and respect in our very large, but also very intimate industry, I wanted to share with you the results of about a 4 month investigation into Jason Hartman's background. What we have found so far and continue to uncover with the help of others in our industry is …..[3]
>
> Nonetheless, we know you to be a reputable voice in the industry and thought you and/or your followers should be aware of the alarming facts found so far. We imagine as this information travels through our industry, the alarming truth is only going to grow more.
>
> You can trust the following site to the details and documents involved is secure. http://jasonhartmanproperties.com/
>
> Please share these details with anyone you know may have crossed paths with, or invested with this individual. Maybe it will help to mitigate their losses of working with him. It sure would have helped us a few years ago to know what we know now, but in the end we prevailed.

61.    John Doe # 2's email is telling for several reasons.

62.    First, it is clear from John Doe # 2's self-inclusion in the "industry" and his use of first-person plural pronouns that he is a business competitor.  He stated, "As somebody *we* know and respect in *our* very large, but also very *intimate* industry . . . ." *Id.* (Emphasis added).

63.    Second, John Doe # 2 defined the relevant market of competitors as "intimate," showing knowledge that the email would cause immense harm to Plaintiffs in that intimate community.

---

[3] False and misleading statements about Plaintiffs have been redacted herein to prevent the salacious and completely fabricated statements from becoming cemented into the public record of this Court.  Plaintiffs will produce further information for an *in camera* review or during discovery under a protective order.

64.     Third, by wishing to share "[w]hat *we* have found so far" with respect to a "4 month investigation into Jason Hartman's background," John Doe # 2 revealed that he was working in concert with John Doe # 1 with respect to the purported "investigation results" that were posted on the Infringing Website.   The same statements also misrepresented to the recipients that they were receiving true and accurate statements of fact based on a "4 month investigation."

65.     Fourth, John Doe # 2's statement that "we know you to be a reputable voice in the industry" again demonstrates that he is an industry competitor seeking to cause commercial harm and unfairly compete.

66.     Fifth, John Doe # 2's statements that "we . . . thought you and/or your followers should be aware of the alarming facts found so far" and "[p]lease share these details with anyone you know may have crossed paths with" demonstrate that John Doe # 2 was disseminating the false and misleading information contained on the Infringing Website with the intent that it be widely distributed for maximal damage.

67.     Sixth, John Doe # 2's statements that "the alarming truth is only going to grow more" and "[y]ou can trust the following site to the details" demonstrate, again, John Doe # 2's intentional misrepresentation that the information contained on the Infringing Website was accurate and factual.

68.     The impersonation worked.  Plaintiffs' clients did indeed open the email that they would not have otherwise opened and read because they believed the email to be coming from Mr. Hartman.

69.     In impersonating Mr. Hartman and targeting Plaintiffs' clients, John Doe # 2 willfully infringed the Service Marks and attempted to tarnish said marks.

14

70.     In addition to committing civil violations of law, John Doe # 1's impersonation of Mr. Hartman was also a crime under, *inter alia*, Florida Criminal Statute § 817.568(2)(a)-(b).  On or around July 30, 2018, Mr. Hartman filed a sworn statement with the Palm Beach County Sheriff's Office in District 4 – Delray Beach, and gave his consent to prosecute the matter.  Around the same time, Mr. Hartman also filed a criminal complaint with the FBI's Internet Crime Complaint Center citing Defendants' criminal impersonation and systematic transmission of false contact data by means of "wire communications" in furtherance of a "scheme" and "artifice to defraud" within the meaning of the federal wire fraud statute.

**Slippery Bandit**

71.     After weeks of communications and pleas to the administrators of ProtonMail, on or around Friday, July 27, 2018, Plaintiffs were successful in getting the Imposter Account shut down.

72.     But the identity thief, John Doe # 2, was not out of options.  Two days later, on July 29, 2018, Plaintiffs' colleagues forwarded them emails from a new, never-before-seen email account, HartmanInvestigators@gmail.com (the "Second Account").

73.     E-mails from the Second Account were, much like the first, targeted at Plaintiffs' clients and colleagues, and directed the recipients to the Infringing Domain.

