## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-61907-CIV-GAYLES/SELTZER

PLATINUM PROPERTIES INVESTOR
NETWORK, INC.; THE HARTMAN
MEDIA COMPANY, LLC; and JASON
HARTMAN,                                          **JURY TRIAL DEMANDED**

            Plaintiffs,                          **INJUNCTIVE RELIEF DEMANDED**

    v.

CHARLES SELLS; STEPHANIE
PUTICH; YOUNG CHUNG; THE PIP-
GROUP, LLC; AND JOHN DOES 1-10,

            Defendants.
_____/

## FIRST AMENDED COMPLAINT

Plaintiffs Platinum Properties Investor Network, Inc. ("**Platinum Properties**"),

The Hartman Media Company, LLC ("**HMC**"), and Jason Hartman ("**Mr. Hartman**")

(collectively, "**Plaintiffs**"), by their undersigned attorneys, file this First Amended

Complaint ("Complaint") against Charles Sells, Stephanie Putich, Young Chung, The PIP-

Group, LLC, and John Does 1-10 whose names are not readily available ("**Defendants**")

for federal service mark counterfeiting, service mark infringement, false designation of

origin and unfair competition, dilution, deceptive and unfair trade practices, fraud, tortious

interference, and civil conspiracy.  For Plaintiffs' Complaint against Defendants, Plaintiffs

allege the following, based upon personal knowledge as to themselves and their own acts,

and upon information and belief as to all other matters, based upon, *inter alia*, the

investigation conducted by and through their attorneys, which included, among other

things, issuing court-authorized subpoenas, hiring forensic and cyber investigators, reviewing and analyzing the infringing website, consulting with experts in the field of information technology, filing a proceeding under the Uniform Domain Name Dispute Resolution Policy ("**UDRP**"), and performing a review of information readily obtainable on the Internet.[1]

## NATURE OF THE ACTION

1.      This is an action for service mark counterfeiting and fraud arising from Defendants' surreptitious creation, use, and promotion of a blackmail hit-site meant to harm Plaintiffs' businesses.

2.      Defendants, self-described industry competitors to Plaintiffs, decided that instead of competing fairly and building their business through hard work and contribution to the marketplace of ideas, they would turn to civil and criminal violations of law to destroy their competitors and profit therefrom.

3.      In an effort to drive business away from Plaintiffs, and to destroy the large market share they have earned through years of education and service to the profession, Defendants, while attempting to conceal their identities, (1) resorted to criminal impersonation, (2) used Plaintiffs' trademarks to confuse and deceive Plaintiffs' clients and colleagues, and (3) defrauded Plaintiffs' clients by making false and misleading representations regarding their own identity and operations and regarding Plaintiffs and their businesses.

---

[1] The allegations in this First Amended Complaint are supported by ample documentary and forensic evidence, including, but not limited to, subpoena responses, Internet Protocol addresses, access logs, Domain Name Server records, source code analysis, and expert analysis.

4.     Defendants have gone above beyond passive misconduct to actively target Plaintiffs' business and clientele.  Defendants engaged in a continuous email marketing campaign that targeted Plaintiffs' clients and colleagues, and used impersonation and guile to direct them to infringing domain names and an infringing website.

5.     Moreover, to conceal their identity and cover their tracks, Defendants used, and are still using, the newest generation of web tools used by hackers, cyber-pirates, and child-pornographers to insulate themselves from liability while perpetrating, *inter alia*, criminal impersonation, intellectual property infringement, and unfair competition.

6.     Defendants have succeeded in their efforts; they have caused substantial harm to Plaintiffs' business and reputation, and continue to irreparably harm Plaintiffs. Plaintiffs have frustratingly attempted to stop Defendants' violations of law and prevent further harm, but to no avail.  With each small success, Defendants simply redirect web-traffic, obtain new domain names and email addresses, and skirt law enforcement.

7.     After filing complaints with the U.S. Federal Bureau of Investigation ("**FBI**"), the Palm Beach County Sheriff's Office, and commencing an international arbitration proceeding under the UDRP, Plaintiffs had no further options but to file this action.

## **PARTIES**

8.     Plaintiff Mr. Hartman is a resident of Palm Beach County, Florida, and has conducted business, through various entities, in Florida for more than twenty years.

9.     Plaintiff Platinum Properties is a California corporation with a registered agent at 4400 N. Scottsdale Road, #9-322, Scottsdale, AZ 85251, and a correspondence address at 401 E. Las Olas Blvd. # 130707, Ft. Lauderdale, FL 33301.

10.     Plaintiff HMC is a Wyoming limited liability company with a registered agent at 60 E. Simpson Ave, PO Box 2869, Jackson, WY 83001.

11.     Mr. Hartman, directly or indirectly, owns Platinum Properties, HMC, and The Jason Hartman Foundation, a philanthropic organization dedicated to assisting young adults with free financial literacy education, and providing micro lending to help citizens of developing countries become financially self-sustaining (jasonhartmanfoundation.org).

12.     Defendants Charles Sells ("**Sells**") is an individual who resides in Hilton Head Island, South Carolina.  Defendant Sells is the self-proclaimed founder, Chief Executive Officer, and Managing Director of PIP (as defined below).  He represents to the public that "he and his team have been investing in distressed assets such as tax liens, tax deeds, traditional bank foreclosures, fix-and-flips, and long-term buy/hold cash-flowing investments since 1996."  Defendant Sells regularly publishes articles on Think Realty, a website for real estate investment advice, including articles titled "3 Reasons to Fix and Flip Outside Your Local Market" and "5 Actionable Rules for Buying Foreclosures at Auction."

13.     Defendant The PIP-Group, LLC ("**PIP**") is a South Carolina limited liability company created in May of 2018, but incorporated through a "formerly known as" entity, PIP-East, LLC, which was incorporated on January 9, 2013.  PIP's registered agent is Defendant Sells, and it maintains a registered agent address at 20 Towne Drive, Bluffton, South Carolina 29910.[2]

---

[2] Defendant Sells also owns and is the registered agent for no fewer than six different entities.  The goal of this network of entities is to obscure Defendant Sells' assets and frustrate any collection efforts resulting from a judgment against him or his companies. The known entities are as follows: Chimera LLC; PIP; Platinum Property Acquisitions

14.     According to its Linkedin page, PIP has been in business since 2004, and "presents realistic, turn-key solutions to individual investors."  "With over 20 years of experience, The PIP Group … has the experience to provide you the profits and success you are looking to achieve in your distressed property investments – whether those be in tax liens, tax deeds, traditional bank foreclosures, fix and flips and even long-term buy/hold cash flow investments."  PIP also represents that "all investments made by The PIP Group are in the investors' names, each individual maintains total control of his or her portfolio."

15.     Defendant Stephanie Putich ("**Putich**") is an individual who maintains a registered address in Richmond, Virginia, but upon information and belief, currently resides in Hilton Head Island, South Carolina.  Defendant Putich is a Client Relations Manager for Defendant PIP and has been since September 2017.

16.     Defendant Young Chung ("**Chung**") is an individual who resides in Tucker, Georgia and is an associate of PIP.

17.     Plaintiffs are not aware of the true names and capacities of Defendants John Does 1-10.  Upon information and belief, John Does 1-10 have conspired with, aided and abetted the unlawful conduct of Defendants Sells, Putich, Chung, and PIP described in this Complaint.  Plaintiffs will amend the Complaint to allege the names and capacities of these Defendants when ascertained.

18.     Upon information and belief, the unlawful conduct of John Does 1-10 alleged in this Complaint was in the scope of their relationship with one another and with Defendants named herein, and each said Defendant acted with the knowledge,

---

LLC; Platinum REOs & Acquisitions LLC; SNS of HHI LLC; and Vision Tax Lien Services Incorporated.  Upon information and belief, the aforementioned entities are shams and alter egos of one another.

participation, permission, consent and/or authority of the others in respect to some or all of the unlawful conduct alleged in this Complaint.

19.    Upon information and belief, each Defendant aided and abetted the other, and has been aided and abetted by the other, in respect to some or all of the unlawful conduct alleged in this Complaint.

**Relevant Non-Parties**

20.    Non-Party 1337 Services LLC dba Njalla ("**Njalla**") is not a real LLC but rather a business formed and operating in the Caribbean Islands of St. Kitts and Nevis. It was created by a notorious copyright thief who was sentenced to prison in Sweden for his creation of The Pirate Bay, Peter Sunde Kolmisoppi (a.k.a Peter Sunde). Njalla is a self-described middleman that sits "between the domain name registration service and [the actual controller of the domain name], acting as a privacy shield." As explained by Njalla on its website, "When you purchase a domain name through Njalla, we own it for you. However, the agreement between us grants you full usage rights to the domain. Whenever you want to, you can transfer the ownership to yourself or some other party." *See* https://njal.la.

21.    Non-Party Tucows Inc. ("**Tucows**") is a Pennsylvania corporation with headquarters located at 96 Mowat Avenue, Toronto, Ontario, Canada M6K 3M1. Tucows' common stock is traded on the NASDAQ Capital Market under the symbol "TCX" and on the Toronto Stock Exchange under the symbol "TC."

22.    Non-Party Tucows Domains Inc. ("**Tucows Domains**") is an Ontario, Canada corporation that is indirectly wholly owned by Tucows. Specifically, Tucows Domains is wholly owned by Tucows.com Co., a Nova Scotia, Canada corporation, which

is wholly owned by Tucows (Delaware) Inc., a Delaware corporation, which in turn is wholly owned by Tucows.

