## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-61907-CIV-SMITH/VALLE

PLATINUM PROPERTIES INVESTOR
NETWORK, INC.; THE HARTMAN
MEDIA COMPANY, LLC; and JASON
HARTMAN,                                          **JURY TRIAL DEMANDED**

        Plaintiffs,                        **INJUNCTIVE RELIEF DEMANDED**

   v.

CHARLES SELLS; STEPHANIE
PUTICH; YOUNG CHUNG; THE PIP-
GROUP, LLC; BLINDSPOT DIGITAL,
LLC; ELENA CEBOTARI SELLS; and
JOHN DOES 1-8,

        Defendants.
_____/

### SECOND AMENDED COMPLAINT

Plaintiffs Platinum Properties Investor Network, Inc. ("**Platinum Properties**"),

The Hartman Media Company, LLC ("**HMC**"), and Jason Hartman ("**Mr. Hartman**")

(collectively, "**Plaintiffs**"), by their undersigned attorneys, file this Second Amended

Complaint ("Complaint") against Charles Sells, Stephanie Putich, Young Chung, The

PIP-Group, LLC, Blindspot Digital, LLC, Elena Cebotari Sells, and John Does 1-8 whose

names are not readily available (collectively, "**Defendants**") for federal service mark

counterfeiting, contributory service mark counterfeiting, federal service mark

infringement, contributory service mark infringement, cybersquatting, federal unfair

competition, federal false advertising, violation of the Racketeer Influenced and

Corruption Organization Act ("RICO"), federal RICO conspiracy, Florida civil remedies

for criminal practices, Florida civil remedies for criminal practices conspiracy, Florida statutory false advertising, Florida civil conspiracy, common law unfair competition, common law tortious interference, common law injurious falsehood, defamation *per se*, defamation, defamation by implication, common law fraud, negligent misrepresentation, common law invasion of privacy, and Florida statutory invasion of privacy.   For Plaintiffs' Complaint against Defendants, Plaintiffs allege the following, based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, issuing court-authorized subpoenas, hiring forensic and cyber investigators, reviewing and analyzing the infringing website, consulting with experts in the field of information technology, filing a proceeding under the Uniform Domain Name Dispute Resolution Policy ("**UDRP**"), and performing a review of information readily obtainable on the Internet.[1]

## <u>NATURE OF THE ACTION</u>

1.      This is an action for service mark counterfeiting, fraud and related causes of action arising from Defendants' surreptitious creation, use, and promotion of a blackmail hit-site meant to harm Plaintiffs' businesses.

2.      Defendants, self-described industry competitors to Plaintiffs, decided that instead of competing fairly and building their business through hard work and contribution to the marketplace of ideas, they would turn to civil and criminal violations of law to destroy their competitors and profit therefrom.

---

[1] The allegations in this Second Amended Complaint are supported by ample documentary and forensic evidence, including but not limited to subpoena responses, Internet Protocol addresses, access logs, Domain Name Server records, source code analysis, expert analysis, and documents produced by Defendants in this case.

3.      In an effort to drive business away from Plaintiffs, and to destroy the large market share Plaintiffs have earned through years of education and service to the profession, Defendants, while attempting to conceal their identities, (1) resorted to criminal impersonation and retaliation, (2) used Plaintiffs' trademarks to confuse and deceive Plaintiffs' clients and colleagues, and (3) defrauded Plaintiffs by making false and misleading representations regarding their own identity and operations.

4.      Defendants have gone beyond passive misconduct to actively target Plaintiffs' business and clientele.  Defendants engaged in a continuous email marketing campaign that targeted Plaintiffs' clients and colleagues, and used impersonation and guile to direct them to infringing domain names and an infringing website.

5.      Moreover, to conceal their identity and cover their tracks, Defendants used the newest generation of web tools used by hackers, cyber-pirates, and child-pornographers to insulate themselves from liability while perpetrating, *inter alia*, criminal impersonation, intellectual property infringement, and unfair competition.

6.      Defendants have succeeded in their efforts; they have caused substantial harm to Plaintiffs' business and reputation, and continue to irreparably harm Plaintiffs. Plaintiffs have frustratingly attempted to stop Defendants' violations of law and prevent further harm, but to no avail.  With each small success, Defendants simply redirect web-traffic, obtain new domain names and email addresses, and skirt law enforcement.

7.      After filing complaints with the U.S. Federal Bureau of Investigation ("**FBI**"), the Palm Beach County Sheriff's Office, and commencing an international arbitration proceeding under the UDRP, Plaintiffs had no further options but to file this action.

## PARTIES

8.      Plaintiff Mr. Hartman is a resident of Palm Beach County, Florida, and has conducted business, through various entities, in Florida for more than twenty years.

9.      Plaintiff Platinum Properties is a California corporation with a registered agent at 4400 N. Scottsdale Road, #9-322, Scottsdale, AZ 85251, and a correspondence address at 401 E. Las Olas Blvd. # 130707, Ft. Lauderdale, FL 33301.

10.     Plaintiff HMC is a Wyoming limited liability company with a registered agent at 60 E. Simpson Ave, PO Box 2869, Jackson, WY 83001.

11.     Mr. Hartman, directly or indirectly, owns Platinum Properties, HMC, and The Jason Hartman Foundation, a philanthropic organization dedicated to assisting young adults through free financial literacy education, and providing micro lending to help citizens of developing countries become financially self-sustaining (jasonhartmanfoundation.org).

12.     Defendant Charles Sells ("**Sells**") is an individual who resides in Hilton Head Island, South Carolina.  Sells is the self-proclaimed founder, Chief Executive Officer, and Managing Director of PIP (as defined below).  He represents to the public that "he and his team have been investing in distressed assets such as tax liens, tax deeds, traditional bank foreclosures, fix-and-flips, and long-term buy/hold cash-flowing investments since 1996."  Sells regularly publishes articles on Think Realty, a website for real estate investment advice, including articles titled "3 Reasons to Fix and Flip Outside Your Local Market" and "5 Actionable Rules for Buying Foreclosures at Auction."

13.     Defendant The PIP-Group, LLC ("**PIP**") is a South Carolina limited liability company created in May of 2018, but incorporated through a "formerly known as" entity, PIP-East, LLC, which was incorporated on January 9, 2013.  PIP's registered

agent is Sells, and it maintains a registered agent address at 20 Towne Drive, Bluffton, South Carolina 29910.[2]

14.     According to its LinkedIn page, PIP has been in business since 2004, and "presents realistic, turn-key solutions to individual investors."  "With over 20 years of experience, The PIP Group … has the experience to provide you the profits and success you are looking to achieve in your distressed property investments – whether those be in tax liens, tax deeds, traditional bank foreclosures, fix and flips and even long-term buy/hold cash flow investments."  PIP also represents that "all investments made by The PIP Group are in the investors' names, each individual maintains total control of his or her portfolio."

15.     Defendant Elena "Lena" Cebotari Sells ("**Lena**") is an individual who resides in Hilton Head Island, South Carolina. According to her LinkedIn page, Lena has been the Director of Operations of "PIP-Group, LLC" since October 2012. Her role with PIP is described as "Management of tax liens and tax deed. Liaising with superiors to make decisions for operational activities and set strategic goals. Supervising staff from different departments and provide constructive feedback. Review financial information and adjust operational budgets to promote profitability. Evaluate overall performance by gathering, analyzing and interpreting data and metrics. Plan and monitor the day-to-day running of business to ensure smooth progress."

---

[2] Sells also owns and is the registered agent for no fewer than six different entities.  The goal of this network of entities is to obscure Sells' assets and frustrate any collection efforts resulting from a judgment against him or his companies.  The known entities are as follows: Chimera LLC; PIP; Platinum Property Acquisitions LLC; Platinum REOs & Acquisitions LLC; SNS of HHI LLC; and Vision Tax Lien Services Incorporated.  Upon information and belief, the aforementioned entities are shams and alter egos of one another.

16.     Lena is self-described as an "[e]xperienced Director Of Operations with a demonstrated history of working in the real estate industry. Skilled in Sales, Real Estate Transactions, Investment Properties, Foreclosures, and Management."

17.     Defendant Stephanie Putich ("**Putich**") is an individual who maintains a registered address in Richmond, Virginia, but upon information and belief, currently resides in Hilton Head Island, South Carolina.  Putich is a Client Relations Manager for Defendant PIP and has been since September 2017.

18.     Defendant Blindspot Digital, LLC ("**Blindspot**") is a Georgia corporation with a principal office address at 2575 Darlene Ct., Tucker, GA, 30084. Defendant Blindspot's registered agent is Young Chung, with an address of 2575 Darlene Ct., Tucker, GA, 30084.  Defendant Blindspot's entity control number is listed as 18016311.

19.     Defendant Young Chung ("**Chung**") is an individual who resides at 2575 Darlene Ct., Tucker, GA, 30084. Chung is the Chief Executive Office of Defendant Blindspot.

20.     The majority of Chung's professional career has been in franchise lead generation, working at franchise web portals. Chung worked with nationwide and international franchisors and business opportunities to generate franchise leads and prospects so the vice presidents of franchise development, franchise consultants, and sales teams would sell franchises. Defendant Chung's role in the companies was in sales, but the ultimate goal of these companies was generating leads and prospects who wanted to start a franchise business by using paid search advertising, email newsletters, and organic search results.

21.     Plaintiffs are not aware of the true names and capacities of Defendants John Does 1-8.  Upon information and belief, John Does 1-8 have conspired with, aided and abetted the unlawful conduct of the named Defendants herein.  Plaintiffs will amend the Complaint to allege the names and capacities of these Defendants when ascertained.

22.     Upon information and belief, the unlawful conduct of John Does 1-8 alleged in this Complaint was in the scope of their relationship with one another and with Defendants named herein, and each said Defendant acted with the knowledge, participation, permission, consent and/or authority of the others in respect to some or all of the unlawful conduct alleged in this Complaint.

23.     Upon information and belief, each Defendant aided and abetted the other, and has been aided and abetted by the other, in respect to some or all of the unlawful conduct alleged in this Complaint.

**Relevant Non-Parties**

24.     Non-Party 1337 Services LLC dba Njalla ("**Njalla**") is not a real LLC but rather a business formed and operating in the Caribbean Islands of St. Kitts and Nevis.  It was created by a notorious copyright thief who was sentenced to prison in Sweden for his creation of The Pirate Bay, Peter Sunde Kolmisoppi (a.k.a Peter Sunde).  Njalla is a self-described middleman that sits "between the domain name registration service and [the actual controller of the domain name], acting as a privacy shield."  As explained by Njalla on its website, "When you purchase a domain name through Njalla, we own it for you. However, the agreement between us grants you full usage rights to the domain. Whenever you want to, you can transfer the ownership to yourself or some other party." *See* https://njal.la.

25.     Non-Party Tucows Inc. ("**Tucows**") is a Pennsylvania corporation with headquarters located at 96 Mowat Avenue, Toronto, Ontario, Canada M6K 3M1. Tucows' common stock is traded on the NASDAQ Capital Market under the symbol "TCX" and on the Toronto Stock Exchange under the symbol "TC."

26.     Non-Party Tucows Domains Inc. ("**Tucows Domains**") is an Ontario, Canada corporation that is indirectly wholly owned by Tucows.  Specifically, Tucows Domains is wholly owned by Tucows.com Co., a Nova Scotia, Canada corporation, which is wholly owned by Tucows (Delaware) Inc., a Delaware corporation, which in turn is wholly owned by Tucows.

27.     Non-Party Proton Technologies AG ("**Proton**") is a company based in the Canton of Geneva, Switzerland, with headquarters located at Chemin du Pré-Fleuri, 3 CH-1228 Plan-les-Ouates, Genève, Switzerland.  Proton owns and operates ProtonMail, an end-to-end encrypted email service founded in 2014 that enables users to establish anonymous email accounts.  As advertised on the ProtonMail website, "No personal information is required to create your secure email account. By default, we do not keep any IP logs which can be linked to your anonymous email account. Your privacy comes first."  Moreover, Proton stores its servers for ProtonMail at two different locations in Switzerland, outside of United States and European Union jurisdiction.  As explained on the ProtonMail website, "ProtonMail is incorporated in Switzerland and all our servers are located in Switzerland. This means all user data is protected by strict Swiss privacy laws."  *See* https://protonmail.com.

28.     Non-Party Google LLC ("**Google**") is a wholly owned subsidiary of Alphabet Inc., with its headquarters located at 1600 Amphitheatre Parkway, Mountain

View, California 94043. Google offers a free advertising-supported email service known as "Gmail" that has more than one billion monthly active users.

29.    Non-Party VPNetworks, LLC dba TorGuard ("**TorGuard**") is a Florida limited liability company with a principal address at 618 E. South Street, Suite 500, Orlando, Florida 32801. TorGuard maintains a copyright agent at 450 S. Orange Ave, Suite 550, Orlando, FL 32801. TorGuard offers an anonymous email service called TorGuard Stealth Mail, and advertises its services to intellectual property thieves who want to use "torrents." Indeed, as the company advertises, "[t]he reference to 'tor' in TorGuard relates to 'torrents' and guarding one's privacy when using bitorrent."

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338.

31.    This Court has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367(a), because they form part of the same case and controversy and derive from a common nucleus of operative facts.

32.    Venue is proper in this District pursuant to 28 U.S.C. § 139l(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

33.    This Court has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193 since they are doing business in Florida, engaging in business activities directed to Florida, committing a pattern of tortious conduct in Florida, using personal property in

Florida as a means of perpetrating that conduct, and purposefully availing themselves of the opportunity to conduct commercial activities in Florida.

34.     Defendants Sells and PIP are routinely paid for and engage in speaking events in the State of Florida, from which they earn clients and revenue.  Indeed, the first time Plaintiff Mr. Hartman and Sells met in person was at the Equity Trust Conference in Orlando, Florida.

35.     Defendants Sells and PIP regularly solicit clients from Florida and have worked with and profited from tens, if not hundreds, of Florida residents.

36.     Upon information and belief, Defendants own, use, possess, or hold a mortgage or other lien on real property within Florida.

37.     Defendants trampled on service marks that are used in Florida, and they gain value from associations made by Florida residents upon seeing the service marks.

38.     Defendants have directed their tortious activity directly at a Florida resident, Mr. Hartman, and his companies, which do business in Florida.  Plaintiffs collectively own a multitude of properties in Florida as part of their assets and business operations.  Plaintiffs also conduct conferences and property tours in Orlando and New Port Richey, Florida.  Plaintiffs have also attended over 100 conferences and events in Florida.  Finally, Plaintiffs finance property purchases in Florida.  Thus, Defendants' attempt to damage Plaintiffs' business operations was an attempt to damage Florida commerce and businesses.

39.     Moreover, in perpetrating their unlawful conduct, Defendants sent direct communications and marketing material to various Florida residents and defrauded such Florida residents through said campaigns.  Plaintiffs and other Florida residents have

been directly injured as a result of Defendants' conduct in Florida, which is at issue in this action.

40.     Defendants utilized infrastructure and computer networks located in Florida to perpetrate their unlawful conduct, and sought to have an effect in Florida and upon Florida residents.  In fact, Defendants utilized the instrumentalities and services of a Florida company (*i.e.*, TorGuard), with its base operations in Florida, to perpetrate their unlawful conduct as described herein.   By TorGuard's express terms of service, Defendants entered into a contractual agreement in Florida, whose terms are "governed by and construed in accordance with the laws of the State of Florida," and expressly agreed to "submit to the jurisdiction and venue of [an appropriate state or federal court located in the State of Florida]."  In this way, *inter alia*, Defendants purposely availed themselves of the protections and powers of the courts of Florida.

41.     Defendants retained counsel in Florida to challenge various subpoenas, Orders of this Court, and generally to avail themselves of the protections of this State.

42.     For these and other reasons, Defendants' contacts with Florida are substantial, and Defendants are engaged in substantial activity within this State.

## BACKGROUND

### Plaintiffs' Hard-Earned Reputation and Goodwill

43.     Mr. Hartman grew up in a low-income home in Los Angeles, CA, going to public schools through high school.

44.     At 16, Mr. Hartman saw a television program involving a real estate mogul discussing his success as a real estate investor.  Mr. Hartman bought the mogul's book and had his first introduction to the real estate market.

45.     At 18, at his mother's behest, Mr. Hartman took his first trip to a real estate investment seminar in Anaheim, California.  Intrigued and inexperienced, two days later, Mr. Hartman began searching for real estate schools.  He enrolled in Century 21®'s Real Estate Course for $99.

46.     By 19, Mr. Hartman received his real estate license and began working as a real estate agent for Century 21 part-time while attending college.

47.     He was a hard worker, and in Mr. Hartman's first full month in the business, he sold five (5) properties.  But instead of using his earnings and savings on a new car, an impressive resistance for any 19-year-old, he invested it in his real estate career, keeping his dreams big.

48.     Mr. Hartman bought his first rental property from a client at age 20, and remained committed to real estate ever since.

49.     Today, Mr. Hartman is a world-renowned industry professional who has been involved in several thousand real estate transactions, and has owned income properties in 11 states and 17 cities, including multiple cities in Florida.

50.     His company, Platinum Properties, helps people achieve financial freedom by making prudent purchases of income properties in conservative markets nationwide.

51.     Mr. Hartman serves as a guru in his trade and has spent years building his name and reputation.  Indeed, his speaking engagements have been attended by tens of thousands of people around the world; his latest conference was on November 3-4, 2018.  His podcasts are equally popular.  Mr. Hartman has interviewed senators, presidential candidates, thought leaders, college professors and economists on his programs.

52.     As a result, Plaintiffs collectively earn an annual revenue of more than $3.0 million, and have been recognized by INC. Magazine as among the INC. 5000 Fastest Growing Private Companies in America.

**The Federally Registered Trademarks**

53.     In recognition of the prominence developed by the Jason Hartman name and brand in the real estate investment industry over the years, the United States Patent and Trademark Office ("**PTO**") issued two service mark registrations covering Mr. Hartman's name and website domain name.

54.     On March 1, 2013, Plaintiff, through HMC, filed an application in the PTO to register JASONHARTMAN.COM as a service mark. The JASONHARTMAN.COM service mark was officially registered in the PTO on October 15, 2013 (Registration No. 4,418,120).

