**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 18-61907-CIV-SMITH/VALLE

PLATINUM PROPERTIES INVESTOR NETWORK, INC.; THE HARTMAN MEDIA COMPANY, LLC; and JASON HARTMAN,

Plaintiffs,

v.

CHARLES SELLS; STEPHANIE PUTICH; YOUNG CHUNG; THE PIP-GROUP, LLC; BLINDSPOT DIGITAL, LLC; ELENA CEBOTARI SELLS; and JOHN DOES 1-8,

Defendants.
______________________________________/

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS (D.E. 82)

Ava K. Doppelt, Esq.
Florida Bar No. 393738
adoppelt@allendyer.com
ALLEN, DYER, DOPPELT & GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

Steven Pollack, Esq.
*(Admitted Pro Hac Vice)*
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

Jeffrey E. Grell, Esq.
(*Admitted Pro Hac Vice*)
jgrell@grellfeist.com
GRELL FEIST PLC
825 Nicollet Mall, Suite 625
Minneapolis, MN 55402
Telephone: (612) 353-5530

*Counsel for Plaintiffs*

# TABLE OF CONTENTS


INTRODUCTION .......... 1

LEGAL STANDARD UNDER RULE 12(b)(6) .......... 2

ARGUMENT .......... 3

I. PLAINTIFFS STATE A SUBSTANTIVE RICO CLAIM (18 U.S.C. § 1962(c)) .......... 3

A. The SAC Alleges Two Actionable Enterprises .......... 3

B. The SAC Alleges An Open-ended Pattern of Racketeering .......... 7

II. DEFENDANTS' BOOTSTRAPPED ARGUMENTS ALSO FAIL .......... 11

III. PLAINTIFFS' CLAIMS AGAINST LENA ARE WELL-PLEADED .......... 11

IV. PLAINTIFFS' CLAIMS FOR COMMON LAW FRAUD (COUNT XX) AND NEGLIGENT MISREPRESENTATION (COUNT XXI) ARE WELL-PLEADED .......... 12

V. PLAINTIFFS' INVASION OF PRIVACY CLAIMS ARE WELL-PLEADED .......... 15

VI. DEFENDANTS' SINGLE-ACTION RULE ARGUMENT IGNORES THE SAC .......... 17

CONCLUSION .......... 19

## INTRODUCTION

Defendants' Partial Motion to Dismiss (D.E. 82) (the "Motion") is merely another dilatory tool meant to obstruct the administration of justice, delay accountability, and increase litigation expenses for Plaintiffs. With single-paragraph arguments and a deluge of randomly cited cases having little relevance, Defendants attempt to throw darts at a well-pleaded complaint, which is well-supported by ample evidence.[1] Documentary evidence, including ***Defendants' own documents*** produced in this case, support the allegations in the Second Amended Complaint (D.E. 75) (the "SAC"), and Defendants know that. The lengths to which Defendants went to increase their market share and defraud Plaintiffs, consumers, and the public-at-large is heinous.

Charles Sells ("Sells") used his business, The PIP-Group, LLC ("PIP"), to set up a criminal enterprise, spending countless man-hours and many thousands of dollars, to gain an unfair edge over competition and defraud consumers. In true Bonnie and Clyde fashion, Sells recruited his wife, a PIP contractor versed in lead-generation, and a senior PIP employee to devise a web of deceit. Among their many unscrupulous acts, Defendants assumed at least 12 false identities (¶ 246[2]), created at least eight fake e-mail accounts using false identification information, for fraudulent purposes (¶ 209), used international concealing agents routinely employed by cyber-criminals (¶ 5), duped at least three different marketing agencies using false identification information and offshore "burner" credit cards (*see, e.g.*, ¶¶ 145, 179-86, 196-98), used over nine online service providers (¶ 209), used multiple fake online profiles on a real estate investing platform to trick consumers (¶¶ 278-301), counterfeited Plaintiffs' trademarks to

---

[1] Defendants claim that "[t]he SAC includes one-hundred twenty-two (122) pages . . . and twenty-two (22) counts." This incorrect description is indicative of Defendants' gloss-over of the SAC. In reality, the SAC consists of one-hundred twelve (112) pages and twenty-three (23) counts.

[2] References to "¶ _" refer to paragraphs in the SAC.

mislead and misdirect consumers (¶¶ 73-76), lied to law enforcement in an attempt to derail a multi-state criminal investigation (¶¶ 134-44), and harassed and attempted to intimidate a witness to that investigation (¶¶ 145-49). In doing so, Defendants committed no-fewer than ten federal and state crimes. (¶¶ 206-66.) Contrary to Defendants' representation, Defendants harmed not only Plaintiffs and their clients but the many thousands of consumers and service providers who were duped by Defendants' misconduct. If not for Plaintiffs' pain-staking enforcement efforts, Defendants would have achieved their goal. (*See, e.g.*, ¶¶ 117, 125, 135, 150, 175-78, 181, 187, 190, 204, 366.)

**LEGAL STANDARD UNDER RULE 12(b)(6)**

"A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim tests the sufficiency of the complaint—it does not reach the merits of the case." *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 616CV2001ORL31GJK, 2017 WL 2834783, at *2 (M.D. Fla. 6/30/17) (citing *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984)). A court faced with such a motion to dismiss must accept all factual allegations in the complaint as true and construe the allegations "in the light most favorable to the plaintiffs." *See Rivell v. Private Health Care Systems, Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008). Ultimately, "[a] complaint is sufficient if [the facts alleged and the inferences drawn therefrom indicate that] the plaintiff is entitled to relief under any legal theory." *Bailey v. Janssen Pharmaceutica, Inc.*, 288 F. App'x 597, 603 (11th Cir. 2008).

