# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 18-61907-CIV-SMITH/VALLE

PLATINUM PROPERTIES INVESTOR
NETWORK, INC.; THE HARTMAN MEDIA
COMPANY, LLC; and JASON HARTMAN,

        Plaintiffs,

    v.

CHARLES SELLS; STEPHANIE PUTICH;
YOUNG CHUNG; THE PIP-GROUP, LLC;
BLINDSPOT DIGITAL, LLC; ELENA
CEBOTARI SELLS; and JOHN DOES 1-8,

        Defendants.
_____/


## <u>EXPERT REPORT OF CRAIG KRONENBERGER</u>


**Prepared for**:
Pollack Law, P.C., counsel for Plaintiffs

**Submitted By**:
Stripe Reputation, Inc. 1190 North Highland Ave Atlanta, GA 31106

**Dated:**
February 10, 2020

**INTRODUCTION**

**A. The Assignment**

Pollack Law, P.C. (the "Firm") retained Stripe Reputation, Inc. to provide expert opinions concerning the online or digital reputation of Plaintiffs Platinum Properties Investor Network, Inc., The Hartman Media Company, LLC, and Jason Hartman (collectively, "Plaintiffs") in connection with claims for, among others, false advertising, unfair competition, injurious falsehood and defamation against Charles Sells; Stephanie Putich; Young Chung; The Pip-Group, LLC; Blindspot Digital, LLC; Elena Cebotari Sells; and John Does 1-8; United States District Court, Southern District of Florida, Case No. 18-61907-CIV-SMITH/VALLE (the "Lawsuit"). Specifically, the Firm asked Stripe to evaluate the volume and reach of online content and conversation involving Jason Hartman and determine the cost of a digital campaign designed to reach the audience to which the defamatory statements at issue in the Lawsuit were disseminated with the message that the defamatory statement is not true.

This report is submitted as of February 10, 2020 ("Report Date"). The findings herein reflect our analysis of the information provided to us and our independent research as of the Report Date. We reserve the right to amend, expand, and/or supplement this report should additional information or data be made available.

This report was prepared primarily by Craig Kronenberger, with the assistance of individuals employed by Stripe Reputation acting under his supervision.

**B. Expert Qualifications**

Over the course of my 22-year career, I have developed extensive knowledge, education, experience, and training in the digital media, public relations and online reputation management fields. I am proficient in using multiple industry-standard technologies that help evaluate the performance and impact of content across social media, news media, email and search engines. I currently am engaged with an average of 10 reputation management or crisis assignments per week. Throughout my career, I have extensively studied the impact and damage caused by the dissemination of online content and developed significant knowledge, experience, and expertise in understanding how information disseminates online and its long-term impact on a brand or individual's reputation.

I am currently the owner and CEO of Stripe Reputation, a leading global consultancy firm in the field of reputation management and crisis. Stripe Reputation provides services in a wide array of digital marketing and reputation management strategies and services, such as digital measurement and analytics, paid media management, crisis and issues management, news media analysis and monitoring, and search engine optimization, among others. My

reputation management work has included companies such as Coca-Cola, General Electric and Hyundai, as well as individuals such as Paul Allen and the Koch family.

Prior to Stripe Reputation, I was Global Managing Director of Strategic Growth at Edelman, the world's largest public relations firm, with more than 5,000 employees in 65 cities and affiliates in more than 35 cities. At Edelman, I was responsible for leading global teams in the areas of Search Engine Management, Digital Crisis and Risk, Paid Media, Research, and Insights.

Prior to Edelman, I held managing positions with iCrossing and Digitas-Modem Media, where I led search engine management strategy for brands such as Delta Airlines, Home Depot, Sony, Coca-Cola, CNN, and Marriott. At Digitas-Modem Media, I was named Global Practice Lead for Search Marketing, where I was instrumental in building search practices in Europe and Asia. My digital marketing experience also includes search marketing strategy and global governance for Hewlett Packard, Coca-Cola, Unilever, Kraft, and General Motors.

## C. Expert Testimony

During the previous four years, I have testified as an expert at trial or by deposition in the following cases:

- *ELIAS KIFLE VS ETHIOPIAN REVIEW, INC.*

*Court: United States District Court, Northern District of Georgia Case No.: 1:12-cv-02697*

*Nature of Suit: Assault, Libel, and Slander*

- *JASON MILLER VS. GIZMODO MEDIA, KATHERINE KRUEGER, WILL MENAKER*

*Court: United States District Court, Southern District of Florida Case No.: 1:18-cv-24227-CMA*

*Nature of Suit: Defamation*

- *OPDEWEEGH VS. CAUFF*

*Court: Eleventh Judicial Circuit, Miami-Dade County, Florida Case No.: [Sealed]*
*Nature of Suit: Defamation*

- *GORDIE DANIELS V. HSN, INC. HSNI, LLC; AND QURATE RETAIL, INC., D/B/A QURANTE RETAIL GROUP*

**D. Compensation**

Stripe was retained on January 29, 2020, to assess Hartman's online reputation and provide a written expert report and testimony. Stripe agreed to provide the following activities billed at a specific hourly rate:

- Reputation Analysis……………........$250/HR
- Expert Opinion……………………..$450/HR
- Court Testimony/Deposition Time…$450/HR

## SUMMARY OF OPINIONS

Plaintiffs have spent at least twenty years establishing an online presence and relationship with business partners through the Jason Hartman brand and use of the mark and internet domain name, JasonHartman.com. More than six years ago, Plaintiffs received official registrations with The U.S. Patent and Trademark Office (PTO), the federal agency that oversees the registration of federal trademarks, for the service marks "JASONHARTMAN.COM" and "JASON HARTMAN." As such, since these registrations were accepted and continuously used in commerce, public entities and persons who have been exposed to "JASONHARTMAN.COM" or "JASON HARTMAN" online have correctly associated these entities and sources with Plaintiffs.

The negative campaign launched against Mr. Hartman and his businesses directly attacks Mr. Hartman's reputation and the credibility Plaintiffs have built around their brand by, among other things, repetitively impersonating their online presence across different platforms and undermining the associations consumers and business partners correctly made between the service marks and Plaintiffs' business. The Digital Marketing Institute -- an institution aimed at furthering the skills and knowledge of digital professionals on a global scale with more than 55,000 alumni members worldwide -- notes, "successful campaigns often include many different formats," and suggests fifteen different elements for a successful campaign (Exhibit 8). The negative campaign launched against Mr. Hartman deployed many of these tactics, including email, social media, SEO and PPC, landing pages, and content creation.

