**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 18-61907-CIV-SMITH/VALLE

PLATINUM PROPERTIES INVESTOR NETWORK, INC.; THE HARTMAN MEDIA COMPANY, LLC; and JASON HARTMAN,

Plaintiffs,

v.

CHARLES SELLS; STEPHANIE PUTICH; YOUNG CHUNG; THE PIP-GROUP, LLC; BLINDSPOT DIGITAL, LLC; ELENA CEBOTARI SELLS; and JOHN DOES 1-8,

Defendants.
_________________________________/

**PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF GREGORY R. BOND**

Plaintiffs Platinum Properties Investor Network, Inc. ("**PPIN**"), The Hartman Media Company, LLC ("**HMC**"), and Jason Hartman ("**Hartman**") (collectively, "**Plaintiffs**") respectfully move to exclude the expert testimony of Gregory R. Bond pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure ("**FRCP**"), as well as Rule 702 of the Federal Rules of Evidence ("**FRE**") and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## I. INTRODUCTION

Plaintiffs, a group of industry professionals working to educate and service real estate investors, seek compensation for tremendous losses they sustained as a result of Defendants' multi-faceted criminal scheme involving, *inter alia*, the propagation of counterfeit domain names and a disparaging hit-site meant to (1) deter others from doing business with Plaintiffs and (2) help Defendant The PIP-Group, LLC ("**PIP**") earn revenue. In support of their claims, Plaintiffs retained a prominent cybersecurity and cyber-intelligence expert, Mr. Oz Avenstein

("**Avenstein**"), to provide expert opinions concerning the existence of certain HTML elements on the relevant websites, how they function, and what they are typically used for. Defendants offered an alleged digital marketing expert, Gregory R. Bond ("**Bond**"), to purportedly rebut Mr. Avenstein's testimony. Bond's report was titled, "Expert Rebuttal Report of Gregory R. Bond In Response to Report of Oz Avenstein." (Ex. A at 1.) The rebuttal stops there, however. The Court should preclude Bond from testifying at trial, and should strike his expert report, for several reasons.

First, Bond is not a rebuttal expert witness. Even though Bond was disclosed as a rebuttal expert to Plaintiffs' cyber-security expert, Avenstein, Bond failed to analyze or discuss Avenstein's opinions in his rebuttal report. Instead, Bond presented entirely new arguments that support Defendants' case-in-chief, including that the relevant websites were simple websites and that they had no "effect on anyone or anything other than Jason Hartman." Thus, Bond cannot be considered a true rebuttal witness.

Second, Bond's opinions are inadmissible under FRE 702 because they fail to meet the *Daubert* requirements for admissibility. Bond did not conduct an independent and objective investigation from which to form his opinions. Outside of SEMRush data, the reliability of which Bond questioned at his deposition, and a backup of thebrokeguru.com as it appeared on a single day (August 28, 2019), Bond did not consider any pertinent evidence. In relying only upon third-party projections, Bond offered an untestable and unscientific methodology for his opinions. He has not provided any reasons, bases, or independent data for his opinions. Bond provided no analysis of HTML elements or website code, which is what Avenstein discussed. Bond has failed to apply any methodology for his opinions or offer any way to verify the processes and analyses he has allegedly conducted. As a result, his conclusory opinions are unreliable under Rule 702 and *Daubert*. The Court should therefore exclude his report and prohibit him from testifying.

## II.   PROCEDURAL BACKGROUND

This Court issued its scheduling order (the "**Scheduling Order**") in this case on March

18, 2019. (DE 47.) The Scheduling Order set February 3, 2020 as the deadline for Plaintiffs to "disclose experts, expert witness summaries, and reports as required by Fed. R. Civ. P. 26(a)(2)." (*Id*. at 1.) Defendants were required to "disclose experts, expert witness summaries, and reports as required by Fed. R. Civ. P. 26(a)(2)" by February 24, 2020. (*Id*.) And the Scheduling Order set the deadline for the "[e]xchange of rebuttal expert witness summaries and reports as required by Fed. R. Civ. P. 26(a)(2)" on March 13, 2020. (*Id*.) Pursuant to the parties' joint request, this Court granted a 7 day extension of the aforementioned deadlines. (DE 92-93.) The new deadlines were February 10, March 2, and March 20, 2020, respectively. On March 9, 2020, Defendants requested an additional 10-day extension of their deadline to disclose rebuttal experts (*i.e.*, until March 30, 2020), which was granted. (DE 94-95.)