74.     For example, in a July 29, 2018 email from the Second Account to Plaintiffs' colleague, John Doe # 2 stated: "http://jasonhartmanproperties.com.  Good Information to discuss with Mr. Hartman on your next Podcast with him.  Thank you."

75.     Notably, emails from the Second Account were also tailored to trick Plaintiffs' clients and colleagues into thinking the email was coming from Mr. Hartman.

For example, the aforementioned July 29, 2018 email contained the subject "Jason Hartman Updated Web Site," which led people to believe that JasonHartman.com, one of the Service Marks, had been "updated," and that Mr. Hartman was sending out emails about it.

76.     Complaints have been lodged with Google but no action has been taken. John Doe # 2 has contacted an unknown number of Plaintiffs' clients and colleagues, spreading and promoting the Infringing Domain and Infringing Website.

77.     John Doe # 1, too, seems to find ways to slip away.  As described further herein, when the Infringing Domain Name was locked, meaning that it could not be transferred, in connection with Plaintiffs' commencement of an international arbitration against the Infringing Domain Name registrant, John Doe # 1 redirected traffic from the Infringing Domain Name to yet another domain, the Redirect Domain.

### A Good Criminal Always Covers His Tracks

78.     In true criminal fashion, John Does # 1-2 have taken every step possible to cover their tracks and conceal their methods of impersonation and violations of law.  For example, not only is ProtonMail based in Switzerland (with some of the world's strictest privacy laws), but it publicly advertises on its website that (1) "[n]o personal information is required to create your secure email account," (2) "we do not keep any IP logs which can be linked to your anonymous email account," (3) "[a]ll emails are secured automatically with end-to-end encryption. This means even we cannot decrypt and read your emails," (4) "all user data is protected by strict Swiss privacy laws," (5) "ProtonMail's security measures are intense: end-to-end encryption and user authentication protocols so rigorous even the creators can't read user emails," (6) "we don't have the technical ability

to decrypt your messages, and as a result, we are unable to hand your data over to third parties," and (7) "[a]s ProtonMail is outside of US and EU jurisdiction, only a court order from the Cantonal Court of Geneva or the Swiss Federal Supreme Court can compel us to release the extremely limited user information we have."

79.     Moreover, John Doe # 1 chose a registrar, Tucows, that has a history of non-compliance with valid takedown requests from trademark holders.  *See* Ex. C at p. 16 ("Based in Canada, Tucows is reportedly an example of a registrar that fails to take action when notified of its clients' infringing activity.").

80.     Tucows Domains, contrary to express agreements with The Internet Corporation for Assigned Names and Numbers ("ICANN"), hid the Infringing Domain Name registrant's information on the Whois database.  To engage in domain name registration, a registrar is required to enter into agreements with ICANN that obligate the registrar to ensure accurate and current data in the "Whois database," which provides information about domain name owners to enable members of the public to contact the domain name owners about technical and legal issues related to those domain names.  Here, however, the Whois database provides no registrant information for the Infringing Domain Name.

81.     Therefore, to even learn who the registrant was, Plaintiffs were forced to institute an action with the World Intellectual Property Organization ("WIPO") Arbitration and Mediation Center pursuant to the UDRP.

82.     Eventually, pursuant to mandatory requests under the UDRP, Tucows Domains disclosed the registrant information, only to reveal that there was yet another layer of identity concealment employed by John Doe # 1.

83.     Instead of registering with Tucows himself, John Doe # 1 used an intermediary, Njalla, based in the near-judgment-proof territory of St. Kitts and Nevis, that sits "between the domain name registration service and [the actual controller of the domain name], acting as a privacy shield."   As Njalla advertises on its website, "[w]hen you purchase a domain name through Njalla, we own it for you. However, the agreement between us grants you full usage rights to the domain. Whenever you want to, you can transfer the ownership to yourself or some other party."

84.     The filing of this action is a last resort, and presents the only hope that Plaintiffs will be able to stop the ongoing and relentless infringement of their Service Marks and substantial damage to their reputation, goodwill, and business.

## COUNT I

### Federal Service Mark Counterfeiting

85.     Plaintiffs incorporate by reference all of their allegations in the preceding paragraphs.

86.     Defendants intentionally used a counterfeit of Plaintiffs' registered mark without consent, and Defendants' use of the counterfeit mark is likely to cause confusion or to cause mistake or deceive.