23.     Non-Party Proton Technologies AG ("**Proton**") is a company based in the Canton of Geneva, Switzerland, with headquarters located at Chemin du Pré-Fleuri, 3 CH-1228 Plan-les-Ouates, Genève, Switzerland.  Proton owns and operates ProtonMail, an end-to-end encrypted email service founded in 2014 that enables users to establish anonymous email accounts.  As advertised on the ProtonMail website, "No personal information is required to create your secure email account. By default, we do not keep any IP logs which can be linked to your anonymous email account. Your privacy comes first." Moreover, Proton stores its servers for ProtonMail at two different locations in Switzerland, outside of United States and European Union jurisdiction.  As explained on the ProtonMail website, "ProtonMail is incorporated in Switzerland and all our servers are located in Switzerland. This means all user data is protected by strict Swiss privacy laws." *See* https://protonmail.com.

24.     Non-Party Google LLC ("**Google**") is a wholly owned subsidiary of Alphabet Inc., with its headquarters located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google offers a free advertising-supported email service known as "Gmail" that has more than one billion monthly active users.

25.     Non-Party, VPNetworks, LLC dba TorGuard ("**TorGuard**") is a Florida limited liability company with a principal address at 618 E. South Street, Suite 500, Orlando, Florida 32801.  TorGuard maintains a copyright agent at 450 S. Orange Ave, Suite 550, Orlando, FL 32801.  TorGuard offers an anonymous email service called TorGuard Stealth Mail, and advertises its services to intellectual property thieves who want

to use "torrents." Indeed, as the company advertises, "[t]he reference to 'tor' in TorGuard relates to 'torrents' and guarding one's privacy when using bitorrent."

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338.

27. This Court has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367(a), because they form part of the same case and controversy and derive from a common nucleus of operative facts.

28. Venue is proper in this District pursuant to 28 U.S.C. § 139l(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

29. This Court has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193 since they are doing business in Florida, engaging in business activities directed to Florida, committing a pattern of tortious conduct in Florida, using personal property in Florida as a means of perpetrating that conduct, and purposefully availing themselves of the opportunity to conduct commercial activities in Florida.

30. Defendants Sells and PIP are routinely paid for and engage in speaking events in the State of Florida, from which they earn clients and revenue. Indeed, the first time Plaintiff Mr. Hartman and Defendant Sells met in person was at the Equity Trust Conference in Orlando, Florida.

31. Defendants Sells and PIP regularly solicit clients from Florida and have worked with and profited from tens, if not hundreds, of Florida residents.

32.    Upon information and belief, Defendants own, use, possess, or hold a mortgage or other lien on real property within Florida.

33.    Defendants trampled on service marks that are used in Florida, and they gain value from associations made by Florida residents upon seeing the service marks.

34.    Defendants have directed their tortious activity directly at a Florida resident, Mr. Hartman, and his companies, which do business in Florida.  Plaintiffs collectively own a multitude of properties in Florida as part of their assets and business operations.  Plaintiffs also conduct conferences and property tours in Orlando and New Port Richey, Florida. Plaintiffs have also attended over 100 conferences and events in Florida.  Finally, Plaintiffs finance property purchases in Florida.  Thus, Defendants' attempt to damage Plaintiffs' business operations was an attempt to damage Florida commerce and businesses.

35.    Moreover, in perpetrating their unlawful conduct, Defendants sent direct communications and marketing material to various Florida residents and defrauded such Florida residents through said campaigns.  Plaintiffs and other Florida residents have been directly injured as a result of Defendants' conduct in Florida, which is at issue in this action.

36.    Defendants utilized infrastructure and computer networks located in Florida to perpetrate their unlawful conduct, and sought to have an effect in Florida and upon Florida residents.  In fact, Defendants utilized the instrumentalities and services of a Florida company (*i.e.*, TorGuard), with its base operations in Florida, to perpetrate their unlawful conduct as described herein.  By TorGuard's express terms of service, Defendants entered into a contractual agreement in Florida, whose terms are "governed by and construed in accordance with the laws of the State of Florida," and expressly agreed to "submit to the jurisdiction and venue of [an appropriate state or federal court located in the State of

Florida]." In this way, *inter alia*, Defendants purposely availed themselves of the protections and powers of the courts of Florida.

37. Defendants retained counsel in Florida to challenge various subpoenas, Orders of this Court, and generally to avail themselves of the protections of this State.

38. For these and other reasons, Defendants' contacts with Florida are substantial, and Defendants are engaged in substantial activity within this State.

## BACKGROUND

### Plaintiffs' Hard-Earned Reputation and Goodwill

39. Mr. Hartman grew up in a low-income home in Los Angeles, CA, going to public schools through high school.

40. At 16, Mr. Hartman saw a television program involving a real estate mogul discussing his success as a real estate investor. Mr. Hartman bought the mogul's book and had his first introduction to the real estate market.

41. At 18, at his mother's behest, Mr. Hartman took his first trip to a real estate investment seminar in Anaheim, California. Intrigued and inexperienced, two days later, Mr. Hartman began searching for real estate schools. He enrolled in Century 21®'s Real Estate Course for $99.

42. By 19, Mr. Hartman received his real estate license and began working as a real estate agent for Century 21 part-time while attending college.

43. He was a hard worker, and in Mr. Hartman's first full month in the business, he sold five (5) properties. But instead of using his earnings and savings on a new car, an impressive resistance for any 19-year-old, he invested it in his real estate career, keeping his dreams big.

44.     Mr. Hartman bought his first rental property from a client at age 20, and remained committed to real estate ever since.

45.     Today, Mr. Hartman is a world-renowned industry professional who has been involved in several thousand real estate transactions, and has owned income properties in 11 states and 17 cities, including multiple cities in Florida.

46.     His company, Platinum Properties, helps people achieve financial freedom by making prudent purchases of income properties in conservative markets nationwide.

47.     Mr. Hartman serves as a guru in his trade and has spent years building his name and reputation.  Indeed, his speaking engagements have been attended by tens of thousands of people around the world; his latest conference was on November 3-4, 2018. His podcasts are equally popular.  Mr. Hartman has interviewed senators, presidential candidates, thought leaders, college professors and economists on his programs.

48.     As a result, Plaintiffs collectively earn an annual revenue of more than $3.0 million and have been recognized by INC. Magazine as among the INC. 5000 Fastest Growing Private Companies in America.

**The Federally Registered Trademarks**

49.     In recognition of the prominence developed by the Jason Hartman name and brand in the real estate investment industry over the years, the United States Patent and Trademark Office ("**PTO**") issued two service mark registrations covering Mr. Hartman's name and website domain name.

50.     On March 1, 2013, Plaintiff, through HMC, filed an application in the PTO to register JASONHARTMAN.COM as a service mark.  The JASONHARTMAN.COM

service mark was officially registered in the PTO on October 15, 2013 (Registration No. 4,418,120).

51.     Plaintiffs' first use of the JASONHARTMAN.COM service mark in commerce was on December 29, 1996.  Plaintiff has used the JASONHARTMAN.COM service mark in commerce continuously since that time.

52.     On June 17, 2013, Plaintiff, through HMC, filed an application in the PTO to register JASON HARTMAN as a service mark.  The JASON HARTMAN service mark was officially registered in the PTO on January 21, 2014 (Registration No. 4,470,582). Plaintiffs' first use of the JASON HARTMAN service mark in commerce was in September 1985.  Plaintiff has used the JASON HARTMAN service mark in commerce continuously since that time.

53.     Both JASON HARTMAN and JASONHARTMAN.COM (collectively, the "**Service Marks**") are federally registered service marks for financial investment in the field of real estate and financial services, namely, real estate note brokerage, in International Class 36 (U.S. Cls. 100, 101 and 102).

54.     In sum, the mark JASON HARTMAN has been federally registered for nearly five years and has been in commercial use for 23 years.  JASONHARTMAN.COM also has been federally registered for nearly five years, and has been in commercial use for nearly 22 years.

**Use of the Service Marks**

55.     Plaintiffs make extensive use of the Service Marks.

56.     Use of the JASON HARTMAN mark by Plaintiffs currently appears as follows on the home page of Plaintiffs' website at www.jasonhartman.com:



57.    After more than 20 years of substantial and uninterrupted use, combined with extensive advertising of tens of millions of dollars, Plaintiffs' Service Marks have become well known to the public, and are "famous" for all purposes relevant to this Complaint.

58.    Indeed, Plaintiffs expend approximately $1.5 million annually on marketing efforts in connection with the JASON HARTMAN mark.

**Relationship Between the Parties**

59.    Defendants Sells and PIP and Plaintiffs (collectively referred to as the "**Competing Parties**") staunchly compete in a close and intimate industry.  Indeed, the Competing Parties are business competitors in every way.

60.     The Competing Parties compete for clients (*i.e.*, investors), listeners to their audio productions, readers of their blogs and written works, and attendees of their speeches and lectures, all in the field of real estate investment services.

61.     Defendant PIP and Plaintiff Platinum Properties share similar names. Plaintiff Platinum Properties has been incorporated under and has used the trade name "Platinum Properties Investor Network" since March 27, 2007.  Similarly, Defendants Sells and PIP use "PIP" as an acronym for "Platinum Investment Properties," a term they use in long-form in advertisements and contracts, and Defendant Sells also owns Platinum Property Acquisitions LLC and Platinum REOs & Acquisitions LLC.

62.     The Competing Parties expend significant sums in attempting to attract the same clients that are looking for "turn-key" (meaning full service) real estate investment programs and opportunities.