55.     Plaintiffs' first use of the JASONHARTMAN.COM service mark in commerce was on December 29, 1996. Plaintiff has used the JASONHARTMAN.COM service mark in commerce continuously since that time.

56.     On June 17, 2013, Plaintiff, through HMC, filed an application in the PTO to register JASON HARTMAN as a service mark. The JASON HARTMAN service mark was officially registered in the PTO on January 21, 2014 (Registration No. 4,470,582). Plaintiffs' first use of the JASON HARTMAN service mark in commerce was in September 1985. Plaintiff has used the JASON HARTMAN service mark in commerce continuously since that time.

57.     Both JASON HARTMAN and JASONHARTMAN.COM (collectively, the "**Service Marks**") are federally registered service marks for financial investment in

the field of real estate and financial services, namely, real estate note brokerage, in International Class 36 (U.S. Cls. 100, 101 and 102).

58.     In sum, the mark JASON HARTMAN has been federally registered for nearly five years and has been in commercial use for 23 years. JASONHARTMAN.COM also has been federally registered for nearly five years, and has been in commercial use for nearly 22 years.

**Use of the Service Marks**

59.     Plaintiffs make extensive use of the Service Marks.

60.     Use of the JASON HARTMAN mark by Plaintiffs recently appeared as follows on the home page of Plaintiffs' website at www.jasonhartman.com:



61.     After more than 20 years of substantial and uninterrupted use, combined with extensive advertising of tens of millions of dollars, Plaintiffs' Service Marks have

become well known to the public, have achieved secondary meaning, and are "famous" for all purposes relevant to this Complaint.

62.     Indeed, Plaintiffs expend approximately $1.5 million annually on marketing efforts in connection with the JASON HARTMAN mark.

**Relationship Between the Parties**

63.     Defendants Sells and PIP and Plaintiffs (collectively referred to as the "**Competing Parties**") staunchly compete in a close and intimate industry.  Indeed, the Competing Parties are business competitors in every way.

64.     The Competing Parties compete for clients (*i.e.*, investors), listeners to their audio productions, readers of their blogs and written works, and attendees of their speeches and lectures, all in the field of real estate investment services.

65.     Defendant PIP and Plaintiff Platinum Properties share similar names. Plaintiff Platinum Properties has been incorporated under and has used the trade name "Platinum Properties Investor Network" since March 27, 2007.  Similarly, Defendants Sells and PIP use "PIP" as an acronym for "Platinum Investment Properties," a term they use in long-form in advertisements and contracts, and Sells also owns Platinum Property Acquisitions LLC and Platinum REOs & Acquisitions LLC.

66.     The Competing Parties expend significant sums in attempting to attract the same clients who are looking for "turn-key" (*i.e.*, full service) real estate investment programs and opportunities.

67.     The Competing Parties provide education on the same topics, and have given speeches and lectures at the same events and conferences.

68.     The competition in the Competing Parties' intimate industry has always been fierce, but until the occurrence of the conduct complained of herein, the competition between the Competing Parties was more or less fair.

69.     Although the Competing Parties have engaged in several rounds of litigation in the past, such litigation involves conduct that pre-dates the events described herein and is largely irrelevant to this Action.

70.     After years of coming in second to Plaintiffs' success in the industry, Defendants took the competition to a whole new – unlawful – level by engaging in the conduct described herein.  Defendants engaged in unconscionable and criminal conduct in an attempt to strike a death blow to Plaintiffs' business and enjoy the spoils.

71.     After committing widespread fraud on the public and using unprecedented methods to conceal their unlawful conduct, Defendants have been unmasked.  Plaintiffs now seek to hold Defendants liable for their criminally and civilly culpable conduct.

**The Infringing Domain Names**

72.     In early 2017, Sells through PIP and its employees, Defendants Putich and Lena, as well as Chung as an independent contractor to PIP, conspired together and concocted a plan to debilitate Plaintiffs and their businesses.  Chung's experience in lead generation was particularly useful and necessary to Sells, as it was necessary to draw leads from the misconduct.

73.     As an initial step, at the direction of Sells, on or around May 17, 2018, Chung located the domain name JasonHartmanProperties.com (the "**Primary Infringing Domain**") on GoDaddy.com and provided the name to Sells.

74.     On May 17, 2018, Sells personally, and on his home computer, paid for and set up the Primary Infringing Domain, through Njalla as a reseller of Tucows Domains (the domain name registrar).  The Primary Infringing Domain was hosted on Njalla's servers in Switzerland and accessible globally.

75.     The same day, Sells personally or through his agents paid for and directed the set-up of at least five other similar internet domain names, including (1) JasonHartmanInvestments.com;  (2) JasonHartmanRealEstateInvestments.com;  and  (3) JasonHartmanMedia.com (collectively referred to as the "**Secondary Infringing Domains**," and together with the Primary Infringing Domain referred to collectively as the "**Infringing Domain Names**.")

76.     All of the Secondary Infringing Domains redirected traffic to the Primary Infringing Domain, which hosted a website that was accessible globally.

77.     Although the Infringing Domain Names were technically "owned" by Defendants' concealing agent, Njalla, they were wholly controlled, promulgated, and held in trust for Defendants at all relevant times.  Continuing to the date of this Complaint, the Secondary Infringing Domains are still in Defendants' control and are being held by Njalla as an agent and for the care of Defendants.

78.     On their faces, the Infringing Domain Names are identical to and incorporate the Service Marks (JASON HARTMAN and JASONHARTMAN.COM), except for the addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

79.     Indeed, the Infringing Domain Names were created intentionally to cause consumer confusion and target the class of services directly covered by the Service

Marks, and for which such marks are used.  Seeking to inflict maximal damage to Plaintiffs' business and trademarks, Sells and his agents intentionally purchased and used domain names specific to the real estate market (*e.g.*, by adding the real estate descriptors "properties" and "real estate investments" to "Jason Hartman"), the field in which the Service Marks are used and maintain registered protection.

80.    Neither Sells nor any other Defendant ever had any permission, license or agreement with Plaintiffs authorizing them to use the Service Marks, and in fact, they do not use the Service Marks for any lawful purpose.

81.    Instead, as described further below, Defendants' use of the Infringing Domain Names has always been in bad faith and for commercial gain to misleadingly divert customers, and to tarnish the Service Marks.  Moreover, Defendants have used and continue to use the Infringing Domain Names to commit widespread fraud on the public and intentionally destroy existing and potential business relationships between Plaintiffs and their clients and colleagues.

**The Infringing Website**

82.    The website hosted on the Primary Infringing Domain and accessible through all of the Infringing Domain Names (the "**Infringing Website**") was tailor-crafted to defraud the public, tarnish the Service Marks, destroy Plaintiffs' business, and defame Mr. Hartman personally.[3]

---

[3] As described further below, the Infringing Website has been hosted on yet a new domain name that is currently operating as of the date of this Complaint.

83.     On or around May 29, 2018, Sells, using PIP's property and assets, directed Chung to set up the hosting service for the Infringing Website, which was paid for and hosted through My-Zone.Net Hosting ("**My-Zone**").

84.     On or around May 29, 2018, when registering an account with My-Zone, Sells or Chung, at the direction of Sells, provided My-Zone with false identification and contact information.  Sells or Chung, at the direction of Sells, represented, and continues to represent, to My-Zone that he has the following contact information:

> HARTMAN MEDIA
> ATTN: JASON HARTMAN
> 123 BONEHEAD WAY
> LAS VEGAS, Nevada, 88901
> United States

85.     Invoices and bills from My-Zone were therefore issued to "Hartman Media." As the address provided was fake and Defendants failed to pay issued invoices, upon information and belief, My-Zone continues to hold Hartman Media (*i.e.*, HMC) in arrears, which may have an effect on HMC's credit.

86.     Sells, using PIP's property and assets, also directed Chung to build the Infringing Website using a Word Press application.  Chung did so.

87.     The Infringing Website not only utilizes unauthorized copies of Plaintiffs' Service Marks and copyrighted works, but attempts to disparage Plaintiffs' business success through false and misleading statements of material fact.  The Infringing Website is replete with false statements relating to Plaintiffs' business, financial history, litigation history, commercial dealings, alleged prurient nature, credibility, and trustworthiness.

88.     Even worse, Defendants utilize and distort the decisions of the courts of the United States in perpetuating their fraud and unlawful conduct.

89.     On or around May 30, 2018, Sells and his agents represented through publication on the Infringing Website that "Jason Hartman has more than 100 lawsuits filed by, or against him in the last 10 years."  This statement is false.  Mr. Hartman has been involved in only a fraction of that number of cases in his entire life, let alone the last ten years. This false and misleading representation was continuously published on the Infringing Website through August 28, 2019.

90.     On or around May 30, 2018, Sells and his agents represented through publication on the Infringing Website that Mr. Hartman has been involved in "70 cases in Orange County, CA alone."  This representation was false when made and continues to be false. This false and misleading representation was continuously published on the Infringing Website through August 28, 2019.

91.     To boot, the Infringing Website was, and still is, completely devoid of any privacy policy, terms and conditions, or anything that would bring it in compliance with Global Data Protection Regulations ("**GDPR**"), despite its accessibility globally.  Despite this, the Infringing Website installed unauthorized cookies and trackers onto each visitor's computer, and solicited visitor information through a "Contact Us" fill-in webform.

92.     By meticulously tracking all of the Infringing Website's visitors, Defendants were able to not only contact Plaintiffs' clients and colleagues they knew and directly solicited, but also their clients and colleagues who had been referred to the site or were misdirected there through an online search due to source confusion.  In this way, Defendants were casting a large net to attract as many potential clients as possible.

93.     For those visitors who were persuaded by the content on the Infringing Website, Defendants, through the Infringing Website, provided a mechanism to provide their contact information through the "Contact Us" fill-in form.

94.     In this way, Defendants intentionally sought to simultaneously destroy Plaintiffs and take their clients.

95.     The Infringing Website was active and publicly accessible from on or around May 30, 2018 through August 28, 2019. On August 7, 2019, Plaintiffs' counsel sent a legal takedown notice to Defendants' counsel. Pursuant to an agreement between the parties, the Infringing Website has been temporarily taken down without any admission of liability. Defendants have several domain names, including fakeguru.com, that are ready and able to host the Infringing Website.  Upon information and belief, Defendants fully intend on continuing their scheme to defraud the public until they destroy Plaintiffs.

**The Campaign Begins With Criminal Impersonation Through ProtonMail**

96.     In or around May 2018, around the same time that Sells and his agents set up the Infringing Website on the Infringing Domain Names, Sells or his agents created an account with an anonymous email service, ProtonMail, and targeted Plaintiffs' business clientele and colleagues through an impersonator email address, JasonHartman@protonmail.com (the "**Impersonator Account**").

97.     Baiting the recipients to open a message they were led to believe was from Mr. Hartman, Defendants directed Plaintiffs' clients to the Primary Infringing Domain. Specifically, on June 29, 2018 at 11:45 AM ET, Defendants sent an email from the Impersonator Account to Plaintiffs' clients, stating the following:

To Whom It May Concern:

As somebody we know and respect in our very large, but also very intimate industry, I wanted to share with you the results of about a 4 month investigation into Jason Hartman's background. What we have found so far and continue to uncover with the help of others in our industry is .....[4]

Nonetheless, we know you to be a reputable voice in the industry and thought you and/or your followers should be aware of the alarming facts found so far. We imagine as this information travels through our industry, the alarming truth is only going to grow more.

You can trust the following site to the details and documents involved is secure. http://jasonhartmanproperties.com/

Please share these details with anyone you know may have crossed paths with, or invested with this individual. Maybe it will help to mitigate their losses of working with him. It sure would have helped us a few years ago to know what we know now, but in the end we prevailed.

98.     Defendants' email was telling for several reasons.

99.     First, it is clear from Defendants' self-inclusion in the "industry" and their use of first-person plural pronouns that they knew Sells and PIP were business competitors, and were directly targeting Plaintiffs' clients and colleagues in the industry. Defendants stated, "As somebody **we** know and respect in **our** very large, but also very **intimate** industry . . . ."

100.     Second, Defendants defined the relevant market of competitors as "intimate," showing knowledge that the email would cause immense harm to Plaintiffs in that intimate community.

101.     Third, Defendants' statement that "we know you to be a reputable voice in the industry" again demonstrates that they knew Sells and PIP were industry competitors

---

[4] Certain false and misleading statements about Plaintiffs have been redacted herein to prevent the salacious and fabricated statements from becoming cemented into the public record of this Court. Plaintiffs will produce further information for an *in camera* review or during discovery under a protective order.

seeking to cause commercial harm and unfairly compete.  Defendants also knew that directing their email to those precise recipients would cause maximum harm to Plaintiffs' relationships.

102.    Fourth, Defendants' statements that "we . . . thought you and/or your followers should be aware of the alarming facts found so far," and "[p]lease share these details with anyone you know may have crossed paths with, or invested with this individual" demonstrate that Defendants were disseminating the false and misleading information contained on the Infringing Website and through the Infringing Domain Names with the intent that it be widely distributed for maximal damage, and maximum reward (*e.g.*, obtaining business leads).

103.    Fifth, Defendants' statements that "the alarming truth is only going to grow more," and "[y]ou can trust the following site to the details" demonstrate, again, Defendants' intentional misrepresentation that the information contained on the Infringing Website was accurate and factual.

104.    Sixth, in the last paragraph of the email, Defendants impersonated a former client, investor, and/or a whistleblower working in Plaintiffs' companies, when in reality, Defendants were nothing of the sort.  Defendants were simply working for Sells and PIP, as competitors seeking to defraud the email recipients.

105.    The impersonation worked.  Plaintiffs' clients did indeed open the emails that they would not have otherwise opened and read because they believed the email to be coming from Mr. Hartman.  Moreover, Plaintiffs' clients and colleagues emailed Plaintiffs with questions and confusion surrounding the emails.  Some stopped doing business with Plaintiffs, and Plaintiffs' businesses were severely harmed.

106.     In impersonating Mr. Hartman and targeting Plaintiffs' clients, Defendants willfully infringed the Service Marks and attempted to tarnish said marks.

107.     In addition to committing civil violations of law, Sells' impersonation of Mr. Hartman was also a crime under, *inter alia*, Florida Criminal Statute § 817.568(2)(a)-(b).

108.     Defendants' fraud on the public was conducted rampantly and via multiple intentional misrepresentations as detailed herein, each of which Defendants hoped the recipient of the unsolicited email would rely upon, and which they did in fact rely upon, causing harm to Plaintiffs.

109.     In sum, emails from the Impersonator Account were meant to misappropriate Plaintiffs' goodwill, Service Marks, and reputation to perpetrate a fraud on the public while misleading the reader.

**Beyond Unsolicited Emails**

110.     Also on June 29, 2018, Sells or his agents committed similarly unlawful conduct on a public forum, hand selected to cause maximal damage in the Competing Parties' intimate industry.

111.     On June 29, 2018, for example, Sells or Lena created and disseminated a post on a real estate investment forum called BiggerPockets, using the name of another individual, "Ray Douglas," which directed readers to the Primary Infringing Domain (the "**6/29/18 BiggerPockets Post**"). The 6/29/18 BiggerPockets Post explained to readers, "You can trust the following site to the details and documents involved is secure."

112.    Sells or Lena created the account for Ray Douglas from their home computer the day before publishing the 6/29/18 BiggerPockets Post and provided false identification information to BiggerPockets in connection therewith.

113.    Moreover, in baiting potential leads to use the "Contact Us" form on the Infringing Website, Sells or Lena represented that "Email to and from this address are encrypted and your privacy is of our utmost importance."

114.    The 6/29/18 BiggerPockets Post highlights Defendants' goal to encourage visits to the Infringing Website through use of Plaintiffs' Service Marks, and to use that website and abuse of the Service Marks as a means to obtain leads for commercial opportunities, all while Defendants made fraudulent misrepresentations along the way. Indeed, BiggerPockets is self-described as "The Real Estate Investing Social Network," and invites users on its homepage to "[j]oin the millions of people achieving financial freedom through the power of real estate investing."  Thus, Sells or Lena was directly targeting Plaintiffs' commercial interests and the relevant fields covered by the Service Marks.

**Additional Public Forum Activity in the Following Weeks**

115.    On July 10, 2018, Sells, finally posting as himself, again made a public posting on a popular public forum directing individuals to the Primary Infringing Domain and stating, "I would like to thank whomever compiled [all] of this detailed data and public record and organizing in (sic) one place."

116.    Like his other misrepresentations, Sells made the aforementioned statement intentionally, and for the sole purpose of misleading readers as to the source of the content on the Infringing Website.  The truth was, and still is, that Sells and his agents

were the ones who "compiled [all] of this detailed data and public record and organizing in (sic) one place."   Had users known the truth -- that Defendants were business competitors with no affiliation or connection to Plaintiffs, and that they created the Infringing Website -- the users would not have ever even visited, viewed, or relied upon the content on the Infringing Website.   Instead, Sells fraudulently misrepresented the source, and thus reliability, of the information being disseminated.   To make matters worse, Sells was using Plaintiffs' Service Marks in the Infringing Domain Names to further gain credibility and mislead consumers regarding the source of the website.

### Notice of Infringing Use and Sells' Wrath

117.   In response to Sells' July 10, 2018 public posting, on July 22, 2018, Plaintiffs' counsel, Steven Pollack, Esq., sent Sells a cease-and-desist letter (the "**7/22/18 Notice Letter**").   Among other things, the 7/22/18 Notice Letter expressly notified Sells that he was directing individuals to a website that infringed Plaintiffs' Service Marks. The 7/22/18 Notice Letter stated, in relevant part:

> [Y]ou knowingly and intentionally directed readers to a website that is illegally cybersquatting and infringing on Mr. Hartman's registered trademarks (*see* Trademark Registration Nos. 4470582 and 4418120).
>
> ***
>
> We believe that your conduct described above is actionable under state and federal law and has caused, and will continue to cause, damage for which you may be held liable. In addition to state law claims of defamation, libel, trade libel, fraud, false advertising, intentional interference with contractual relations and prospective business relationships, and unfair competition, we believe you have committed violations of federal law, including, but not limited to, violations of Section 43(a) of the Lanham Act and contributory trademark infringement. *See Inwood Laboratories, Inc. v. Ives Laboratories*, Inc., 456 U.S. 844 (1982). We demand that you immediately:
>
> (1) discontinue all promotion, advertising, and suggestion of websites that are known to infringe on Mr. Hartman's federally registered trademarks, such as jasonhartmanproperties.com.