The Supreme Court's most recent formulation of the pleading specificity "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [a] required element [of a claim]." *Bailey*, 288 F. App'x at 602. "It is sufficient if the complaint succeeds in 'identifying facts that are suggestive enough to render [the element] plausible.'" *Id.*

## ARGUMENT

### I. PLAINTIFFS STATE A SUBSTANTIVE RICO CLAIM (18 U.S.C. § 1962(c))

Defendants' arguments in support of their motion to dismiss Plaintiffs' RICO claims demonstrate only that Defendants do not understand RICO. Defendants accurately describe the elements of a § 1962(c) claim, but beyond that, Defendants' brief is near nonsense. Plaintiffs have alleged both actionable enterprises and a pattern of racketeering.

#### A. The SAC Alleges Two Actionable Enterprises

[3] Plaintiffs allege two actionable enterprises: (1) a legal entity enterprise and (2) an association-in-fact enterprise. As to the first type of enterprise, the SAC alleges that Defendants Sells, Lena, Putich, and Chung operated and managed PIP as a legal entity enterprise. (*See* ¶¶ 363, 377.) Defendants' Motion does not mention, let alone challenge, the sufficiency of PIP as a RICO enterprise because PIP is clearly actionable. PIP, as a legal entity, is distinct from the individuals who own, control or act on its behalf (*i.e.*, Defendants Sells, Lena, Putich, and Chung) and is also distinct from the pattern of racketeering. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001); *Boyle v. United States*, 556 U.S. 938, 955 (2009). The SAC, therefore, meets the enterprise element of RICO on this basis alone.

---

[3] Defendants cite a Seventh Circuit case to imply that a RICO claim must involve a "legitimate" firm or enterprise. (Motion at 4.) Certainly, "RICO was designed to protect legitimate enterprises from becoming vehicles through which unlawful activities are committed." (*Id.* (*quoting Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1356 (11th Cir. 2016).) Equally certain, however, is that RICO also applies to wholly illegitimate enterprises. In its very first decision concerning RICO, the Supreme Court held that "neither the language nor structure of RICO limits its application to legitimate 'enterprises.' Applying it also to criminal organizations does not render any portion of the statute superfluous nor does it create any structural incongruities within the framework of the Act." *United States v. Turkette*, 452 U.S. 576, 587, 590 (1981) (court's emphasis). The Court went on to explain that "the result is neither absurd or surprising. On the contrary, insulating the wholly criminal enterprise from prosecution under RICO is the more incongruous position…[W]e are unpersuaded that Congress confined the reach of the law to … *only* the infiltration of legitimate business." *Id.*; *see also Al-Rayes v. Willingham*, 914 F.3d 1302, 1309 (11th Cir. 2019) ("Not only has the Supreme Court rejected the assertion that an association-in-fact enterprise must be 'businesslike,' it has also instructed lower courts not to require that association-in-fact enterprises have the formal characteristics often associated with businesses or other legal entities."). The legitimacy or illegitimacy of the enterprise is irrelevant.

Although the SAC can proceed solely on the basis of its allegations concerning PIP as an enterprise, it additionally alleges an association-in-fact enterprise, which is also actionable. (*See* ¶¶ 362, 376.) Defendants acknowledge that the SAC adequately alleges an actionable purpose and the necessary association-relationships (Motion at 5), so they only "challenge the third structural feature of an 'association-in-fact' enterprise:" the longevity requirement. (*Id.*)

In support of their challenge, Defendants cite three cases, but each of those cases simply sustained the plaintiffs' RICO claims, holding that those particular enterprises, which happened to last a period of years, possessed sufficient longevity.[4] ***None of the cases cited by Defendants states or even implies that longevity requires "an extended period of time, usually at least a few years***." (*Id.*) The fact that a particular enterprise lasting several years satisfied the longevity requirement does not mean that any enterprise lasting less than several years necessarily fails to constitute an enterprise. Defendants' argument is not sanctioned by the Supreme Court's decision in *Boyle v. United States* or any Eleventh Circuit case, and is indeed contrary to the great weight of authority.

Courts have held that an association-in-fact enterprise may possess sufficient longevity even if it functions only for a few months. *See, e.g., Caro-Bonet v. Lotus Mgmt., LLC*, 195 F. Supp.3d 428, 432 (D. Puerto Rico 2016) (an enterprise that functioned for seven months possessed sufficient longevity); *BAC Home Loans Servicing, LP v. Texas Realty Holdings, LLC*, 901 F. Supp. 2d 884, 919 (S.D. Tex. 2012) (a tax-lien scheme enterprise was actionable where defendants obtained multiple tax loans and defaulted on them less than three months later); *Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F. Supp. 2d 911, 1037-38 (C.D. Cal. 2011)

[4] *See* Motion at 5 (citing *Laudien v. Caudill*, 92 F. Supp.3d. 614, (E.D. Ky. 2015) (stating "[Plaintiff] has made a plausible showing that the total duration of the enterprise was approximately four years, which is enough time to [satisfy the longevity requirement]"); *United States v. Eiland*, 738 F.3d 338, 360 (11th Cir. 2013) (holding that an enterprise lasting two years was "sufficient to permit the [] associates to pursue the enterprise's purpose" and actionable); *Ouwinga v. Benistar 419 Plan Servs.*, 694 F.3d 783, 794-95 (6th Cir. 2012) (holding that an enterprise that functioned for five years was actionable)).