From at least June 10, 2018 - August 28, 2019, the Defendants' campaign was heavily reliant on the repetitive, misleading misuse of Mr. Hartman's online identity, various false aliases, and disparaging websites. This was achieved by promoting impersonating representations of Mr. Hartman across different platforms on numerous occasions, including 1) misleading websites, 2) unaffiliated email addresses, 3) applying marketing tactics to influence search engine results of the intentionally infringing and disparaging websites, 4) pushing a continuous email campaign targeted to the Plaintiffs' clients and colleagues, and 5) posting negative comments on notable industry forums.

The various documents supplied by the Defendants in this case, show that the tarnishing of Mr. Hartman's brand reputation throughout the campaign was intended to mislead an expansive audience of industry contacts who would impact Mr. Hartman's business

relationships, including a minimum of 80 percent of Mr. Hartman's LinkedIn connections, Mr. Hartman's podcast subscribers, a Mailchimp account of 169 contacts, and a Constant Contact email database of 178 contacts. These individuals were targeted through a network of multiple websites and at least 10 email blasts sent on June 29, 2018, July 29, 2018, August 10, 2018, August 14, 2018, August 17, 2018, September 10, 2018, October 14, 2018, October 23, 2018, October 29, 2018, and November 2, 2018.

Although the Plaintiffs' reputation can never be fully repaired and brought back to the condition it was in prior to the Defendants' conduct, after a thorough analysis, I have concluded that reputation remediation costs to counteract the Defendants' campaign will cost the Plaintiffs, taking a conservative approach, between $1.7 million and $1.8 million.

## **ASSESSMENT**

We identified critical themes in our assessment which included the use of a multi-channel, highly targeted, negative, misleading, and high frequency or on-going campaign to destroy Plaintiffs' reputation.[1] Each is discussed in detail below.

## A. **IMPERSONATING AND MISLEADING USERS VIA FAKE EMAIL ADDRESSES AND WEBSITES**

On May 17, 2018, at least six domains fully incorporating Mr. Hartman's name and service marks were purchased by parties unaffiliated with Mr. Hartman. The first was "[www.JasonHartmanProperties.com](www.JasonHartmanProperties.com)", which will be here on out referred to as the "JHPDomain." At least an additional five domains were purchased and set up to implement source reforwarding, or URL forwarding, to the "JHPDomain."

The function of a source reforwarding or URL forwarding is to send internet visitors from one URL or website to another. The redirecting domains acquired were: "Jasonhartmaninvestments.com," "Jasonhartmanlegalproblems.com," "Jasonhartmanlies.com," "Jasonhartmanrealestateinvestments.com," and "Jasonhartmanmedia.com." Additionally, I understand that other redirecting domains may have included: "jasonhartmanpropertyinvestments.com," "jasonhartmanrealestateinvestments.com," and

---

[1] I understand that the fact-finding process is ongoing and that additional details and information may be provided to counsel. If such information is provided to me, I may wish to update, amend, or supplement this report to reflect the new information.

"jasonhartmaninvestmentproperties.com." (DEF0030196). As such, when a website user intended to visit any of these websites, he or she was forwarded to the "JHPDomain" instead, thereby increasing the chances that the JHPDomain would be visited. These domain names were strikingly similar to the Plaintiffs' domain names, JasonHartman.com, HartmanMedia.com, and JasonHartman.com/Properties.

By increasing the traffic to the JHPDomain, the campaign intended to spread the Defendants' negative messaging to a larger audience of individuals in the industry across the United States, including to those who have partnerships or business interests with Mr. Hartman, customers, friends and followers of Mr. Hartman.

In addition to establishing domains, the campaign launched against Mr. Hartman included email addresses which also included Mr. Hartman's name. Throughout June-November 2018 at least 10 email blasts were sent from email addresses, impersonating or negative to Mr. Hartman.

Repetitive tactics were used to reach people connected to Mr. Hartman including several large-scale digital marketing campaigns. For example, on June 29, 2018, an email was sent from JasonHartman@protonmail.com, an email unaffiliated with or established by Mr. Hartman, to Mr. Hartman's business clients. The email stated: "I wanted to share with you the results of about a 4-month investigation into Jason Hartman's background" and claimed that Mr. Hartman has "over 100+ lawsuits, multiple foreclosures" and "evictions from his office spaces."

As part of the email campaign, at least four fake email addresses were established with the goal of gaining trust with the person opening them and/or disparaging Mr. Hartman. These emails included: (1) JasonHartman@protonmail.com, (2) thebrokeguru@protonmail.com, (3) thebrokeguru@email.tg, and (4) HartmanInvestigators@gmail.com. Each of these accounts sent messages linking back to JHPDomain or TheBrokeGuru.com, where further negative information was communicated with the goal of destroying the Plaintiffs' reputation. The redirects to the JHPDomain were active from about June 10, 2018, through the end of October 2018. After October 2018, I understand that the Defendants' operated their website solely through TheBrokeGuru.com. Most email campaigns after August 5, 2018, led readers to TheBrokeGuru.com.

It's important to point out that even if a person didn't click over to the JHPDomain or TheBrokeGuru.com, the information in the email alone was significantly damaging to Mr. Hartman's reputation.

By beginning emails with negative subject lines, the campaign already established a negative tone with readers, taking on negative headline tactics used by media and news outlets to influence readers to expand the text to read more. A September 2019 research study published in the Proceedings of the National Academy of Sciences of the United States assessed 1,000 people across 17 countries in relation to news headlines. The study found that, on average, individuals demonstrate a bias towards negative news and pay more attention to negative information than positive (Exhibit 07). By beginning emails with negative subject lines, the Defendants were utilizing the same strategy to gain more readership. For example, the email subject line for an August 15, 2018 email stated: "Worked with Jason Hartman? That could be BAD NEWS for you!" For those that did click the links in the email, the website provided an even a deeper attack on Mr. Hartman.