Plaintiffs disclosed three experts and served their expert reports on February 10, 2020. (*See* DE 112-6 (Avenstein), DE 115-2 (Kronenberger), DE 150 (Cuneo).) Defendants did not disclose or serve any affirmative expert reports on March 2, 2020. Fact discovery closed on March 27, 2020. On March 30, 2020, Defendants disclosed and served two rebuttal expert reports, which puported to be in rebuttal to two of Plaintiffs' disclosed experts.

## III. ARGUMENT AND CITATION OF AUTHORITIES

### A. Bond Should Be Excluded Because He is Not Offering True Rebuttal Testimony

#### i. Legal Restrictions on Rebuttal Experts Under Rule 26

Unlike initial experts, rebuttal experts are only permitted to testify for a "limited, narrow purpose." *Kirksey v. Schindler Elevator Corp.*, No. 15-0115-WS-N, 2016 U.S. Dist. LEXIS 128522, at *73 (S.D. Ala. Sep. 20, 2016). "Rule 26 permits rebuttal expert testimony only where it 'is intended solely to contradict or rebut evidence on the same subject matter identified by another party.'" *Wreal, LLC v. Amazon.com, Inc.*, No. 14-21385-CIV-LENARD/GOODMAN, 2016 U.S. Dist. LEXIS 192613, at *6-7 (S.D. Fla. Jan. 7, 2016) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii).) Accordingly, "[c]ourts in this district have strictly held that rebuttal testimony is

permitted only when it directly addresses an assertion raised by an opponent's experts." *Id*.[1] The relevant "opponent expert" for purposes of assessing the proper scope of rebuttal testimony is the expert identified by the rebutting party at the time of disclosure. *See Incardone v. Royal Carribean Cruises, Ltd.*, 2018 U.S. Dist. LEXIS 209109, at *15 (S.D. Fla. Dec. 11, 2018) ("While related in a broad sense to what future treatment is needed for Plaintiffs, McKay's findings . . . rebut Plaintiffs' *psychiatrists' findings*, not **Forman**'s findings contained in his life care plans. RCCL identified McKay as a rebuttal witness to Forman, not Plaintiffs' psychiatrists. Thus, this is not proper rebuttal testimony to Forman's testimony and should be excluded.")[2]

Importantly, rebuttal testimony "cannot be used to advance new arguments or new evidence, and a rebuttal expert cannot offer separate and distinct analysis." *Wreal*, 2016 U.S. Dist. LEXIS 192613, at *7. If expert testimony is not so circumscribed, then "the overwhelming weight of authority is that preclusion is required and mandatory absent some unusual or extenuating circumstances - that is, substantial justification." *Id*.

Bond's report traverses all of these limitations and offers new analyses, arguments, and evidence meant for Defendants' case-in-chief. *See Incardone*, 2018 U.S. Dist. LEXIS 209109, at *22 ("Rebuttal testimony should not be allowed, if it logically belongs in the case-in-chief and goes to the case's central issue of causation."); *Stephenson v. Wyeth LLC*, 2011 U.S. Dist. LEXIS 119013 (D. Kan. Oct. 14, 2011).

---

[1] *See Guevara v. NCL (Bah.) Ltd.*, 2017 U.S. Dist. LEXIS 126253, at *14 (S.D. Fla. Aug. 8, 2017); *Jetport, Inc. v. Miami*, 2017 U.S. Dist. LEXIS 228485, at *19 (S.D. Fla. July 10, 2017); *Quantum Capital, LLC v. Banco De Los Trabajadores*, 2015 U.S. Dist. LEXIS 186035, at *9 (S.D. Fla. Oct. 19, 2015); *1550 Brickell Assocs. v. Q.B.E. Ins. Corp.*, 2010 U.S. Dist. LEXIS 121250, at *7 (S.D. Fla. Nov. 1, 2010); *Pelican Pointe of Sebastian II Condo. Ass'n v. Empire Indem. Ins. Co.*, 2009 U.S. Dist. LEXIS 138617, at *5 (S.D. Fla. July 29, 2009); *see also Bradenton Beauty & Barber Acad., Inc. v. First Nat'l Ins. Co. of Am.*, 2017 U.S. Dist. LEXIS 106091, at *6 (M.D. Fla. Apr. 6, 2017); *Tuscumbia City Sch. Sys. v. Pharmacia Corp.*, 2014 U.S. Dist. LEXIS 191779, at *3 (N.D. Ala. Sep. 3, 2014) ("To be considered a rebuttal, the George Report must have been intended solely to rebut the specific contentions made in defendant's expert reports."); *Schablonentechnik v. MacDermid Graphic Arts, Inc.*, 2005 U.S. Dist. LEXIS 45982, at *9 (N.D. Ga. June 21, 2005).