87.     John Doe # 1 simply added a descriptive term to a domain name associated with Plaintiffs' goods and services and John Doe # 2 didn't even care to do as much, instead opting to completely copy and use Plaintiffs' JASON HARTMAN registered mark to direct traffic to the Infringing Domain Name.

88.     Defendants used concealing agents and took multiple steps to conceal their identity and frustrate the discovery of their wrongdoings.

89.     Defendants' conduct violates the standards of business conduct reflected in the fictitious trade name statutes of the states such as Florida which require persons engaged in the advertising and sale of products and services to identify themselves so that they are amenable to service of process in actions arising from the advertising and sale of such goods and services, as well as the federal criminal fictitious name statute at 18 U.S.C. § 1342.

90.     As Defendants have reaped extraordinary profits, by way of harming a direct competitor, from the unlawful conduct described in this Complaint, and are undeterred by the UDRP proceeding that has been filed, Defendants have no reason to terminate their conduct unless confronted with an award of statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c).

91.     Defendants' depiction of Plaintiffs' Service Marks in the Infringing Domain Name, Infringing Website, the Impersonator Account and Second Account are "spurious" within the meaning Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A), because they are not "genuine or authentic."

92.     Defendants use their spurious depictions of Plaintiffs' Service Marks for "trafficking in services" within the meaning of the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A).

93.     The spurious depictions of Plaintiffs' Service Marks in Defendants' websites and email addresses are "identical with, or substantially indistinguishable from"

the genuine service mark within the meaning of Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320 (e)(1)(a)(ii).

94.     The services advertised by Defendants with spurious depictions of Plaintiffs' Service Marks are identical to the services for which that mark is registered within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(l)(A)(ii).

95.     Defendants are using spurious depictions of Plaintiffs' Service Marks "in connection with" the services covered by Plaintiffs' federal service mark registrations within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A)(iii).

96.     Defendants' spurious depictions of Plaintiffs' Service Marks are "likely to cause confusion, to cause mistake, or to deceive" within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A)(iv).

97.     By their acts aforesaid, Defendants have engaged, and are engaged, in the counterfeiting of Plaintiffs' Service Marks within the meaning of Sections 32(1) and 45 of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320.

98.     To carry out their counterfeiting enterprise, Defendants engage in the systematic transmission of false contact data by means of "wire communications" in furtherance of a "scheme" and "artifice to defraud" within the meaning of the federal wire fraud statute at 18 U .S.C. § 1343 and the federal fictitious name statute at 18 U.S.C. § 1342.

99.     The irreparable harm to Plaintiffs and the public resulting from Defendants' conduct, combined with the willfulness of Defendants and the manifest need for deterrence, warrant broad injunctive relief and an assessment of maximum statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c), as well as costs and attorney fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT II

## Federal Service Mark Infringement

100.     Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

101.     Defendants, with the intent to deceive the public, are using in commerce reproductions, counterfeits, copies and colorable imitations of Plaintiffs' federally registered Service Marks in connection with the sale, offering for sale, distribution and/or advertising of real estate investment services in a manner that is likely to cause confusion, mistake, and deception, leading the public falsely to believe that Defendants' services, and the services advertised at Defendants' websites and email addresses, are the services of Plaintiffs, or are sponsored or approved by, or are in some way connected with the Plaintiffs.

102.     Moreover, Defendants' unlawful use of the Service Marks are intended to (1) cause consumer confusion, (2) devalue and tarnish the Service Marks, (3) harm

21

Plaintiffs' business, (4) usurp Plaintiffs' clients, goodwill and reputation, and (5) result in profit to Defendants as competitors in an "intimate" industry.

103.    By their acts aforesaid, Defendants are engaged in federal service mark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), causing irreparable harm to Plaintiff and the public and warranting an assessment of treble damages and attorney fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT III

### Cybersquatting

104.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

105.    Defendants have registered, and are trafficking in, using, and maintaining Internet domain names and email addresses incorporating and imitating Plaintiffs' federally registered Service Marks, with the bad faith intent to profit from the goodwill associated with those marks.