63.     The Competing Parties provide education on the same topics, and have given speeches and lectures at the same events and conferences.

64.     The competition in the Competing Parties' intimate industry has always been fierce, but until the occurrence of the conduct complained of herein, the competition between the Competing Parties was more or less fair.

65.     Although the Competing Parties have engaged in several rounds of litigation in the past, such litigation involves conduct that pre-dates the events described herein and is largely irrelevant to this Action.

66.     After years of coming in second to Plaintiffs' success in the industry, Defendants took the competition to a whole new – unlawful – level by engaging in the

conduct described herein.  Defendants engaged in unconscionable and criminal conduct in an attempt to strike a death blow to Plaintiffs' business and enjoy the spoils.

67.     After committing widespread fraud on the public and using unprecedented methods to conceal their unlawful conduct, Defendants have been unmasked.  Plaintiffs now seek to hold Defendants liable for their criminally and civilly culpable conduct.

**The Infringing Domain Names**

68.     Defendants conspired together and concocted a plan to debilitate Plaintiffs and their businesses.  As an initial step, on May 17, 2018, Defendant Sells personally, and on his home computer, paid for and set up the internet domain name, JasonHartmanProperties.com (the "**Primary Infringing Domain**"), through Njalla, as a reseller of Tucows Domains (the domain name registrar).  The Primary Infringing Domain was hosted on Njalla's servers in Switzerland and accessible globally.

69.     The same day, Defendant Sells paid for and set up at least five other similar internet domain names, including (1) JasonHartmanInvestments.com; (2) JasonHartmanRealEstateInvestments.com; and (3) JasonHartmanMedia.com (collectively referred to as the "**Secondary Infringing Domains**," and together with the Primary Infringing Domain referred to as the "**Infringing Domain Names**.")

70.     All of the Secondary Infringing Domains redirected traffic to the Primary Infringing Domain, which hosted a website that was accessible globally.

71.     Although the Infringing Domain Names were technically "owned" by Defendant Sells' concealing agent, Njalla, they were wholly controlled, promulgated, and held in trust for Defendant Sells at all relevant times.  Continuing to the date of this

Complaint, the Secondary Infringing Domains are still in Defendant Sells' control and are being held by Njalla as an agent and for the care of Defendant Sells.

72.     On their faces, the Infringing Domain Names are identical to and incorporate the Service Marks (JasonHartman and JasonHartman.com), except for the addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

73.     Indeed, the Infringing Domain Names were created intentionally to cause consumer confusion and target the class of services directly covered by the Service Marks, and for which such marks are used.  Seeking to inflict maximal damage to Plaintiffs' business and trademarks, Defendant Sells intentionally purchased and is using domain names specific to the real estate market (*e.g.*, by adding the real estate descriptors "properties" and "real estate investments" to "Jason Hartman"), the field in which the Service Marks are used and maintain registered protection.

74.     Neither Defendant Sells nor any other Defendant ever had any permission, license or agreement with Plaintiffs authorizing them to use the Service Marks, and in fact, they do not use the Service Marks for any lawful purpose.

75.     Instead, as described further below, Defendants' use of the Infringing Domain Names has always been in bad faith and for commercial gain to misleadingly divert customers, and to tarnish and dilute the Service Marks.  Moreover, Defendants have used and continue to use the Infringing Domain Names to commit widespread fraud on the public and intentionally destroy existing and potential business relationships between Plaintiffs and their clients and colleagues.

**The Infringing Website**

76.     The website hosted on the Primary Infringing Domain and accessible through all of the Infringing Domain Names (the "**Infringing Website**") was tailor-crafted to defraud the public, tarnish the Service Marks, destroy Plaintiffs' business, and defame Mr. Hartman personally.[3]

77.     The Infringing Website not only utilizes unauthorized copies of Plaintiffs' Service Marks and copyrighted works, but attempts to disparage Plaintiffs' business success through false and misleading statements of material fact.  The Infringing Website is replete with false statements relating to Plaintiffs' business, financial history, litigation history, commercial dealings, alleged prurient nature, credibility, and trustworthiness.

78.     Even worse, Defendants utilize and distort the decisions of the courts of the United States in perpetuating their fraud and unlawful conduct.

79.     The most obvious falsity is the representation on the Infringing Website that "Jason Hartman has more than 100 lawsuits filed by, or against him in the last 10 years." Mr. Hartman has been involved in only a fraction of that number of cases in his entire life, let alone the last ten years.

80.     Another related falsity is the claim that Mr. Hartman has been involved in "70 cases in Orange County, CA alone."  To support such a fraudulent representation, Defendant Sells uploaded a list of all filed cases in the Orange County (CA) Superior Court involving *any*"Jason Hartman."  But Plaintiffs' counsel's public records search revealed that there are at least 29 different individuals with the name Jason Hartman in California,

---

[3] As described further below, the Infringing Website has been hosted on yet a new domain name that is currently operating as of the date of this Complaint.

and countless more who may have been sued there.  Nevertheless, Defendant Sells attempts to disparage the one famous Jason Hartman with fraudulent representations.

81.     To boot, the Infringing Website was, and still is, completely devoid of any privacy policy, terms and conditions, or anything that would bring it in compliance with Global Data Protection Regulations ("**GDPR**").  Despite this, the Infringing Website installed unauthorized cookies and trackers onto each visitor's computer, and solicited visitor information through a "Contact Us" fill-in webform.

82.     By meticulously tracking all of the Infringing Website's visitors, Defendants were able to not only contact Plaintiffs' clients and colleagues they knew and directly solicited, but also their clients and colleagues who had been referred to the site.  In this way, Defendants were casting a large net to attract as many potential clients as possible.

83.     For those visitors who were persuaded by the content on the Infringing Website, Defendants, through the Infringing Website, provided a mechanism to provide their contact information through the "Contact Us" fill-in form.

84.     In this way, Defendants intentionally sought to simultaneously destroy Plaintiffs and take their clients.

**The Campaign Begins With Criminal Impersonation Through ProtonMail**

85.     After setting up the Infringing Website on the Infringing Domain Names, Defendant Sells created an account with an anonymous email service, ProtonMail, and targeted Plaintiffs' business clientele and colleagues through an impersonator email address, JasonHartman@protonmail.com (the "**Impersonator Account**").

86.     Baiting the recipients to open a message they were led to believe was from Mr. Hartman, Defendant Sells directed Plaintiffs' clients to the Primary Infringing Domain.

Specifically, on June 29, 2018 at 11:45 AM ET, Defendant Sells sent an email from the

Impersonator Account to Plaintiffs' clients, stating the following:

> To Whom It May Concern:
>
> As somebody we know and respect in our very large, but also very intimate industry, I wanted to share with you the results of about a 4 month investigation into Jason Hartman's background. What we have found so far and continue to uncover with the help of others in our industry is .....[4]
>
> Nonetheless, we know you to be a reputable voice in the industry and thought you and/or your followers should be aware of the alarming facts found so far. We imagine as this information travels through our industry, the alarming truth is only going to grow more.
>
> You can trust the following site to the details and documents involved is secure. http://jasonhartmanproperties.com/
>
> Please share these details with anyone you know may have crossed paths with, or invested with this individual. Maybe it will help to mitigate their losses of working with him. It sure would have helped us a few years ago to know what we know now, but in the end we prevailed.

87.     Defendant Sells' email was telling for several reasons.

88.     First, it is clear from Defendants Sells' self-inclusion in the "industry" and

his use of first-person plural pronouns that he knew he was a business competitor and was

directly targeting Plaintiffs' clients and colleagues in the industry.  He stated, "As

somebody **we** know and respect in **our** very large, but also very **intimate** industry . . . ."

89.     Second, Defendant Sells defined the relevant market of competitors as

"intimate," showing knowledge that the email would cause immense harm to Plaintiffs in

that intimate community.

---

[4] Certain false and misleading statements about Plaintiffs have been redacted herein to prevent the salacious and fabricated statements from becoming cemented into the public record of this Court.  Plaintiffs will produce further information for an *in camera* review or during discovery under a protective order.

90.     Third, Defendant Sells' statement that "we know you to be a reputable voice in the industry" again demonstrates that he knew he was an industry competitor seeking to cause commercial harm and unfairly compete.  He also knew that directing his email to those precise recipients would cause maximum harm to Plaintiffs' relationships.

91.     Fourth, Defendant Sells' statements that "we . . . thought you and/or your followers should be aware of the alarming facts found so far," and "[p]lease share these details with anyone you know may have crossed paths with, or invested with this individual" demonstrate that Defendant Sells was disseminating the false and misleading information contained on the Infringing Website and through the Infringing Domain Names with the intent that it be widely distributed for maximal damage, and maximum reward (*e.g.*, from obtainingleads through the "Contact Us" fill-in form).

92.     Fifth, Defendant Sells' statements that "the alarming truth is only going to grow more," and "[y]ou can trust the following site to the details" demonstrate, again, Defendant Sells' intentional misrepresentation that the information contained on the Infringing Website was accurate and factual.

93.     Sixth, in the last paragraph of the email, Defendant Sells impersonated a former client, investor, and/or a whistleblower working in Plaintiffs' companies, when in reality, Defendant Sells was nothing of the sort.  He was simply a competitor seeking to defraud the email recipients.

94.     The impersonation worked.  Plaintiffs' clients did indeed open email  they would not have otherwise opened and read because they believed the email to be coming from Mr. Hartman.  Moreover, Plaintiffs' clients and colleagues emailed Plaintiffs with

questions and confusion surrounding the emails.  Some stopped doing business with Plaintiffs, and Plaintiffs' businesses were severely harmed.