118.    Instead of heeding Plaintiffs' counsel's clear and unequivocal warning, Sells did the opposite.

119.    First, Sells responded by email to Plaintiffs' counsel, stating his intention to continue his unlawful conduct.

120.    Second, Sells turned his attention to Plaintiffs' counsel personally. Specifically, on or around July 22, 2018, Sells called Plaintiffs' counsel's office and told the office staff that he contacted "the Bar" and learned that Plaintiffs' counsel "isn't even a lawyer."  These statements against an officer of the Court were  false, are exceptional in gravity, and were intended to hurt Plaintiffs' counsel's reputation and undermine his willingness to work with Plaintiffs.  Plaintiffs' counsel, however, remained resilient in the face of this scare tactic.

121.    Third, Sells increased his unlawful conduct in the subsequent weeks.

122.    Fourth, that very day, on July 22, 2018, Sells directed Putich to perform updates to the Infringing Website and add content thereto. In an email to Putich, Sells wrote the following, in relevant part:

> Back to doing some of the dirty stuff that makes us all want to puke....
>
> Hartman has now filed another suit (this time in NYC.)  It is just more crap, but we are making an impact, which his what we want.  I have a task that may make you want to spew.  Yes, I actually need you to listen (and watch) this idiot in his YouTube and podcast recordings.

123.    Upon information and belief, Sells' reference to a lawsuit in New York City was referring to the cease and desist from Plaintiffs' counsel. No lawsuit was ever filed by Plaintiffs against any Defendants in New York City.

124.    Sells then assigned the task of listening to Plaintiffs' podcasts and YouTube videos, in order to find additional clients and colleagues to add to the email

distribution list, to Lena.   Lena knowingly and intentionally assisted Sells in that endeavor.

**Slippery Bandit – Sells Does it Again**

125.    After weeks of communications and pleas to the administrators of ProtonMail, on or around Friday, July 27, 2018, Plaintiffs were successful in getting the Impersonator Account shut down.

126.    But the identity thief, Sells, was not out of options.  Two days later, on July 29, 2018, Plaintiffs' clients and colleagues forwarded Plaintiffs emails from a new, never-before-seen email account, HartmanInvestigators@gmail.com (the "**Misleading Gmail Account**").

127.    Sells or his agent, using PIP's property and assets, signed up for the Misleading Gmail Account on July 17, 2018.   In doing so, Sells or his agent misrepresented his or her true identity to Google and represented to Google that his or her name was Hartman Investigators, a fictitious identity. He or she also provided Google with a false telephone number with a San Jose, California area code.

128.    E-mails from the Misleading Gmail Account were, much like with the first account, targeted at Plaintiffs' clients and colleagues, and directed the recipients to the Primary Infringing Domain.

129.    The titles of the emails were intentionally misleading and intended to trick recipients of the email, such as "Jason Hartman Updated Web Site."

130.    For example, in a July 29, 2018 email from the Misleading Gmail Account to Plaintiffs' client and colleague, Sells or his agent stated: "http://jasonhartmanproperties.com. Good Information to discuss with Mr. Hartman on

your next Podcast with him. Thank you."  Moreover, the email contained the subject line, "Jason Hartman Updated Web Site," which led the recipient to believe that JasonHartman.com, one of the Service Marks, had been "updated," and that Mr. Hartman was sending out emails about it.

131.    Indeed, in an example of actual consumer confusion, the recipient of the July 29, 2018 email, Plaintiffs' client and colleague, thought the email address reflected investigators hired by Mr. Hartman and working on his behalf.  She visited the website thinking it was important information being sent from Plaintiffs that she needed to see.

132.    That wasn't the case at all, however.  Sells or his agent were just passing off and committing fraud, which by this time had become rampant.

133.    As a result of Defendants' conduct, Plaintiffs received calls from clients and colleagues inquiring about the Infringing Website and the Infringing Domain Names. Some of Plaintiffs' clients and colleagues stopped working with them and canceled scheduled speaking engagements because of Defendants' scheme.  Plaintiffs were being substantially and increasingly damaged by the day, and had to do something.

**Plaintiffs' Attempts at Mitigation Lead to Defendants' Further Criminal Conduct**

134.    As the law is not yet well-equipped to quickly address cyber-criminals operating through anonymous concealing agents, Plaintiffs could not do much but make attempts to mitigate the mounting damage.

135.    On or around July 30, 2018, Mr. Hartman filed a sworn statement with the Palm Beach County Sheriff's Office in District 4 – Delray Beach, and gave his consent to prosecute the matter.  Around the same time, Mr. Hartman also filed a criminal complaint with the FBI's Internet Crime Complaint Center, citing Defendants' criminal

impersonation and systematic transmission of false contact data by means of "wire communications" in furtherance of a "scheme" and "artifice to defraud" within the meaning of the federal wire fraud statute.

136.    In his report to the local police, Mr. Hartman named Defendants Sells as a potential suspect. An officer with the Palm Beach County Sheriff's Office then confirmed that Sells was a resident of Beaufort County, South Carolina and turned to that jurisdiction for assistance with the investigation.

137.    On August 13, 2018, Officer Andrew Calore of the Beaufort County Sheriff's Office worked with Deputy Venner of the Palm Beach County Sheriff's Office to further investigate the matter.  Officer Calore wrote an investigation narrative in which he described his review of the Infringing Website through visiting the Primary Infringing Domain. Officer Calore noted that he "did not observe any possible contact information related to [the website] or anything else that would allow [him] to determine how, when, where, and by whom the website was created by." Officer Calore also noted that Protonmail was based in Switzerland and did not have a legal compliance center to accept subpoenas and would likely not comply with U.S. subpoenas.

138.    Officer Calore advised Deputy Venner that he believed the criminal statute, South Carolina Code of Law 16-7-150, relating to "Slander and Libel," may be implicated by the complained of conduct. The statute reads "any person who shall with malicious intent originate, utter, circulate or publish any false statement or matter concerning another the effect of which shall tend to injure such person in his character or reputation shall be guilty of a misdemeanor."

139.    Officer Calore wrote in his report that he "informed Deputy Venner that proving Sells is responsible for this incident will be tough to prove unless he confesses to the aforementioned information due to [Officer Calore] not being able to prove who created the web site with the information or being able to link the e-mail address to Sells due to a lack of IP address."

140.    On August 14, 2018, Officer Calore made contact with Sells and asked him to come to the office for an interview.  An in-person interview of Defendants Sells was conducted by Officer Calore, while Sells' counsel, David Klein was on speaker phone, at 1:00 pm local time.

141.    Officer Calore informed Sells that Mr. Hartman had filed a report with the Palm Beach County Sheriff's Office and they were requesting assistance from the Beaufort County Sheriff's Office.

142.    Officer Calore's notes regarding his interview with Sells are below, in relevant part:

> I informed Sells that Hartman had filed a report with the Palm Beach County Sheriff's Office regarding some falsified information about him and Hartman believes that a website had been created in order to create slander about him. I further informed Sells that Hartman believes that Sells had created that website about him which Sells denies any involvement in creating. Sells did advise that he has supplied some details about his litigation to a website. Sells informed me that the website was called "thebrokeguru.com". I informed Sells the website which Hartman provided was "jasonproperties.com" and Sells believes the actual website was "Jasonhartmanproperties.com"…

> I informed Sells that Hartman' s biggest complaint was that he believes a fake website was formed against him which created the slander and that a fraudulent email account was created in order to send clients of his emails about his personal information including civil litigation. Sells advised he has seen the website and all the information which appears to be on the website is all public information.

***

> *I asked Sells if he stole Hartman's identity and he advised he did not. I asked Sells if he had any involvement in the creation of the Websites and he advised he did not. I then asked Sells if he had any involvement in any of the emails which were sent to his clients and he advised he did not.*

143.    Thus, Sells provided demonstrably and knowingly false information to Officer Calore of the Beaufort County Sheriff's Office in the midst of a criminal investigation and for the purpose of avoiding criminal liability and obstructing the investigation.

144.    Sells' knowingly false statements to Officer Calore that he had no involvement in the creation of the subject websites and no involvement in any of the emails that were sent to Plaintiffs' clients did in fact mislead Officer Calore. Following the interview with Sells, Officer Calore wrote the following:

> Based on the interview which I conducted and not having any type of evidence linking Sells to the websites and/or emails, there does not appear to be any criminal activity in violation of South Carolina code of laws pertaining to statute 16-7-150. This investigation did not establish any criminal activity; therefore the case will be closed as unfounded. I will make contact with the Palm Beach County Sheriff's Office and supply them with a copy of this investigation report and provide them with the proper procedures if they require a copy of the interview with Sells.

145.    Within days, and before the Palm Beach County Sheriff's Office closed the investigation, Sells caused emails to go out through PIP and its resources to Plaintiffs' clients and colleagues via Mailchimp, as further described below.  On August 17, 2018, Defendants represented to the public that Plaintiff Hartman "fil[ed] a false criminal claim against [Sells]."

146.    Moreover, Sells caused the email claiming that Mr. Hartman filed a "false police report" to be sent out to HMC's producer, with the intent and knowledge that the email would be forwarded to Mr. Hartman.

147.    Thereafter, Sells published the representation that Mr. Hartman "filed a false police report" and published a copy of the police report on the website hosted at the New Domain Name, along with audio of Mr. Hartman's call to the Palm Beach County Sheriff's Office reporting the crime.

148.    Sells also stated on said website that Mr. Hartman filed a "fake police report on the matter – what a complete waste of time and resource for our public service officers!"

149.    Sells disseminated and published the police report, audio of Mr. Hartman's 911 call, and falsely claimed that Mr. Hartman lied to law enforcement and filed a false police report, as well as "waste[d] . . . resources for our public service officers" with the intention of harassing and intimidating Mr. Hartman as a victim and witness of Sells' criminal conduct, including Sells' obstruction of justice and lying to police officers with intent to hinder and obstruct a criminal investigation.

**Endless Misconduct**

150.    On July 30, 2018, Plaintiff HMC filed a UDRP complaint with the World Intellectual Property Organization ("**WIPO**") in connection with the Primary Infringing Domain, the only domain name that Plaintiffs knew about at the time.

151.    By August 1, 2018, WIPO unmasked the registrant of the Primary Infringing Domain (whose name was concealed through Whois Guard protection, just another of the many layers of concealment used by Defendants).  The registrant was Njalla.

152.    By August 3, 2018, Plaintiff HMC amended its UDRP complaint to name Njalla as the respondent.  WIPO confirmed receipt of the amended UDRP complaint and

sent a notification email to all parties to the proceeding, and the following email address: "whois+jasonhartmanproperties.com@njal.la."

153.    On or around August 4, 2018, seeing that the Primary Infringing Domain was now locked by the registrar and that Njalla was named in the UDRP proceeding, Sells purchased yet another new domain name (the "**New Domain Name**") and a hosting plan from Bluehost.

154.    Unlike previous accounts, which utilized Sells' personal information and were signed up from Sells' personal home computer, Sells or his agent signed up for Bluehost's services using his official PIP email address and PIP's business address. Thus, Sells or his agent again utilized business assets to engage in the unlawful conduct further described herein.

155.    Within days of signing up, however, Sells or his agent changed the user account information to a false name, false address, and false contact information.

156.    User access logs show that Putich and Chung assisted Sells in setting up and managing this New Domain Name, including the falsification of the account information.

157.    Along with the New Domain Name, Defendants signed up for a new anonymous email account, this time using TorGuard Stealth Mail (the "**TorGuard Email Address**").  The TorGuard Email Address matched the name chosen for the New Domain Name.

158.    On August 5, 2018, Defendants transferred the Infringing Website to the New Domain Name and redirected all traffic from the Primary Infringing Domain to the

New Domain Name.  Thus, Defendants kept all of the Infringing Domain Names active and all redirected to the New Domain Name, which now hosted the Infringing Website.

159.   And still, the Infringing Website solicited contact information from visitors, and installed trackers and cookies on every visitor's computer without any warning, in violation of U.S. and European regulations.   Moreover, the Infringing Website was completely devoid of a privacy policy, terms of use, or any other notation of legitimacy and compliance with law.  And the Infringing Website still did not contain any disclaimer of any affiliation with Plaintiffs or their Service Marks.

160.   On August 10, 2018, equipped with the New Domain Name and the TorGuard Email Address, Defendants resumed their unsolicited email marketing campaign to Plaintiffs' clients and colleagues, now directing them to the New Domain Name and expanding the subject line to "The Truth About Jason Hartman."

161.   The emails were sent from the TorGuard Email Address to an identical new ProtonMail account, and blind copied Plaintiffs' clients and colleagues, some of whom forwarded the emails to Plaintiffs, explaining that they complained time and time again to the sender, that they didn't want the spam but kept getting it.

162.   The emails distributed by Sells or his agent through the TorGuard Email Address were unsolicited, did not contain an opt-out, and repeated the same false and misleading information on the Infringing Website while simultaneously misrepresenting that the sender was "part of a much, much bigger picture."  This latter representation was false when made, and was made intentionally to trick readers into believing that the content on the Infringing Website was more reliable and trustworthy than it really was.  It was also intentionally made to trick readers into believing that there were more people

complaining about Plaintiffs' services than there really were.  These false representations were made with the intent to harm Plaintiffs' businesses.  Sells was working on his own and through his agents to unfairly compete with a business competitor to gain that which he could not gain through fair competition.

163.    On August 14, 2018, Sells or his agent repeated the August 10, 2018 email blast almost identically, except this time he changed the subject line to "Worked with Jason Hartman? That could be BAD NEWS for you!"  Again, these emails were unsolicited, did not contain an opt-out, and repeated the same misrepresentations as mentioned above.

164.    On August 15, 2018, Putich signed into the Bluehost account from her home computer and made changes to the Infringing Website, still hosting traffic from the Infringing Domain Names.  This was done in preparation for the upcoming email marketing campaign that was to occur later that day.

165.    The same day, August 15, 2018, Defendants Sells, from his home computer, and Putich, from her home computer, organized a widespread email marketing campaign through Mailchimp, a self-described "always-on marketing platform [that] works around the clock to help you find your people, grow your business, and get smarter as you go."

166.    Defendants intentionally falsified their address in their primary account information with Mailchimp, using Plaintiff Platinum Properties' address, including suite number, so as to create a false affiliation with Plaintiff Platinum Properties.

167.     Defendants' Mailchimp account contained 169 "subscribers," almost all of whom had not given Defendants permission to email them, and many of whom had specifically requested to *not* be emailed.

168.     On August 17, 2018, Defendants distributed hundreds of emails to Plaintiffs' clients and colleagues through Mailchimp, which appeared to be coming from the TorGuard Email Address (the "**8/17/18 Email Blast**").   Each email contained false contact information, including a falsified address that was identical to Plaintiff Platinum Properties' address.   The title of the emails sent out was "Discover the Latest Hartman Updates."

169.     Plaintiffs' clients and colleagues were utterly confused, and sent emails to Plaintiffs asking to be taken off Plaintiffs' email list.   Some colleagues emailed Plaintiff Mr. Hartman, exclaiming, "Even though I put the last email in spam, this email still just got through!"

170.     As another example, on August 10, 2018, one of Plaintiffs' clients and colleagues responded to the unsolicited email, stating "[w]ho are you and how did you get my email address?" On August 14, 2018, Sells or his agent responded through the TorGuard Email Address stating, "You apparently have an affiliation, or conduct business with Jason Hartman, or have in the past.  We thought you might like to know the truth about the person you are working with." On August 16, 2018, Plaintiffs' client and colleague responded, "You can keep me on... but who are you?" On August 20, 2018 at 11:42 AM, Sells or his agent responded through the TorGuard Email Address stating, "We are a collective of investors, service providers and vendors . . .  He is the epitome of what can often give our industry a bad name and the documents we are posting only

scratch the surface of what is out there.  We will keep posting new information as we gather it."

171.   The information provided to Plaintiffs' client and colleague was knowingly and intentionally false when made, and was made for the purpose of garnering undeserved credibility, making the recipient believe that Plaintiffs had caused harm to a "collective of investors, service providers, and vendors," and hiding the fact that the people really behind the TorGuard Email Address were Sells and his agents.

172.   On August 17, 2018, Sells finally did make known that he was at least somewhat involved in the New Domain Name. But even then, Sells and his agents falsely represented that Sells was just "One of Our Contributors," and that his contribution to the Infringing Website was new. Indeed, in the body of the August 17, 2018 email, Defendants purported to include "A Message From One Of Our Contributors, Charles Sells of The PIP Group."  This representation was intentionally false and misleading, since the entire email, and the New Domain Name which readers were directed to, were created and maintained by Sells and his agents.  Sells was not "one of our contributors," but the Infringing Website's only content contributor and creator, and it  was compiled with the help of his agents, who were hired by and paid through PIP.  The false and misleading statement was made with the intention to mislead recipients into believing that the email was coming from a reputable source.

173.   In the same August 17, 2018 email, Sells or his agent represented that Mr. Hartman filed a "false criminal claim" against Sells. Also contained in the August 17, 2018 were the Material False Statements (defined below). These were knowingly false

statements when made and were made to fraudulently induce the recipients to not do business with Plaintiffs.

174.    Defendants intentionally misrepresented that the source of the August 17th email was Plaintiff Platinum Properties.  This was done, *inter alia*, to conceal the true source of the information -- a biased business competitor acting alone and through his own agents -- and to provide enhanced credibility to a false and misleading email. Plaintiffs' clients and colleagues did in fact rely on Defendants' false and misleading representations as described herein, and Plaintiffs have been damaged thereby. A snippet showing the relevant portion of the footer of each email sent out through the 8/17/18 Email Blast is below:

4400 N Scottsdale Rd Ste 9 · Scottsdale, AZ 85251-**3331** · USA



175.    On August 18, 2018, Plaintiffs' counsel sent a cease and desist notice to Mailchimp and asked them to shut down the account connected to the TorGuard Email Address and preserve all evidence.