(denying summary judgment on the issue of enterprise even though the association-in-fact enterprise operated for no more than four months). Defendants' reliance on *Jones v. Scott Davis Chip Mill*, 2017 WL 5127717 (N.D. Ala. Nov. 11, 2017) is misplaced. In *Jones*, the plaintiff alleged an association-in-fact enterprise consisting of McMillan, Davis and Brasher, but the complaint's only allegation against Davis was that he gave Brasher the idea to commit the crime; thereafter, "there is simply no evidence … that Davis helped Brasher carry out the scheme, supervised the scheme, or even discussed the scheme with Brasher again." (*Id.* at *18.) As to McMillan, he put a stop to the crime as soon as he found out about it, "suggesting that the common purpose prong may not be satisfied." *Id.* In the SAC, Plaintiffs allege that all members of the enterprise were actively engaged throughout the scheme, and that the scheme stopped only because Plaintiffs forced it to stop.

Indeed, *Boyle* never even discusses the longevity requirement in terms of temporal duration. Instead, the Supreme Court adopted a much more flexible standard, divorced from any specific durational requirements, simply saying that the enterprise's longevity must be "sufficient to permit these associates to pursue the enterprise's purpose." *Id.* (quoting *Boyle*, 556 U.S. at 946). Importantly, the Supreme Court requires only that the enterprise function long enough to ***pursue*** its purpose(s); longevity does not require the enterprise to ***achieve*** its purpose, in part or in whole. *Id.* Plaintiffs' alleged association-in-fact enterprise possessed(es) sufficient longevity to ***pursue*** its purpose(s). According to the SAC, Defendants pursued their purposes by taking all of the following actions (among others):

- They acquired and established counterfeit website domains. (¶¶ 72-81, 86, 153.)

- They used PIP's property and assets to host the counterfeit domains and infringing websites. (¶ 83.)

- They used unauthorized copies of Plaintiffs' service marks and copyrighted works in their efforts to disparage Plaintiffs. (¶ 87.)
- They published false statements regarding Plaintiffs' business, financial history, litigation history, commercial dealings, alleged prurient nature, credibility, and trustworthiness. (¶¶ 87.)
- They misused court documents to commit fraud on the public. (¶¶ 88-90.)
- They tracked and solicited Plaintiffs' clients using guile, impersonation, and the secret installation of computer malware (*i.e.*, cookies and trackers). (¶¶ 92-94, 110-114.)
- They sent imposter emails to Plaintiffs' clients, making it appear that the emails were coming from Plaintiffs, when instead they were coming from Defendants. (¶¶ 96-109, 127-133.)
- They lied to law enforcement in an attempt to derail a multi-state criminal investigation that would have stopped their schemes. (¶¶ 134-44.)
- They harassed and attempted to intimidate a witness to that investigation. (¶¶ 145-49.)
- They sent countless false and deceptive emails regarding Plaintiffs. (¶¶ 150-186, 191-205.)
- They created false endorsements and acclaim for PIP. (¶¶ 278-301.)

(*See also id.* at ¶¶ 209-220.) Plaintiffs' alleged association-in-fact enterprise possesses longevity sufficient to pursue its purpose(s). To the extent the alleged association-in-fact enterprise stopped pursuing its purposes, that stoppage occurred only because Plaintiffs took repeated actions against Defendants, which ultimately forced Defendants to cease their criminal conduct. (*Id.* at ¶¶ 95, 125, 134-144, 150-152, 178, 187-190, 204.) Plaintiffs further allege that Defendants will resume pursuit of their objectives at the earliest opportunity. (*Id.* at ¶ 205.) Once again, "the very concept of an association in fact is expansive." *Al-Rayes*, 914 F.3d at 1307 (citing *Boyle*, 556 U.S. at 944). Like the alleged legal entity enterprise, Plaintiffs' alleged association-in-fact enterprise is actionable, so Defendants' Motion must be denied.

### B. <u>The SAC Alleges An Open-ended Pattern of Racketeering</u>

Defendants expend great energy arguing that Plaintiffs did not allege a closed-ended pattern of racketeering, but the SAC does not even attempt to allege closed-ended continuity. (*ECF No. 75* at ¶¶ 366, 379.) The SAC alleges only open-ended continuity. (*Id.*) Certainly, closed-ended continuity exists when a pattern "extend[s] over a substantial period of time." *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 242 (1989). If this were the only way continuity could be established, however, RICO plaintiffs would have no choice but to sit back and wait for a substantial period of time, allowing the defendant to carry on with its criminal activity (without any fear of reprisal) while the plaintiff is injured over and over and over again. A RICO plaintiff need not sit back and wait. In fact, the Supreme Court requires that a RICO plaintiff act with diligence. *See Rotella v. Wood*, 528 U.S. 549, 561 (2000); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-196 (1997). Open-ended continuity is intended to address those situations where a RICO plaintiff discovers acts of racketeering and diligently brings a RICO claim, regardless of whether the acts of racketeering have extended for a substantial period of time.

Open-ended continuity "depends on whether the *threat* of continuity is demonstrated." *H.J. Inc.*, 492 U.S. at 242 (court's emphasis). This *threat* may be implicit or explicit. *Id.* The threat of continuity is viewed at the time the racketeering activity occurred, and without the benefit of hindsight. *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991).