### B. MULTI-CHANNEL CAMPAIGN

According to Google domains, "purchasing multiple domains can help ensure that people looking for your website find you" (Exhibit 09). By acquiring multiple domains, the intended purchaser was able to take up more real estate within search results. Further, by implementing URL forwarding to the JHPDomain, the campaign followed marketing strategies to improve SEO (search engine optimization), including backlinking.

According to Moz, an inbound marketing and marketing analytics software, "backlinks are especially valuable for SEO because they represent a 'vote of confidence' from one site to another" (Exhibit 14). Google prioritizes content by popularity and credibility (which can also be assessed in terms of confidence). As such, content ranks better within Google's search results the more clicks it gets, and the more other sources link to it.

By intentionally acquiring multiple domains and establishing source reforwarding, the campaign increased backlinks to the source sites: JHPDomain and TheBrokeGuru.com. These were strategic tactics implemented to organically increase the likelihood of clicks and visibility of the sites to online users connected to or engaged with Mr. Hartman's business.

In addition to organic efforts (tactics that are deployed without any paid promotion), an October 16, 2018 email from Mr. Sells to Mr. Chung shows conversation around the launch of a

pay-per-click (PPC) ad that linked to the JHPDomain. Industry organizations, such as the Digital Marketing Institute, agree that launching PPC ads, particularly Google search ads, help to "reach people who are actively searching for terms related to your business" (Exhibit 19). By launching a PPC ad campaign in addition to acquiring multiple domains with Mr. Hartman's name or disparaging to Mr. Hartman, the Defendants could strategically leverage both organic and paid marketing tactics to intentionally increase the visibility of their websites.

### EMAIL CAMPAIGN

Defendants' e-mail campaign sent continuous emails to individuals listed within databases affiliated with and networks of Mr. Hartman. According to Mailchimp, a leading marketing automation platform and an email marketing service, "You'll see the highest ROI when you build and maintain an engaged subscriber list, made up of people who want to receive your messages (and who opted in on purpose)" (Exhibit 15). As the emails used Mr. Hartman's name and referenced him within the subject line, recipients of these emails were more likely to open the emails, which spread the intended messages published on the JHPDomain.

We know that the Defendants sent emails to large groups of people based on both the email databases and notifications from email hosting services. On August 10, 2018, ProtonMail alerted thebrokeguru@protonmail.com that its sending limit had been reached and was reminded that the service "is not for bulk emailing and spamming." As a result, the account's sending ability was frozen for one hour (DEF001055). Another important factor to note is that the emails targeted individuals who had expressed a desire to stop receiving these communications. This is evidenced by an August 18 email from Mr. Sells to Mrs. Putich in which he notes that the Mailchimp account was shut down and they need to stay in compliance and remove unsubscribed emails.

### INDUSTRY WEBSITES AND FORUMS

Online industry forums are destinations where people interested in a certain topic, such as real estate investment or consumer protection, can engage in discussions with others focused on the issue and topic. Industry websites and forums are often used by those most engaged in an industry or topic.

On June 29, an individual under the alias "Ray Douglas" posted about Mr. Hartman on BiggerPockets.com, a trusted industry forum mentioned in *Forbes, Inc., Fox News, Money, The Street,* and *CNBC.* The post stated, "You can trust the following site to the details and documents involved is secure…" and the "email to and from this address are encrypted and your privacy is of utmost importance." The post linked to the JHPDomain, spreading this message to BiggerPockets.com's community of more than 1.6M real estate professionals and enthusiasts.



On September 22, 2016, a Ripoff Report was submitted by "Mark A" that negatively reviewed PIP. On July 9, 2018, Mr. Sells responded to this Ripoff Report by attributing the post to Mr. Hartman, stating that Mr. Hartman is "known in our industry to be a fraud," and directing readers to a link to the JHPDomain while stating, "I would like to thank whomever compiled all of this detailed data and public record and organizing it in one place." This tactic, again made it seem that the JHPDomain was credible and shared the negative messaging on the site with a large social community. This is just an example of several Ripoff Reports submitted to disparage the professional success and work of Mr. Hartman and his companies. According to Ripoff Report, they have had 9,008,617,292 total visits.

The negative content shared in Ripoff Reports and industry forums was effective in both damaging Mr. Hartman's professional reputation and destroying potential client relationships. For example, a potential investor and customer named Rala Burbaker emailed JasonHartman.com for more information and about her interest in becoming a client. As a result,

on October 8, 2018, she was assigned as a lead to a PPIN sales associate (Exhibit 01). Rala came across the negative posts on Ripoff Report and pointed it out to the PPIN sales associate, questioning the company and its practices. As evidenced in a response to Rala's question on the same day in an email with the subject line "Youtube videos & Ripoff Report (Exhibit 02), the PPIN sales associate attempted to correct the false information Rala had seen on Ripoff Report by sharing videos of Mr. Hartman and PPIN's events and stating: "The next question to ask, is why aren't there more reports like this out there if this was 'real' - Jason has been in the public eye for 20+ years... and been podcasting since 2007... if we deceived our clients, treated them poorly, stole, etc... this information would be all over the internet, and we would not be the most successful company in this space."

Despite sharing this correcting information and having a phone call with the potential client to further explain the situation and assuage her concerns, Rala chose not to work with the Plaintiffs. This client interaction not only illustrates the professional and reputational impact inflicted on the Plaintiffs, but also the difficulty Mr. Hartman has had and will continue to have in changing and shifting the opinions of people who interacted with the misleading and malicious campaign.

### *EFFECTIVENESS OF MULTI-CHANNEL CAMPAIGN*

The multi-month campaign employed tactics used by marketing practitioners in order to increase awareness of an intended message to a target audience. In this case, the intended message was tarnishing Mr. Hartman's reputation and the targeted audience was Mr. Hartman's business relationships. By leveraging different channels, spanning websites, email aliases, search engines, and industry platforms, each element of the campaign worked in tandem to fraudulently portray the established digital platforms as credible sources of information about Mr. Hartman and his businesses. Each of the websites linked back to the source site, JHPDomain, increasing backlinks and credibility of the JHPDomain within search results. The expanded visibility of the JHPDomain, between the website reforwarding, emails, and comments on platforms, increased the visibility of these negative messages to Mr. Hartman's contacts. Additionally, the comments on platforms, disguised as objective consumer and industry feedback, further propelled negative messaging by linking to the JHPDomain, thus increasing the cycle of visibility of the source site.