[2] Unless otherwise noted, all emphasis in original and all internal citations omitted throughout.

ii. <u>The Bond Report Addresses "Plaintiff's Claims," Not Avenstein's Report</u>

Based on Defendants' disclosures and Bond's testimony, Bond is supposed to rebut the opinions expressed by Avenstein. (*See* Ex. A at 1, 3; Ex. B at 11:24-12:9, 12:24-13:23.) But Bond makes no attempt to rebut Avenstein's opinions, and instead focuses solely on "plaintiff's claims." (*See, e.g.*, Ex. A at 4.) Indeed, Bond agrees with Avenstein's opinions and conclusions. (Ex. A at 4, 13 ("Avenstein points to factually correct elements" and "[Avenstein's] report is not incorrect"); Ex. B at 80:9-25, 88:1-19, 91:24-92:3, 94:1-16, 94:17-23, 96:4-17.) Therefore, Bond builds off of his base legal conclusion that the Avenstein report is "irrelevant" to Plaintiffs' claims (Ex. A at 13) and does not "present conclusions that would support plaintiff's claims" (*id*. at 4). Bond also critiques the phrasing of Avenstein's statements, explaining how he would phrase things differently. (Ex. B at 88:1-19.) Neither Bond's legal analysis nor his critique on Avenstein's phrasing makes Bond's opinions a proper rebuttal.

In *Bradenton Beauty & Barber Academy, Inc. v. First National Insurance Company of America*, the court ruled that Plaintiff's purported rebuttal expert, Scott Russell, was not truly a rebuttal expert because his "opinions rebutted Defendant's theories that the dwellings could be reoccupied, rather than Defendant's experts' opinions." 2017 U.S. Dist. LEXIS 106091, at *6. Indeed, the defendant did not have any expert that opined on whether the subject dwellings could be reoccupied. *Id*. Consequently, the court ruled that "at best, Mr. Russell is an untimely-disclosed expert" and excluded Mr. Russell's opinion. *Id*.

Similarly, in *Pelican Pointe of Sebastian II Condo. Ass'n v. Empire Indem. Ins. Co.*, the court rejected the rebutting party's attempt to broadly define "subject matter" as used in Rule 26(a)(2)(C)(ii) to essentially mean "the cause of action." 2009 U.S. Dist. LEXIS 138617, at *2. The court held that "[a] rebuttal . . . is not meant to challenge a whole case-in-chief but rather some facet of the other party's evidence." *Id*. at *2-3. Accordingly, the court struck the rebutting expert's disclosure where his opinion did "not limit itself to challenging [the opponent expert's] report by questioning, for example, his methodology or the bases underlying his analysis and conclusions" but instead discussed "the Defendant's case in full, including new matters . . . not

addressed by [the opponent expert] and new evidence not produced to the Plaintiff." *Id*. at *3.

Further, in *Quantum Capital, LLC v. Banco De Los Trabajadores*, the plaintiff's expert analyzed a debt financing deal and a concommitant equity sell-off that were the subject of two contracts. 2015 U.S. Dist. LEXIS 186035, at *6-7. The expert opined on the appropriate amount of damages stemming from a breach of those contracts. *Id*. Defendant's rebuttal expert undercut the plaintiff's expert's analysis by opining that the plaintiff would actually be entitled to $0 in damages because the underlying transactions that would have led to fulfillment of the contracts would be illegal if completed. *Id*. at *8-9. The court held that the rebuttal expert's "opinions are not proper rebuttal opinions because they address new topics." *Id*. at *9. Plaintiff's expert, the court ruled, did not provide any "analysis as to whether the transactions were legal or how the securities laws may govern the transactions." *Id*. Accordingly, the rebuttal expert's opinions as to the legality of underlying transactions was stricken. *Id*. The court further stated, "[i]t was improper for Defendants to introduce such evidence through a rebuttal expert and Plaintiff is prejudiced by being unable to proffer their own rebuttal expert on the legality of these transactions." (*Id*.)