106.    Plaintiffs' Service Marks were distinctive, and had acquired distinctiveness, long before Defendants registered the Internet domain names identified in this Complaint.

107.    The marks used in the Infringing Domain Name, Infringing Website, the Impersonator Account and Second Account are identical and/or confusingly similar to Plaintiffs' Service Marks.

108.    Defendants do not have any intellectual property or other rights in the names "Jason Hartman" or "JasonHartman.com."

22

109.    Defendants have never used the name "Jason Hartman" to identify themselves, and have never been commonly known by the name "Jason Hartman."

110.    Upon information and belief, Defendants have never made any use of the name "Jason Hartman" in connection with the offering or sale of any *bona fide* good or service.

111.    Upon information and belief, Defendants have never made any *bona fide* fair use of the name "Jason Hartman" on any website.

112.    Defendants registered and used the Infringing Domain Name, Infringing Website, the Impersonator Account and Second Account to divert consumers from Plaintiffs' website to the Infringing Domain and Infringing Website for Defendants' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of those websites.

113.    By their acts aforesaid, Defendants have violated the Anticybersquatting Consumer Protection Act ("ACPA"), Pub. L. No. 106-113, 113 Stat. 1501 (1999), codified at Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), causing irreparable injury to Plaintiffs and the public.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT IV

### Federal Unfair Competition, False
### Representation and False Designation of Origin

114.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

115.    By their acts aforesaid, Defendants have engaged, and are engaged, in federal unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), causing irreparable injury to Plaintiff and the public.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT V

## Federal Dilution

116.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

117.    Plaintiffs federally registered Service Marks are famous, and were famous before Defendants' first commercial use of the Infringing Domain Name, Infringing Website, Impersonator Account, and Second Account, within the meaning of the Federal Trademark Dilution Act, codified at Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), based on extensive sales and advertising under those marks.

118.    Defendants' use of Plaintiffs' federally registered Service Marks have diluted, and is likely to dilute, the distinctive quality of those marks, causing them to be blurred in the minds of consumers and to lose their commercial significance as designations of source and origin.

119.    Defendants' use of the Infringing Domain Name, Infringing Website, Impersonator Account, and Second Account has weakened, and is likely to weaken, the commercial magnetism of Plaintiffs' Service Marks and to diminish its ability to evoke their original associations.

120.    By their acts aforesaid, Defendants have diluted, and are diluting, the selling power of Plaintiffs' Service Marks by blurring their uniqueness and singularity, and by

tarnishing them with negative associations, in violation of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c).

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT VI

### Florida Dilution

121.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

122.    This Court has original jurisdiction over this pendent claim pursuant to 28 U.S.C. § 1338(b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

123.    Because of their distinctiveness and substantial, continuous and exclusive use by Plaintiffs for many years, the large sums in advertising expended on them by Plaintiffs over the years, including within the State of Florida, and their strong recognition among the purchasing public, Plaintiffs' Service Marks are famous within the State of Florida, and are entitled to broad protection, with or without a showing of competition between the parties, and with or without an actual likelihood of confusion between the marks, pursuant to the Florida dilution statute, Fla. Stat. Ann. § 495.151.

124.    In any event, Defendants are direct industry competitors with Plaintiffs and their use of the Service Marks, or confusingly similar marks, actually caused consumer confusion.

125.    Defendants' use of Plaintiffs' Service Marks has diluted, and is likely to dilute, the distinctive quality of those marks, depriving them of commercial value and injuring the business reputation of Plaintiffs, in violation of the Florida dilution statute, Fla. Stat. Ann. § 495.151.

126.     By their actions as described in this Complaint, Defendants willfully intended to trade on Plaintiffs' reputation and cause dilution of its famous mark.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT VII

### Florida Statutory False Advertising

127.     Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

128.     This Court has original jurisdiction over this pendent claim pursuant to 28 U.S.C. § 1338(b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

129.     Defendants, by their acts aforesaid, have engaged, and are engaged, in false advertising in violation of Fla. Stat. §§. 817.06 and 817.40-817.47.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT VIII

### Florida Civil Conspiracy

130.     Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

131.     This Court has original jurisdiction over this pendent claim pursuant to 28 U.S.C. § 1338(b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

132.     Upon information and belief, John Does # 1-2 acted in concert pursuant to an oral or written agreement to commit the violations of law detailed herein.