95.     In impersonating Mr. Hartman and targeting Plaintiffs' clients, Defendant Sells willfully infringed the Service Marks and attempted to tarnish said marks.

96.     In addition to committing civil violations of law, Defendant Sells' impersonation of Mr. Hartman was also a crime under, *inter alia*, Florida Criminal Statute § 817.568(2)(a)-(b).

97.     Defendant Sells' fraud on the public was conducted rampantly and via multiple intentional misrepresentations, each of whichhe hoped the recipient of the unsolicited email would rely upon, and which they did in fact rely upon, causing harm to Plaintiffs.

98.     In sum, emails from the Impersonator Account were meant to misappropriate Plaintiffs' goodwill, Service Marks, and reputation to perpetrate a fraud on the public while misleading the reader.

**Beyond Unsolicited Emails**

99.     Also on June 29, 2018, the same day Defendant Sells began his infringement and fraud campaign through use of the Impersonator Account, he committed similarly unlawful conduct on a public forum, hand selected to cause maximal damage in the Competing Parties' intimate industry.

100.    On June 29, 2018, Defendant Sells created and disseminated a post on a real estate investment forum called BiggerPockets, using an alias, "Ray Douglas," which directed readers to the Primary Infringing Domain (the "**6/29/18 BiggerPockets Post**").

21

The 6/29/18 BiggerPockets Post explained to readers, "You can trust the following site to the details and documents involved is secure."

101.    Moreover, in baiting potential leads to use the "Contact Us" form on the Infringing Website, Defendant Sells represented that "Email to and from this address are encrypted and your privacy is of our utmost importance."

102.    The 6/29/18 BiggerPockets Post highlights Defendants' goal to encourage visits to the Infringing Website through use of Plaintiffs' Service Marks, and to use that website and abuse of the Service Marks as a means to obtain leads for commercial opportunities, all while Defendants made fraudulent misrepresentations along the way. Indeed, BiggerPockets is self-described as "The Real Estate Investing Social Network," and invites users on its homepage to "[j]oin the millions of people achieving financial freedom through the power of real estate investing."  Thus, Defendant Sells was directly targeting Plaintiffs' commercial interests and the relevant fields covered by the Service Marks.

**Additional Public Forum Activity in the Following Weeks**

103.    On July 10, 2018, Defendant Sells, finally posting as himself, again made a public posting on a popular public forum directing individuals to the Primary Infringing Domain and stating, "I would like to thank whomever compiled [all] of this detailed data and public record and organizing in (sic) one place."

104.    Like his other misrepresentations, Defendant Sells made the aforementioned statement intentionally, and for the sole purpose of misleading readers as to the source of the content on the Infringing Website.  The truth was, and still is, that Defendant Sells and his agents were the ones who "compiled [all] of this detailed data and

public record and organizing in (sic) one place." Had users known the truth -- that Defendants were business competitors with no affiliation or connection to Plaintiffs, and that they created the Infringing Website -- the users would not have ever even visited, viewed, or relied upon the content on the Infringing Website. Instead, Defendant Sells fraudulently misrepresented the source, and thus reliability, of the information being disseminated. To make matters worse, Defendant Sells was using Plaintiffs' Service Marks in the Infringing Domain Names to further gain credibility and mislead consumers regarding the source of the website.

### Notice of Infringing Use and Defendant Sells' Wrath

105.    In response to Defendant Sells' July 10, 2018 public posting, on July 22, 2018, Plaintiffs' counsel, Steven Pollack, Esq., sent Defendant Sells a cease-and-desist letter (the "**7/22/18 Notice Letter**"). Among other things, the 7/22/18 Notice Letter expressly notified Defendant Sells that he was directing individuals to a website that infringed Plaintiffs' Service Marks. The 7/22/18 Notice Letter stated, in relevant part:

> [Y]ou knowingly and intentionally directed readers to a website that is illegally cybersquatting and infringing on Mr. Hartman's registered trademarks (*see* Trademark Registration Nos. 4470582 and 4418120).
>
> ***
>
> We believe that your conduct described above is actionable under state and federal law and has caused, and will continue to cause, damage for which you may be held liable. In addition to state law claims of defamation, libel, trade libel, fraud, false advertising, intentional interference with contractual relations and prospective business relationships, and unfair competition, we believe you have committed violations of federal law, including, but not limited to, violations of Section 43(a) of the Lanham Act and contributory trademark infringement. *See Inwood Laboratories, Inc. v. Ives Laboratories*, Inc., 456 U.S. 844 (1982). We demand that you immediately:
>
> (1) discontinue all promotion, advertising, and suggestion of websites that are known to infringe on Mr. Hartman's federally registered trademarks, such as jasonhartmanproperties.com.

106.    Instead of heeding Plaintiffs' counsel's clear and unequivocal warning, Defendant Sells did the opposite.

107.    First, Defendant Sells responded by email to Plaintiffs' counsel, stating his intention to continue his unlawful conduct.

108.    Second, Defendant Sells turned his attention to Plaintiffs' counsel personally.  Specifically, Defendant Sells called Plaintiffs' counsel's office and told the office staff that he contacted "the Bar" and learned that Plaintiffs' counsel "isn't even a lawyer."  These statements against an officer of the Court were  false, are exceptional in gravity, and were intended to hurt Plaintiffs' counsel's reputation and undermine his willingness to work with Plaintiffs.  Plaintiffs' counsel, however, remained resilient in the face of this scare tactic.

109.    Third, Defendant Sells increased his unlawful conduct in the subsequent weeks.

**Slippery Bandit – Sells Does it Again**

110.    After weeks of communications and pleas to the administrators of ProtonMail, on or around Friday, July 27, 2018, Plaintiffs were successful in getting the Impersonator Account shut down.

111.    But the identity thief, Defendant Sells, was not out of options.  Two days later, on July 29, 2018, Plaintiffs' clients and colleagues forwarded Plaintiffs emails from a new, never-before-seen email account, HartmanInvestigators@gmail.com (the "**Misleading Gmail Account**").

112.    E-mails from the Misleading Gmail Account were, much like with the first account, targeted at Plaintiffs' clients and colleagues, and directed the recipients to the Primary Infringing Domain.

113.    The title of the email was intentionally misleading and intended to trick recipients of the email.

114.    Unlike in previous email campaigns where Defendant Sells would describe some of the contents of the Primary Infringing Domain, when using the Misleading Gmail Account, Defendant Sells kept his emails cryptic and confusing.

115.    For example, in a July 29, 2018 email from the Misleading Gmail Account to Plaintiffs' client and colleague, Defendant Sells stated: "http://jasonhartmanproperties.com. Good Information to discuss with Mr. Hartman on your next Podcast with him. Thank you."  Moreover, the email contained the subject line, "Jason Hartman Updated Web Site," which led people to believe that JasonHartman.com, one of the Service Marks, had been "updated," and that Mr. Hartman was sending out emails about it.

116.    Indeed, in an example of actual consumer confusion, the recipient of the July 29, 2018 email, Plaintiffs' client and colleague, thought the email address reflected investigators hired by Mr. Hartman and working on his behalf.  She visited the website thinking it was important information being sent from Plaintiffs that she needed to see.

117.    That wasn't the case at all, however.  Defendant Sells was just passing off and committing fraud, which by this time had become rampant.

118.    As a result of Defendants' conduct, Plaintiffs received calls from clients and colleagues inquiring about the Infringing Website and the Infringing Domain Names.

Some of Plaintiffs' clients and colleagues stopped working with them and canceled scheduled speaking engagements because of Defendants' scheme.  Plaintiffs were being substantially and increasingly damaged by the day, and had to do something.

**Attempt at Mitigation – Efforts Taken to Stem the Flow of Damage**

119.    As the law is not yet well-equipped to quickly address cyber-criminals operating through anonymous concealing agents, Plaintiffs could not do much but make attempts to mitigate the mounting damage.

120.    On or around July 30, 2018, Mr. Hartman filed a sworn statement with the Palm Beach County Sheriff's Office in District 4 – Delray Beach, and gave his consent to prosecute the matter.  Around the same time, Mr. Hartman also filed a criminal complaint with the FBI's Internet Crime Complaint Center, citing Defendants' criminal impersonation and systematic transmission of false contact data by means of "wire communications" in furtherance of a "scheme" and "artifice to defraud" within the meaning of the federal wire fraud statute.

121.    On the same day, Plaintiff HMC filed a UDRP complaint with the World Intellectual Property Organization ("**WIPO**") in connection with the Primary Infringing Domain, the only domain name that Plaintiffs knew about at the time.

122.    By August 1, 2018, WIPO unmasked the registrant of the Primary Infringing Domain (whose name was concealed through Whois Guard protection, just another of the many layers of concealment used by Defendants).  The registrant was Njalla.

123.    By August 3, 2018, Plaintiff HMC amended its UDRP complaint to name Njalla as the respondent.  WIPO confirmed receipt of the amended UDRP complaint and

sent a notification email to all parties to the proceeding, and the following email address: "whois+jasonhartmanproperties.com@njal.la."

**Endless Misconduct**

124.    The next day, on or around August 4, 2018, seeing that the Primary Infringing Domain was now locked by the registrar and that Njalla was named in the UDRP proceeding, Defendant Sells purchased yet another new domain name (the "**New Domain Name**") and a hosting plan from Bluehost.

125.    Unlike previous accounts, which utilized Defendant Sells' personal information and were signed up from Defendant Sells' personal home computer, Defendant Sells signed up for Bluehost's services using his official PIP email address and PIP's business address.  Thus, Defendant Sells utilized business assets to engage in the unlawful conduct further described herein.