176.    In response to Plaintiffs' counsel's request, on August 18, 2018, Mailchimp sent a questionnaire to Sells or his agent. The questionnaire asked, *inter alia*, "What are your goals for your Mailchimp emails?" To this, Sells or his agent replied, "[t]o provide valued information within our industry." Another question asked, "How are you building your mailing list?" To this, Sells or his agent replied, "Addresses have been collected by various methods such as; reply to messages received, collected at trade shows, or events, provided as a contact source in presentations provided." This response

was knowingly and demonstrably false when made. Sells and his agents compiled email distribution lists by combing through Plaintiffs' podcasts to find guests on HMC's shows and listeners thereto, secreting attendee lists from conferences that Plaintiffs were known to attend and speak at, compiling a list of known professional and trade associations, and finding Plaintiffs' clients and colleagues through other illegitimate and nonconsensual methods. No email recipient ever signed up for Defendants' emails.

177.    On August 23, 2018, Mailchimp replied to Plaintiffs' counsel confirming that they suspended the subject account for violating their Terms of Use.

**Plaintiffs Make Contact**

178.    Without any ability to stop the onslaught, on August 20, 2018, Plaintiff Mr. Hartman sent a cease and desist demand and notification of infringement and false designation of origin to the web-owner of the New Domain Name through the Infringing Website's webform.  Instead of heeding the demand, Sells ridiculed it in a later email blast.

**Constant Contact Email Marketing Campaign**

179.    Despite being notified of and fully aware of the plethora of complaints about spam mail and harassing misconduct, Defendants continued.

180.    On August 29, 2018, Defendants organized another widespread email marketing campaign, this time through Constant Contact, a self-described "leading expert in email marketing for over 20 years."

181.    Again, Defendants provided Constant Contact with a falsified address, falsified contact information, and falsified billing information, including false credit card information.  Yet the reference email for the account was the TorGuard Email Address.

Ultimately, the account was flagged for "severe/high visibility and complaints," and shut down for failure to render payment.  But before then, Defendants sent out another email blast.

182.    On September 10, 2018, Defendants, through Constant Contact, used the TorGuard Email Address to send hundreds of emails to Plaintiffs' clients and colleagues. The title of each email was "Important Hartman Update," and the mailing was purported to come from a company located at 3950 S. Las Vegas Blvd., Las Vegas, Nevada 89119, the address for the Mandalay Bay Resort and Casino.

183.    The emails, like others before them, continued to espouse the false and misleading statements described herein, including the Material False Statements.

184.    Further, the emails ridiculed Plaintiffs' counsel, and published Plaintiff Mr. Hartman's personal IP address and personal information, which were obtained when Plaintiff Mr. Hartman sent the cease-and-desist demand through the Infringing Website's "Contact Us" webform.

185.    Although the new emails seemed to be, at least in part, compiled with input from counsel, since they distanced the sender from an affiliation with Mr. Hartman and included an attempt at a preemptive defense to cybersquatting liability, they contained fraudulent misrepresentations and broke several federal laws as outlined below.

186.    Plaintiffs' clients and colleagues again contacted Plaintiffs asking why they were still receiving emails when they marked such as spam.

**UDRP Liability**

187.    On October 2, 2018, the first real blow to Defendants' actions was dealt by WIPO.  In a scathing six-page decision, the WIPO arbitrator held that (1) the Primary

Infringing Domain was confusingly similar to the JASON HARTMAN Service Mark; (2) neither the registrant nor the real party in interest had any legitimate interest in use of the Primary Infringing Domain; (3) the use of the Primary Infringing Domain could not have been a "fair use" or the legitimate exercise of free speech protected under the First Amendment; (4) the Primary Infringing Domain created an "impermissible risk of user confusion . . . particularly given that the additional descriptive term "properties" is directly relevant to the [Plaintiffs'] business;" (5) "it was manifestly a deliberate decision by the [Defendants] to include Mr. Hartman's name in the [Primary Infringing Domain];" (6) the [Defendants'] use of the Primary Infringing Domain "is misleading and likely to attract visitors who are searching for Mr. Hartman's business;" and (7) respondent's use of the Primary Infringing Domain "amounts to bad faith registration and use." Accordingly, WIPO ordered that the domain name at issue be transferred to Plaintiff HMC.

188.    The decision was emailed to every email address on file with Njalla, the Impersonator Account, and the Misleading Gmail Account.

189.    Despite having constructive if not actual notice of the UDRP decision with a clear finding of bad faith infringement, Defendants continued to keep the Primary Infringing Domain and all the other Infringing Domain Names active and redirecting to the Infringing Website.  This continued until October 23, 2018, when Tucows Domains finally transferred the Primary Infringing Domain to Plaintiffs.

190.    The other Infringing Domain Names remain in Defendants' care, custody, and control.  The New Domain Name and the Infringing Website were up and active through August 28, 2019 and were only taken down pursuant to a temporary agreement

between counsel for the parties.  Defendants have and continue to hold as of the date of this Second Amended Complaint several other email addresses, including fakeguru@protonmail.com, protony@protonmail.com, the TorGuard Email Address, and others, as well as the Secondary Infringing Domains.  Defendants will surely continue their misconduct as soon as this Action is resolved.

### **Committed to Misconduct – Defendants Continue**

191.    Despite obtaining a negative decision in the UDRP proceeding, Defendants continued to publish false and misleading statements and information on the New Domain Name, including the false statements that Mr. Hartman filed a false police report and had multiple arrest warrants.

192.    On or around October 14, 2018, Defendants sent yet another email blast to Plaintiffs' clients and colleagues, which contained one or more of the Material False Statements. At least two of Plaintiffs' clients and colleagues engaged with the email and clicked on the links, including members of the prestigious company Rich Dad Education, LLC, which Plaintiffs worked with. Viewership and engagement information was, without knowledge to the recipient, captured and maintained by Defendants.

193.    On October 16-17, 2018, Sells sent an email to Chung directing him to create a pay-per-click campaign and Google AdWords campaign using Plaintiffs' Service Marks to increase the visibility and traffic to the Infringing Website.

194.    Indeed, even as late as October 23, 2018, Defendants disseminated at least 50 emails to Plaintiffs' clients and colleagues intended to destroy Plaintiffs' relationships with the recipients. On that date, Sells wrote to Putich via their PIP email addresses stating, "When you blast this, just make sure you are very careful to only do like 10 at a

time and BCC them.  Oh and obviously update the website and move the current content/post into the blog."

195.    On October 29, 2018, Putich already began preparing for the next email blast and requested old content compiled by Lena on or around July 24, 2018.

196.    The same day, October 29, 2018, Defendants used yet another email marketing service, this time called "Mad Mimi," to send out emails to Plaintiffs' clients and colleagues.  Mad Mimi's website states that "Mad Mimi is the easiest way to create, send, share and track email newsletters online. Mad Mimi is for people who want email marketing to be simple. Every day, over 40 million emails are sent, shared and tracked using our delightful and powerful service."

197.    To sign up for the Mad Mimi service, Defendants created yet another email address, fakeguru@protonmail.com, and provided false contact information to Mad Mimi, including a contact name of "Harold Johnson."

198.    On October 31, 2018, Sells told Putich via their PIP email addresses, "Steph, let's go ahead and put these into PDFs, so we can link to them from the email blast/site.  If you can shoot those over to me, we should be able to get a blast out tonight, or tomorrow."

199.    On November 2, 2018, Sells sent Putich another email address, consisting of another of Plaintiffs' clients and stated, "Add to our Hartman mail list and send him the recent blast, please."

200.    On November 5, 2018, Putich confirms that she made updates to the Infringing Website.

201. On November 7, 2018, Putich informed Sells, in an email titled "JH Email Contacts" that she "made a list and modified the contact list" and advised, "Please let me [know] if there is anything I can do for this."

202. The same day, Sells forwarded the emails from Putich to Lena.

203. Documentary discovery is still ongoing between the parties, and Plaintiffs have barely scraped the surface of Defendants' misconduct.

204. Just weeks before filing this Second Amended Complaint, Defendants finally took down the New Domain Name. The New Domain Name had been published for over one year and was removed only after Plaintiffs' counsel sent an email on August 7, 2019 to Defendants' counsel advising them of further liability, including in connection with copyright violations, if the website remained up.

205. Plaintiffs have no doubt that Defendants will resume their misconduct described herein with fervor, using new domain names and new email addresses as soon as this Action is resolved.

### Criminal Conduct

206. In engaging in the conduct described herein, Defendants have violated state and federal criminal law. These violations of law are the touchstone of unfair competition, and warrant the imposition of punitive damages, sanctions, and the highest statutory damages allowable by law for each violation of Plaintiffs' Service Marks. They also give rise to violations under federal and state Racketeer Influenced and Corrupt Organizations Acts, as described further below.

207. Sells used PIP as an enterprise to organize and direct the other Defendants to perpetuate the schemes described herein.

208. Sells, using PIP as an enterprise, violated at least the following criminal statutes, 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1037 (fraudulent use of email), 18 U.S.C. § 2320 (criminal counterfeiting), 18 U.S.C. § 1513 (retaliation), 18 U.S.C. § 1349 (conspiracy), Fla. Stat. Ann. §§ 817.034 (Florida Communications Fraud Act), 817.06 (misleading advertisements), 817.41 (misleading advertisements), 817.411 (false statements in advertising), 817.483 (false communication information), 817.568 (criminal use of personal identification information), 817.569 (criminal use of public records information), 837.012 (perjury), 837.05 (false reports to law enforcement authorities), 837.055 (false information to law enforcement during investigation), 914.22 (tampering with or harassing a witness, victim, or informant), S.C. Code §§ 16-7-150 (malicious defamation), 16-9-10(A)(2) (perjury).

### Wire Fraud (18 U.S.C. § 1343)
### Florida Communications Fraud Act (Fla. Stat. § 817.034)

209. Defendants, by and through each other and their agents (in PIP), engaged in a systematic and ongoing scheme with the intent to defraud, deceive, mislead by (among other things):

- impersonating Jason Hartman, thereby inducing Plaintiffs' clients to visit Defendants' Infringing Website, where their information was collected through cookies and trackers or through a "Contact Us" web-form as part of Defendants' commercial lead generation tactics, and which disparaged Mr. Hartman with false statements;

- providing false contact information to various servicers in order to obtain access to their services under false pretenses, including My-Zone,

BiggerPockets, Bluehost, Njalla, Mailchimp, Constant Contact, Google, TorGuard, and Mad Mimi;

- misrepresenting that Sells or Lena was Ray Douglas and/or Don Wilson to deceive and defraud prospective real estate investment clients;

- implementing email marketing campaigns, on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, September 10, 2018, October 14, 2018, October 23, 2018, October 29, 2018, and November 2, 2018, in which Defendants made false and misleading statements concerning their participation in a larger enterprise with the intent to appear larger and more credible and to portray Plaintiffs as perpetrating a scheme on a large group of people.  These representations were false when made.  Defendants knew that they were false, because they were not part of a large enterprise, but were merely operating under the auspices of Sells, and were supporting Sells' desire to control the market and destroy the competition, which he could not do through hard work and lawful means.  Plaintiffs' clients and colleagues relied upon Defendants' false and misleading misrepresentations and terminated their business relationships with Plaintiffs because of them. Had they known the truth -- that the emails were coming from Sells and his associates who were on a crusade to control the market and destroy competition -- Plaintiffs' clients and colleagues would not have assigned any credibility to the false and misleading statements in the emails;

- misleading email recipients into believing that emails sent through the Mailchimp campaign and the Constant Contact campaign were being sent from others.  By falsifying the company address on the emails, Defendants intended to create a false association with Plaintiff Platinum Properties.  Defendants further intended the falsified address to mislead email recipients into believing that the emails were coming from a larger organization.  In reality, the emails were coming solely from Defendants and their agents, who were on a crusade to control the market and destroy competition.  Plaintiffs' clients and colleagues did in fact rely upon Defendants' representations.  Had they known the truth, Plaintiffs' clients and colleagues would not have assigned any credibility to the false and misleading statements in the emails;

- misrepresenting the source of their emails described herein, thereby tricking Plaintiffs' clients and colleagues into visiting the Infringing Website, which collected their personal information through hidden cookies and web-trackers;

- disseminating and causing to be published the Material False Statements (defined below);

- registering and directing the material falsification of header information in hundreds of commercial electronic mail messages, and intentionally initiating the transmission of such messages to hundreds of Plaintiffs' clients and colleagues;

- registering and directing the maintenance and use of information that materially falsified the identity of the actual registrant of at least the following eight electronic mail accounts:

  (1) JasonHartman@protonmail.com, (2) thebrokeguru@protonmail.com, (3) thebrokeguru@email.tg, (4) fakeguru@protonmail.com, (5) HartmanInvestigators@gmail.com, (6) protony@protonmail.com, (7) prontony@protonmail.com, and (8) mail@jasonhartmanproperties.com.

- registering and directing the maintenance and use of information that materially falsified the identity of the actual registrant of at least the following two online user accounts with BiggerPockets: (1) Ray Douglas and (2) Don Wilson.

- registering and directing the maintenance and use of information that materially falsified the identity of the actual registrant of at least all four Infringing Domain Names.

By engaging in such activities (among others), Defendants knowingly devised or knowingly participated in a scheme or artifice to defraud Plaintiffs or to obtain the money or property of Plaintiffs (or their customers) by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343 and Fla. Stats.817.034(3)(d) and 4(a-b).

210.   Defendants' scheme to defraud described in paragraph 209 is contrary to public policy or fails to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society, in violation of 18 U.S.C. § 1343.

211.    Defendants could foresee that the interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. § 1343.

212.    In particular, Defendants knew or could foresee that the interstate wires would be used to further or facilitate their scheme to defraud (*supra* at ¶ 209).

213.    Defendants acting singly and in concert, personally or through their agents, used the interstate wires or caused the interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Plaintiffs, within the meaning of 18 U.S.C. § 1343.

214.    It is not possible for Plaintiffs to plead with particularity all instances of wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications (such as when false emails were first distributed or when infringing websites were published) are within the exclusive control and within the exclusive knowledge of Defendants or other presently unknown individuals.

215.    By way of example, however, Defendants specifically used the interstate wires or caused the interstate wires to deliver each and every false, deceptive and misleading statement described in paragraphs 84, 89-90, 97, 110-12, 115, 120, 127, 129-32, 140-49, 160-176, 181-83, 192-97 (*supra*) and 286-99 (*infra*), including but not limited to the following false, deceptive and misleading communications:

| Type of Communication | Date | From/To | False Statement |
|---|---|---|---|
| Written communication | Approx. May 29, 2018 | Sells or his agent to My-Zone | Falsely identified self as "Hartman Media" |
| Publication on Infringing Website | May 30, 2018 | Sells or his agent to the public | "Jason Hartman has more than 100 lawsuits filed by, or against him in the last 10 years." |
| Publication on | May 30, 2018 | Sells or his agent | Mr. Hartman has been involved in |

| Infringing Website | | to the public | "70 cases in Orange County, CA alone." |
|---|---|---|---|
| Written e-mail | June 29, 2018 | Sells or his agent to Plaintiffs' clients and colleagues, and to Plaintiffs themselves | (1) Impersonation as "Jason Hartman" (2) "I wanted to share with you the results of about a 4 month investigation into Jason Hartman's background" (3) Information was provided with the "help of others in our industry" (4) "Over 100+ lawsuits, multiple foreclosures" (5) "evictions from his office spaces" |
| Written publication on message board | June 29, 2018 | Sells or Lena to potential investing clients | (1) falsely identified self as "Ray Douglas" (2) "I wanted to share with you the results of about a 4 month investigation into Jason Hartman's background" (3) Information was provided with the "help of others in our industry" (4) "Over 100+ lawsuits, multiple foreclosures" (5) "evictions from his office spaces" |
| Written communication | July 17, 2018 | Sells or his agent to Google | (1) listed identification information with fictitious name and false phone number |
| Written e-mail | July 29, 2018 | Sells or his agent to Plaintiffs' clients and colleagues, and to Plaintiffs themselves | (1) "Jason Hartman Updated Web Site" (2) Use of counterfeit website, http://jasonhartmanproperties.com |
| Written e-mail | August 10, 2018 | Sells or his agent to Plaintiffs' clients and colleagues | (1) "part of a much, much bigger picture" (2) False Material Statements (defined below) |
| Oral statement to law enforcement officer | August 14, 2018 | Sells to Officer Calore | (1) Sells did not steal Mr. Hartman's identity (2) Sells did not have any involvement in the creation of the subject websites (3) Sells did not have any |

| | | | involvement in any of the emails which were sent to Mr. Hartman's clients and colleagues |
|---|---|---|---|
| Written communication | August 15, 2018 | Sells and Putich to Mailchimp | (1) falsely identified themselves using fictitious name, "Hartman Exposed" (2) falsely identified themselves as belonging to fictitious entity, "The Broke Guru" (3) falsely identified themselves as having an address at 4400 N Scottsdale Rd Ste. 9, Scottsdale, AZ 85251-3331 |
| Written e-mail and publication on Infringing Website | August 17, 2018 | Sells or his agent to Plaintiffs' clients and colleagues, to Plaintiffs themselves, including Mr. Hartman, and to the public at large | (1) Mr. Hartman filed a false police report against Sells (2) Sells is "One of Our Contributors" (3) Material False Statements (4) false address, which was the same as Platinum Properties' address, creating a false association |
| Written communication | August 18, 2018 | Sells or his agent to Mailchimp | (1) "Addresses have been collected by various methods such as; reply to messages received, collected at trade shows, or events, provided as a contact source in presentations provided." (2) denied that "any of the list data [was] collected through partner, affiliate, or third-party collection methods?" |
| Written e-mail | August 20, 2018 | Sells or his agent to Plaintiffs' client and colleague | "We are a collective of investors, service providers and vendors" |
| Written communication | August 29, 2018 | Sells or his agent to Constant Contact | (1) falsely identified themselves using fictitious name, "Hartman Exposed" (2) falsely identified themselves as belonging to fictitious entity, "The Broke Guru" (3) falsely identified themselves as having an address at 3950 Las |

| | | | Vegas Blvd, Las Vegas, NV US 89119<br>(4) provided false billing information, including false credit card number and the false name John Rosen<br>(5) provided false phone contact details, using a phone number based out of Anaheim, California. |
|---|---|---|---|
| Written e-mail | September 10, 2018 | Sells or his agent to Plaintiffs' clients and colleagues, and Plaintiffs themselves | (1) falsified address information<br>(2) "Important Hartman Update,"<br>(3) Material False Statements |
| Written e-mail | October 14, 2018 | Sells or his agent to Plaintiffs' clients and colleagues | Material False Statements |
| Written e-mail | October 23, 2018 | Sells or his agent to Plaintiffs' clients and colleagues | Material False Statements |
| Written e-mail | October 23, 2018 | Sells or his agent to Plaintiffs' clients and colleagues | Material False Statements |
| Written e-mail | Approx. November 1, 2018 | Sells or his agent to Plaintiffs' clients and colleagues | Material False Statements |
| Written e-mail | November 2, 2018 | Putich to Plaintiffs' client and colleague | Material False Statements |
| Written communication | February 6, 2019 | Sells or his agent to BiggerPockets | falsely identified themselves as "Dylan DeBellis" |
| Written communication | February 15, 2019 | Sells or his agent to BiggerPockets | Provided false identification information using the name, "Don Wilson" |
| Written publication on message board | Approx. February 16, 2019 | Sells or his agent to the public | (1) falsely posted as "Don Wilson"<br>(2) "Loving the Free Educational content provided by PIP Group"<br>(3) "I stumbled across the company PIP Group. The PIP Group provides all of its content for free, and I really enjoy the |

| | | | webinars that break down almost everything I needed to learn about Tax Liens!"<br>(4) concealed compensatory relationship with PIP |
|---|---|---|---|
| Written publication on message board | Approx. February 16, 2019 | Sells or his agent to the public | (1) falsely posted as "Dylan DeBellis"<br>(2) concealed compensatory arrangement with PIP |
| Written publication on message board | Approx. February 16-20, 2019 | Sells or his agent to the public | (1) falsely posted as "Don Wilson"<br>(2) "I haven't passed the "educational stage" yet."<br>(3) concealed compensatory arrangement with PIP |
| Written publication on message board | March 5, 2019 | Sells or his agent to the public | (1) falsely posted as "Dylan DeBellis"<br>(2) concealed compensatory arrangement with PIP |

216. All of the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communications.

217. Some or all of the communications described above have appeared and still appear in recipients' inboxes and appeared on Defendants' websites since the date of their original posting through August 28, 2019. They no longer appear on Defendants' websites solely due to the enforcement action taken by Plaintiffs to stem the flow of damages causes by Defendants' misconduct.