Without "covering the field of possibilities," the Supreme Court said a threat can be demonstrated when the acts of racketeering have become the "regular way of conducting the defendant's ongoing legitimate business." *H.J. Inc.*, 492 U.S. at 243. Here, Defendants are allegedly engaged in an ongoing legitimate business that "invest[s] in distressed assets such as tax liens, tax deeds, traditional bank foreclosures, fix-and-flips, and long-term buy/hold cash-flowing" and provides "real estate investment advice." (¶¶ 12-20.) Defendants have been

engaged in this business since at least 2004. (¶ 14.) Defendants were all employees, contractors or owners of the legitimate business enterprise. (¶¶ 12-20.) Pursuant to their legitimate business, Defendants are competitors of Plaintiffs. (¶ 2.)

Plaintiffs further allege that in the course of their regular business, Defendants engage(d) in a scheme to defraud Plaintiffs and others of property, money, clients, and intellectual property, by unfairly competing with Plaintiffs through the use of counterfeit domain names and fraudulent misrepresentations, among other things. (*Id.* at ¶ 3.) Contrary to Defendants' argument, the SAC is not pled "in conclusory fashion." (Motion at 8.) Defendants make no Rule 9(b) argument, nor could they. The SAC pleads specific instances of Defendants' repeated establishment of infringing websites (¶¶ 82-95, 153-167), false emails, impersonation of Plaintiffs and harassment of Plaintiffs' clients (¶¶ 96-109, 125-133, 168-186, 191-205), publication of false internet posts disparaging Plaintiffs (¶¶ 110-116), and false statements to law enforcement (¶¶ 134-149). The SAC contains a chart that – by itself – pleads the particulars of nearly 30 acts of wire fraud. (¶ 215.) The SAC also alleges facts to support the assertion that Defendants' conduct threatened to continue indefinitely. (¶¶ 366, 379.) Defendants demonstrated extreme guile and cunning in their efforts to avoid detection and to perpetuate their fraud despite Plaintiffs' best efforts to stop it. To conceal their identities Defendants did not purchase infringing website domains directly and openly, but through Njalla and Bluehost, who are internet middlemen acting as a "privacy shield" for scam artists. (¶¶ 24, 74, 77, 151-154.) Defendants further used anonymous email services (like ProtonMail, Gmail, ToGuard, and Mailchimp) to send emails impersonating Plaintiffs to Plaintiffs' clients and business associates. (¶¶ 96, 126, 157.) Defendants encouraged the recipients of their false information to share the disparaging information to a broader audience, exponentially multiplying the effectiveness of their campaign of falsehoods. (¶ 102.) Defendants also invited the recipients to do business with

them, while secretly obtaining personal computer information from them and tracking their internet behavior. (¶ 225.) Defendants also unfairly competed with Plaintiffs and other market participants by assuming false identities and creating false acclaim for PIP on an online real estate investing forum. (¶¶ 278-300.) Once Defendants were identified, Plaintiffs sought to stop them, and to the extent Defendants ended their scheme to defraud and defame Plaintiffs, it was only because of Plaintiffs' repeated cease and desist letters (¶¶ 95, 117, 177-178), complaints to and investigations by law enforcement (¶¶ 135-139), complaints to the World Intellectual Property Organization (150-152, 187-190), and the very complaint that Defendants now seek to dismiss (¶¶ 204-205). If the SAC does not – at a minimum – allege an implicit threat of continuing criminal conduct, it is hard to imagine a complaint that would.[5]

Defendants argue that there is no continuing threat because "Defendants [sic] conduct has ceased" (Motion at 8), but Plaintiffs forced the cessation of Defendants' criminal conduct – at least for now.[6] Defendants did not voluntarily terminate their conduct. *Compare with Jones*, 2017 WL 5127717 at *18 (there was no continuity because one defendant put an end to the

---

[5] Defendants argue that there can be no continuity because their scheme is directed at "a single victim – Plaintiffs." (Motion at 9.) Ignoring Defendants' internal inconsistency, *i.e.*, referring on one hand to "a single victim" while referring to plural "Plaintiffs" on the other hand, the argument is also wrong. There are alleged countless victims of Defendants' scheme, although they are not plaintiffs to this action Defendants' false emails misled countless clients, causing them to waste time and resources to unravel the ruse. Regardless, courts commonly sustain RICO claims brought by a single victim. *See, e.g., Cedric Kushner*, 533 U.S. at 166 (sustaining RICO claim brought by single corporation); *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (reversing order to dismiss RICO claim brought by a single employee against his employer, who obstructed justice by terminating employee who engaged in protected activity); *Handeen v. LeMaire*, 112 F.3d 1339, 1351 (8th Cir. 1997) (sustaining RICO claim brought by a single judgement creditor who had been defrauded of his judgement); *Laudien*, 92 F. Supp.3d at 620 (denying motion to dismiss RICO claim brought by the administratrix of a decedent's estate).

[6] Notably, Defendants continued engaging in misconduct even after being named in this Action. (¶¶ 180-250.) Additionally, Defendants still own almost all of the fraudulent e-mail accounts and potentially countless other yet undiscovered e-mail addresses that were used to perpetrate the misconduct described in the SAC. Defendants also still own the website hosting accounts used to perpetrate the misconduct. Moreover, as noted by Defendants, the parties have been at each other's throats for years and there is no end in sight. (ECF 86 at 59) ("Sells and Hartman, and certain of Hartman's related companies, have consistently been involved in litigation dating back to 2014.") Defendants elevated the parties' animus to an unprecedented and criminal level, and there is no indication that their creative criminal minds intend to stop here. Indeed, Defendants' averment of frivolous counterclaims and baseless motions, like this Motion, is further evidence that Defendants have no intention of ceasing their crusade against Plaintiffs.

criminal conduct as soon as he discovered it). Courts have long held that a defendant does not benefit from the fortuitous interruption of his criminal conduct. *See Lugo v. State*, 845 So. 2d 74, 100 n.50 (Fla. 2003) (citing *State v. Lucas*, 600 So.2d 1093, 1095 (Fla. 1992).)