### C. COMPETITIVE ADVANTAGE AND POTENTIAL FOR GREAT ACTIVATION

It is important to note that while the Defendants were attacking Mr. Hartman through the websites mentioned above and the multi-channel campaign, they were at the same time capitalizing on the harm they were causing the Plaintiffs. During this multi-channel campaign, I understand that the Defendants were also spending large amounts on a PPC campaign for their own website. Based on my experience, I can fairly conclude that this was likely done to best capture and reach those that the Defendants were attempting to turn away from Mr. Hartman and his business (DEF0030104-25).

Additionally, we reviewed the technology tools used by the Defendants to enhance the effectiveness of their web and email efforts. These tools included:

- **HTML Words Ads** - Used on WordPress websites to allow you to automatically run advertising on your website through Google.
- **MaxMind** - Allows you to locate the geography and other insights on users visiting the website.
- **GoogleAnalytics** - Tracks usage of a website including information around visitors, what they did and where they went.
    - I understand that Defendants, to date, have not produced any Google Analytics reports.
- **CookieJar** - Used to manage and track cookies that are captured on a website when a person visits the site. The purpose of the cookie is to help the website keep track of visits and activity, and enable retargeting.
- **Opt In Monster** - Personalizes the website experience with messaging, allows you to run testing to ensure people like the experience, helps identify the location of the user, segments audiences into different types groups of people, and helps you retarget users with ads . It is also used to help integrate search engine best practices into a website with the goal of creating more visibility with search engines.

Additionally, users posting a comment on the Defendants' websites had their name, email and IP address recorded, as evidenced by Mr. Hartman's comment on the site (DEF0030132).

In my experience, these tools and data capture activities are used to understand users' locations and other insights from those visiting the website in order to re-target those users with advertising, to capture leads and to increase visibility on search engines. While we did not

receive data on how these tools were used, by their existence and integration in the multi-channel campaign, it is likely that they were leveraged. These tools are typically used to run online marketing campaigns, and as such, the Defendants were empowered to run ads on the misleading sites, thus possibly generating revenue, and to retarget all who engaged with the site with additional negative information and content.

### D. ESTIMATES OF REACH AND LIMITATIONS OF DATA

The Defendants undertook a focused, malicious and effective campaign aimed at tarnishing Mr. Hartman's reputation, destroying his professional standing within his business community and harming the viability of his companies.

There were several elements that illustrate and begin to quantify the reach of the damaging communications and activities. However, at the time of writing this assessment, we were only provided with some of the materials used in reach calculation. Nonetheless, the information provided paints a clear picture of the immense reputational damage inflicted on Mr. Hartman.

One of the central tactics of the Defendants was the establishment and use of surreptitious domain names to host websites aimed at disparaging the Plaintiffs professionally. Based on the information provided, I can determine that in just a four-month period, one of the websites generated site traffic of 4,588 visits with 1,847 unique visits. As the number of total visits is higher than the unique visits, we know that some of these people went to the site more than once, resulting in repeated exposure to the defamatory and misleading information.

The question of how many individuals interacted with the relevant websites is particularly hard to answer as the Defendants have not provided visitor statistics from June and July 2018 (when the JHPDomain was being spread publicly in emails and forums), as well as July through August 2019.

The reach of the negative content housed on the websites may have been further amplified by the use of pay-per-click (PPC) ads. PPC ads are ads that appear in search results related to a specific keyword. Brands and individuals can bid on relevant keywords to ensure the intended audience is served the ad content. The ads are then used to drive those who click them to a specific web destination. Based on the information provided, there were multiple discussions about PPC campaigns, including a possible one-time $500 investment in ads, as noted in an

October 16 email between Mr. Sells and Mr. Chung. Given the number of web properties and their live duration, we would expect this spend to be much higher. PPC ads were specifically employed to direct people to the negative site as on October 17, Mr. Sells stated to Mr. Chong, "I want to run it a month before and a month after each of the events he does. Kinda need your help in determining what something like this might cost. Terms would be: Jason Hartman, Hartman Media, Creative Wealth Network…"

On another occasion, Mr. Sells was even more direct in his instruction to Mr. Chung when he gave direction to, "…build out a PPC campaign to put the brokeguru website right below Jason Hartman." This correspondence shows a direct effort to negatively influence Mr. Hartman's digital reputation through search results, as the vast majority of people searching for Jason Hartman would have encountered the ad driving to the negative site while it was live.

As data was not provided, I cannot confirm a PPC campaign was initiated. However, given the correspondences referenced above as well as the other tactics employed, it is highly likely that PPC ads were executed by Defendants for their own website, pipgroup.com, or for the relevant websites. Even if PPC ads were not initiated, the impact of the negative efforts is still clear.

In addition to using PPC ads to drive traffic to the misleading sites, we also know that the Defendants leveraged emails to engage potential colleagues, associates and customers of the Plaintiffs. The Defendants worked to specifically reach people who work with or are related professionally to Mr. Hartman. On August 9, Mr. Chung stated in an email, "But I figured out how to get probably 80% of his LinkedIn contacts." According to LinkedIn, Mr. Hartman has 500+ connections, meaning that at least 400 of his contacts were targeted with the negative content.

Regarding emails, based on the information provided by the Defendants, we know that emails were sent out to approximately 169 recipients through Mailchimp. However, we have also identified in Exhibit 03 that not all of the recipients' names are on the list as in an October 30, 2018 email Mr. Sells instructs Mrs. Putich to import emails into Mad Mimi, an email marketing service. As we have not been provided with information regarding the Defendants' use of Mad Mimi, we do not believe we have a full list of companies and individuals emailed. Additionally, as names were removed from the various databases over time, we do not have a complete list of all recipients. As we do not have data on complete email mailing, we cannot determine the exact

number of email recipients but estimate it to be multiple larger than the 169 listed in Mailchimp and 178 listed in Constant Contact.