Like the rebutting experts in *Bradenton*, *Pelican Pointe*, and *Quantum Capital*, Bond too attempts to rebut Plaintiffs' theories of the case that were not mentioned by Avenstein and thus improperly opines on new topics. Importantly, Bond reviewed the Second Amended Complaint even though Avenstein did not. (*Compare* Ex. A at 17 *and* DE 112-6 at 18.) And throughout Bond's report, he references plaintiff's "claims", "accusations," and "goals," not Avenstein's. (Ex. A at 4, 11-13.) For example, Bond points to "plaintiff's accusation that the defendant was using th[e relevant] site as a lever to deploy search engines as a weapon to harm the plaintiff's business." (*Id*. at 12.) Avenstein does not make this accusation, however. And in fact, Bond expressly testified that Avenstein did not opine on how the relevant websites caused "harm" to any plaintiff's business. (Ex. B at 143:13-16.) Avenstein is a cyber-expert that analyzed web-code to determine whether specific online tools were used on a website and aimed or targeted

towards a particular subject. He did not assess the efficacy of Defendants' SEO campaign or the "harm" suffered by Plaintiffs. Indeed, Bond recognizes this and discusses throughout his report how Avenstein does not discuss the website's effect on Plaintiffs or the success of thebrokeguru.com and jasonhartmanproperties.com. (Ex. A at 4, 13 (claiming Avenstein "does not demonstrate in any way that any of these features created success or traffic for the website in question"); *see* Ex. B at 143:17-24, 198:14-21, 199:23-25.) Nevertheless, those are the exact issues that Bond focuses on. (*See, e.g.*, Ex. A at 4, 12-13.)

Moreover, like in *Pelican Pointe*, Bond's report is based almost entirely on "new evidence not produced to the Plaintiff [prior to Bond's report]." First, Bond heavily relies on his and his "developer's" analysis of the back-end configuration of thebrokeguru.com website (arrived at through some unexplained password reset hack) but Avenstein never even accessed the back-end of the website. (*Compare* Ex. B at 107:21-109:7 and Ex. C at 99:8-25, 102:10-15.) Second, every exhibit and screenshot in Bond's report consists of new evidence not produced to Plainitffs, except in connection with Bond's report. (*See* Ex. A at 4-7, 11, 15-18.) Third, Bond relies heavily on his independent and distinct analyses using SEMRush data, which was not used or referenced at all by Avenstein. (Ex A at 4-5, 7, 9, 17-18.) Fourth, Bond relies on his review of Plaintiffs' website, jasonhartman.com, even though it was neither reviewed nor referenced by Avenstein in connection with his report. (Ex. A at 4, 7, 17-18; Ex. C at 51:18-22, 98:3-7.) Fifth, Bond engages in a new and independent "negative SEO" discussion, not touched upon or invited by Avenstein's report. (Ex. A at 6-7.) When pressed to point to a single reference in Avenstein's report warranting the "negative SEO" analysis, Bond struggled and admitted that he took too much out of too little. (*See* Ex. B at 141:22-143:12.)

Further supporting Plaintiffs' point is Bond's claim that Avenstein isn't even qualified to opine on the issues that Bond opines on. He states, "[i]f your goal is to use your website to outcompete competitors in search and report on performance, then a digital marketer is expert (sic). I wouldn't ask a security professional to report on an SEO strategy or web performance (or

lack thereof) in any case." (Ex. A at 8.) This is notable because, as Bond recognizes, Avenstein does not opine on these issues. Avenstein offered no testimony on the subject of whether the relevant websites sought to "outcompete" anyone in "search" or "report on performance." (*See generally* DE 112-6.) Avenstein merely sought to recognize that certain functions were used on the website by embedding certain elements into the code of the website. (*Id.*) He did not discuss a campaign to outcompete anyone or the website's reports on performance. (*Id.*) While there is no requirement that initial and rebuttal experts be from the same discipline, entirely different skillsets should be a consideration in determining whether the experts are offering opinions on the same subject matter.

Accordingly, Bond is not a true rebuttal expert and his disclosure should be stricken.

iii. <u>Bond Offers Testimony Solely Related to Defendants' Case-in-Chief</u>

In addition to solely addressing "plaintiff's claims" rather than Avenstein's opinions, Bond seeks to support Defendants' arguments raised early on in this case as part of their case-in-chief. For example, Defendants raised multiple affirmative defenses claiming that Plaintiffs' damages were not caused by the websites. (*See* DE 84, 85, and 86 at p. 2.) Bond's report looks to support these affirmative defenses by claiming that the websites did not "create confusion," Defendants' SEO strategy was not well orchestrated and was not effective, there was little traffic to the relevant website, and "there is no evidence" that Plaintiffs were actually damaged by Defendants' conduct. (*See* Ex. A at 4-8, 10-13.) Additionally, Chung stated in his responses to Plaintiffs' interrogatories back on July 18, 2019, "Defendant did not perform any back-end code alterations or HTML related SEO efforts to optimize or improve the organic rankings of the websites at issue in this lawsuit. There were no on-page or off-page SEO techniques used or implemented . . . ." (DE 136-9 at 5, Original Reply to Interrogatory 13.) Defendants affirmatively used these "facts" in attempting to defeat Plaintiffs' motion for summary judgment, and even cited to Bond's report several times. (DE 145 at ¶¶76-81, 87; DE 145-1 at ¶¶6-7; DE 145-9.) Thus, Bond's testimony is squarely of the type that "logically" belongs in Defendants'