133.     John Does # 1-2 performed in accordance with their mutual agreement to perpetrate violations of state and federal law as detailed herein and to further their

conspiracy to harm Plaintiffs' business in an effort to obtain an unfair competitive advantage and profit off of their conduct.

134.    Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT IX

### Common Law Unfair Competition

135.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

136.    This Court has original jurisdiction over this pendent claim pursuant to 28 U.S.C. § 1338(b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

137.    By their acts aforesaid, Defendant have engaged, and are engaged, in common law unfair competition under Florida law.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT X

### Common Law Tortious Interference

138.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 84.

139.    This Court has original jurisdiction over this pendent claim pursuant to 28 U.S.C. § 1338(b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

140.     By their acts aforesaid, Defendant have engaged, and are engaged, in common law tortious interference with business contracts and prospective business relationships under Florida law.

141.     Defendants intentionally directed their unlawful activities at Plaintiffs' clients and colleagues with whom Plaintiff had contractual agreements to work, and for some, had the prospect of doing ample prospective work.

142.     Those targeted by Defendants' activities did indeed either break contractual agreements with Plaintiffs and/or stopped doing business with Plaintiffs as a result of Defendants' conduct.  Some of Plaintiffs' colleagues and former clients were dissuaded by the false and defamatory content on the Infringing Website.

143.     Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

1.     For an order permanently enjoining Defendants, collectively and individually, and their officers, shareholders, partners, principals, agents, assignees, beneficiaries, successors, licensees, distributors, attorneys, proxies, alter egos, aliases, and all other persons acting in concert with Defendants collectively or individually, from:

(a) registering or using as a trade name, trademark, service mark, Internet domain name, e-mail address, or portion thereof, any name or term that incorporates, imitates, or is confusingly similar to any of Plaintiffs' federally

registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM;

(b) purchasing, selling, or using any form of advertising including keywords or "AdWords" in Internet advertising containing any mark that incorporates, initiates, or is confusingly similar to Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, and requiring Defendants, when purchasing or selling Internet advertising using keywords, AdWords or the like, to activate the name JASON HARTMAN as a negative keyword or negative AdWord in any Internet advertising purchased, sold or used;

(c) infringing Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, including all written and spoken terms equivalent or confusingly similar thereto;

(d) using Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, or any name or mark that incorporates, imitates, or is reminiscent of or confusingly similar thereto, for any product or service, or in any letterhead, sign, website, advertising or promotion, e-mail or other sales solicitation or business listing, either in print, broadcast, electronic or other form, either separately or compositely with other words;

(e) using Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, or any name or mark confusingly similar thereto, as a corporate and/or trade name and/or fictitious

name or portion thereof;

(f) making representations, directly or indirectly, to anyone, anywhere, by any means, including but not limited to unauthorized co-branding, that Defendants are related to, associated or affiliated with, or sponsored, endorsed or approved by Plaintiff;

(g) in any manner depicting, uttering or imitating Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, for the purpose of misappropriating the trade and goodwill of Plaintiffs by association, imitation, fraud, mistake or deception; and

(h) unfairly competing with Plaintiffs in any manner.

2.      For an order directing Defendants to file with this Court and serve upon Plaintiffs within thirty (30) days after service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with, and will continue to comply with, the injunction and further orders of this Court.

3.      For an accounting of profits pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

4.      For lost profits and damages in such amount as may appear appropriate following a trial on the merits, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

5.      For statutory damages in the amount of $200,000 per domain name and email address used by Defendants to propagate their scheme described herein, pursuant Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(c)(1).

6.      For treble damages pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

7.      For statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c).

8.      For costs and attorney fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), and Fla. Stat. §501.2105.

9.      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Respectfully submitted this 15th day of August 2018.

s/Ava K. Doppelt
Ava K. Doppelt, Esq.
Florida Bar No. 393738
adoppelt@allendyer.com
ALLEN, DYER, DOPPELT
& GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

Steven Pollack, Esq.
(*Pro Hac Vice Forthcoming*)
steve@stevepollacklaw.com
225 Broadway, Suite 850
New York, NY 10007
Telephone: (917) 268-6812