126.    Within days of signing up, however, Defendant Sells changed the user account information to a false name, false address, and false contact information.

127.    User access logs show that Defendants Putich and Chung assisted Defendant Sells in setting up and managing this New Domain Name, including the falsification of the account information.

128.    Along with the New Domain Name, Defendants signed up for a new anonymous email account, this time using TorGuard Stealth Mail (the "**TorGuard Email Address**").  The TorGuard Email Address matched the name chosen for the New Domain Name.

129.    On August 5, 2018, Defendants transferred the Infringing Website to the New Domain Name and redirected all traffic from the Primary Infringing Domain to the

New Domain Name.  Thus, Defendants kept all of the Infringing Domain Names active and all redirected to the New Domain Name, which now hosted the Infringing Website.

130.    And still, the Infringing Website solicited contact information from visitors, and installed trackers and cookies on every visitor's computer without any warning, in violation of U.S. and European regulations.  Moreover, the Infringing Website was completely devoid of a privacy policy, terms of use, or any other notation of legitimacy and compliance with law.  And the Infringing Website still did not contain any disclaimer of any affiliation with Plaintiffs or their Service Marks.

131.    On August 10, 2018, equipped with the New Domain Name and the TorGuard Email Address, Defendants resumed their unsolicited email marketing campaign to Plaintiffs' clients and colleagues, now directing them to the New Domain Name and expanding the subject line to "The Truth About Jason Hartman."

132.    The emails were sent from the TorGuard Email Address to an identical new ProtonMail account, and blind copied Plaintiffs' clients and colleagues, some of whom forwarded the emails to Plaintiffs, explaining that they complained time and time again to the sender, that they didn't want the spam but kept getting it.

133.    The emails distributed by Defendant Sells through the TorGuard Email Address were unsolicited, did not contain an opt-out, and repeated the same false and misleading information on the Infringing Website while simultaneously misrepresenting that Defendant Sells was "part of a much, much bigger picture."  This latter representation was false when made, and was made intentionally to trick readers into believing that the content on the Infringing Website was more reliable and trustworthy than it really was.  It was also intentionally made to trick readers into believing that there were more people

complaining about Plaintiffs' services than there really were.  These false representations were made with the intent to harm Plaintiffs' businesses.  Defendant Sells was working on his own and through his agents to unfairly compete with a business competitor to gain that which he could not gain through fair competition.

134.   On August 14, 2018, Defendant Sells repeated the August 10, 2018 email blast almost identically, except this time he changed the subject line to "Worked with Jason Hartman? That could be BAD NEWS for you!"  Again, the emails sent from Defendant Sells were unsolicited, did not contain an opt-out, and repeated the same misrepresentations as mentioned above.

135.   On August 15, 2018, Defendant Putich signed into the Bluehost account from her home computer and made changes to the Infringing Website, still hosting traffic from the Infringing Domain Names.  This was done in preparation for the upcoming email marketing campaign that was to occur later that day.

136.   The same day, August 15, 2018, Defendants Sells, from his home computer, and Defendant Putich, from her home computer, organized a widespread email marketing campaign through Mailchimp, a self-described "always-on marketing platform [that] works around the clock to help you find your people, grow your business, and get smarter as you go."

137.   Defendants intentionally falsified their address in their primary account information with Mailchimp, using Plaintiff Platinum Properties' address, including suite number, so as to create a false affiliation with Plaintiff Platinum Properties.

138.   Defendants' Mailchimp account contained 169 "subscribers," almost all of whom had not given Defendants permission to email them, and many of whom had specifically requested to *not* be emailed.

139.   On August 17, 2018, Defendants distributed hundreds of emails to Plaintiffs' clients and colleagues through Mailchimp, which appeared to be coming from the TorGuard Email Address (the "**8/17/18 Email Blast**").   Each email contained false contact information, including a falsified address that was identical to Plaintiff Platinum Properties' address.   The title of the emails sent out was "Discover the Latest Hartman Updates."

140.   Plaintiffs' clients and colleagues were utterly confused, and sent emails to Plaintiffs asking to be taken off Plaintiffs' email list.   Some colleagues emailed Plaintiff Mr. Hartman, exclaiming, "Even though I put the last email in spam, this email still just got through!"

141.   In the body of the emails, Defendants purported to include "A Message From One Of Our Contributors, Charles Sells of The PIP Group."   This representation was intentionally false and misleading, since the entire email and the New Domain Name which readers were directed to, were created and maintained by Defendant Sells.   Defendant Sells was not "one of our contributors," but the Infringing Website's *only* contributor, as its creator.   The false and misleading statement was made with the intention to mislead recipients into believing that the email was coming from a reputable source.

142.   Indeed, Defendants intentionally misrepresented that the source of the email was from Plaintiff Platinum Properties.   This was done, *inter alia*, to conceal the true source of the information -- a biased, business competitor acting alone and through his own agents

-- and to provide enhanced credibility to a false and misleading email. Plaintiffs' clients and colleagues did in fact rely on Defendants' false and misleading representations as described herein, and Plaintiffs have been damaged thereby.

143.    A snippet showing the relevant portion of the footer of each email sent out through the 8/17/18 Email Blast is below:

4400 N Scottsdale Rd Ste 9 · Scottsdale, AZ 85251-3331 · USA|



**Plaintiffs Make Contact**

144.    Without any ability to stop the onslaught, on August 20, 2018, Plaintiff Mr. Hartman sent a cease and desist demand and notification of infringement and false designation of origin to the web-owner of the New Domain Name through the Infringing Website's webform.

145.    Instead of heeding the demand, Defendant Sells ridiculed it in a later email blast.

146.    Eventually, so many individuals reported abuse to Mailchimp that the company shut down Defendants' account. This still did not deter Defendants.

**Constant Contact Email Marketing Campaign**

147.    Despite being notified of and fully aware of the plethora of complaints about spam mail and harassing misconduct, Defendantscontinued.

148.    On August 29, 2018, Defendants organized another widespread email marketing campaign, this time through Constant Contact, a self-described "leading expert in email marketing for over 20 years."

149.    Again, Defendants provided Constant Contact with a falsified address, falsified contact information, and falsified billing information, including false credit card information.  Yet the reference email for the account was the TorGuard Email Address. Ultimately, the account was flagged for "severe/high visibility and complaints," and shut down for failure to render payment.  But before then, Defendants sent out another email blast.

150.    On September 10, 2018, Defendants, through Constant Contact, used the TorGuard Email Address to send hundreds of emails to Plaintiffs' clients and colleagues. The title of each email was "Important Hartman Update," and the mailing was purported to come from a company located at 3950 S. Las Vegas Blvd., Las Vegas , Nevada 89119, the address for the Mandalay Bay Resort and Casino.

151.    The emails, like others before them, continued to espouse the false and misleading statements described herein.

152.    Further, the emails ridiculed Plaintiffs' counsel, and published Plaintiff Mr. Hartman's personal IP address and personal information, which were obtained when Plaintiff Mr. Hartman sent the cease-and-desist demand through the Infringing Website's "Contact Us" webform.

153.    Although the new emails seemed to be, at least in part, compiled with input from counsel, since they distanced the sender from an affiliation with Plaintiff Mr. Hartman and included an attempt at a preemptive defense to cybersquatting liability, they contained fraudulent misrepresentations and broke several federal laws as outlined below.

154.    Plaintiffs' clients and colleagues again contacted Plaintiffs asking why they were still receiving emails when they marked such as spam.

**UDRP Liability**

155.    On October 2, 2018, the first real blow to Defendants' actions was dealt by WIPO.  In a scathing six-page decision, the WIPO arbitrator held that (1) the Primary Infringing Domain was confusingly similar to the JASON HARTMAN Service Mark; (2) neither the registrant nor the real party in interest had any legitimate interest in use of the Primary Infringing Domain; (3) the use of the Primary Infringing Domain could not have been a "fair use" or the legitimate exercise of free speech protected under the First Amendment; (4) the Primary Infringing Domain created an "impermissible risk of user confusion . . . particularly given that the additional descriptive term "properties" is directly relevant to the [Plaintiffs'] business;" (5) "it was manifestly a deliberate decision by the [Defendants] to include Mr. Hartman's name in the [Primary Infringing Domain];" (6) the [Defendants'] use of the Primary Infringing Domain "is misleading and likely to attract visitors who are searching for Mr. Hartman's business;" and (7) respondent's use of the Primary Infringing Domain "amounts to bad faith registration and use."  Accordingly, WIPO ordered that the domain name at issue be transferred to Plaintiff HMC.

156.    The decision was emailed to every email address on file with Njalla, the Impersonator Account, and the Misleading Gmail Account.

157.    Despite having constructive if not actual notice of the UDRP decision with a clear finding of bad faith infringement, Defendants continued to keep the Primary Infringing Domain and all the other Infringing Domain Names active and redirecting to the Infringing Website.  This continued until October 23, 2018, when Tucows Domains finally transferred the Primary Infringing Domain to Plaintiffs.

158.    The other Infringing Domain Names remain in Defendants' care, custody, and control.  The New Domain Name and the Infringing Website are still up and active as of the date of this Complaint.

**Criminal Conduct**

159.    In engaging in the conduct described herein, Defendants have violated state and federal criminal law.  These violations of law are the touchstone of unfair competition, and warrant the imposition of punitive damages, sanctions, and the highest statutory damages allowable by law for each violation of Plaintiffs' Service Marks.