218. Each and every use of the interstate wires described above was committed by Defendants with the specific intent to defraud Plaintiffs or their clients and colleagues, or to obtain the property of Plaintiffs' clients and colleagues by means of false or fraudulent pretenses, representations, or promises. Defendants' acts of wire fraud in violation of 18 U.S.C. § 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

219.    Defendants' scheme to defraud, as set forth above, violates Fla. Stat. § 817.034(3)(d) and 4(a-b).

220.    Plaintiffs' customers justifiably relied on Defendants' fraudulent representations and omissions made pursuant to the above-described scheme in that, among other things, Defendants fraudulently and deceptively induced Plaintiffs' customers to visit and enroll on Defendants competing websites, to disassociate from Plaintiffs, and to purchase services from Defendants rather than Plaintiffs, resulting in loss of sales to Plaintiffs, and directly caused Plaintiffs to sustain considerable expense in investigating the matters.

### Federal Criminal Counterfeiting (18 U.S.C. § 2320)

221.    18 U.S.C. § 2320 imposes criminal liability on "[w]hoever intentionally . . . traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services . . . or attempts or conspires to [do so]."

222.    Defendants use their spurious depictions of Plaintiffs' Service Marks for "trafficking in services" within the meaning of the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A).  Indeed, the services advertised and offered by Defendants are the same as those offered by Plaintiffs' businesses, and are in the same field covered by the Service Marks.

223.    The spurious depictions of Plaintiffs' Service Marks in Defendants' websites and email addresses are "identical with, or substantially indistinguishable from" the genuine service marks within the meaning of Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(a)(ii). Indeed, on their faces, the Infringing Domain Names are identical to and incorporate the

Service Marks (JASON HARTMAN and JASONHARTMAN.COM), except for the addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

224.    The services advertised and offered by Defendants (*e.g.*, turn-key, real estate investment programs) with spurious depictions of Plaintiffs' Service Marks are identical to the services for which those marks are registered (*i.e.*, financial investment in the field of real estate and financial services, namely, real estate note brokerage, in International Class 36 within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(l)(A)(ii).

225.    Defendants are using spurious depictions of Plaintiffs' Service Marks "in connection with" the services covered by Plaintiffs' federal service mark registrations within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A)(iii).  Indeed, visitors to the Infringing Domain Names were immediately tracked through the unauthorized installation of cookies and trackers on their computer and were encouraged to complete a "Contact Us" form to become leads for Defendants' business, which offered the same services as Plaintiffs' businesses.

226.    Defendants' spurious depictions of Plaintiffs' Service Marks are "likely to cause confusion, to cause mistake, or to deceive" within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A)(iv).  Indeed, they have actually caused extensive customer confusion.

**Federal Retaliation (18 U.S.C. § 1513)**

227.     18 U.S.C. § 1513(e) imposes criminal liability on "[w]hoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense."

228.     Sells knowingly and with the intent to retaliate falsely claimed in direct solicitations and emails to hundred of Plaintiffs' clients and colleagues, including trade associations, and on his website that Mr. Hartman filed a false police report and publicized Mr. Hartman's police report, with his home address and personal information, and his 911 call audio.  Defendants' conduct was intended to and did in fact intimidate Mr. Hartman and affect his livelihood in the form of lost sales and business opportunities. Defendants' conduct also caused debilitating emotional harm to Mr. Hartman.

229.     Sells performed the aforementioned conduct in direct retaliation against Mr. Hartman for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, including the federal criminal offenses mentioned above.

**Florida False Advertising (Fla. Stat. §§ 817.06 and 817.41(1))**

230.     As alleged with particularity above (paragraphs 63-133, 153-77, and 180-226), Defendants, by and through each other and their agents, intended and continue to intend to sell services directly or indirectly to the public and/or intended and continue to intend to increase consumption or use of their services and have made, published, disseminated, circulated, or placed before the public in the State of Florida (and

elsewhere) advertisements regarding their merchandise and services that contain assertions, representations, and/or statements that are untrue, deceptive, or misleading in violation of Fla. Stats. 817.06 and 817.41(1).

231.   As alleged with particularity above (paragraphs 63-133, 153-77, and 180-226), Defendants, by and through each other and their agents, have made or have disseminated or caused to be made or disseminated before the general public of the State of Florida (and elsewhere) misleading advertisements that are designed and intended to obtain money under false pretenses in violation of Fla. Stat. §§ 817.40(5) and 817.41(1).

232.   Defendants knew or through the exercise of reasonable care should have known or could have ascertained that the misleading advertisements described above (paragraphs 63-133, 153-77, and 180-226) were untrue or misleading, and Defendants disseminated the misleading advertisements described above (paragraphs 63-133, 153-77, and 180-226) with the intent or purpose, either directly or indirectly, to sell or dispose of Defendants' services in violation of Fla. Stat. §§ 817.40(5) and 817.41(1).

233.   The misleading advertisements described above (paragraphs 63-133, 153-77, and 180-226) were disseminated by Defendants, directly or indirectly, and made material misrepresentations and/or misleading statements of fact.

234.   Each Defendant knew or should have known of the falsity of the statements contained in the misleading advertisements.

235.   Each Defendant intended that the misrepresentations and misleading statements would induce consumers of services to act on the misrepresentations or misleading statements.

236.    Plaintiffs were injured when consumers relied on Defendants' misrepresentations or misleading statements to buy Defendants' services rather than Plaintiffs' services, and to the extent that Defendants' misrepresentations or misleading statements adversely affected the reputation of Plaintiffs and their services.

**Florida False Communication Information (Fla. Stat. § 817.843)**

237.    Fla. Stat. § 817.843 imposes criminal liability on "Any person who transmits or publishes the number or code of an existing, canceled, revoked, or nonexistent telephone number or credit number or other credit device, or method of numbering or coding which is employed in the issuance of telephone numbers or credit numbers or other credit devices, with the intent to avoid or to cause another to avoid lawful charges."

238.    Sells, through his agents (including PIP), violated this statute on numerous occasions. First, Sells purchased Visa gift cards, "burner cards," and even a "burner phone" from Puerto Rico to various services in connection with the misconduct described herein, including but not limited to My-Zone, Bluehost, Njalla, Mailchimp, Constant Contact, Google, TorGuard, and Mad Mimi. For many of the services, the temporary card information was just to get past the initial verification process, and Sells had no intention to ever pay full price for the service or continue the subscription.

239.    For My-Zone, Sells left several invoices unpaid and on the name of Hartman Media, ATTN: Jason Hartman.

240.    The aforementioned conduct was done specifically and intentionally by Sells to avoid lawful charges, and, upon information and belief, create financial liability for HMC.

### Florida Criminal Use of Personal Identification Information
### (Fla. Stat. § 817.568)

241.    Fla. Stat. § 817.568 makes it a felony for any person to "willfully and without authorization fraudulently use[], or possess[] with intent to fraudulently use, personal identification information concerning another person without first obtaining that person's consent, commits the offense of fraudulent use of personal identification information."

242.    Section (4) makes clear that if any person engages in the unlawful use of personal identification "for the purpose of harassing that person," then he or she commits the offense of harassment by use of personal identification information under criminal penalty.

243.    Section (9) imposes felony criminal liability on "[a]ny person who willfully and fraudulently creates or uses, or possesses with intent to fraudulently use, counterfeit or fictitious personal identification information concerning a fictitious person, or concerning a real person without first obtaining that real person's consent, with intent to use such counterfeit or fictitious personal identification information for the purpose of committing or facilitating the commission of a fraud on another person, commits the offense of fraudulent creation or use, or possession with intent to fraudulently use, counterfeit or fictitious personal identification information, a felony of the third degree."

244.    Use of a public record in the commission of any crime under Fla. Stat. § 817.568 results in an up-charge to the next higher degree of criminal penalty.

245.    Notably, "personal identification information" includes a name.

246.    Sells, through his agents (including PIP), violated each and every one of the aforementioned provisions, as well as directed the other Defendants to violate the

aforementioned criminal provisions of Fla. Stat. § 817.568 by, among other things, creating, using, and holding himself, and others acting at his direction, out to be (1) Jason Hartman, (2) Ray Douglas, (3) Don Wilson, (4) Dylan DeBellis, (5) Harold Johnson, (6) Hartman Media Company, (7) Hartman Investigators (provided to Google), (8) Hartman Exposed (provided to Mailchimp and Constant Contact as the account owner identification information), (9) The Broke Guru (provided to Mailchimp as a company name), (10) Asaf Levy (provided to Bluehost), (11) John Johnson (provided to Bluehost for use in cPanel), and (12) John Rosen (provided to Constant Contact as billing information). Upon information and belief, Defendants used many more false names.

247.    Sells, through his agents (including PIP), further provided false address and other identifying information to the aforementioned service providers, as well as to email recipients.

248.    Defendants used false and fictitious identifying information to, *inter alia*, fraudulently gain unwarranted and undeserved attention to their emails and websites, fraudulently gain unwarranted and undeserved esteem, fraudulently gain access to various services, including hosting services and rights to post on online commercial forums, and to fraudulently destroy, injure, and discredit Plaintiffs while consequently increasing their own market share and gaining an unfair competitive advantage in the real estate investment market.

249.    Defendants committed the aforementioned conduct knowingly, willfully, and wantonly.

250.     Defendants knew they were not the individuals they identified themselves as, and did not utilize any of the addresses that they represented themselves to be located at.

251.     The recipients of the fraudulent personal identification information and fictitious and counterfeit information did rely upon Defendants' false misrepresentations, and provided valuable undeserved attention, esteem, services, and/or contact information.

252.     Indeed, once visitors were fraudulently attracted to Defendants' website, their personal information was captured through the use of cookies and trackers.

**Florida Criminal Use of Personal Records (Fla. Stat. § 817.569)**

253.     Fla. Stat. § 817.569 criminally prohibits the use of any public record or information obtainable only through such public record, or "knowingly provid[ing] false information that becomes part of a public record to facilitate or further the commission of a misdemeanor in the first degree or a felony of the third degree.

254.     Sells, through his agents (including PIP), violated this provision by, *inter alia*, (1) using the Palm Beach County Sheriff's Office public records, including Mr. Hartman's police report and 911 call audio, to harass and intimidate Mr. Hartman, as a victim and witness of Sells' crimes, (2) using said records to further the false and fraudulent misrepresentation that Mr. Hartman filed a false police report, and (3) using court records through links in fraudulent emails to Plaintiffs' clients and colleagues and on the Infringing Website in order to defraud the public and disseminate false and misleading advertisements.

255.     Moreover, Sells knowingly provided false information to the Beaufort County Sheriff's Office about his ownership and role in the creation of the Primary

Infringing Domain and the Infringing Website. Sells knew those false statements would become part of a public record, and indeed, requested such public records through a Freedom of Information Act request to the Beaufort County Sheriff's Office, requesting, *inter alia*, "all documents concerning or related to Palm Beach County Sheriff's Office Case No, 18103031."

256.    Defendants committed the aforementioned conduct knowingly, willfully, and wantonly.

### Florida False Statements to Law Enforcement (Fla. Stat. § 837.05)

257.    Fla. Stat. § 837.05 imposes criminal liability on any "person who knowingly gives false information to a law enforcement officer concerning the alleged commission of any crime."

258.    Moreover, Fla. Stat. § 837.055 imposes criminal liability on anyone who "knowingly and willfully gives false information to a law enforcement officer who is conducting a . . . felony criminal investigation with the intent to mislead the officer or impede the investigation."

259.    As described herein, Sells knowingly and unabashedly provided false information about his commission of the crimes described herein, which include felony offenses, to Officer Calore on August 13, 2018. In particular, Officer Calore noted "I asked Sells if he had any involvement in the creation of the Websites and he advised he did not. I then asked Sells if he had any involvement in any of the emails which were sent to his clients and he advised he did not."

260.     Officer Calore was assisting the Palm Beach County Sheriff's Office in an ongoing investigation into the criminal complaint made by Mr. Hartman in Palm Beach County, Florida. Sells was fully aware of this fact.

261.     The false information was conveyed by Officer Calore to Deputy Venner of the Palm Beach County Sheriff's Office, who in turn closed the criminal investigation in reliance on the false statements of material fact made by Sells.

**Florida Criminal Tampering (Fla. Stat. § 914.22)**

262.     Fla. Stat. § 914.22 criminalizes the knowing intimidation, attempted intimidation, engaging in misleading conduct toward another person with intent to cause or induce any person to "(a) Withhold testimony, or withhold a record, document, or other object, from an official investigation or official proceeding" or "(e) Hinder, delay, or prevent the communication to a law enforcement officer or judge of information relating to the commission or possible commission of an offense or a violation of a condition of probation, parole, or release pending a judicial proceeding."

263.     The statute further criminalizes the intentional harassment of another person, when such person thereby hinders, delays, prevents, or dissuades any person from (a) attending or testifying in an official proceeding or cooperating in an official investigation; (b) reporting to a law enforcement officer or judge the commission or possible commission of an offense or a violation of a condition of probation, parole, or release pending a judicial proceeding; (c) arresting or seeking the arrest of another person in connection with an offense; or (d) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or from assisting in such prosecution or proceeding.

264.     Sells knowingly and with the intent to retaliate falsely claimed in direct solicitations and emails to hundred of Plaintiffs' clients and colleagues, including trade associations, and on his website, that Mr. Hartman filed a false police report and publicized Mr. Hartman's police report, with his home address and personal information, and his 911 call audio. Defendants' conduct was intended to and did in fact intimidate Mr. Hartman and affect his livelihood in the form of lost sales and business opportunities. Defendants' conduct also caused debilitating emotional harm to Mr. Hartman.

265.     Moreover, and relevant to this section, Defendants' conduct was intended to and did cause Mr. Hartman to not pursue any further criminal investigations, especially since he was fraudulently induced to believe that the police report was false. Mr. Hartman began to seriously question his beliefs and stopped communicating with law enforcement officers regarding Defendants' conduct.  In the course of this case, however, Mr. Hartman learned that his police report was entirely correct, and it was Defendants who were making false statements to law enforcement in order to avoid criminal liability, end an ongoing criminal investigation, and continue their misconduct described herein.

266.     Indeed, *the very next day* after Sells told Officer Calore that he had no involvement in the subject emails or websites, Sells directed Putich to send out another email blast and directed Chung to update the Infringing Website.

### Other Criminal Conduct – Warranting Leave to Amend

267.     Defendants' unauthorized and secret installation of cookies and trackers on website users' computers, especially when those users were defrauded into visiting the site in the first place, additionally invokes violations of the Federal Wiretap Act, 18 U.S.C. § 2510, Stored Communications Act, 18 U.S.C.A. § 2701, Computer Fraud and

Abuse Act, 18 U.S.C.A. § 1030, and the Video Privacy Protection Act, 18 U.S.C.A. § 2710(a).  Plaintiffs expressly reserve the right to amend this Complaint to allege civil causes of action in connection with these aforementioned violations of law as additional details become available through discovery.

268.    Moreover, on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, September 10, 2018, October 14, 2018, October 23, 2018, October 29, 2018, and November 2, 2018, Defendants engaged in rampant violations of the CAN-SPAM Act of 2003, which should subject them to an investigation by the Federal Trade Commission and a civil suit by various internet service providers.

269.    Plaintiffs intend to refer Defendants to all appropriate authorities for investigation and prosecution, and work with such authorities to bring Defendants to justice.

**A Clear Showing of Knowing and Intentional Conduct Through Extraordinary Concealment Efforts**

270.    Defendants took every step possible to cover their tracks and conceal their methods of impersonation and violations of law.  For example, not only is ProtonMail based in Switzerland (with some of the world's strictest privacy laws), but it publicly advertises on its website that (1) "[n]o personal information is required to create your secure email account;" (2) "we do not keep any IP logs which can be linked to your anonymous email account;" (3) "[a]ll emails are secured automatically with end-to-end encryption. This means even we cannot decrypt and read your emails;" (4) "all user data is protected by strict Swiss privacy laws;" (5) "ProtonMail's security measures are intense: end-to-end encryption and user authentication protocols so rigorous even the creators can't read user emails;" (6) "we don't have the technical ability to decrypt your

messages, and as a result, we are unable to hand your data over to third parties;" and (7) "[a]s ProtonMail is outside of US and EU jurisdiction, only a court order from the Cantonal Court of Geneva or the Swiss Federal Supreme Court can compel us to release the extremely limited user information we have."