This is because "in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred." *Busacca*, 936 F.2d at 238. Subsequent events, such as the temporary cessation of the misconduct, are irrelevant to the continuity determination. *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410 (6th Cir. 2012) (quoting *Busacca*.). In other words, the question of whether the defendant's acts threaten to continue indefinitely is not viewed with the benefit of hindsight, and a finding of open-ended continuity is not precluded, when a defendant's pattern of racketeering is interpreted by events that are beyond the defendant's control, such as the commencement of legal action, arrest, indictment, or guilty verdict. *See Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1529-30 (9th Cir. 1995) (citing *Busacca*, 936 F.2d at 238); *see also Lucas*, 600 So.2d at 1095 (applying *Busacca* to a claim under the "Florida RICO Act" and holding that the pattern was open-ended); *CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924, 929 (4th Cir. 2013); *United States v. Cadden*, 2016 WL 3167066, *3 n.7 (D. Mass. June 6, 2016); *Nafta v. Feniks Int'l House of Trade (U.S.A.) Inc.*, 932 F. Supp. 422, 427-428 (E.D.N.Y. 1996). The SAC alleges that Plaintiffs fought mightily to terminate Defendants' pattern of racketeering, and when one effort succeeded, Defendants re-emerged elsewhere to continue their scheme to defraud and defame Plaintiffs – like a sick game of internet whack-a-mole. Even as of the filing of this opposition brief, Plaintiffs are still being forced to take efforts to stop Defendants' rampant and widespread misconduct. (*See* ¶¶ 204-205.) Under these circumstances, a determination that open-ended continuity has not been pled would only punish a diligent plaintiff while rewarding an unrepentant and repugnant perpetrator. Defendants' Motion must be denied.

## II. DEFENDANTS' BOOTSTRAPPED ARGUMENTS ALSO FAIL

Defendants bootstrap their arguments against Plaintiffs' claims for RICO conspiracy (Count IX), "Florida RICO (Count X)[,] and Florida RICO conspiracy (Count XI)" to their argument against Plaintiffs' federal RICO claim (Count VIII). (Motion at 9-10.) Accordingly, as Plaintiffs' Federal RICO claim (Count VIII) should survive, Defendants' bootstrapped arguments must fail, and Plaintiffs' Counts IX, X and XI should also survive.

## III. PLAINTIFFS' CLAIMS AGAINST LENA ARE WELL-PLEADED

Defendants lob a one-paragraph argument in their Motion seeking dismissal of Elena Cebotari Sells ("Lena") because, apparently, "Lena is only specifically referenced in the RICO counts of the Second Amended Complaint." (Motion at 3.) This is factually false. (*See, e.g.*, ¶¶ 72, 124, 195, 202). Defendants make no serious argument for her dismissal.

Lena is PIP's Director of Operations (¶ 15). She assisted with the development and execution of the plan to debilitate Plaintiffs and their businesses through the creation of counterfeit domain names and infringing websites. (¶ 72.) She directly and specifically assisted in the creation of the email distribution list that that was used by Defendants to perpetrate their misconduct. (¶ 124) Indeed, the SAC expressly alleges, "Sells then assigned the task of listening to Plaintiffs' podcasts and YouTube videos, in order to find additional clients and colleagues to add to the email distribution list, to Lena. Lena knowingly and intentionally assisted Sells in that endeavor." (*Id.*) Lena also prepared fraudulent content for distribution to Plaintiffs' clients and colleagues. (¶ 195; *see also* ¶ 202.) She also created false identities for use on BiggerPockets and directed users to visit the counterfeit domain names. (¶¶ 111-14, 209.) She is adequately notified of the allegations against her by the specific allegations in the SAC. (¶¶ 15-16, 72, 111-14, 124, 195, 202, 209, 362-63, 365-67, 371-73, 376-80, 383-85.) Defendants' argument is frivolous.

## IV. <u>PLAINTIFFS' CLAIMS FOR COMMON LAW FRAUD (COUNT XX) AND NEGLIGENT MISREPRESENTATION (COUNT XXI) ARE WELL-PLEADED</u>

Defendants distort the substance of Plaintiffs' fraud and negligent misrepresentation claims, and then seek dismissal claiming a lack of justifiable reliance and recoverable damages. (Motion at 10-13.) Defendants argue that because Plaintiffs knew that many of the representations that Defendants made in their emails and online posts were false, so too Plaintiffs must have known that Defendants were also lying about their identity and network. (*See* Motion at 11-12.) Next, Defendants argue that Plaintiffs have not suffered any damage by their reliance on Defendants' fraudulent misrepresentations because Plaintiffs only spent money on investigation efforts "in order to file this lawsuit." (*See* Motion at 12-13.) Both arguments ignore the express allegations in the SAC.