Overall, while there is additional data not supplied that would help quantify the reach of this negative content, it is my professional opinion that the attacks reached significantly more people than current information suggests and had a significant and detrimental impact on Mr. Hartman's reputation.[2]

## E. REPUTATIONAL IMPACT OF DEFENDANTS' ACTIONS

Based on the activities of the Defendants, and my extensive professional expertise in reputation management and digital marketing, it is my professional assessment that the actions of the Defendants resulted in significant reputational damage to Mr. Hartman due a campaign that was multi-channel, targeted, repetitive, and negative and purposely misleading.

The attacks on Mr. Hartman were targeted and showcase an application of digital marketing strategies leveraged with the purpose of making an impact with a priority audience. Effective marketing efforts begin with identifying the audiences to target relevant to the program objectives. The Defendants systematically targeted those whose views of Mr. Hartman were material to his business and livelihood. For the disparaging email blasts, the Defendants conducted LinkedIn searches to identify at least 400 people who were connected to or did business with Mr. Hartman or who were related to Mr. Hartman's industry. The Defendants also targeted people who followed and participated in Mr. Hartman's podcast. In a July 22, 2018 email to Mrs. Putich, Mr. Sells wrote, "Yes, I actually need you to listen (and watch) this idiot in his YouTube and podcast recordings." The instruction to listen to the podcast was intended to identify additional clients, colleagues and listeners to target with negative content. Mr. Chung adhered to this instruction and listened to hours of podcasts.

On July 29, the Defendants sent an email to Mr. Hartman's colleagues and clients sharing a link to the infringing site and stated: "Good Information to discuss with Mr. Hartman on your next Podcast with him." This again clearly suggests that the Defendants were sharing defamatory information with relevant audiences to influence their view of Mr. Hartman. In this case, these devious tactics were in part successful as the recipient replied, "I was very concerned about your

---

[2] Note, I am not providing legal opinions and the analyses provided are based on a finding of liability.

email, even more so after reviewing the site further. I like to provide both sides on my show. Can somebody come on and talk more about this, or can you provide more info about it? We take our shows credibility very seriously and would like to know more."

Additionally, the Defendants articulated their aim to shift the opinions of Mr. Hartman in an August 14, 2018 email response to one of Mr. Hartman's clients or colleagues. When one of the targeted clients or colleagues responded to an unsolicited email, stating "[w]ho are you and how did you get my email address?," the Defendants responded saying "You apparently have an affiliation, or conduct business with Jason Hartman, or have in the past. We thought you might like to know the truth about the person you are working with." Again, this correspondence shows a focused effort on inflicting reputational damage.

Outside of directly targeting Mr. Harman's network of colleagues, clients, and partners, the Defendants also targeted their negative messages to industry and broader digital audiences. For example, using the alias Ray Douglas, the Defendant noted that he was "burned" by Mr. Hartman's services in a trusted real estate forum, BiggerPockets.com. The Defendants also made false allegations against Mr. Hartman on the popular consumer protection site, Ripoff Report.

As the Defendants targeted an audience of reputational importance to Mr. Hartman, it is my opinion that the main objective of these efforts was to negatively influence the perception of the Plaintiff with this audience.

Targeting alone does not generate reputational damage. However, when the targeting is coupled with the negative content, the significant impact of these activities is further evident. The content displayed in the relevant websites and in emails was negative towards the Plaintiffs. The content attempted to cast Mr. Hartman as unreliable, a fraud, a womanizer and an untrustworthy businessman. Throughout the correspondence and attacks, the legitimacy of Mr. Hartman's business is repeatedly called into question, as is his professional integrity. Examples of negative content meant to deter others from engaging in business relationships with the Plaintiff or to cast Mr. Hartman in a negative light include the following statements:

- On the JHPDomain: "Jason Hartman has more than 100 lawsuits filed by, or against him in the last 10 years."
- On the JHPDomain: Mr. Hartman has been involved in "70 cases in Orange County, CA alone."

- In a June 28, 2018 post on BiggerPockets.com, the Defendants, posing as "Ray Douglas" stated: "I wanted to share with you the results of about a four month investigation into Jason Hartman's background. Over 100+ lawsuits, multiple foreclosures and evictions from his office spaces and investments, posting fake news stories against companies he is involved in legal squabbles with, arrest warrants, legal sanctions and hundreds of thousands in settlements and judgments. Even a filthy sexist website, where he calls himself 'Jake Swank.'"
- In an August 10, 2018 email blast from Naresh Vissa, with the subject line, "The Truth about Jason Hartman (More)", the email stated: "Multiple foreclosures and evictions against him personally and his businesses" and "Approximately $500k in settlements and judgments against him.""
  - In the same email, a claim was made that Jason Hartman has:
    - "over 100 lawsuits we have uncovered in just TWO states, along with MULTIPLE ARREST WARRANTS"
    - "A prior website and over 50 podcasts where he portrays himself as 'Jake Swank.' A man devoted to helping other men become womanizers . . ."

The tone and allegations asserted in the emails and relevant websites were highly damaging to the image and reputation of the Plaintiffs. The totality of negative content that shared false and professionally-damaging information about Mr. Hartman alone would be strong evidence of reputational damage. However, this impact was further exacerbated by repetition and significant potential reach of the negative content.

The Defendants set up multiple websites for the sole purpose of sharing false and negative content. The Defendants sent out at least 10 emails. Additionally, as the Defendants employed various websites and email addresses to spread their negative content, it is likely that repeat email recipients and site visitors gained the inaccurate perception that the negative sentiment about Mr. Hartman was widespread and shared by numerous people in the industry.

In addition, emails were not only sent to individuals but entire companies and groups. On September 10, 2018, Gino Zahnd responded to an unsolicited email from thebrokeguru@email.tg demanding that the Defendants "never email my entire company again" (Exhibit 04). Given that the entire company was emailed, it is likely that not every employee had worked with or was

previously aware of Mr. Hartman. As such, not only did this effort harm the Plaintiff's reputation with existing business contacts, but the negative content was potentially the first information some of the employees engaged with about Mr. Hartman, likely causing a negative initial impression of his reputation.

Beyond this incident, there is also evidence from email lists that the Defendants emailed @member and @info email alias addresses, including an alias for IMN members. As such, these emails would be received by all who subscribe to those email lists, drastically increasing the reach. Steve Glener of IMN noted that several people had received such messages.