case-in-chief, goes to the issue of causation and damages, and is inappropriate for rebuttal. *Incardone*, 2018 U.S. Dist. LEXIS 209109, at *22; *see Post-Confirmation Comm. for Small Loans, Inc. v. Martin*, 2016 U.S. Dist. LEXIS 44270, at *30-31 (M.D. Ga. Mar. 31, 2016) (precluding to allow testimony as rebuttal "because Hart's Report more so served to further the Committee's case-in-chief rather than to rebut the opinions reached in the Edwards Report."); *Stephenson*, 2011 U.S. Dist. LEXIS 119013 at *4-5, *8.

Moreover, the fact that Defendants submitted the aforementioned defense theories and evidence before seeing Avenstein's report further supports exclusion of Bond's testimony. *See Jetport, Inc. v. Miami*, No. 1:16-cv-23303-UU, 2017 U.S. Dist. LEXIS 228485, at *19 (S.D. Fla. July 10, 2017) (citing cases); *see also Tramonte v. Fibreboard Corp.*, 947 F.2d 762, 766 (5th Cir. 1991) ("A trial court does not abuse its discretion in excluding rebuttal evidence when the offering party already has presented evidence on the same issue as a part of its case.")

iv.    There is No Substantial Justification for Defendants' Late Disclosure and Plaintiffs are Prejudiced by Being Unable to Submit a Rebuttal Expert

The Court's Scheduling Order and multiple extensions provided Defendants ample opportunity to make a proper disclosure of its affirmative defense expert. Indeed, the Scheduling Order specifically provided a deadline, 21 days after Plaintiffs' disclosure deadline, for Defendants to disclose initial experts. (*See* DE 47 at 1.) The Scheduling Order then contemplated an "exchange" of rebuttal reports based on the parties' compliance with the other deadlines. (*Id.*) Plaintiffs complied with their deadlines, Defendants did not.

Defendants' late disclosure severely prejudiced Plaintiffs as it precluded Plaintiffs from offering a rebuttal expert of their own to rebut the opinions of Bond, which would have been expressly permitted by the Scheduling Order had Defendants properly designated and timely disclosed Bond. *See Quantum Capital*, 2015 U.S. Dist. LEXIS 186035, at *9.

Therefore, the disclosure of Bond should be stricken and Bond should be precluded from testifying at trial.

**B. To the Extent Bond's Opinions Constitute Rebuttal Opinions, They are Inadmissible Under FRE 702 and *Daubert***

i. Legal Standard Under *Daubert* and its Progeny

The admission of expert testimony is governed by FRE 702, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). "Under this framework, district courts are charged with a gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury.'" *Incardone*, 2018 U.S. Dist. LEXIS 209109, at *7-8 (*quoting McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). The court's gatekeeping function "inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993).

"To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue." *Incardone*, 2018 U.S. Dist. LEXIS 209109, at *8 (*citing Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005)). In assessing the reliability of an expert's reasoning or methodology courts use four nonexclusive factors: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey*, 298 F.3d at 1256.

ii. Bond is Not Qualified to Testify on Legal Matters, Opine on the Sufficiency of the Evidence, or Malicious use of Cybertools

Bond admitted that he has no legal training, and is not a lawyer. (Ex. B at 56:2-13.) Yet, he opines in his report on "the conclusions required to prove . . . the plaintiff's case," whether particular circumstances "imply" maliciousness "when applied to the facts of this case," and other legal matters. (Ex. A at 13.) Similarly, Bond admitted that he did not review all evidence produced in this case. (Ex. B at 126:16-23, 169:17-20, 175:16-22.) Yet, he consistently states unequivocally that "no evidence has been presented" on certain matters and makes conclusions based on that unqualified and mistaken belief. (Ex. A at 10, 12.) This is especially problematic since (1) Bond did not review any code or backup copy of jasonhartmanproperties.com at all and (2) only reviewed a backup of thebrokeguru.com that was preserved over one year after the website was created and well after this case was filed, without assessing whether anything on the website changed over time. (Ex. B at 13:24-18:9.) Bond also admitted that he is not a cybersecurity expert. (*Id*. at 35:21-23, 39:10-20, 51:12-20.) Yet, Bond opines on whether Defendants utilized cybertools in a "malicious" manner. (Ex. A at 10.)