160.    Defendants' conduct as described herein should subject them to criminal charges under, *inter alia*, 18 U.S.C. § 1343 (wire fraud), 18 U.S.C.A. § 1037 (fraudulent use of email), 18 U.S.C. § 1349 (conspiracy), 18 U.S.C. § 2320 (criminal counterfeiting), Fla. Stat. Ann. § 817.568 (criminal use of personal identification information), and Ga. Code Ann. § 16-9-121 (identity fraud).

161.    Defendants' unauthorized and secret installation of cookies and trackers on website users' computers, especially when those users were defrauded into visiting the site in the first place, additionally invokes violations of the Federal Wiretap Act, 18 U.S.C. § 2510, Stored Communications Act, 18 U.S.C.A. § 2701, Computer Fraud and Abuse Act, 18 U.S.C.A. § 1030, and the Video Privacy Protection Act, 18 U.S.C.A. § 2710(a).  Plaintiffs expressly reserve the right to amend this Complaint to allege civil causes of action in connection with these aforementioned violations of law as additional details become available through discovery.

162.    Moreover, on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, and September 10, 2018, Defendants engaged in rampant

violations of the CAN-SPAM Act of 2003, which should subject them to an investigation by the Federal Trade Commission and a civil suit by various internet service providers.

163.    Plaintiffs intend to refer Defendants to all appropriate authorities for investigation and prosecution, and work with such authorities to bring Defendants to justice.

164.    Moreover, as discovery unveils further details of Defendants' scheme, Plaintiffs expressly reserve their right to amend this Complaint to add a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c).

### A Clear Showing of Knowing and Intentional Conduct Through Extraordinary Concealment Efforts

165.    Defendants took every step possible to cover their tracks and conceal their methods of impersonation and violations of law.  For example, not only is ProtonMail based in Switzerland (with some of the world's strictest privacy laws), but it publicly advertises on its website that (1) "[n]o personal information is required to create your secure email account;" (2) "we do not keep any IP logs which can be linked to your anonymous email account;" (3) "[a]ll emails are secured automatically with end-to-end encryption. This means even we cannot decrypt and read your emails;" (4) "all user data is protected by strict Swiss privacy laws;" (5) "ProtonMail's security measures are intense: end-to-end encryption and user authentication protocols so rigorous even the creators can't read user emails;" (6) "we don't have the technical ability to decrypt your messages, and as a result, we are unable to hand your data over to third parties;" and (7) "[a]s ProtonMail is outside of US and EU jurisdiction, only a court order from the Cantonal Court of Geneva

or the Swiss Federal Supreme Court can compel us to release the extremely limited user information we have."

166.     Similarly, Defendants utilized ThorGuard Stealth Mail, which advertises its use of anonymous, encrypted emails and "uncrackable security," and accepts payment for its services in untraceable cryptocurrency.

167.     Moreover, Defendant Sells chose a registrar, Tucows, that has a history of non-compliance with valid takedown requests from trademark holders.

168.     Tucows Domains, contrary to express agreements with The Internet Corporation for Assigned Names and Numbers ("**ICANN**"), hid the Infringing Domain Names registrant's information on the Whois database.  To engage in domain name registration, a registrar is required to enter into agreements with ICANN that obligate the registrar to ensure accurate and current data in the "Whois database," which provides information about domain name owners to enable members of the public to contact the domain name owners about technical and legal issues related to those domain names.  Here, however, the Whois database provides no registrant information for the Infringing Domain Names.

169.     Moreover, Tucows Domains has repeatedly ignored numerous warnings from Plaintiffs' counsel about Njalla breaking the company's terms and conditions imposed on resellers, and its facilitation of criminal conduct.

170.     Moreover, Defendants used an intermediary, Njalla, based in the near-judgment-proof territory of St. Kitts and Nevis, that sits "between the domain name registration service and [the actual controller of the domain name], acting as a privacy shield."  As Njalla advertises on its website, "[w]hen you purchase a domain name through

Njalla, we own it for you. However, the agreement between us grants you full usage rights to the domain. Whenever you want to, you can transfer the ownership to yourself or some other party."

171.    Furthermore, Defendants provided falsified information to Google, Mailchimp, and Constant Contact.

172.    Thus, Defendants utilized *at least* four layers of concealment to frustrate law enforcement efforts (*i.e.*, Whois Guard, Njalla, Tucows (noncompliant registrar), false information).  Defendants failed nonetheless and will be brought to justice.

## COUNT I

### Federal Service Mark Counterfeiting

173.    Plaintiffs incorporate by reference all of their allegations in the preceding paragraphs.

174.    Defendants intentionally purchased, activated, and maintained the Infringing Domain Names, which are counterfeits of Plaintiffs' registered Service Marks. They did so without consent and with the precise goal of causing consumer confusion and deceiving the public.

175.    Visitors to the Infringing Domain Names were immediately tracked through the unauthorized installation of cookies and trackers on their computer, and were encouraged to complete a "Contact Us" form to become leads for Defendants' business, which offered the same services as Plaintiffs' businesses.

176.    At all relevant times, Defendants maintained and managed traffic to the Infringing Domain Names.

177.    Defendants used concealing agents and took multiple steps to conceal their identities and frustrate the discovery of their wrongdoings.

178.    Defendants' conduct violates the standards of business conduct reflected in the fictitious trade name statutes of states such as Florida, which require persons engaged in the advertising and sale of products and services to identify themselves so that they are amenable to service of process in actions arising from the advertising and sale of goods and services, as well as the federal criminal fictitious name statute at 18 U.S.C. § 1342.

179.    As Defendants have reaped extraordinary profits, by way of harming a direct competitor, from the unlawful conduct described in this Complaint, and are undeterred by the UDRP proceeding that has been decided against them, Defendants have no reason to terminate their conduct unless confronted with an injunction and an award of statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c).

180.    Defendants' useof Plaintiffs' Service Marks in the Infringing Domain Names, Infringing Website, the Impersonator Account and Misleading Gmail Account are "spurious" within the meaning Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A), because they are not "genuine or authentic."

181.    Defendants use their spurious depictions of Plaintiffs' Service Marks for "trafficking in services" within the meaning of the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A).  Indeed, the services advertised and offered by Defendants are the same as those offered by Plaintiffs' businesses, and are in the same field covered by the Service Marks.

182.   The spurious depictions of Plaintiffs' Service Marks in Defendants' websites and email addresses are "identical with, or substantially indistinguishable from" the genuine service marks within the meaning of Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(a)(ii).  Indeed, on their faces, the Infringing Domain Names are identical to and incorporate the Service Marks (JasonHartman and JasonHartman.com), except for the addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

183.   The services advertised and offered by Defendants (*e.g.*, turn-key, real estate investment programs) with spurious depictions of Plaintiffs' Service Marks are identical to the services for which those marks are registered (*i.e.*, financial investment in the field of real estate and financial services, namely, real estate note brokerage, in International Class 36 within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(l)(A)(ii).

184.   Defendants are using spurious depictions of Plaintiffs' Service Marks "in connection with" the services covered by Plaintiffs' federal service mark registrations within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A)(iii).  Indeed, visitors to the Infringing Domain Names were immediately tracked through the unauthorized installation of cookies and trackers on their computer and were encouraged to complete a "Contact Us" form to become leads for Defendants' business, which offered the same services as Plaintiffs' businesses.

185.   Defendants' spurious depictions of Plaintiffs' Service Marks are "likely to cause confusion, to cause mistake, or to deceive" within the meaning of Section 32(1) of

the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A)(iv).  Indeed, they have actually caused extensive customer confusion.

186.    By their acts aforesaid, Defendants have engaged, and are engaged, in the counterfeiting of Plaintiffs' Service Marks within the meaning of Sections 32(1) and 45 of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320.

187.    To carry out their counterfeiting enterprise, Defendants engage in the systematic transmission of false contact data by means of "wire communications" in furtherance of a "scheme" and "artifice to defraud" within the meaning of the federal wire fraud statute at 18 U .S.C. § 1343 and the federal fictitious name statute at 18 U.S.C. § 1342.

188.    The irreparable harm to Plaintiffs and the public resulting from Defendants' conduct, combined with the willfulness of Defendants and the manifest need for deterrence, warrant broad injunctive relief and an assessment of maximum statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c), as well as costs and attorney fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT II
### Federal Service Mark Infringement

189.    Plaintiffs incorporate by reference all of their allegations in the preceding paragraphs and specifically reference paragraphs 174 through 188 above.

190.    Defendants, with the intent to deceive the public, are using in commerce reproductions, counterfeits, copies and colorable imitations of Plaintiffs' federally registered Service Marks in connection with the sale, offering for sale, distribution and/or advertising of real estate investment services in a manner that is likely to cause confusion, mistake, and deception, leading the public falsely to believe that Defendants' services, and the services advertised at Defendants' websites and email addresses, are the services of Plaintiffs, or are sponsored or approved by, or are in some way connected with the Plaintiffs.

191.    Moreover, Defendants' unlawful use of the Service Marks is intended to (1) cause consumer confusion, (2) devalue and tarnish the Service Marks, (3) harm Plaintiffs' business, (4) usurp Plaintiffs' clients, goodwill and reputation, and (5) result in profit to Defendants, as competitors in an "intimate" industry.

192.    Defendants' incorporation of Plaintiffs' Service Marks in the Infringing Domain Names, Infringing Website, the Impersonator Account and Misleading Gmail Account were and are likely to cause confusion.  Indeed, on their faces, the Infringing Domain Names are identical to the Service Marks (JasonHartman and JasonHartman.com), except for the addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

193.    Defendants' use of the Infringing Domain Names ismisleading and likely to attract visitors who were searching for Mr. Hartman's business.  Moreover, Defendants' intentional solicitation of Plaintiffs' clients and colleagues using the Service Marks is *prima facie* evidence of service mark infringement and passing off.