271.　Similarly, Defendants utilized ThorGuard Stealth Mail, which advertises its use of anonymous, encrypted emails and "uncrackable security," and accepts payment for its services in untraceable cryptocurrency.

272.　Moreover, Sells chose a registrar, Tucows, that has a history of non-compliance with valid takedown requests from trademark holders.

273.　Tucows Domains, contrary to express agreements with The Internet Corporation for Assigned Names and Numbers ("**ICANN**"), hid the Infringing Domain Names registrant's information on the Whois database.　To engage in domain name registration, a registrar is required to enter into agreements with ICANN that obligate the registrar to ensure accurate and current data in the "Whois database," which provides information about domain name owners to enable members of the public to contact the domain name owners about technical and legal issues related to those domain names. Here, however, the Whois database provides no registrant information for the Infringing Domain Names.

274.　Moreover, Tucows Domains has repeatedly ignored numerous warnings from Plaintiffs' counsel about Njalla breaking the company's terms and conditions imposed on resellers, and its facilitation of criminal conduct.

275.　Moreover, Defendants used an intermediary, Njalla, based in the near-judgment-proof territory of St. Kitts and Nevis, that sits "between the domain name

registration service and [the actual controller of the domain name], acting as a privacy shield." As Njalla advertises on its website, "[w]hen you purchase a domain name through Njalla, we own it for you. However, the agreement between us grants you full usage rights to the domain. Whenever you want to, you can transfer the ownership to yourself or some other party."

276.    Furthermore, Defendants provided falsified information to Google, Mailchimp, and Constant Contact.

277.    Thus, Defendants utilized *at least* four layers of concealment to frustrate law enforcement efforts (*i.e.*, Whois Guard, Njalla, Tucows (noncompliant registrar), false information). Defendants failed nonetheless and will be brought to justice.

**Fake Reviews as a Competitive Tool**

278.    Following the initiation of this Action and hampered by Plaintiffs' enforcement efforts, Defendants engaged in novel and additional deceptive practices that constitute unfair competition.

279.    BiggerPockets, LLC owns and operates a website accessible at www.BiggerPockets.com, known colloquially as BiggerPockets®.

280.    BiggerPockets is self-described as "The Real Estate Investing Social Network," and invites users on its homepage to "[j]oin the millions of people achieving financial freedom through the power of real estate investing." Similarly, BiggerPockets advertises on its website that it "offer[s] content, tools, and a community of over 1,300,000 members to help people . . . find partners, deals, and financing and make the best investing decisions possible." BiggerPockets represents that "it works hard to bring

together real estate experts, newbies and everyone in between to gain the knowledge needed to reach their full potential."

281.    In sum, BiggerPockets is the go-to forum to solicit real estate investing clients and customers.

282.    In the first half of 2019, Sells, acting through PIP, directed PIP employees to create fake online profiles sometimes using real names of other individuals to post positive content about PIP on BiggerPockets.

283.    During the same time period, multiple accounts were opened by Sells using names of former employees of PIP but pretending to be new clients to the real estate investment world.

284.    This was done in an effort to create false endorsements and acclaim for PIP.

285.    As discussed further herein, these accounts were also used to disparage Plaintiffs, industry competitors to PIP, and perpetuate Defendants' infringing conduct.

286.    On February 6, 2019, Sells or a third-party acting at Sells' direction created an account using the name, "Dylan DeBellis" from an IP address belonging to PIP.

287.    Sells or a third-party acting at Sells' direction provided false contact information for the "Dylan DeBellis" account, which was signed up for using an IP address belonging to PIP.

288.    Although Dylan Debellis is listed as an Executive Director of PIP with the Better Business Bureau, no such information was disclosed by the user of the "Dylan DeBellis" account to BiggerPockets.

289.    On or about February 15, 2019, Sells or a third-party acting at Sells' direction created an account using the name, "Don Wilson."

290.    In creating the "Don Wilson" account, Sells or a third-party acting at his direction provided false identification and contact information to BiggerPockets. Indeed, although "Don Wilson" purported to be from New Jersey, the account was created in Hilton Head Island, South Carolina, where PIP's office is located.

291.    After creating the "Don Wilson" account, Sells or a third-party acting at Sells' direction created a thread on BiggerPockets titled, "Loving the Free Educational content provided by PIP Group."

292.    Sells posted a comment on the thread from the "Don Wilson" account stating the following:

> I have been into Flipping houses for a few years now and I truly enjoy it! I have recently (I know, I'm late) learned about Investing with tax liens... When I found out about this method of investing I went digging through the internet for more educational content. I stumbled across the company PIP Group. The PIP Group provides all of its content for free, and I really enjoy the webinars that break down almost everything I needed to learn about Tax Liens!
>
> Has anyone else checked this company out? and what is your favorite source of educational content when you are searching for some answers?
>
> Thanks a bunch.
>
> Don

293.    Sells or a third-party acting at his direction then logged in to the "Dylan Debellis" account from the same internet network in Hilton Head Island, South Carolina that was used to leave the "Don Wilson" comment and stated: "@Don Wilson I have seen some of their webinars as well... I thought they were very informative! I also enjoy the content that is published on bp! This is a very smart and savvy network..."

294.    The comment from the "Dylan Debellis" account was designed to look like it was from a neutral real estate investor. The user of the "Dylan Debellis" account failed to disclose that Dylan Debellis was an executive director of PIP and that the account was being used by Sells or at his direction.

295.    Sells or a third-party acting at his direction went on to post on the same thread, making similarly deceptive promotions for PIP on at least February 16, 17, 18, 20, 2019. For example, in one post, the user of the "Don Wilson" account stated to a real person on the thread, "I haven't passed the "educational stage" yet. I was simply just referring to [PIP's] content. You say you have worked with them in the past?  They seem to be quite informed on the topic of distressed real estate... is this your belief as well?" In another post, the "Don Wilson" account stated, "As I said I am very new to the tax lien world, so maybe that's why I found this 'basic intro' to be fulfilling. Anything more might have been overwhelming (for a novice like myself)."

296.    On March 5, 2019, the user of the "Dylan DeBellis" account stated, "I am new to BP and to Real Estate Investing, and would really like to just see what different options are out there." At the very least, the user did not disclose that he was a sophisticated real estate investment servicer and an executive director of PIP.

297.    More and more new accounts joined the thread and began posting in support of PIP. The unusual activity garnered attention until the moderator noted the following:

> @Ned Carey has nothing against the company. Ned is fair and objective, but fake accounts and fake testimonials are a serious concern. ***All six people that had positive things to say about PIP Group opened accounts within the last week and their first and ONLY posts on BiggerPockets were to prop up PIP Group***. ***Some accounts have since been closed***. This casts doubt on any of the positive feedback here. In fact just the opposite. If a company is willing to use these

tactics, it calls into question their overall business practices. PIP Group is not an educational provider. They are a company that sells notes.

PIP Group is welcome to advertise in the BiggerPockets market place, where you will find other legitimate companies selling a variety of services.

Don Wilson first post joined 2-15-19

Dylan DeBellis first post joined 2-6-19

Erwin Vargas first post joined 2-11-19

Albert Stancato first post joined 2-8-19

Bradford Page first post joined 2-19-19

Richard Gataveckas first post joined 2-19-19

Robin Horne first post joined 2-19-19

298.    Sells or a third-party acting at his direction created at least the accounts that used the names Ray Douglas, Don Wilson, and Dylan DeBellis for the sole purpose of misleading the public in the form of false and biased endorsements.

299.    Upon information and belief, Sells or a third-party acting at his direction created other accounts on various fora with the intention of misleading the public and publishing deceptive praise for PIP.

300.    Among other things, Sells' aforementioned misconduct has violated and continues to violate Federal Trade Commission guidelines concerning the use of endorsements and testimonials in advertising as codified in 16 C.F.R. § 255. Specifically, Sells and those acting at his direction failed to disclose material connections between themselves and PIP in violation of 16 C.F.R. §§ 255.1(d), 255.2(c), and 255.5.

301.    The aforementioned conduct discussed in this section is referred to herein as the "**False and Deceptive BiggerPockets Endorsements**."

## COUNT I

### Federal Service Mark Counterfeiting
(*By HMC against All Defendants*)

302.    Plaintiffs incorporate by reference all of their allegations in the preceding paragraphs.

303.    Defendants intentionally purchased, activated, and maintained the Infringing Domain Names, which are counterfeits of Plaintiff's registered Service Marks. They did so without consent and with the precise goal of causing consumer confusion and deceiving the public.

304.    Visitors to the Infringing Domain Names were immediately tracked through the unauthorized installation of cookies and trackers on their computer, and were encouraged to complete a "Contact Us" form to become leads for Defendants' business, which offered the same services as Plaintiffs' businesses.

305.    At all relevant times, Defendants maintained and managed traffic to the Infringing Domain Names.

306.    Defendants used concealing agents and took multiple steps to conceal their identities and frustrate the discovery of their wrongdoings.

307.    Defendants' conduct violates the standards of business conduct reflected in the fictitious trade name statutes of states such as Florida, which require persons engaged in the advertising and sale of products and services to identify themselves so that they are amenable to service of process in actions arising from the advertising and sale of goods and services, as well as the federal criminal fictitious name statute at 18 U.S.C. § 1342.

308.   As Defendants have reaped extraordinary profits, by way of harming a direct competitor, from the unlawful conduct described in this Complaint, and are undeterred by the UDRP proceeding that has been decided against them, Defendants have no reason to terminate their conduct unless confronted with an injunction and an award of statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c).

309.   Defendants' use of Plaintiff's Service Marks in the Infringing Domain Names, Infringing Website, the Impersonator Account and Misleading Gmail Account are "spurious" within the meaning Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A), because they are not "genuine or authentic."

310.   Defendants use their spurious depictions of Plaintiff's Service Marks for "trafficking in services" within the meaning of the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A).   Indeed, the services advertised and offered by Defendants are the same as those offered by Plaintiffs' businesses, and are in the same field covered by the Service Marks.

311.   The spurious depictions of Plaintiff's Service Marks in Defendants' websites and email addresses are "identical with, or substantially indistinguishable from" the genuine service marks within the meaning of Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(a)(ii). Indeed, on their faces, the Infringing Domain Names are identical to and incorporate the Service Marks (JASON HARTMAN and JASONHARTMAN.COM), except for the

addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

312.    The services advertised and offered by Defendants (*e.g.*, turn-key, real estate investment programs) with spurious depictions of Plaintiff's Service Marks are identical to the services for which those marks are registered (*i.e.*, financial investment in the field of real estate and financial services, namely, real estate note brokerage, in International Class 36 within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(l)(A)(ii).

313.    Defendants are using spurious depictions of Plaintiff's Service Marks "in connection with" the services covered by Plaintiff's federal service mark registrations within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A)(iii).  Indeed, visitors to the Infringing Domain Names were immediately tracked through the unauthorized installation of cookies and trackers on their computer and were encouraged to complete a "Contact Us" form to become leads for Defendants' business, which offered the same services as Plaintiffs' businesses.

314.    Defendants' spurious depictions of Plaintiff's Service Marks are "likely to cause confusion, to cause mistake, or to deceive" within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the criminal counterfeiting statute at 18 U.S.C. § 2320(e)(1)(A)(iv).  Indeed, they have actually caused extensive customer confusion.

315.    By their acts aforesaid, Defendants have engaged, and are engaged, in the counterfeiting of Plaintiff's Service Marks within the meaning of Sections 32(1) and 45

of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1127, and the criminal counterfeiting statute at 18 U.S.C. § 2320.

316.    To carry out their counterfeiting enterprise, Defendants engage in the systematic transmission of false contact data by means of "wire communications" in furtherance of a "scheme" and "artifice to defraud" within the meaning of the federal wire fraud statute at 18 U .S.C. § 1343 and the federal fictitious name statute at 18 U.S.C. § 1342.

317.    The irreparable harm to Plaintiffs and the public resulting from Defendants' conduct, combined with the willfulness of Defendants and the manifest need for deterrence, warrant broad injunctive relief and an assessment of maximum statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c), as well as costs and attorney fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiff demands judgment against Defendants as set forth in the Prayer for Relief.

## COUNT II

### Contributory Service Mark Counterfeiting
(*By HMC against All Defendants*)

318.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

319.    Defendants assisted one another in purchasing, maintaining, managing, publishing, registering, and promulgating the Infringing Domain Names.

320.     Defendants further assisted one another in publishing and promulgating e-mails from the Impersonator Account.

321.     Sells intentionally induced each and every other Defendant into engaging in the misconduct described in Count I.

322.     Defendants Chung, Blindspot Digital, and Putich each supplied multiple products to Sells and Defendant PIP who they knew and had reason to know were directly counterfeiting the Service Marks.

323.     By their acts aforesaid, Defendants have engaged, and are engaged, in contributory service mark counterfeiting in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), causing irreparable injury to Plaintiff and the public, and warranting permanent injunctive relief and an assessment of statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c).

WHEREFORE, Plaintiff demands judgment against Defendants as set forth in the Prayer for Relief.

## COUNT III

### Federal Service Mark Infringement
(*By HMC against All Defendants*)

324.     Plaintiffs incorporate by reference all of their allegations in the preceding paragraphs and specifically reference paragraphs 303 through 317 above.

325.     Defendants, with the intent to deceive the public, are using in commerce reproductions, counterfeits, copies and colorable imitations of Plaintiff's federally registered Service Marks in connection with the sale, offering for sale, distribution and/or advertising of real estate investment services in a manner that is likely to cause

confusion, mistake, and deception, leading the public falsely to believe that Defendants' services, and the services advertised at Defendants' websites and email addresses, are the services of Plaintiffs, or are sponsored or approved by, or are in some way connected with the Plaintiffs.

326.    Moreover, Defendants' unlawful use of the Service Marks is intended to (1) cause consumer confusion, (2) devalue and tarnish the Service Marks, (3) harm Plaintiffs' business, (4) usurp Plaintiffs' clients, goodwill and reputation, and (5) result in profit to Defendants, as competitors in an "intimate" industry.

327.    Defendants' incorporation of Plaintiff's Service Marks in the Infringing Domain Names, Infringing Website, the Impersonator Account and Misleading Gmail Account were and are likely to cause confusion.  Indeed, on their faces, the Infringing Domain Names are identical to the Service Marks (JASON HARTMAN and JASONHARTMAN.COM), except for the addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

328.    Defendants' use of the Infringing Domain Names ismisleading and likely to attract visitors who were searching for Mr. Hartman's business.   Moreover, Defendants' intentional solicitation of Plaintiffs' clients and colleagues using the Service Marks is *prima facie* evidence of service mark infringement and passing off.

329.    The services advertised and offered by Defendants (*e.g.*, turn-key, real estate investment programs) with spurious depictions of Plaintiff's Service Marks are identical to the services for which those marks are registered (*i.e.*, financial investment in the field of real estate and financial services, namely, real estate note brokerage, in

International Class 36 within the meaning of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

330.    By their acts aforesaid, Defendants are engaged in federal service mark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), causing irreparable harm to Plaintiff and the public and warranting a permanent injunction and an assessment of damages and attorney fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiff demands judgment against Defendants as set forth in the Prayer for Relief.

## COUNT IV

### Contributory Service Mark Infringement
(*By HMC against All Defendants*)

331.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

332.    By their acts aforesaid, Defendants have engaged in contributory service mark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

WHEREFORE, Plaintiff demands judgment against Defendants as set forth in the Prayer for Relief.

## COUNT V

### Cybersquatting
(*By HMC against All Defendants*)

333.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

334.    Defendants have registered, and are trafficking in, using, and maintaining the Infringing Domain Names, Infringing Website, Impersonator Account, and

Misleading Gmail Account, which incorporate and imitate Plaintiff's federally registered Service Marks, with the bad faith intent to profit from the goodwill associated with those marks.

335.   Plaintiff's  Service  Marks  were  distinctive,  and  had  acquired distinctiveness, long before Defendants registered the Internet domain names identified in this Complaint.

336.   The marks used in the Infringing Domain Name, Infringing Website, the Impersonator Account and Misleading Gmail Account are identical and/or confusingly similar to Plaintiff's Service Marks.

337.   Defendants  do  not  have  any  intellectual  property  or  other  rights  in  the names "JASON HARTMAN" or "JASONHARTMAN.COM."

338.   Defendants  have  never  used  the  name  "Jason  Hartman"  to  identify themselves, and have never been commonly known by the name "Jason Hartman."

339.   Defendants  are  not  engaging  in  any  lawful  use  of  the  name  "Jason Hartman" or "JasonHartman.com."

340.   Defendants registered and used the Infringing Domain Names, Infringing Website, the Impersonator Account and Misleading Gmail Account to divert consumers from Plaintiffs' website to the Infringing Domain Names and Infringing Website for Defendants' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of those websites.

341.   After capturing traffic from individuals searching for Plaintiffs' business or directly solicited through one of the many email marketing campaigns or public posts from the Defendants, the Infringing Website, accessed through the Infringing Domain

Names, installed unauthorized cookies and trackers onto each visitor's computer, and solicited visitor information through a "Contact Us" fill-in webform.

342.    By tracking all of the Infringing Website's visitors, Defendants were able to not only contact Plaintiffs' clients and colleagues it knew and directly solicited, but also their clients and colleagues who had been referred to the site.   In this way, Defendants were casting a large net to attract as many potential clients as possible.

343.    In this way, Defendants intentionally sought to simultaneously destroy Plaintiffs and take their clients.  Each website visitor was a potential lead for Defendants.

344.    By their acts aforesaid, Defendants have violated the Anticybersquatting Consumer Protection Act ("ACPA"), Pub. L. No. 106-113, 113 Stat. 1501 (1999), codified at Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), causing irreparable injury to Plaintiffs and the public.