Defendants made several representations specifically to mislead Plaintiffs. On June 30, 2018, Hartman filed a criminal complaint with law enforcement naming Sells as a potential suspect. (¶¶ 135-36.) On or around August 14, 2019, Sells was made aware that he was named as a suspect in connection with the misconduct described in the SAC. (¶ 140.) Thereafter, Defendants made statements to Plaintiffs directly, and to third-parties intending the message to get to Plaintiffs, that Sells was *not* the party responsible for the misconduct. For example, on August 17, 2018, Defendants represented to the public and directly to The Hartman Media Company, LLC's producer, that by naming Sells as a suspect, Hartman had filed a false criminal claim against Sells. (¶¶ 145-49.) Three days later, on August 17, 2018, "Sells and his agents falsely represented that Sells was just 'One of Our Contributors,' and that his contribution to the Infringing Website was new." (¶ 172.) Three days after that, on August 20, 2018, Sells represented to Plaintiffs' client and colleague, "We are a collective of investors, service providers and vendors." (¶ 170.) The next month, on September 10, 2018, Plaintiffs contacted

Defendants directly through the "Contact Us" form on the Infringing Website to which Defendants replied to Plaintiffs the following: "Curiosity has us all wondering why you are so focused on your attack of Charles Sells? Yes, he is more than happy to help expose the truth, but . . . how could you possibly believe this could be about one man?" (¶ 434-35.) These are just a few of the many misrepresentations meant to mislead Plaintiffs. And Plaintiffs did indeed rely on these misrepresentations. (¶ 437.) Among other things, Plaintiffs spent many thousands of dollars on hiring forensic experts to identify the perpetrator who Plaintiffs were led to believe was falsely identified in Hartman's criminal complaint. (*Id.*) Defendants' conduct also caused "substantial emotional and pecuniary harm and injury to Plaintiffs." (¶ 438.) Defendants cherry-pick and completely omit the aforementioned misrepresentations. (Motion at 11-12.) On this basis alone, Defendants' analysis is moot.

Moreover, Defendants have not established – nor can they – that Plaintiffs knew that the above-referenced misrepresentations were false or that their falsity was obvious to Plaintiffs.[7] Indeed, the SAC belies such a conclusion and amply alleges that discovering the falsity of Defendants' representations only became possible after Plaintiffs fought for expedited discovery in this action, which had to be commenced as a "John Doe" suit. (¶¶ 5-7, 77, 134, 150-52, 241-52.) Accordingly, Defendants' reliance argument fails.

Defendants' second argument relating to damages fails quickly. Initially, Defendants are inappropriately requesting the Court to "sort out the type of damages that can be awarded" on Plaintiffs' fraud claim. *Razor Capital, LLC v. CMAX Fin. LLC*, No. 17-80388-CIV, 2017 WL 3481761, at *6 (S.D. Fla. Aug. 14, 2017) ("it is not appropriate at the motion to dismiss stage to

[7] *See generally Butler v. Yusem*, 44 So.3d 102 (Fla. 2010) ("a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him."); 27 Fla. Jur 2d Fraud and Deceit § 47.

sort out the type of damages that can be awarded."); *Lady Di Fishing Team, LLC v. Brunswick Corp.*, No. 3:07–cv–402–J–33TEM, 2007 WL 3202715, at * 9 (M.D. Fla. Oct. 29, 2007) (denying without prejudice motion to strike the plaintiff's claim for incidental and consequential damages at the motion to dismiss stage). In this motion to dismiss, Defendants' request is premature.

Next, contrary to Defendants' assertions (Motion at 12-13), Plaintiffs' damages are directly tied to the relevant misrepresentations. (*See* ¶ 437.) Among other things, Plaintiffs seek costs they would not have expended but for Defendants' misrepresentations, including costs for forensic investigators. *See Lopez v. Rica Foods, Inc.*, 277 F. App'x 931, 932–33 (11th Cir. 2008) ("To adequately plead causation in a fraud claim under Florida law, a plaintiff must only allege damage or injury as a result of the misrepresentation.") Hartman also seeks compensation for the emotional injuries caused to him by, *inter alia*, being led to believe (1) he filed a false police report naming Sells as a suspect, and (2) that his clients had formed a collective unit meant to destroy him. Moreover, he had to live every day doubting who he could trust or who was harassing him – all of which stem from his reliance on Defendants' malicious misrepresentations.

Finally, Defendants' assumption that the identification of Defendants was solely for litigation purposes is irrelevant, but also misplaced. Plaintiffs sought to identify Defendants for a myriad of non-litigation reasons including but not limited to (1) knowing that Hartman had not filed a false police report, (2) knowing that Plaintiffs were not harming or in any way committing a disservice to their clients and vendors – which would have led to costly corporate and business reforms, (3) providing Plaintiffs the ability to undertake enforcement efforts besides litigation to attempt to stop Defendants' conduct, and (4) ensuring that no data breach of Plaintiffs' systems had occurred. Plaintiffs are permitted to hold Defendants accountable for their fraud, including

by seeking compensatory damages for losses sustained because of Plaintiffs' reliance on Defendants' fraudulent misrepresentations.

## V. PLAINTIFFS' INVASION OF PRIVACY CLAIMS ARE WELL-PLEADED

The parties generally agree on the applicable law for Plaintiffs' invasion of privacy claims but Defendants botch its application. (*See* Motion at 13-15.) Fla. Stat. § 540.08 "prohibits the unauthorized use of a person's name or likeness for commercial, trade, or advertising purposes. The use is actionable under the statute because of the way the defendants associate the individual's name or personality with something else." *Valentine v. C.B.S., Inc.*, 698 F.2d 430, 433 (11th Cir. 1983). Here, among other things, Defendants used Hartman's name in at least five different domain names. (¶¶ 73-76.) Each such domain name – and thus Hartman's name – was used to *directly* promote Defendants' fully assembled product, the Infringing Website.[8] (¶¶ 444-45, 452-53.) Defendants' product, the Infringing Website, was used for commercial, trade, *and* advertising purposes. (¶¶ 446, 455.) Defendants did not only imply endorsement, they went a step further by passing off their products (*i.e.*, domain names), and email addresses, as belonging to Hartman. (*See* ¶¶ 73-80, 96-97, 348-49.)