Based on a response from an email recipient, we know that some of the recipients received more than one email as some colleagues emailed Mr. Hartman stating, "Even though I put the last email in spam, this email still just got through!"

Lastly, the immense impact of the targeted, negative and repetitive attacks is further deepened by the devious and deliberately misleading nature of the correspondence. The Defendants went to significant lengths to shroud their true identity and make it appear as if the sites and communications were connected to or sent by Mr. Hartman. This is particularly evident by the use of Mr. Hartman's service marks in the internet domain names. This tactic made the campaign waged by the Defendants incredibly damaging to Mr. Hartman as undoubtedly some recipients of emails or visitors to the infringing sites were misled by these tactics.

In email messages, the Defendants posed as fellow colleagues and framed communications in a way that suggested familiarity and an existing relationship with the recipient. For example, on June 29, 2018, the Defendants sent an email from JasonHartman@protonmail.com to the Plaintiffs' clients, stating the following, "As somebody we know and respect in our very large, but also very intimate industry..." The fact the Defendants presented themselves in a familiar voice amplified the impact of the negative content as research from the 2020 Edelman Trust Barometer shows that a "person like yourself" is the third most credible source of information about a company.



The Defendants' efforts not only reverberated online but had far reaches offline as well. Word of mouth undoubtedly spread the negative content, especially given the misleading framing of the communications to make them seem as coming from trusted sources. This is in part evidenced by a cancelled speaking engagement for Mr. Hartman at an IMN Conference. According to its website, <u>IMN</u> produces over 45 conferences annually, providing must-attend platforms for real estate industry leaders to share thought leadership and execute deals. On August 20, Mr. Hartman received a note from Steven Glener stating, "I'm really sorry but we can't have someone like Sells emailing our clients and conference attendees who wouldn't know the truth about the situation. We are happy to give you a pass to attend the conference without charge until this is settled."

The above statement both underscores the professional impact felt from these negative attacks, as well the incredible reach of the efforts, as Glener notes that the Defendants could email both their clients and attendees. Unfortunately, the relationship with IMN further deteriorated due to the impact of the Defendants' attacks and eventually the comp pass was rescinded. This not only signifies a loss in potential business opportunity but the diminished status of Mr. Hartman and the perception that engagement with him would be risky.

The above is just one example of the reach and impact of the email campaign. On another occasion, the Defendants sent an email to Jason Burack from <u>brokeguru@email.tg</u>.  Jason

Burack is the co-founder of [Wall St. for Main St](#)., which offers "offers high quality investor education and research for beginners, high net worth clients and everyone in between who wants to learn to adapt to the current macroeconomic situation." The email (Exhibit 06) states: "Imagine you are the president of a Real Estate Investor Association. Hartman convinces you he would be a great speaker for your monthly meetup. You agree, bring him in and after it is too late, somebody in your meeting knows of all of his past maleficence. CAN YOU IMAGINE THE EMBARRASSMENT you would be subjected to??? We are not trolling Hartman. We are doing a service to the industry to make anyone we can, aware of who and what they are dealing with. We can assure you, the public records speak for themselves and he is NOT the man he portrays himself to be. "

In summary, it is my professional assessment that the multi-channel, targeted, negative and misleading, campaign waged by the Defendants had a significant and detrimental impact on the reputations of the Plaintiffs.

### APPROACH AND COST TO REPAIR REPUTATION

To begin to repair the Plaintiffs' reputations, we must attempt to reach those who saw and read the negative content with new, sourced content that counters the lies and accusations of the Defendants. The goal of the campaign would be to target those who may have been impacted with a multi-channel campaign that communicates and reinforces the positive reputation of the Plaintiffs. In addition, we will look to increase frequency or the times someone may see the campaign across a similar time period to help ensure message resonance.

Similar to the Defendants' efforts, reputation repair strategies would need to be multi-channel, targeted and repetitive. To overcome the damage done by the negative and misleading content, a priority on the development of positive, trust-building materials and communications would be key.

One of the elements of the repair strategy will be to reach people on the channels that the Defendants used. Specifically, this would entail initiating a public relations/reputation repair campaign to engage real estate professionals who have may have come in contact with the Defendants' attacks; running paid ads on LinkedIn to reach Mr. Hartman's professional community; running paid ads on BiggerPockets.com to reach readers who may have engaged with negative reviews and posts on this site; and launching a PPC campaign to drive people

searching for Mr. Hartman to a statement that corrects and addresses the Defendants' misinformation.

### *REPUTATION REPAIR CAMPAIGN MANAGEMENT COSTS*

To manage the ongoing repair and positive promotion of Mr. Hartman's reputation, a focused reputation repair campaign would need to be initiated. This would most likely require hiring a PR or digital marketing agency to execute the reputation repair program. Based on our experience in this space, we assess that the repair campaign would require four key work streams to address the various issues created by the Defendants:

- **Drive awareness to information that corrects falsehoods.**
    - Develop a webpage on Mr. Hartman's website and post a statement and facts explaining the situation and correcting the negative information.
    - Run a paid campaign to drive people searching for Mr. Hartman in relation to the Defendants' accusations to the correcting information. We recommend running ads through search engines, LinkedIn and industry publications impacted for at least a year given the extent of the Defendants' actions.
- **Elevate reputation through PR.**
    - Secure positive media coverage for the Plaintiffs around business topics in high-authority media outlets relevant to the industry and likely to be read by those targeted by the Defendants.
    - Identify and secure speaking opportunities in relevant industry events that positively position the work and expertise of Mr. Hartman.
    - Amplify and target positive high-authority news coverage to audiences likely to have received negative content.
- **Reinforce trust over time**
    - Initiate a new email newsletter to customers and colleagues sharing industry insight and expertise from Mr. Hartman, as well as sharing the link to the correcting statement.
        - Email should be sent quarterly.
    - Create and execute a paid targeting strategy for podcast promotion
- **Suppress Negative Search Results**

- ○ Launch a negative suppression campaign to remove negative search results (e.g., Ripoff Report) from Jason Hartman-related search terms, including
    - Developing and publishing positive content for influence search results
    - Back-link building on positive search placements
    - Paid media campaign management
    - Request take-downs of any negative content online

An effective campaign would require at least one year of concerted and focused efforts to repair the reputation from a PR or integrated marketing agency. Based on my experience working in PR and digital agency, this effort would require at least 80 hours of work a month by the agency. Assuming a conservative blended rate of $250/hour, this would equate to $20,000 a month. As we recommend at least one year of ongoing efforts, total cost reputational repair PR is at least **$240,000**, not including paid media costs.