Bond's inexperience and zealous desire to help Defendants' case is shown in his erroneous definition of typosquatting. Bond mistakenly equates typosquatting and combosquatting with cybersquatting. Thus, he errantly imposes several requirements before one can conclude typosquatting or combosquatting occurred: (1) a malicious intent by the domain name registrant, (2) content on the website accessible at the registered domain name that "mimick[s]" another website (akin to a phishing scheme), (3) a pecuniary motive, (4) demonstrated success in confusing consumers through the point of sale, and (5) a showing that the website accessible at the domain name ranks on Google. (Ex. A at 10; Ex. B at 177:24-183:25.) Bond's multi-factor definition of typosquatting is at odds with Avenstein's definition, this Court's recognition of initial interest confusion, as well as the entire body of case law and

scholarship concerning the term "typosquatting."[3] Bond is a digital marketer and lacks the knowledge and experience to assess the actions of online threat actors. Accordingly, Bond is unqualified to render the opinions expressed in his report and should be precluded from doing so.

iii. Bond's Methodology is Flawed and Unreliable

Bond's methodology is fatally flawed, unreliable, and unsupported in multiple respects. First, Bond's SEMRush analyses are out-of-date and unreliable. Indeed, Bond himself discredited the SEMRush data that he relied upon. Second, Bond failed to review documents that would be critical to review for his analyses to be reliable. Third, Bond relies on multiple untested, undescribed, and unverifiable methods.

**1. Bond Relied on SEMRush Data from the Wrong Time Period and That is Demonstrably Erroneous**

Bond makes conclusions based on his review of SEMRush data from March 26-27, 2020. (*See, e.g.*, Ex. A at 5-6.) As the parties agree, however, jasonhartmanproperties.com was no longer active after October 22, 2018 (DE 136 at ¶57; DE 157 at ¶57) and thebrokeguru.com was deactivated on August 28, 2019 pursuant to an agreement between counsel (DE 136, ¶61; DE 157, ¶61). Thus, data from March 2020 is irrelevant. In contrast to the obsolete data relied upon by Bond, data from SEMRush within the relevant time period (*e.g.*, July 2019) shows thebrokeguru.com ranking on Google for 18 keywords, including "platinum properties investor network," multiple iterations of "jason hartman," and even "pipgroup.com." (Ex. D at 2.)

[3] *See, e.g.*, *S. Co. v. Dauben Inc.*, 324 F. App'x 309, 312 n.2 (5th Cir. 2009) (stating typosquatting is simply the "registering of domain names that are intentional misspellings of distinctive or famous names."); *Green v. Fornario*, 486 F.3d 100, 103 n.5 (3d Cir. 2007) (describing typosquatting as a "subgenera of cybersquatting" that "involves registering a domain name that is but a letter or two off from a distinctive mark"); *see also Tex. Int'l Prop. Assocs. v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 587 (N.D. Tex. 2009); *Cent. Source LLC v. Annualdcreditreport.com*, 2014 U.S. Dist. LEXIS 152129, at *7 (E.D. Va. July 11, 2014); Jordan Arnot, NAVIGATING CYBERSQUATTING ENFORCEMENT IN THE EXPANDING INTERNET, 13 J. Marshall Rev. Intell. Prop. L. 321, 325 (2014); Brandon Marsh, ICANN'T HELP MYSELF: BENEFICIAL ADJUSTMENTS TO THE NEW GENERIC TOP-LEVEL DOMAIN NAME EXPANSION PROCESS, 95 J. Pat. & Trademark Off. Soc'y 195, 205 (2013) ("Typosquatting, defined as 'registering a domain name that is but a letter or two off from a distinctive mark,' comprises another prevalent form of cyber abuse.")

Moreover, to the extent Bond relies on the subject data to show website traffic, he undermined its reliablity at his deposition. (Ex. B at 160:9-165:18 ("this is their algorithm that includes a lot of uncertainty since it's an estimate of other websites' traffic.") Moreover, Bond's testimony on the issue is directly contradicted by actual visitor data, not SEMRush estimates. (*See* DE 115 at 4.) Thus, Bond's conclusions based on out-dated and "uncertain" data are unreliable and demonstrably erroneous.

**2. Bond Failed to Review Crucial Documents**

Bond draws conclusions based on his belief that there is "no evidence" or "insufficient" evidence to support plaintiff's claims no fewer than 12 times in his report. (Ex A at 8-10, 12-13.) For example, Bond claims "in this case, there is no quantifiable evidence presented that damage occurred or that tactics associated with malicious SEO strategies took place." (Ex. A at 8.) There are multiple issues with this methodology. First, as discussed above, Bond inappropriately addressed plaintiff's claims rather than Avenstein's opinions, and therefore searched for evidence in Avenstein's report in support of points that Avenstein didn't make. Second, Bond's conclusions are inappropriate and unreliable because Bond failed to review critical documents, including (1) website visitor data (DE 102-3), (2) the Lutz Declaration (DE 34-13), (3) scope of work documents created by Chung (DE 136-14 at 36-41), and (4) copies of the relevant website as it appeared when it was live. (*See* Ex. A at 17.)