194.    The services advertised and offered by Defendants (*e.g.*, turn-key, real estate investment programs) with spurious depictions of Plaintiffs' Service Marks are identical to the services for which those marks are registered (*i.e.*, financial investment in the field of real estate and financial services, namely, real estate note brokerage, in International Class 36 within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

195.    By their acts aforesaid, Defendants are engaged in federal service mark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), causing irreparable harm to Plaintiff and the public and warranting a permanent injunction and an assessment of damages and attorney fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT III

## Cybersquatting

196.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

197.    Defendants have registered, and are trafficking in, using, and maintaining the Infringing Domain Names, Infringing Website, Impersonator Account, and Misleading Gmail Account, which incorporate and imitate Plaintiffs' federally registered Service Marks, with the bad faith intent to profit from the goodwill associated with those marks.

198.    Plaintiffs' Service Marks were distinctive, and had acquired distinctiveness, long before Defendants registered the Internet domain names identified in this Complaint.

199.    The marks used in the Infringing Domain Name, Infringing Website, the Impersonator Account and Misleading Gmail Account are identical and/or confusingly similar to Plaintiffs' Service Marks.

200.    Defendants do not have any intellectual property or other rights in the names "Jason Hartman" or "JasonHartman.com."

201.    Defendants have never used the name "Jason Hartman" to identify themselves, and have never been commonly known by the name "Jason Hartman."

202.    Defendants are not engaging in any lawful use of the name "Jason Hartman" or "JasonHartman.com."

203.    Defendants registered and used the Infringing Domain Names, Infringing Website, the Impersonator Account and Misleading Gmail Account to divert consumers from Plaintiffs' website to the Infringing Domain Names and Infringing Website for Defendants' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of those websites.

204.    After capturing traffic from individuals searching for Plaintiffs' business or directly solicited through one of the many email marketing campaigns or public posts from the Defendants, the Infringing Website, accessed through the Infringing Domain Names, installed unauthorized cookies and trackers onto each visitor's computer, and solicited visitor information through a "Contact Us" fill-in webform.

205.    By tracking all of the Infringing Website's visitors, Defendants were able to not only contact Plaintiffs' clients and colleagues it knew and directly solicited, but also their clients and colleagues who had been referred to the site.  In this way, Defendants were casting a large net to attract as many potential clients as possible.

206.    In this way, Defendants intentionally sought to simultaneously destroy Plaintiffs and take their clients.  Each website visitor was a potential lead for Defendants.

207.    By their acts aforesaid, Defendants have violated the Anticybersquatting Consumer Protection Act ("ACPA"), Pub. L. No. 106-113, 113 Stat. 1501 (1999), codified at Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), causing irreparable injury to Plaintiffs and the public.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT IV

### Federal Unfair Competition, False Representation and False Designation of Origin

208.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

209.    Defendants' incorporation of Plaintiffs' Service Marks in the Infringing Domain Names, Infringing Website, the Impersonator Account and Misleading Gmail Account were and are likely to cause confusion.  Indeed, on their faces, the Infringing Domain Names are identical to the Service Marks (JasonHartman and JasonHartman.com), except for the addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

210.    The services advertised and offered by Defendants (*e.g.*, turn-key, real estate investment programs) with spurious depictions of Plaintiffs' Service Marks are identical to the services for which those marks are registered (*i.e.*, financial investment in the field of real estate and financial services, namely, real estate note brokerage, in International Class36.

211.    Moreover, Defendants engaged in intentional passing off to the highest degree.  In addition to impersonating Plaintiffs through the Impersonator Account, the Mailchimp email marketing campaign discussed herein directly falsified and used Plaintiff Platinum Properties' address.

212.    Defendants engaged in this passing off and falsification of information to, *inter alia*, (1) divert traffic from Plaintiffs' actual website to the Infringing Website, (2) build leads through the secret and unauthorized installation of cookies and trackers on visitors' computers and the maintenance of a "Contact us" webform, (3) disparage and destroy Plaintiffs' Service Marks and businesses, (4) increase their market share as a natural and intended result of the destruction of Plaintiffs' competing businesses, and (5) falsely associate themselves with Plaintiffs and fraudulently obtain consumer trust and reliance.

213.    By their acts aforesaid, Defendants have engaged, and are engaged, in federal unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), causing irreparable injury and damage to Plaintiff and the public.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT V

### Federal Dilution

214.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

215.    Plaintiffs' federally registered Service Marks are famous, and were famous before Defendants' first commercial use of the Infringing Domain Names, Infringing

Website, Impersonator Account, and Misleading Gmail Account, within the meaning of the Federal Trademark Dilution Act, codified at Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), based on Plaintiffs' extensive sales and advertising under those marks.

216. Defendants' use of Plaintiffs' federally registered Service Marks has diluted, and is likely to dilute, the distinctive quality of those marks, causing them to be blurred in the minds of consumers and to lose their commercial significance as designations of source and origin.

217. Defendants' use of the Infringing Domain Names, Infringing Website, Impersonator Account, and Misleading Gmail Account has weakened, and is likely to weaken, the commercial magnetism of Plaintiffs' Service Marks and to diminish their ability to evoke their original associations.

218. By their acts aforesaid, Defendants have diluted, and are diluting, the selling power of Plaintiffs' Service Marks by blurring their uniqueness and singularity, and by tarnishing them with negative associations, in violation of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c).

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT VI

## Florida Dilution

219. Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

220. Because of their distinctiveness and substantial, continuous and exclusive use by Plaintiffs for many years, the large sums in advertising expended on them by Plaintiffs over the years, including within the State of Florida, and their strong recognition

among the purchasing public, Plaintiffs' Service Marks are famous within the State of Florida, and are entitled to broad protection, with or without a showing of competition between the parties, and with or without an actual likelihood of confusion between the marks, pursuant to the Florida dilution statute, Fla. Stat. Ann. § 495.151.

221.    In any event, Defendants are direct industry competitors with Plaintiffs, and their use of the Service Marks, or confusingly similar marks, actually caused consumer confusion.

222.    Defendants' use of Plaintiffs' Service Marks has diluted, and is likely to dilute, the distinctive quality of those marks, depriving them of commercial value and injuring the business reputation of Plaintiffs, in violation of the Florida dilution statute, Fla. Stat. Ann. § 495.151.

223.    By their actions as described in this Complaint, Defendants willfully intended to trade on Plaintiffs' reputation and cause dilution of their famous marks.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT VII

## Florida Statutory False Advertising

224.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

225.    In addition to impersonating Plaintiffs through the Impersonator Account, the Mailchimp email marketing campaign discussed herein directly falsified and used Plaintiff Platinum Properties' address.

226.    Defendants engaged in this passing off and falsification of information to, *inter alia*, (1) divert traffic from Plaintiffs' actual website to the Infringing Website,

(2) build leads through the secret and unauthorized installation of cookies and trackers on visitors' computers and the maintenance of a "Contact us" webform, (3) disparage and destroy Plaintiffs' Service Marks and businesses, (4) increase their market share as a natural and intended result of the destruction of Plaintiffs' competing businesses, and (5) falsely associate themselves with Plaintiffs and fraudulently obtain consumer trust and reliance.

227.    Moreover, in addition to creating false affiliations, the advertisements disseminated by Defendants through Impersonator Account, Misleading Gmail Account, Mailchimp email marketing campaign, Constant Contact email marketing campaign, and through the public forum postings described herein contain assertions, representations and statements which are untrue, deceptive, and misleading.

228.    Defendants made a false representation by sending out email using the Impersonator Account.  The representation was that the email was coming from Jason Hartman.  Defendants knew that they were not Jason Hartman.  Defendants instead made the representation with the intent that the recipient would rely upon the familiar email address, open the unsolicited email, and rely on its contents.  Plaintiffs' clients and colleagues did in fact rely upon the false and misleading representation by Defendants in using the Impersonator Account.  Such reliance has caused damage to Plaintiffs.

229.    Through their email marketing campaigns, on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, and September 10, 2018, Defendants made false and misleading statements concerning their participation in a larger enterprise, with the intent to appear larger and  more credible, and to portray Plaintiffs as perpetrating a scheme on a large group of people.  These representations were false when

made.  Defendants knew that they were false because, they were not part of a large enterprise, but were merely operating under the auspices of Defendant Sells, and were supporting Defendant Sells' desire to control the market and destroy the competition, which he could not do through hard work and lawful means.  Plaintiffs' clients and colleagues relied upon Defendants' false and misleading misrepresentations and terminated their business relationship with Plaintiffs because of it.  Had they known the truth -- that the emails were coming from Defendant Sells and his associates who were on a crusade to control the market and destroy competition --Plaintiffs' clients and colleagues would not have assigned any credibility to the false and misleading statements in the emails.

230.    Defendants further intentionally and knowingly mislead email recipients into believing that emails being sent through the Mailchimp campaign and the Constant Contact campaign were being sent from others.  By falsifying the company address on the emails, Defendants intended to create a false association with Plaintiff Platinum Properties. Defendants further intended the falsified address to mislead email recipients into believing that they were coming from a larger organization.  In reality, however, the emails were coming solely from Defendant Sells and his associates, who were on a crusade to control the market and destroy competition.  Plaintiffs' clients and colleagues did in fact rely upon Defendants' representations.  Had they known the truth, Plaintiffs' clients and colleagues would not have assigned any credibility to the false and misleading statements in the emails.