WHEREFORE, Plaintiff demands judgment against Defendants as set forth in the Prayer for Relief.

## COUNT VI

### Federal Unfair Competition, False
### Representation and False Designation of Origin
(*By All Plaintiffs against All Defendants*)

345.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

346.    Defendants' incorporation of Plaintiffs' Service Marks in the Infringing Domain Names, Infringing Website, the Impersonator Account and Misleading Gmail Account were and are likely to cause confusion.  Indeed, on their faces, the Infringing Domain Names are identical to the Service Marks (JASON HARTMAN and

JASONHARTMAN.COM), except for the addition of certain generic terms such as "properties," "media," "investments," and "real estate investments."

347. The services advertised and offered by Defendants (*e.g.*, turn-key, real estate investment programs) with spurious depictions of Plaintiffs' Service Marks are identical to the services for which those marks are registered (*i.e.*, financial investment in the field of real estate and financial services, namely, real estate note brokerage, in International Class 36.

348. Moreover, Defendants engaged in intentional passing off to the highest degree. In addition to impersonating Plaintiffs through the Impersonator Account, the Mailchimp email marketing campaign discussed herein directly falsified and used Plaintiff Platinum Properties' address.

349. Defendants engaged in this passing off and falsification of information to, *inter alia*, (1) divert traffic from Plaintiffs' actual website to the Infringing Website, (2) build leads through the secret and unauthorized installation of cookies and trackers on visitors' computers and the maintenance of a "Contact us" webform, (3) disparage and destroy Plaintiffs' Service Marks and businesses, (4) increase their market share as a natural and intended result of the destruction of Plaintiffs' competing businesses, and (5) falsely associate themselves with Plaintiffs and fraudulently obtain consumer trust and reliance.

350. By their acts aforesaid, Defendants have engaged, and are engaged, in federal unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), causing irreparable injury and damage to Plaintiffs and the public.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT VII

### Federal False Advertising
(*By All Plaintiffs against All Defendants*)

351.   Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

352.   In engaging in the misconduct described herein, Defendants engaged in an organized campaign to increase their market share in the real estate investment market.

353.   As part of that campaign, Defendants created, maintained, and published commercial advertisements and promotional material that contained false and misleading statements about Plaintiffs' services.

354.   The subject commercial advertisements and promotional materials consisted of both invitations to trade (*e.g.*, solicitation through the Infringing Website's "Contact Us" form, and solicitations on public forum postings discussed herein) and communications designed to advance business interests (*e.g.*, by disparaging Plaintiffs and their services).

355.   Moreover, Defendants employed deceptive promotional content for PIP through fake accounts on BiggerPockets when they engaged in the False and Deceptive BiggerPockets Endorsements.

356.   The statements in Defendants' emails to Plaintiffs' clients and colleagues, the redirecting of internet traffic via use of Plaintiffs' Service Marks, and the statements on the Infringing Website were all made by Defendants in an effort to gain market share.

357.     Defendants' false and misleading statements in their commercial advertisements and promotional materials did indeed have a material effect on consumers' purchasing and investment decisions.

358.     Defendants' false and misleading statements in their commercial advertisements and promotional materials certainly affect interstate commerce and were disseminated from at least three states and into Florida, among other states.

359.     By their acts aforesaid, Defendants have engaged, and are engaged, in federal false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), causing irreparable injury and damage to Plaintiffs and the public.

360.     Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, including damages in the form of lost sales and immense damage to Plaintiffs' business reputation, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT VIII

### Racketeer Influenced and Corrupt Organization Act (Federal RICO)
(*By All Plaintiffs Against Sells, Lena, Putich, and Chung*)

### 18 U.S.C. § 1962(c)

361.     Plaintiffs reallege and restate paragraphs 1 through 301 as if fully set forth herein and further state:

### (Defendant Persons / Enterprises)

362.     Defendants Sells, Lena, Putich, and Chung (or any subgroup thereof) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that

they are "a group of individuals associated in fact" (hereinafter referred to as the "Individual Enterprise").

    a.   Sells, Lena, Putich, and Chung share the common purpose of (among other things) fraudulently and deceptively marketing PIP's services, the common purpose of fraudulently inducing Plaintiffs' customers to purchase PIP's services, the common purpose of defaming and disparaging Plaintiffs, and/or the common purpose of fraudulently dissuading members of the consuming public from doing business with Plaintiffs.

    b.   Sells, Lena, Putich, and Chung are related in that they are officers, owners, employees, paid contractors, or associates of PIP.

    c.   The Individual Enterprise possesses sufficient longevity in that the Individual Enterprise has operated since May 2018 (at a minimum), continues to operate, and has achieved its purpose(s) in whole or in part.

Sells, Lena, Putich, and Chung are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Individual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (*supra* at ¶¶ 209-20), federal counterfeiting (*supra* at ¶¶ 221-26), and federal retaliation (*supra* at ¶¶ 227-29).

    363.   In the alternative to paragraph 362, PIP, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Sells, Lena, Putich,

and Chung are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of PIP through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (*supra* at ¶¶ 209-20), federal counterfeiting (*supra* at ¶¶ 221-26), and federal retaliation (*supra* at ¶¶ 227-29).

364.     At all relevant times, the enterprises alleged in paragraphs 362 and 363 were engaged in, and their activities affected, interstate commerce and foreign commerce.

### (Pattern of Racketeering Activity)

365.     All of the acts of racketeering described in paragraphs 209-29, *supra*, were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to, *inter alia*, defame and defraud Plaintiffs and their clients and colleagues in order to gain market share and increase their earnings, and defraud potential investors on BiggerPockets so they could unlawfully convince them into doing business with PIP, their common result was to defraud Plaintiffs and their clients and colleagues; Sells, Lena, Putich, and Chung, personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

366.     All of the acts of racketeering described in paragraphs 209-29, *supra*, were continuous so as to form a pattern of racketeering activity in that the acts of racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in

which Defendants Sells, Lena, Putich, Chung and PIP do business or because the acts of racketeering were on-going and were stopped and fortuitously interrupted only when Plaintiffs discovered Defendants' acts of racketeering and took adverse action(s) against Defendants, several examples of which are described in paragraphs 117, 125, 135, 150, 175-78, 181, 187, 190, 204. Other examples include the fact that the fake BiggerPocket accounts were shut down by BiggerPockets after being publicly called out by a moderator (*see* ¶ 297) and successes in this Court, which have certainly helped to stem the flow of damages and put a pause on Defendants' misconduct.

367. As a direct and proximate result of, and by reason of, the activities of Defendants Sells, Lena, Putich, Chung, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages to the extent Plaintiffs' clients and colleagues were fraudulently induced to purchase Defendants' services and do business with Defendants rather than Plaintiffs' services, to the extent that the brand image, trade name and Service Marks of Plaintiffs have been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent Plaintiffs have incurred increased costs of doing business. Plaintiffs are, therefore, entitled to recover threefold the damages sustained, together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

368. Pursuant to 18 U.S.C. § 1964(a), Defendants should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT IX

### Federal RICO Conspiracy
*(By All Plaintiffs Against Lena, Putich, and Chung)*

### 18 U.S.C. § 1962(d)

369.     Plaintiffs reallege and restate paragraphs 1 through 301 as if fully set forth herein and further state:

370.     As alleged in Count VIII, Sells violated 18 U.S.C. § 1962(c).

371.     Lena, Putich and Chung conspired with Sells to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra* ¶¶ 362-63) through a pattern of racketeering activity (*see supra* ¶¶ 209-29) in violation of 18 U.S.C. § 1962(d). In particular, Lena, Putich and Chung intended to or agreed to further an endeavor of Sells which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

372.     Plaintiffs were injured by Lena's, Putich's and Chung's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of wire fraud (*supra* at ¶¶ 209-20), federal counterfeiting (*supra* at ¶¶ 221-26), and federal retaliation (*supra* at ¶¶ 227-29) committed through the enterprises alleged in Count VIII.

373.     As a direct and proximate result of, and by reason of, the activities of Lena, Putich and Chung, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Plaintiffs suffered damages to the extent Plaintiffs' clients and colleagues were fraudulently induced to purchase Defendants' services and do business with Defendants

rather than Plaintiffs' services, to the extent that the brand image, trade name and Service Marks of Plaintiffs have been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent Plaintiffs have incurred increased costs of doing business.  Plaintiffs are, therefore, entitled to recover threefold the damages sustained, together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

374.   Pursuant to 18 U.S.C. § 1964(a), Defendants should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT X

### Florida Civil Remedies For Criminal Practices
*(By All Plaintiffs Against Sells, Lena, Putich, and Chung)*

### Fla. Stat. §§ 772.103(3), 772.104(1)

375.   Plaintiffs reallege and restate paragraphs 1 through 301 as if fully set forth herein and further state:

376.   Defendants Sells, Lena, Putich and Chung constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Individual Enterprise").

    a.   Sells, Lena, Putich, and Chung share the common purpose of (among other things) fraudulently and deceptively marketing PIP's services, the common purpose of fraudulently inducing Plaintiffs' customers to purchase PIP's services, the common purpose of defaming and disparaging Plaintiffs, and/or the common purpose of fraudulently

dissuading members of the consuming public from doing business with Plaintiffs.

b.   Sells, Lena, Putich, and Chung are related in that they are officers, owners, employees, paid contractors, or associates of PIP.

a.   The Individual Enterprise possesses sufficient longevity in that the Individual Enterprise has operated since May 2018 (at a minimum), continues to operate, and has achieved its purpose(s) in whole or in part.

Defendants Sells, Lena, Putich, and Chung are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed the affairs of Individual Enterprise through a pattern of criminal activity within the meaning of Fla. Stat. § 772.102(4).  Said pattern of criminal activity consisted of, but was not limited to, federal wire fraud (*supra* at ¶¶ 209-20), federal counterfeiting (*supra* at ¶¶ 221-26), and federal retaliation (*supra* at ¶¶ 227-29), communications fraud (*supra* ¶¶ 209-20), false advertising (*supra* ¶¶ 230-36), false communication (*supra* ¶¶ 237-40), criminal use of personal identification (*supra* ¶¶ 241-52), criminal use of records (*supra* ¶¶ 253-56), false statements to law enforcement (*supra* ¶¶ 257-61), and criminal tampering (*supra* ¶¶ 262-66).

377.    In the alternative to paragraph 376, PIP, as a legal entity, constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3).  Defendants Sells, Lena, Putich, and Chung are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed the affairs of PIP through a pattern of criminal activity within the meaning of Fla. Stat. 772.102(4).  Said pattern of criminal activity consisted of, but was not limited to,

federal wire fraud (*supra* at ¶¶ 209-20), federal counterfeiting (*supra* at ¶¶ 221-26), and federal retaliation (*supra* at ¶¶ 227-29), communications fraud (*supra* ¶¶ 209-20), false advertising (*supra* ¶¶ 230-36), false communication (*supra* ¶¶ 237-40), criminal use of personal identification (*supra* ¶¶ 241-52), criminal use of records (*supra* ¶¶ 253-56), false statements to law enforcement (*supra* ¶¶ 257-61), and criminal tampering (*supra* ¶¶ 262-66).

**(Pattern of Criminal Activity)**

378.    All of the criminal acts described in paragraphs 209-20 and 230-66, *supra*, were related so as to establish a pattern of criminal activity, within the meaning of Fla. Stat. 772.102(4), in that their common purpose was to, *inter alia*, defame and defraud Plaintiffs and their clients and colleagues in order to gain market share and increase their earnings, and defraud potential investors on BiggerPockets so they could unlawfully convince them into doing business with PIP, and their common result was to defraud Plaintiffs and their clients and colleagues; Sells, Lena, Putich, and Chung, personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; and Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

379.    All of the criminal acts described in paragraphs 209-20 and 230-66, *supra*, occurred within the five years preceding the filing of this Complaint in that Defendants Sells, Lena, Putich, and Chung have engaged in the criminal acts since May 2018 (at a minimum). Defendants Sells, Lena, Putich, and Chung's criminal acts further threaten to continue indefinitely because the criminal acts are the regular way in which Sells, Lena,

Putich, Chung, and PIP do business, or because the acts of racketeering were ongoing, and were stopped and fortuitously interrupted only when Plaintiffs discovered Defendants' acts of racketeering and took adverse action(s) against Defendants. (*See supra* ¶ 366.)

380.    As a direct and proximate result of, and by reason of, the criminal activities of Defendants Sells, Lena, Putich, and Chung, and their conduct in violation of Fla. Stat. § 772.103(3), clear and convincing evidence will establish that Plaintiffs have been injured by reason of Defendants' violation of Fla. Stat. § 772.103, within the meaning of Fla. Stat. § 772.104(1).   Among other things, Plaintiffs suffered damages to the extent Plaintiffs' clients and colleagues were fraudulently induced to purchase Defendants' services and do business with Defendants rather than Plaintiffs' services, to the extent that the brand image, trade name and Service Marks of Plaintiffs have been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent Plaintiffs have incurred increased costs of doing business.   Plaintiffs are, therefore, entitled to recover threefold the damages sustained, together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

## COUNT XI

### Florida Civil Remedies For Criminal Practices Conspiracy
(*By All Plaintiffs Against Lena, Putich, and Chung*)

### Fla. Stat. §§ 772.103(4), 772.104(1)

381.    Plaintiffs reallege and restate paragraphs 1 through 301 as if fully set forth herein and further state:

382.    As alleged in Count X, Sells violated Fla. Stat. § 772.103(3).

383.    Defendants Lena, Putich and Chung conspired with Sells to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*

¶¶ 376-77) through a pattern of criminal activity (*see supra* ¶¶ 209-20 and 230-66) in violation of Fla. Stat. § 772.103(4). In particular, Defendants Lena, Putich and Chung intended to or agreed to further an endeavor of Sells which, if completed, would satisfy all of the elements of a substantive criminal offense under Fla. Stat. § 772.103(3) and adopted the goal of furthering or facilitating the criminal endeavor.

384.   Plaintiffs were injured by Defendants Lena's, Putich's and Chung's overt criminal acts or are otherwise unlawful under Fla. Stat. § 772.101, *et seq.*, which included (among other acts) federal wire fraud (*supra* at ¶¶ 209-20), federal counterfeiting (*supra* at ¶¶ 221-26), and federal retaliation (*supra* at ¶¶ 227-29), communications fraud (*supra* ¶¶ 209-20), false advertising (*supra* ¶¶ 230-36), false communication (*supra* ¶¶ 237-40), criminal use of personal identification (*supra* ¶¶ 241-52), criminal use of records (*supra* ¶¶ 253-56), false statements to law enforcement (*supra* ¶¶ 257-61), and criminal tampering (*supra* ¶¶ 262-66) committed through the enterprises alleged in Count X.

385.   As a direct and proximate result of, and by reason of, the criminal activities of Defendants Lena, Putich and Chung, and their conduct in violation of Fla. Stat. § 772.103(4), clear and convincing evidence will establish that Plaintiffs have been injured by reason of Defendants' violation of Fla. Stat. § 772.103, within the meaning of Fla. Stat. § 772.104(1).   Among other things, Plaintiffs suffered damages to the extent Plaintiffs' clients and colleagues were fraudulently induced to purchase Defendants' services and do business with Defendants rather than Plaintiffs' services, to the extent that the brand image and trade name of Plaintiffs has been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent Plaintiffs have incurred increased costs of doing business.   Plaintiffs are, therefore, entitled to recover threefold the damages sustained

together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

## COUNT XII

### Florida Statutory False Advertising
(*By All Plaintiffs against All Defendants*)

386.     Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

387.     In addition to impersonating Plaintiffs through the Impersonator Account, the Mailchimp email marketing campaign discussed herein directly falsified and used Plaintiff Platinum Properties' address.

388.     Defendants engaged in this passing off and falsification of information to, *inter alia*, (1) divert traffic from Plaintiffs' actual website to the Infringing Website, (2) build leads through the secret and unauthorized installation of cookies and trackers on visitors' computers and the maintenance of a "Contact us" webform, (3) disparage and destroy Plaintiffs' Service Marks and businesses, (4) increase their market share as a natural and intended result of the destruction of Plaintiffs' competing businesses, and (5) falsely associate themselves with Plaintiffs and fraudulently obtain consumer trust and reliance.

389.     Moreover, in addition to creating false affiliations, the advertisements disseminated by Defendants through Impersonator Account, Misleading Gmail Account, Mailchimp email marketing campaign, Constant Contact email marketing campaign, and through the public forum postings described herein contain assertions, representations and statements which are untrue, deceptive, and misleading.

390.    Defendants made a false representation by sending out email using the Impersonator Account.  The representation was that the email was coming from Jason Hartman.  Defendants knew that they were not Jason Hartman.  Defendants instead made the representation with the intent that the recipient would rely upon the familiar email address, open the unsolicited email, and rely on its contents.  Plaintiffs' clients and colleagues did in fact rely upon the false and misleading representation by Defendants in using the Impersonator Account.  Such reliance has caused damage to Plaintiffs.

391.    Through their email marketing campaigns, on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, September 10, 2018, October 14, 2018, October 23, 2018, October 29, 2018, and November 2, 2018, Defendants made false and misleading statements concerning their participation in a larger enterprise, with the intent to appear larger and  more credible, and to portray Plaintiffs as perpetrating a scheme on a large group of people.  These representations were false when made.  Defendants knew that they were false, because they were not part of a large enterprise, but were merely operating under the auspices of Sells, and were supporting Sells' desire to control the market and destroy the competition, which he could not do through hard work and lawful means.  Plaintiffs' clients and colleagues relied upon Defendants' false and misleading misrepresentations and terminated their business relationship with Plaintiffs because of them.  Had they known the truth -- that the emails were coming from Sells and his associates who were on a crusade to control the market and destroy competition -- Plaintiffs' clients and colleagues would not have assigned any credibility to the false and misleading statements in the emails.

392.    Defendants further intentionally and knowingly mislead email recipients into believing that emails being sent through the Mailchimp campaign and the Constant Contact campaign were being sent from others.  By falsifying the company address on the emails, Defendants intended to create a false association with Plaintiff Platinum Properties.  Defendants further intended the falsified address to mislead email recipients into believing that they were coming from a larger organization.  In reality, however, the emails were coming solely from Sells and his associates, who were on a crusade to control the market and destroy competition.  Plaintiffs' clients and colleagues did in fact rely upon Defendants' representations.  Had they known the truth, Plaintiffs' clients and colleagues would not have assigned any credibility to the false and misleading statements in the emails.