Defendants aver "[t]here is no allegation whatsoever in the Second Amended Complaint that the website used Hartman's name, which in turn directly promoted and caused third parties to sign-up to do business with PIP or any of the other Defendants." (Motion at 14.) Once again, Defendants show that they simply have not read the SAC. The SAC alleges that Defendants solicited their business and services through, among other things, the "Contact Us" webform on the Infringing Website, hosted on the domain names using Hartman's name. (*See, e.g.*, ¶¶ 92-93 (alleging that Defendants sought to "take [Plaintiffs'] clients" through the "Contact Us" fill-in form), ¶¶ 113-14

[8] Notably, Hartman's invasion of privacy claims take no issue with the mere mention of Hartman's name in the context of Defendants' false and misleading representations, in the body or headers of emails, or in any narrative. (*See* ¶¶ 443-450, 452-60.) The subject claims only take issue with the use of Hartman's name in the direct promotion of the Defendants' website-product. Accordingly, Defendants' reliance on *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1360 (N.D. Fla. 2010) is entirely misplaced.

(Defendants used the "Contact Us" form and "abuse[d] the Service Marks as a means to obtain leads for commercial opportunities"), ¶ 304 (website visitors "were encouraged to complete a 'Contact Us' form to become leads for Defendants' business, which offered the same services as Plaintiffs' businesses"), ¶ 354.) In engaging in their misconduct, "Defendants have reaped extraordinary profits." (¶ 308; *see also* ¶¶ 326, 334, 368, 374, 397, 446, 455.)

Defendants point to no legal requirement that the product promoted by Defendants' misappropriation be for sale. This is because no such requirement exists. In *Tyne v. Time Warner Entm't Co., L.P.*, the Florida Supreme Court rejected the argument that limiting the statute to only those situations that "directly promote a product or service" necessarily meant that the use had to be in some kind of advertisement of goods or services for sale. 901 So. 2d 802, 808 (Fla. 2005). In support of its holding, the Court discussed *Ewing v. A–1 Management, Inc.*, 481 So.2d 99 (Fla. 3d DCA 1986). In *Ewing*, the defendants published the names and addresses of the plaintiffs as parents of a fugitive from justice on a wanted poster distributed by the defendant surety company after the plaintiff's son fled while on bail. *Tyne*, 901 So. 2d at 808. The defendant in *Ewing* wasn't selling the wanted poster that made use of plaintiffs' names. The wanted poster was just being used for commercial purposes (*i.e.*, to find the fugitive that the surety company was on the hook for).

The other case positively cited by the *Tyne* court is similar. In *American Ventures, Inc. v. Post, Buckley, Schuh & Jernigan, Inc.*, the defendant used plaintiff's name and resume in business pitch materials provided to Broward County in an attempt to secure a contract for substantial engineering work on a water pipeline. *See* No. C92–1817Z, 1993 WL 468643 at *2, *6 (W.D.Wash. May 18, 1993). The defendant wasn't selling the pitch materials. It was using the pitch materials to secure a commercial opportunity.

The present case is analogous to both the aforementioned cases approved by the *Tyne* court. Defendants used Hartman's name in domain names directly to promote their product (*i.e.*, the infringing website), and in a way that implied false endorsement and even ownership.[9] Like the defendants in *Ewing* and *American Ventures*, Defendants did not sell their product directly. Rather, they used it to secure commercial opportunities and to generate leads for the sale of PIP's services. Like the plaintiffs in *Ewing* and *American Ventures*, Plaintiffs have also stated an actionable claim for invasion of privacy and statutory misappropriation.

## VI. DEFENDANTS' SINGLE-ACTION RULE ARGUMENT IGNORES THE SAC

Again, the parties generally agree on the applicable law but not its application. On the point of law that Defendants omit, Plaintiffs fill in the gap. The single action rule applies only when there exists "a failed defamation claim." *Ovadia v. Bloom*, 756 So.2d 137, 141 (3d DCA 2000); *see also Fridovich v. Fridovich*, 598 So.2d 65, 69 (Fla. 1992) ("It is clear that a plaintiff is not permitted to make an end-run around a ***successfully invoked*** defamation privilege by simply renaming the cause of action and repleading the same facts.") (Emphasis added); *see also Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 210 (4th DCA 2002). Indeed, even Defendants' cited cases acknowledge that the single action rule "is designed to prevent plaintiffs from circumventing ***a valid defense*** to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm." *Kamau v. Slate*, No. 4:11CV522-RH/CAS, 2012 WL 5390001, at *7 (N.D. Fla. Oct. 1, 2012), *report and recommendation adopted*, No. 4:11CV522-RH/CAS, 2012 WL 5389836 (N.D. Fla. Nov. 5, 2012) (emphasis added). Here, no defamation claim has even been challenged, let alone failed. For this reason alone, the single action rule is inapplicable.