### *PPC CAMPAIGN COSTS*

We will never truly know how many people saw the Defendants' negative content but by using paid advertising on search engines we can ensure that we get in front of people 1.) looking for information around the Plaintiffs, 2.) looking for information around the negative content and Mr. Hartman, and 3.) looking for information around his field of work. This gives us the highest chance of intercepting people who may have been impacted.

As noted in the above summary of reputational repair workstreams, a key component will be driving visibility and traffic to a statement correcting the defamation from audiences who were potentially exposed to the Defendants' attacks. As such, it will be essential to run paid search ads on Google Ads and Microsoft Ads.

Based on the language used in the Defendants' attacks against Mr. Hartman, we recommend building a campaign around and bidding on these keywords in the Google Ads and Microsoft Ads campaigns (Exhibit 16). We chose these keywords because Jason Hartman's name and keywords surrounding his field of work are words people search for in search engines to find information about him. The full list of keywords that Google recommended from the Keyword Planner Tool (we have exported the raw data on to a Google Sheet), as well as the ones we recommend bidding on, are in the attached Google Sheet (Exhibit 16).

The keywords have their average monthly searches included which was provided by Google's Keyword Planner tool. We then multiplied these average monthly search estimates by 12, as we recommend running the campaign for a year. Note that these average monthly search estimates are based on if the keyword was set to the Exact Match Type.

According to Google, an Exact Match keyword is a keyword setting that allows your ad to show only when someone searches for your keyword or close variants of your keyword (Exhibit 17). Close variants may include:

- Misspellings
- Singular or plural forms
- Stemmings (for example, floor and flooring)
- Abbreviations
- Accents
- Reordered words with the same meaning (for example, [shoes mens] and [mens shoes])
- Addition or removal of function words. Function words are prepositions (like in or to), conjunctions (like for or but), articles (like a or the), and other words that don't impact the intent of a search. For example, [shoes for men] is a close variant of [men shoes] with the function word "for" removed.
- Implied words (for example, if your exact match keyword is [daydream vr headset], your ads may show on searches for "daydream headset" since "vr" is implied)
- Synonyms and paraphrases (for example, if your exact match keyword is [bathing suits], ads may also show on searches for "swimming suits")
- Same search intent (for example, if your exact match keyword is [images royalty free], ads may also show on searches for "free copyright images")

Of note, just because someone searches for a keyword, there is no guarantee that they will click on the ad. The average click-through rate for the real estate industry is 3.71% (Exhibit 10). Click-through rate is defined as the number of clicks divided by the number of impressions. A click (Exhibit 11) is when a user on Google clicks on your ad and an impression (Exhibit 12) is when your ad is served. Using the real estate industry average CTR (Click Through Rate) of 3.71%, we can arrive at the number of estimated clicks.

Google's Keyword Planner tool also gives estimates for how much an advertiser should bid on the keywords they (the advertiser) selects in order to be at the top of the page. They provide a low-end bid estimate and a high-end bid estimate.

By multiplying the low and high-end bid estimates by the number of estimated clicks, we arrive at a low-end budget of $310,319.94 and a high-end budget of $1,967,299.27. Averaging these two numbers gives us a budget of $1,138,809.60 for Google.

As for Bing and Yahoo, we used search engine market share statistics (Exhibit 13) to arrive at our budget recommendations for those platforms. Google represents 88.23% of the market in the United States and we are recommending a budget of $1,138,809.60 to be used on that platform. Following this proportion, we recommend a budget of $82,348.47 for Bing (6.38% market share) and a budget of $47,498.80 for Yahoo (3.68% market share). These calculations can also be found here (Exhibit 16).

The total for Google, Bing and Yahoo is **$1,268,656.87.**

### *LINKEDIN PAID MEDIA CAMPAIGN COSTS*

The campaign against Mr. Hartman used emails taken from his LinkedIn connections. Due to the use of connections on LinkedIn, we believe it is a critical place to run a reputational repair campaign targeting people who may have been exposed to the negative content. In addition, LinkedIn is able to target only people interested in real estate investing in the U.S., allowing us to be as precise as possible in reaching those impacted.

The current audience of those in the real estate and commercial real estate industries, specifically those who are investors in real estate on the LinkedIn platform is 1,500,000 (see LinkedIn Screenshot #2). In order to run an awareness campaign that shares positive content about Mr. Hartman on LinkedIn, the platform requires at least a $19.50 CPM (cost per 1,000 impressions) (see LinkedIn Screenshot #1). In order to reach our audience and based on competitive industries, LinkedIn recommends a bid of $103.79, however other advertisers are bidding between $86.49- $158.77. The below recommendation is built around a $86.49 CPM (see LinkedIn Screenshot #3) to remain cost-efficient but also competitive.

LinkedIn Screenshot #1:

## Bid amount

$12.00  per 1,000 impressions

**Bid needs to be at least: $19.50**

Recommended bid: $103.79

Recommended bids are based on your daily budget for improved budget utilization.

Other similar advertisers are bidding between $86.49 - $158.77

Based on this set up, we should expect the below results (see LinkedIn screenshot #2 and #3):

7 Day Spend: $570- $1,000

7 Day Impressions: 6,600- 28,000

CTR (click through rate):0.43%- 0.66%

7-day Clicks: 51- 130

Yearly Impressions: 356,400- 1,512,000

**Total Yearly Spend:** $30,780- $54,000

Audience building plus budgeting below directly from platform ads manager:

LinkedIn Screenshot #2:



LinkedIn Screenshot #3:



Per LinkedIn's best practices, the platform recommends having at least 2-4 ads in each campaign in order to increase performance. In order for 2-4 ads to reach our audience of 1,500,000 people, that would require a spend of **$108,000- $216,000** (Exhibit 18).