Bond admitted that he did not review (1) any emails sent by Defendants to Plaintiffs' clients and colleagues, (2) any posts created by Defendants on third-party websites, (3) Defendants' website, pipgroup.com, (4) server logs or visitor data for pipgroup.com, (5) PIP's marketing data, (6) PIP's email distribution list, (7) internal emails between PIP personnel relating to the relevant websites or otherwise, (8) PIP's pay-per-click advertising documents, or (9) any documents regarding PIP's current or past SEO strategies. (Ex. B at 31:23-34:1.) Moreover, Bond did not analyze any website other than thebrokeguru.com, (Ex. B at 78:7-22, 79:11-25), and even for that website he was limited to a single backup from August 28, 2019 (*id.*

at 13:24-18:9).

As for website visitor data, called AWStats, Bond testified, "I didn't have my own version. I only had what I saw in [Avenstein's] report." (Ex. B at 96:25-97:4.) But Avenstein did not copy any visitor data into his report. (*See* DE 112-6 at 13.) He referenced the data by name and Bates-label along with his discussion about what type of data is included therein. (*Id.*) Thus, Bond failed to analyze crucial data about website visitor traffic and instead relied on "uncertain" estimates from SEMRush, as discussed above.

Moreover, Bond failed to review crucial testimony submitted in this case about user interactions with the relevant website from someone who indicated he was confused by the domain name, jasonhartmanproperties.com. (*See* DE 34-13; *see also* DE 157-5.) Yet, Bond makes several conclusions based on his view that there was "no evidence" of user confusion, or even any "human interaction with the website, outside of" Defendants and Hartman. (*See* Ex. A at 4, 6, 12-13.) Moreover, because Bond failed to review any emails produced in the case, Bond fails to acknowledge or consider that Defendants intentionally selected jasonhartmanproperties.com and similarly deceptive domain names to "run [the website] up high on searches for [Jason Hartman]." (*See* DE 136 at ¶30.) Indeed, Bond opines in his report that "[t]here was no attempt to confuse the audience or 'bait and switch' visitors about the intent or content of the site." (Ex. A at 12.) This is simply not in accord with reality. And Bond's errors are virtually assured by his methodology, namely, drawing conclusions based on a perceived absence of evidence without reviewing all relevant evidence. Holding a hand over one's eyes and concluding that there's nothing but darkness in the world because one sees nothing is the precise type of methodology that is meant to be precluded under FRE 702 and *Daubert*.

Bond's failure to review crucial evidence also caused him to utilize a skewed perspective. For example, Bond's failure to review Defendants' internal emails and scope of work documents forced Bond to assess Defendants' intent and "effort" in a vacuum. Bond ignored what Defendants specifically claimed they were trying to do and what they believed worked. Instead,

Bond used a "what would I do in that situation" thought process. He assumed that the person who created the relevant website and set up the SEO campaign in connection therewith would act exactly as he would. For example, he claims that using "ranking for keywords" is something that people did "in the '90s" and "is no longer how any of the web development as it relates to SEO functions." (Ex. B at 63:16-64:9, 86:8-11, 87:3-4.) He also claims that "authority" is the only thing that matters for a successful SEO campaign. (Ex. B at 102:5-104:20, 153:17-154:13.) Based on this belief, Bond claims, "there is no evidence at all in the report or in any of the material that I reviewed that suggests that any true search engine optimization efforts (ethical or unethical) were undertaken." (Ex. A at 13.) Damning to Bond's analysis, however, is Blindspot's express discussion of the use of "keywords," "HTML tags," and "URL rewrites" to assist PIP's SEO. (*See, e.g.*, DE 136-14 at 40.) Whatever Bond thinks about how an SEO campaign works, it does not comport with Blindspot's. Bond's analysis is conducted in a vacuum and ignores documents created by Defendants that undermine his conclusions. This is especially troubling as he makes conclusions based on what evidence he *didn't* see. There is no need to rely on conjecture in this case, the SEO professional used by Defendants in connection with the relevant websites is a witness, and even a Defendant, in this case. Bond's methodology is flawed, irrelevant, and, if introduced, would only serve to confuse the trier of fact.