231.    Defendants, in misrepresenting the source of their many emails described herein, also tricked Plaintiffs' clients and colleagues into visiting the Infringing Website, which collected their personal information through hidden cookies and web-trackers.

232.    Defendants, by their acts aforesaid, have engaged, and are engaged, in false advertising in violation of Fla. Stat. §§ 817.06 and 817.40-817.47.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

<u>**COUNT VIII**</u>

<u>**Florida Civil Conspiracy**</u>

233.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

234.    Upon information and belief, each Defendant acted in concert with one another pursuant to an oral or written agreement to commit the violations of law detailed herein.  Each Defendant is associated with the same enterprise, PIP, and agreed to work with Defendant Sells to perpetrate the misconduct alleged herein.

235.    Defendants performed in accordance with their agreements with one another to perpetrate violations of state and federal law as detailed herein, and to further their conspiracy to harm Plaintiffs' business in an effort to obtain an unfair competitive advantage and profit from their conduct.

236.    Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT IX

### Common Law Unfair Competition

237.    Plaintiffs incorporate by reference their allegations in paragraphs 208 through213 above.

238.    By their acts aforesaid, Defendant have engaged, and are engaged, in common law unfair competition under Florida law.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT X

### Common Law Tortious Interference

239.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

240.    By their acts aforesaid, Defendant have engaged, and are engaged, in common law tortious interference with business contracts and prospective business relationships under Florida law.

241.    On at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, and September 10, 2018, Defendants intentionally and directly sent out hundreds, if not thousands, of unsolicited and harassing emails to Plaintiffs' clients and colleagues with whom Plaintiff had contractual agreements to work, and for some, had the prospect of doing significant prospective work.

242.    The intent of the aforementioned email campaigns was to coerce the recipients, Plaintiffs' clients and colleagues, to cut off their business relationships with Plaintiffs.  For example, in addition to the content in the body of the emails encouraging readers to cease their business relationship with Plaintiffs, the title of the emails sent out in

the August 14, 2018 email blast was "Worked with Jason Hartman? That could be BAD NEWS for you!"

243.    Those targeted by Defendants' activities did indeed either break contractual agreements with Plaintiffs and/or stopped doing business with Plaintiffs as a result of Defendants' intentional and unjustified interference.  Some of Plaintiffs' colleagues and former clients were dissuaded by the false and defamatory content on the Infringing Website.  For example, one client of Plaintiffs' canceled a speaking engagement where Plaintiffs were scheduled to appear, worth tens of thousands of dollars, stating, "I'm really sorry but we can't have someone like [Defendants] emailing our clients and conference attendees who wouldn't know the truth about the situation."

244.    Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XI

## Common Law Fraud

245.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

246.    Defendants made a false representation by sending out email using the Impersonator Account.  The representation was that the email was coming from Jason Hartman.  Defendants knew that they were not Jason Hartman.  Defendants instead made the representation with the intent that recipients would rely upon the familiar email address, open the unsolicited email, and rely on its contents.  Plaintiffs' clients and colleagues did

in fact rely upon the false and misleading representation by Defendants in using the Impersonator Account.  Such reliance has caused damage to Plaintiffs.

247.    Through their email marketing campaigns, on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, and September 10, 2018, Defendants made false and misleading statements concerning their participation in a larger enterprise with the intent to appear larger and more credible, and to portray Plaintiffs as perpetrating a scheme on a large group of people.  These representations were were false when made.  Defendants knew that they were false because, they were not part of a large enterprise, but were merely operating under the auspices of Defendant Sells, and were supporting Defendant Sells' desire to control the market and destroy the competition, which he could not do through hard work and lawful means.  Plaintiffs' clients and colleagues relied upon Defendants' false and misleading misrepresentations and terminated their business relationships with Plaintiffs because of it.  Had they known the truth -- that the emails were coming from Defendant Sells and his associates who were on a crusade to control the market and destroy competition -- Plaintiffs' clients and colleagues would not have assigned any credibility to the false and misleading statements in the emails.

248.    Defendants further intentionally and knowingly mislead email recipients into believing that emails sent through the Mailchimp campaign and the Constant Contact campaign were being sent from others.  By falsifying the company address on the emails, Defendants intended to create a false association with Plaintiff Platinum Properties.  Defendants further intended the falsified address to mislead email recipients into believing that the emails were coming from a larger organization.  In reality, the emails were coming

solely from Defendant Sells and his associates, who were on a crusade to control the market and destroy competition. Plaintiffs' clients and colleagues did in fact rely upon Defendants' representations. Had they known the truth, Plaintiffs' clients and colleagues would not have assigned any credibility to the false and misleading statements in the emails.

249. Defendants, in misrepresenting the source of their emails described herein, also tricked Plaintiffs' clients and colleagues into visiting the Infringing Website, which collected their personal information through hidden cookies and web-trackers.

250. Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

251. Moreover, the acts and conduct of Defendants in derogation of the rights of Plaintiffs were fraudulent, malicious, and oppressive, thereby supporting the imposition of punitive damages against Defendants as the trier of fact may determine.

252. Moreover, Defendants' provision of falsified information to service providers frustrated Plaintiffs' identification efforts herein, and Plaintiffs therefore sustained considerable expenses in investigating the matters.

## COUNT XII

### Negligent Misrepresentation

253. Plaintiffs incorporate by reference their allegations in paragraphs 245 through 51 above.

254. In the alternative, should the Court find that Defendants lacked the requisite intent to sustain Count XI, the Court should find Defendants liable for negligent

misrepresentation, as the aforementioned misrepresentations were made with at least a negligent state of mind.

**COUNT XIII**

**Invasion of Privacy**

255.     Plaintiffs incorporate by reference their allegations in paragraphs 147 through 52 above.

256.     The Infringing Website was, and still is, completely devoid of any privacy policy, terms and conditions, or anything that would bring it in compliance with GDPR. Despite this, the Infringing Website installed unauthorized cookies and trackers onto each visitor's computer, and solicited visitor's information through a "Contact Us" fill-in webform.

257.     Defendants obtained through fraudulent means and published Plaintiff Mr. Hartman's personal IP address, email address, and personal information, which was obtained when Plaintiff Mr. Hartman sent the cease-and-desist demand through the Infringing Website's "Contact Us" webform.

258.     Moreover, the Infringing Website publicly disclosed Plaintiffs' private information.

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants as follows:

1.     For an order preliminarily and permanently enjoining Defendants, collectively and individually, and their officers, shareholders, partners, principals, agents, heirs, assignees, beneficiaries, successors, licensees, distributors, attorneys, proxies, alter egos, aliases, and all other persons acting in concert with Defendants collectively or individually, from:

55

(a) registering or using as a trade name, trademark, service mark, Internet domain name, e-mail address, or portion thereof, any name or term that incorporates, imitates, or is confusingly similar to any of Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM;

(b) purchasing, selling, or using any form of advertising, including keywords or "AdWords" in Internet advertising containing any mark that incorporates, initiates, or is confusingly similar to Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, and requiring Defendants, when purchasing or selling Internet advertising using keywords, AdWords or the like, to activate the name JASON HARTMAN as a negative keyword or negative AdWord in any Internet advertising purchased, sold or used;

(c) infringing Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, including all written and spoken terms equivalent or confusingly similar thereto;

(d) using Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, or any name or mark that incorporates, imitates, or is reminiscent of or confusingly similar thereto, for any product or service, or in any letterhead, sign, website, advertising or promotion, e-mail or other sales solicitation or business listing, either in print, broadcast, electronic or other form, either separately or compositely with other words;

(e) using Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, or any name or mark confusingly similar thereto, as a corporate and/or trade or business name and/or fictitious name or portion thereof;

(f) making representations, directly or indirectly, to anyone, anywhere, by any means, including but not limited to unauthorized co-branding, that Defendants are related to, associated or affiliated with, or sponsored, endorsed or approved by Plaintiffs;

(g) in any manner depicting, uttering or imitating Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, for the purpose of misappropriating the trade and goodwill of Plaintiffs by association, imitation, fraud, mistake or deception;

(h) unfairly competing with Plaintiffs in any manner; and

(i) contacting Plaintiffs' clients and colleagues with the intent to disseminate false or misleading information and in an effort to harm Plaintiffs and their businesses.

2.    For an order directing Defendants to file with this Court and serve upon Plaintiffs within thirty (30) days after service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with, and will continue to comply with, the injunction and further orders of this Court.

3.    For an accounting of profits pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

4.      For lost profits and damages in such amount as may appear appropriate following a trial on the merits, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

5.      For statutory damages in the amount of $2,000,000 per infringing domain name and email address used by Defendants to propagate their scheme described herein, pursuant Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(c)(2).

6.      For treble damages pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § l117(a).

7.      For statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c).

8.      For punitive damages as the trier of fact may determine.

9.      For costs and attorney fees pursuant to Section 35(a) and (b) of the Lanham Act, 15 U.S.C. § 1117(a) and (b), and Fla. Stat. §501.2105.

10.     For such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.


Respectfully submitted this _____ day of December 2018.


s/Ava K. Doppelt_____
Ava K. Doppelt, Esq.
Florida Bar No. 393738
adoppelt@allendyer.com
ALLEN, DYER, DOPPELT
& GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401

Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

and

Steven Pollack, Esq.
(*Admitted Pro Hac Vice*)
steve@stevepollacklaw.com
225 Broadway, Suite 850
New York, NY 10007
Telephone: (917) 268-6812