393.    Defendants, in misrepresenting the source of their many emails described herein, also tricked Plaintiffs' clients and colleagues into visiting the Infringing Website, which collected their personal information through hidden cookies and web-trackers.

394.    Defendants, by their acts aforesaid, have engaged, and are engaged, in false advertising in violation of Fla. Stat. §§ 817.06 and 817.40-817.47.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XIII

### Florida Civil Conspiracy
(*By All Plaintiffs against All Defendants*)

395.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

396.    Upon information and belief, each Defendant acted in concert with one another pursuant to an oral or written agreement to commit the violations of law detailed herein.  Each Defendant is associated with the same enterprise, PIP, and agreed to work with Sells to perpetrate the misconduct alleged herein.

397.    Defendants performed in accordance with their agreements with one another to perpetrate violations of state and federal law as detailed herein, and to further their conspiracy to harm Plaintiffs' business in an effort to obtain an unfair competitive advantage and profit from their conduct.

398.    Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XIV

### Common Law Unfair Competition
(*By All Plaintiffs against All Defendants*)

399.    Plaintiffs incorporate by reference their allegations in paragraphs 345 through 350 above.

400.    By their acts aforesaid, Defendant have engaged, and are engaged, in common law unfair competition under Florida law.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XV

### Common Law Tortious Interference
(*By HMC and PPIN against All Defendants*)

401.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

402.    By their acts aforesaid, Defendants have engaged, and are engaged, in common law tortious interference with business contracts and prospective business relationships under Florida law.

403.    On at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, September 10, 2018, October 14, 2018, October 23, 2018, October 29, 2018, and November 2, 2018, Defendants intentionally and directly sent out hundreds, if not thousands, of unsolicited and harassing emails to Plaintiffs' clients and colleagues with whom Plaintiff had contractual agreements to work, and for some, had the prospect of doing significant prospective work.

404.    The intent of the aforementioned email campaigns was to coerce the recipients, Plaintiffs' clients and colleagues, to cut off their business relationships with Plaintiffs. For example, in addition to the content in the body of the emails encouraging readers to cease their business relationship with Plaintiffs, the title of the emails sent out in the August 14, 2018 email blast was "Worked with Jason Hartman? That could be BAD NEWS for you!"

405.    Those targeted by Defendants' activities did indeed either break contractual agreements with Plaintiffs and/or stop doing business with Plaintiffs as a result of Defendants' intentional and unjustified interference. Some of Plaintiffs' colleagues and former clients were dissuaded by the false and defamatory content on the

Infringing Website.   For example, one client of Plaintiffs' canceled a speaking engagement where Plaintiffs were scheduled to appear, worth tens of thousands of dollars, stating, "I'm really sorry but we can't have someone like [Defendants] emailing our clients and conference attendees who wouldn't know the truth about the situation."

406.   Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XVI

### Common Law Injurious Falsehood
(*By HMC and PPIN Against All Defendants*)

407.   Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

408.   To the extent Plaintiffs HMC and PPIN did not have legal rights to the relationships that were damaged by Defendants' aforementioned emails sent out on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, September 10, 2018, October 14, 2018, October 23, 2018, October 29, 2018, and November 2, 2018, Plaintiffs HMC and PPIN state a claim for injurious falsehood based on false and misleading statements made in said emails.

409.   In said emails, Defendants made ample false statements about HMC and PPIN and the quality, condition, or value of their property, including the Material False Statements (defined below).

410.     Additionally, Defendants made ample false statements about HMC and PPIN and the quality, condition, or value of their property on the website hosted on the New Domain Name.

411.     Defendants knew the falsehoods perpetuated by them would influence prospective purchasers and investors in HMC's and PPIN's products and services.

412.     Indeed, the intent of the email campaigns and the statements on the website hosted at the New Domain Name was to coerce the recipients to cut off their business relationships with Plaintiffs HMC and PPIN.

413.     The falsehoods perpetuated by Defendants the falsehoods played a material and substantial part in inducing others not to do business with HMC and PPIN, causing a significant loss of sales, revenue, and profit for both companies and a stark reduction in the value of their reputation and goodwill.

414.     Defendants' conduct has caused substantial pecuniary harm and injury to Plaintiffs HMC and PPIN, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XVII

### Defamation *Per Se*
(*By Hartman Against All Defendants*)

415.     Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

416.     Defendants made ample false statements in emails sent out on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, September

10, 2018, October 14, 2018, October 23, 2018, October 29, 2018, and November 2, 2018, on the Infringing Website, and on the website hosted at the New Domain Name about Mr. Hartman that (1) falsely claimed Mr. Hartman committed crimes, (2) would tend to subject one to hatred, distrust, ridicule, contempt, or disgrace; and (3) would tend to injure Mr. Hartman in his trade or profession.

417.    For example, Defendants represented to the public through the aforementioned venues at least the following completely and demonstrably false statements: (1) "Hartman makes false police report," (2) "Hartman gets exposed for not knowing his own tax returns – much less knowing anything about real estate," (3) Mr. Hartman has "multiple arrest warrants," (4) Mr. Hartman has "nearly $500k in judgements (sic) and settlements he has been ordered to pay (which we have uncovered just in 3 states)," (5) "Court Cases – Jason Hartman has OVER 100!," (6) Mr. Hartman has "70 lawsuits in California," (7) "$17,000 judgment against Jason Hartman for failure to pay advertising bill," (8) Mr. Hartman has "20 Lawsuits in Missouri," (9) "The Predatory Lender Is Something You Don't Really Hear About! Look at this lawsuit Jason Hartman filed to try and foreclose of a loan, wherein he claims the penalties and interest are nearly SEVEN TIMES MORE THAN THE ORIGINAL LOAN BALANCE!," and (10) Mr. Hartman was evicted for "failure to pay for office space, totaling close to $29,000." The aforementioned statements are referred to herein as the "**Material False Statements**."

418.    Defendants acted with actual malice in making the false and misleading statements of fact.

419.    Defendants' conduct has caused substantial emotional, reputational, and pecuniary harm and injury to Mr. Hartman, and has caused, and will continue to cause, irreparable harm to him unless enjoined.

WHEREFORE, Plaintiff demands judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XVIII

### Defamation
(*By Hartman Against All Defendants*)

420.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 172 above.

421.    To the extent the misconduct described in Count XVII does not constitute defamation *per se*, Mr. Hartman pleads, in the alternative, a claim for defamation based on the same.

422.    Defendants acted with actual malice in making the aforementioned false and misleading statements of fact.

423.    Defendants' conduct has caused substantial emotional, reputational, and pecuniary harm and injury to Mr. Hartman, and has caused, and will continue to cause, irreparable harm to him unless enjoined.

WHEREFORE, Plaintiff demands judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XIX

### Defamation by Implication
(*By Hartman Against All Defendants*)

424.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

425.    Defendants defamed by implication Mr. Hartman by publishing in this district, domestically, and internationally, at least the above referenced Material False Statements, as they provide the reader the false and/or misleading impression, given by juxtaposition or omission of facts, that Mr. Hartman committed crimes, has multiple arrest warrants issued against him, has over 100 lawsuits filed by or against him, has $500,000 in judgments against him, has been evicted from office space, and is a predatory lender.

426.    Defendants acted with actual malice in making the aforementioned false and misleading statements of fact.

427.    Defendants' conduct has caused substantial emotional, reputational, and pecuniary harm and injury to Mr. Hartman, and has caused, and will continue to cause, irreparable harm to him unless enjoined. Mr. Hartman's injuries include but are not limited to lost earnings and capacity, lost career and business opportunities, loss of reputation, being ostracized, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory and actual damages, as well as loss of reputation in his trade, profession, and personally.

428.    Moreover, the acts and conduct of Defendants in derogation of the rights of Plaintiff were fraudulent, malicious, and oppressive, thereby supporting the imposition of punitive damages against Defendants as the trier of fact may determine.

WHEREFORE, Plaintiff demands judgment against Defendants as set forth in the Prayer for Relief.

## COUNT XX

### Common Law Fraud
(*By All Plaintiffs against All Defendants*)

429.    Plaintiffs incorporate by reference all of their allegations in paragraphs 1 through 301 above.

430.    Defendants repeatedly affirmatively misrepresented to Plaintiffs and to the public, knowing and intending that such information be forwarded to Plaintiffs, that they were someone other than who they truly were.

431.    On June 29, 2018, Defendants represented to the public and to Mr. Hartman via a posting on BiggerPockets that they were an individual named Ray Douglas who was a former client of Plaintiffs and who was "burned by their services."

432.    Defendants further intentionally and knowingly misled Plaintiffs into believing that emails sent through the Mailchimp campaign and the Constant Contact campaign were being sent from others by falsifying the company address on the emails. Defendants intended the falsified address to mislead Plaintiffs into believing that the emails were coming from a larger organization.

433.    Indeed, through their email marketing campaigns, on at least June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, September 10, 2018, October 14, 2018, October 23, 2018, October 29, 2018, and November 2, 2018, Defendants made false and misleading statements concerning their participation in a larger enterprise with the intent to appear larger and more credible, and to portray Plaintiffs as perpetrating a scheme on a large group of people.  These representations were false when made.  Defendants knew that they were false because, they were not part of a large enterprise, but were merely operating under the auspices of PIP and Sells, and

were supporting Sells' desire to control the market and destroy the competition, which he could not do through hard work and lawful means.

434.    Moreover, when Defendants knew that Plaintiffs had suspected Sells to be behind the misconduct, Defendants ardently misrepresented Sells' role.  In emails that Defendants sent, including on August 17, 2019 and on the Infringing Website, Defendants represented that "Charles Sells of The PIP-Group" was only a "contributor" as opposed to the actual orchestrator of the malicious misconduct.

435.    On or around September 10, 2018, Plaintiffs sent correspondence to Defendants through the Contact-Us Form on the Infringing Website. Defendants responded directly to Plaintiffs stating, "Curiosity has us all wondering why you are so focused on your attack of Charles Sells? Yes, he is more than happy to help expose the truth, but . . . how could you possibly believe this could be about one man?"

436.    In contrast to Defendants' many false misrepresentations, the misconduct described herein was solely conducted by Sells and his associates – it was precisely "about one man" and his desire to manipulate the market.

437.    Plaintiffs relied upon Defendants' false and misleading misrepresentations, and expended significant sums of money to determine the true identity of the perpetrators, including filing for expedited discovery in this Action and hiring forensic experts.  Had Plaintiffs known the truth -- that the emails were coming from Sells and his associates who were on a crusade to control the market and destroy competition – Plaintiffs would have named Sells in the case in the beginning, and foregone tens of thousands of dollars worth of investigatory expenses.

438.    Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

439.    Moreover, the acts and conduct of Defendants in derogation of the rights of Plaintiffs were fraudulent, malicious, and oppressive, thereby supporting the imposition of punitive damages against Defendants as the trier of fact may determine.

## COUNT XXI

### Negligent Misrepresentation
(*By All Plaintiffs against All Defendants*)

440.    Plaintiffs incorporate by reference their allegations in paragraphs 245 through 251 above.

441.    In the alternative, should the Court find that Defendants lacked the requisite intent to sustain Count XX, the Court should find Defendants liable for negligent misrepresentation, as the aforementioned misrepresentations were made with at least a negligent state of mind.

## COUNT XXII

### Common Law Invasion of Privacy -
### Commercial Misappropriation of a Person's Likeness
(*By Hartman against All Defendants*)

442.    Plaintiffs incorporate by reference their allegations in paragraphs 1 through 301 above.

443.    Defendants published, displayed, and publicly used Plaintiff Mr. Hartman's name through the Impersonator Account to directly promote its good, the Infringing Website.

444.     Defendants published, displayed, and publicly used Plaintiff Mr. Hartman's name and likeness through the Infringing Domain Name to directly promote its good, the Infringing Website.

445.     Seizing on the public's recognition and the value of Plaintiff Mr. Hartman's name and likeness, Defendants enjoyed wrongfully obtained recognition and attention to its good, the Infringing Website.

446.     The use of Plaintiff Mr. Hartman's name was for purposes of trade and for commercial purposes, as Defendants profited and benefitted commercially through its undeserved and wrongfully earned attention to its good, the Infringing Website, which was used, *inter alia*, for PIP's lead generation and to drive business away from Plaintiffs, as competitors, and towards Defendants.

447.     Defendants commercially exploited the property value of Plaintiff Mr. Hartman's name and likeness.

448.     Defendants did not have any consent at any time to use the name or likeness of Plaintiff Mr. Hartman.

449.     Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiff Mr. Hartman, and has caused, and will continue to cause, irreparable harm to Plaintiff unless enjoined.

450.     Moreover, the acts and conduct of Defendants in derogation of the rights of Plaintiff Mr. Hartman were fraudulent, malicious, and oppressive, thereby supporting the imposition of punitive damages against Defendants as the trier of fact may determine.

## COUNT XXIII

### Florida Statutory Invasion of Privacy -
### Commercial Misappropriation of a Person's Likeness
(*By Hartman against All Defendants*)

451.   Plaintiffs incorporate by reference their allegations in paragraphs 1 through 301 above.

452.   Defendants published, displayed, and publicly used Plaintiff Mr. Hartman's name through the Impersonator Account to directly promote its good, the Infringing Website.

453.   Defendants published, displayed, and publicly used Plaintiff Mr. Hartman's name and likeness through the Infringing Domain Name to directly promote its good, the Infringing Website.

454.   Seizing on the public's recognition and the value of Plaintiff Mr. Hartman's name and likeness, Defendants enjoyed wrongfully obtained recognition and attention to its good, the Infringing Website.

455.   The use of Plaintiff Mr. Hartman's name was for purposes of trade and for commercial purposes, as Defendants profited and benefitted commercially through its undeserved and wrongfully earned attention to its good, the Infringing Website, which was used, *inter alia*, for PIP's lead generation and to drive business away from Plaintiffs, as competitors, and towards Defendants.

456.   Defendants commercially exploited the property value of Plaintiff Mr. Hartman's name and likeness.

457.   Defendants did not have any consent at any time to use the name or likeness of Plaintiff Mr. Hartman.

458.   Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiff Mr. Hartman, and has caused, and will continue to cause, irreparable harm to Plaintiff unless enjoined.

459.   Moreover, the acts and conduct of Defendants in derogation of the rights of Plaintiff Mr. Hartman were fraudulent, malicious, and oppressive, thereby supporting the imposition of punitive damages against Defendants as the trier of fact may determine.

460.   Defendants, by their acts aforesaid, have engaged, and are engaged, in the unauthorized publication of Plaintiff Mr. Hartman's name or likeness in violation of Fla. Stat. § 540.08.

### PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

1.   For an order preliminarily and permanently enjoining Defendants, collectively and individually, and their officers, shareholders, partners, principals, agents, heirs, assignees, beneficiaries, successors, licensees, distributors, attorneys, proxies, alter egos, aliases, and all other persons acting in concert with Defendants, collectively or individually, from:

(a) registering or using as a trade name, trademark, service mark, Internet domain name, e-mail address, or portion thereof, any name or term that incorporates, imitates, or is confusingly similar to any of Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM;

(b) purchasing, selling, or using any form of advertising, including keywords or "AdWords" in Internet advertising containing any mark that incorporates, initiates, or is confusingly similar to Plaintiffs' federally registered

trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, and requiring Defendants, when purchasing or selling Internet advertising using keywords, AdWords or the like, to activate the name JASON HARTMAN as a negative keyword or negative AdWord in any Internet advertising purchased, sold or used;

(c) infringing Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, including all written and spoken terms equivalent or confusingly similar thereto;

(d) using Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, or any name or mark that incorporates, imitates, or is reminiscent of or confusingly similar thereto, for any product or service, or in any letterhead, sign, website, advertising or promotion, e-mail or other sales solicitation or business listing, either in print, broadcast, electronic or other form, either separately or compositely with other words;

(e) using Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, or any name or mark confusingly similar thereto, as a corporate and/or trade or business name and/or fictitious name or portion thereof;

(f) making representations, directly or indirectly, to anyone, anywhere, by any means, including but not limited to unauthorized co-branding, that Defendants are related to, associated or affiliated with, or sponsored, endorsed or approved by Plaintiffs;

(g) in any manner depicting, uttering or imitating Plaintiffs' federally registered trademarks and service marks, including JASON HARTMAN and JASONHARTMAN.COM, for the purpose of misappropriating the trade and goodwill of Plaintiffs by association, imitation, fraud, mistake or deception;

(h) unfairly competing with Plaintiffs in any manner; and

(i) contacting Plaintiffs' clients and colleagues with the intent to disseminate false or misleading information and in an effort to harm Plaintiffs and their businesses.

2.     For an order directing Defendants to file with this Court and serve upon Plaintiffs within thirty (30) days after service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with, and will continue to comply with, the injunction and further orders of this Court.

3.     For an accounting of profits pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

4.     For lost profits and damages in such amount as may appear appropriate following a trial on the merits, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

5.     For statutory damages in the amount of $2,000,000 per infringing domain name and email address used by Defendants to propagate their scheme described herein, pursuant Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(c)(2).

6.     For treble damages pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), 18 U.S.C. § 1964, and Fla. Stat. Ann. § 895.05(7).

7.     For statutory damages pursuant to the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386 (July 2, 1996), codified at Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c).

8.     For punitive damages as the trier of fact may determine.

9.     For costs and attorney fees pursuant to Section 35(a) and (b) of the Lanham Act, 15 U.S.C. § 1117(a) and (b), Fla. Stat. §501.2105, and 18 U.S.C. § 1964, and Fla. Stat. Ann. § 895.05(7).

10.    For such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: September 20, 2019                             Respectfully submitted,

/s/ Ava K. Doppelt
Ava K. Doppelt
Florida Bar No. 393738
adoppelt@allendyer.com
ALLEN, DYER, DOPPELT &
GILCHRIST, P.A.
255 S. Orange Avenue, Suite 1401
Orlando, Florida 32801
Tel. (407) 841-2330
Fax: (407) 841-2343

/s/ Steven Pollack
Steven Pollack, Esq.
(*Admitted Pro Hac Vice*)
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

*Attorneys for Plaintiffs*