---

[9] The distinction that the product here is an intangible product rather than a t-shirt should not make any difference. In 2019, domain names and websites are treated as exchangeable property just as any t-shirt would be. (*See, e.g.*, GoDaddy.com.)

Next, as Defendants acknowledge (Motion at 15), the single action rule dictates that a "claim for defamation cannot be re-characterized in additional, separate counts for libel, slander, or the intentional infliction of emotional distress if the claim arises from the same publication." *Kamau*, 2012 WL 5390001, at *7 (N.D. Fla. Oct. 1, 2012). Plaintiffs try no such thing. Defendants' misapplication of the rule is directly evident from their misrepresentation that "Plaintiffs have alleged several defamation counts…" (Motion at 15.) This is false. The SAC clearly specifies that the defamation claims are brought solely by Hartman. (*See* SAC at pp. 100, 102.) The other Plaintiffs bring no defamation claim based on *any* publication. Conversely, Hartman brings no tortious interference or injurious falsehood claim. (*See* SAC at pp. 98-99.) This alone defeats Defendants' argument.

Moreover, as it currently stands, each claim by each Plaintiff is "properly pled upon the existence of independent facts." *Fridovich*, 598 So.2d at 70; *see also Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 618CV576ORL28DCI, 2019 WL 5328738, at *4 (M.D. Fla. Oct. 21, 2019) ("Plaintiffs aptly note that their tortious interference and FDUTPA claims are not based solely on the website statements that ground their trade libel claim. Instead, those counts include allegations regarding letters Defendants sent to the owners and advice that Defendants gave to the owners—not defamatory statements published about Plaintiffs.").

Finally, Plaintiffs' cautious approach was superfluous since there were so many defamatory publications made by Defendants (*see* ¶¶ 215, 416-17) that all Plaintiffs can easily bring the same causes of action based on different defamatory statements and publications. *See Kamau*, 2012 WL 5390001, at *8 ("to the degree Plaintiffs may present separate claims based on separate publications which fall within the two-year statute of limitations, they could proceed."); *Primerica Fin. Servs., Inc. v. Mitchell*, 48 F.Supp.2d 1363, 1368 (S.D. Fla. 1999) (permitting a tortious interference claim to proceed and noting that although plaintiffs "appear to be relying in

large part upon allegedly untruthful statements in support of their tortious interference claim, they have also pled the other circumstances and facts necessary in support of a claim for tortious interference."). To the extent the Court is inclined to dismiss any causes of action, Plaintiffs respectfully request an opportunity to specify which publications each claim is reliant upon.

There are no statute of limitations issues here, and there is no end-run. Each Plaintiff was injured in a unique way, and seeks to hold Defendants accountable. Defendants' dilatory Motion should be denied.

## CONCLUSION

For all of the aforementioned reasons, Plaintiffs respectfully request that the Court deny, in its entirety, Defendants' Partial Motion to Dismiss the Second Amended Complaint. In the alternative, Plaintiffs respectfully request that the Court grant Plaintiffs the right to replead any causes of action that are deficient. Plaintiffs further request that the Court impose sanctions on Defendants and their counsel to the extent their arguments are baseless, duplicative, or are not reasonably made in good faith pursuant to 28 U.S.C. § 1927 (*see, e.g.*, Motion at 3).

Dated November 1, 2019

Respectfully submitted,

By: /s/ Ava K. Doppelt
Ava K. Doppelt, Esq.
Florida Bar No. 393738
adoppelt@allendyer.com
ALLEN, DYER, DOPPELT
& GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

/s/ Steven Pollack
Steven Pollack, Esq.
(*Admitted Pro Hac Vice)*
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

/s/ Jeffrey E. Grell
Jeffrey E. Grell, Esq.
(*Admitted Pro Hac Vice*)
jgrell@grellfeist.com
GRELL FEIST PLC
825 Nicollet Mall, Suite 625
Minneapolis, MN 55402
Telephone: (612) 353-5530
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 1, 2019, I electronically filed the foregoing using the Case Management/Electronic Case Filing ("CM/ECF") system, which will send a Notice of Electronic Filing to the following CM/ECF participants:

/s/Ava K. Doppelt
Ava K. Doppelt, Esq.
Florida Bar No. 393738

**SERVICE LIST**

Jeffrey M. Partlow, Esq.
Florida Bar No. 110627
jeffrey.partlow@csklegal.com
COLE, SCOTT & KISSANE, P.A.
Tower Place, Suite 400
1900 Summit Tower Boulevard
Orlando, Florida 32810
Telephone: (321) 972-0025
Facsimile: (321) 972-0099

*Counsel for Defendants*

David S. Klein, Esq.
dklein@rlklawfirm.com
Alexandra M. Dishun
(Admitted *Pro Hac Vice*)
adishun@rklawfirm.com
ROUNTREE, LEITMAN
& KLEIN, LLC
Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, Georgia 30329
Telephone: (404) 856-0540
Facsimile: (404) 704-0246

*Counsel for Defendants*

Ava K. Doppelt, Esq.
Florida Bar No. 393738
adoppelt@allendyer.com
ALLEN, DYER, DOPPELT
& GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

*Counsel for Plaintiffs*

Steven Pollack, Esq.
(Admitted *Pro Hac Vice*)
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

*Counsel for Plaintiffs*

Jeffrey E. Grell, Esq.
GRELL FEIST PLC
(Admitted *Pro Hac Vice*)
jgrell@grellfeist.com
825 Nicollet Mall, Suite 625
Minneapolis, MN 55402
Telephone: (612) 353-5530

*Counsel for Plaintiffs*