### *BIGGERPOCKETS.COM AD CAMPAIGN*

Negative content was posted on the industry website BiggerPockets.com potentially reaching any number of viewers who read content on the website. Therefore, correcting the false narrative about Mr. Hartman shared on BiggerPockets.com by the Defendants' negative posts and distribution of the defaming website's URL will require running an ad campaign on BiggerPockets.com that shares positive messages about Mr. Hartman and directs users to the correcting statement.

Due to the negative content residing on this site, we recommend running a paid campaign over the course of 12 months. According to BiggerPockets.com, a minimum spend of $5,000 per advertising campaign is required (Exhibit 05). The exact budget would be determined by the ad

specs and placements available and chosen, however, given the minimum spend, this effort would cost at least **$60,000** for the year.

### SUMMARY OF COSTS

Based on my analyses above, the conservative summary of costs is calculated as follows:

- Agency Support for Reputation Repair Campaign: $240,000
- PPC Campaign: $1,268,656.87
- LinkedIn Ad Campaign: $108,000-216,000
- BiggerPockets.com Ad Campaign: $60,000

**Estimated Total: $1,676,656.87 - $1,784,656.87**

### F. DOCUMENTS CONSIDERED

The following are the documents I reviewed and considered in development of this opinion.

- Each exhibit attached to and referenced in this report.
- Plaintiffs' Second Amended Complaint [D.E. 75].
- Email from Charles Sells to Young Chung sent on October 16, 2018 11:47 AM EDT with the subject "Small project."
- Email chain between Charles Sells to Young Chung sent on October 16, 2018 4:11 PM EDT with the subject "Small project."
- Email from Charles Sells to Stephanie Putich sent on August 18, 2018 9:02 AM EDT with the subject "Jason Hartman email contact list 8-17-18.xls."
- Email chain between Charles Sells and Stephanie Putich around September 8, 2018 6:42 PM EDT with the subject, "RE: A message from our spokesperson."
- Email chain between Charles Sells and Young Chung around August 9, 2018 1:19 PM EDT with the subject, "RE: Invoice 1050 from Blindspot Digital, LLC."
- Email chain between Charles Sells and thebrokeguru@email.tg around September 9, 2018 10:10 AM EDT with the subject, "Re: A message from our spokesperson."
- Email chain between Charles Sells and Young Chung around August 9, 2018 12:32 PM EDT with the subject "RE: Invoice 1050 from Blindspot Digital, LLC."

- Email chain between Charles Sells and Young Chung around August 10, 2018 3:46 PM EDT with the subject, "RE: Email thread."
- Email chain between Charles Sells and Young Chung around August 9, 2018 3:02 PM EDT with the subject, "RE: Invoice 1050 from Blindspot Digital, LLC."
- Email chain between Charles Sells and Young Chung around August 9, 2018 12:12 PM EDT with the subject, "RE: Invoice 1050 from Blindspot Digital, LLC."
- Email chain between Charles Sells and Stephanie Putich around September 7, 2018 2:43 PM EDT with the subject "RE: PIP Promotional Offer."
- Email chain between Charles Sells and Stephanie Putich around November 5, 2018 11:37 AM EST with the subject "RE: Website."
- Email from Stephanie Putich to JasonHartman@protonmail.com on June 25, 2018 12:23 PM EDT with the subject, "New Message From Who's Jason Hartman? – Contact Us or Share your Story."
- Email from JasonHartman@protonmail.com to mail@imn.org on June 28, 2018 with the subject "Fw: Jason Hartman."
- Email from JasonHartman@protonmail.com to tom@wilsonproperties.com, neil@tomwilsonproperties.com, rita@tomwilsonproperties.com on June 29, 2018 2:45 PM EDT with the subject "Jason Hartman."
- Email from JasonHartman@protonmail.com to FlipNerd Support on June 29, 2018 2:55 PM EDT with the subject "[Request received] Fw: Jason Hartman: To Whom It May Concern: > As somebody we know and respect in our very large, but also very intimate industry, I wanted to share.."
- Email from JasonHartman@protonmail.com to thebrokeguru@protonmail.com on August 15, 2018 1:41 PM EDT with the subject "Fwd: Worked with Jason Hartman? That could be BAD NEWS for you!"
- Email from JasonHartman@protonmail.com to mail@investorinthefamily.com on June 29, 2018 3:03 PM EDT with the subject "Fw: Jason Hartman."
- DEF00056-57
- DEF00058-64
- DEF000598-865
- DEF000883

- DEF000884-904
- DEF000927
- DEF000934-35
- DEF001055
- DEF001067-68
- DEF0002005-15
- DEF0025207
- DEF0025240
- DEF0025282-87
- DEF0025593-97
- DEF0025642-44
- DEF0025810
- DEF0025823
- DEF0026298-300
- DEF0026305-08
- DEF0026409-13
- DEF0026773-74
- DEF0026835-37
- DEF0026838-40
- DEF0027754-56
- DEF0027577
- DEF0027956-57
- DEF0028087-88
- DEF0028126-27
- DEF0028176-79
- DEF0028180-82
- DEF0030087-98
- DEF0030140-44
- DEF0030157-60
- PLA_001462

- PLA_001466
- PLA_001471
- PLA_001475
- PLA_001479
- PLA_001644
- PLA_001739
- PLA_001707
- PLA_001709
- PLA_001729
- PLA_001734
- PLA_001735
- PLA_004536
- PLA_004666
- PLA_004668
- PLA_004669
- PLA_004670
- PLA_005488
- PLA_006352
- PLA_007396-411
- PLA_007416-443
- PLA_007456
- Charles Sells - First Supplemental Response and Objections to Discovery Request.pdf
- Charles Sells - Response and Objections to Discovery Request.pdf
- Chung Response to Plaintiffs' Second Set of Interrogatories to Chung.pdf
- Defendants' Initial Disclosures.pdf
- Putich Response to Plaintiffs' Second Set of Interrogatories to Putich.pdf
- Response to Plaintiffs First Set of Interrogatories to Chung .pdf
- Response to Plaintiffs First Set of Interrogatories to Putich.pdf
- Response to Plaintiffs First Set of Interrogatories to The PIP Group.pdf
- Response to Plaintiffs Second Set of Interrogatories to Sells.pdf

- Sells Response to Plaintiffs' Third Set of Interrogatories to Sells.pdf

Dated: February 10, 2020

Craig Kronenberger