**3. Unreliable and Unverified Methods**

Bond's methodology is further flawed because he relies on an undisclosed hack into the back-end of thebrokeguru.com based on a backup copy of the website as it existed on August 28, 2019. (Ex. B at 107:21-109:7.) Since it is undisclosed it is impossible to determine whether this method of analyzing a website has been subjected to peer review and publication, has a known or potential rate of error, or is generally accepted in the scientific community. "The proponent of expert testimony always bears the burden to show that his expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony assists the trier of fact."

*Frazier*, 387 F.3d at 1260. Defendants have not met their burden.

iv. Bond's Testimony Will Not Assist the Trier of Fact

For all of the reasons discussed above, Bond's testimony will not assist the trier of fact. This is especially true with respect to Bond's "backlink" analysis discussed in his report, which of course has no parallel in Avenstein's report. (Ex. A at 17.) In his report, Bond claims that no backlinks were detected on thebrokeguru.com leading to jasonhartman.com as of October 2019. (*Id*.) In other words, there were no links to jasonhartman.com on thebrokeguru.com's website as of October 2019. (Ex. B at 24:7-25:11.) First, the website was taken down pursuant to mutual agreement of counsel in August 2019 so it is meaningless that no such links were detected by SEMRush in October 2019. Bond's claim that "lost links remain for 3 months beyond the time that they are no longer detected" is not based on any scientific method, just Bond's own undisclosed tests of "other domains" (Ex. B at 26:22-31:22). In any event, there is no claim by Plaintiffs, and certainly not by Avenstein, that thebrokeguru.com led visitors to jasonhartman.com through links. Rather, the website led visitors to Defendants' website, pipgroup.com. (*See* DE 147-10 at ¶¶4-22.) Bond is offering inappropriate rebuttal testimony that has no relevance even to Defendants' claims. It will not assist the trier of fact.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that Gregory R. Bond is not a rebuttal expert, and even if he were, his slated testimony is not reliable or admissible under FRE 702. Plaintiffs respectfully request that the Court grant their motion to exclude Gregory R. Bond.

Dated: July 31, 2020

Respectfully submitted,

*/s/ Steven Pollack*
Steven Pollack, Esq.
(*Admitted Pro Hac Vice)*
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

*/s/ Kenneth E. Chase*
Kenneth E. Chase
Florida Bar No. 017661
kchase@chaselaw.com
CHASE LAW & ASSOCIATES, P.A.
700 71st Street
Miami Beach, FL 33141
Telephone: (305) 402-9800
Facsimile: (305) 402-2725

*Attorneys for Plaintiffs*

**RULE 7.1(A)(3) CERTIFICATION**

Counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

*/s/ Steven Pollack*
Steven Pollack

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on July 31, 2020 on all counsel or parties of record on the Service List below.

By: */s/ Kenneth E. Chase*
Kenneth E. Chase

**SERVICE LIST**

Jeffrey M. Partlow, Esq.
jeffrey.partlow@csklegal.com
natasha.acevedo@csklegal.com
COLE, SCOTT & KISSANE, P.A.
Tower Place, Suite 4001
900 Summit Tower Boulevard
Orlando, FL 32810
Telephone: (321) 972-0025
Facsimile: (321) 972-0099

EDWARD S. POLK
Florida Bar No.: 239860 Emails:
edward.polk@csklegal.com
danise.townsend@csklegal.com
COLE, SCOTT & KISSANE, P.A.
9150 South Dadeland Boulevard,
Suite 1400
Miami, Florida 33156
Telephone (786) 268-6763
Facsimile (321) 972-0099

Alexandra M. Dishun, Esq.
David S. Klein, Esq.
(*Admitted Pro Hac Vice*)
adishun@rlklawfirm.com
dklein@rlklawfirm.com
ROUNTREE, LEITMAN & KLEIN, LLC
Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, GA 30329
Telephone: (404) 856-0540
Facsimile: (404) 704-0246

*Attorneys for Defendants*

Ava K. Doppelt, Esq.
adoppelt@allendyer.com
ALLEN, DYER, DOPPELT
& GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

Steven Pollack, Esq.
(*Admitted Pro Hac Vice*)
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

Jeffrey E. Grell, Esq.
(*Admitted Pro Hac Vice*)
jgrell@grellfeist.com
GRELL FEIST PLC
825 Nicollet Mall, Suite 625,
Minneapolis, MN 55402
Telephone: (612) 353-5530

Kenneth E. Chase, Esq.
kchase@chaselaw.com
CHASE LAW & ASSOCIATES, P.A.
700 71st Street
Miami Beach, Fl 33141
Telephone: (305) 402-9800
Facsimile: (305) 402-2725

*Attorneys for Plaintiffs*