UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-61907-CIV-SMITH/VALLE

PLATINUM PROPERTIES INVESTOR
NETWORK, INC.; THE HARTMAN
MEDIA COMPANY, LLC; and JASON
HARTMAN,

        Plaintiffs,

v.

CHARLES SELLS; STEPHANIE
PUTICH; YOUNG CHUNG; THE PIP-
GROUP, LLC; BLINDSPOT DIGITAL,
LLC; ELENA CEBOTARI SELLS; and
JOHN DOES 1-8,

        Defendants.
_____/

**PLAINTIFFS' MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF MICHAEL W. THOMPSON**

Plaintiffs Platinum Properties Investor Network, Inc. ("**PPIN**"), The Hartman Media Company, LLC ("**HMC**"), and Jason Hartman ("**Hartman**") (collectively, "**Plaintiffs**") respectfully move to exclude the expert testimony of Michael W. Thompson pursuant to Rule 702 of the Federal Rules of Evidence ("**FRE**") and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

**I.    INTRODUCTION**

Plaintiffs, a group of industry professionals working to educate and service real estate investors, seek compensation for tremendous losses they sustained as a result of Defendants' multi-faceted criminal scheme involving, *inter alia*, the propagation of counterfeit domain names and a disparaging hit-site meant to (1) deter others from doing business with Plaintiffs and (2) help Defendant The PIP-Group, LLC ("**PIP**") earn revenue. To calculate their damages, Plaintiffs retained a prominent accounting expert, Mr. José G. Cúneo, CPA, CFF, CVA, CFE

1

("**Cuneo**"), to provide expert opinions concerning Plaintiffs' lost profits, corrective advertising expenses, and other damages calculations as permitted by the Court. Defendants offered an alleged accounting expert whose primary work is providing expert testimony, Michael W. Thompson ("**Thompson**"), to purportedly rebut Cuneo's testimony.

The Court should preclude Thompson from testifying at trial, and should strike his expert report because his opinions are inadmissible under FRE 702. Thompson has been ruled to be unreliable by courts across the country and is not qualified to provide the legal analyses that he performs. Moreover, Thompson did not conduct an independent and objective investigation from which to form his opinions. Thompson criticizes Cuneo's methodology but offers no alternatives and cites to no objective standard that was breached by Cuneo. Thompson baselessly imposes audit-like investigation requirements for any accounting expert to offer testimony in a civil case based on nothing more than his understanding of what Rule 26 of the Federal Rules of Civil Procedure require. Thompson proferred analyses based on, admittedly, partial and incomplete evidence, and which when put to the test could not hold up to scrutiny. Moreover, Thompson has not provided any reasons, bases, or independent data for his opinions. Thompson has failed to apply any methodology for his opinions or offer any way to verify the processes and analyses he has allegedly conducted. Finally, Thompson's testimony offers no more than what a lawyer could draw from cross-examination. As a result, Thompson's conclusory opinions are unreliable under Rule 702 and *Daubert*. The Court should therefore exclude his report and prohibit him from testifying as an expert.

## II.     BACKGROUND

### A. Procedural Background

This Court issued its scheduling order (the "**Scheduling Order**") in this case on March 18, 2019. (DE 47.) The Scheduling Order set February 3, 2020 as the deadline for Plaintiffs to "disclose experts, expert witness summaries, and reports as required by Fed. R. Civ. P. 26(a)(2)." (*Id*. at 1.) Defendants were required to "disclose experts, expert witness summaries, and reports

as required by Fed. R. Civ. P. 26(a)(2)" by February 24, 2020. (*Id*.) And the Scheduling Order set the deadline for the "[e]xchange of rebuttal expert witness summaries and reports as required by Fed. R. Civ. P. 26(a)(2)" on March 13, 2020. (*Id*.) Pursuant to the parties' joint request, this Court granted a 7 day extension of the aforementioned deadlines. (DE 92-93.) The new deadlines were February 10, March 2, and March 20, 2020, respectively. On March 9, 2020, Defendants requested an additional 10-day extension of their deadline to disclose rebuttal experts (*i.e.*, until March 30, 2020), which was granted. (DE 94-95.)

Plaintiffs disclosed three experts and served their expert reports on February 10, 2020. (*See* DE 112-6 (Avenstein), DE 115-2 (Kronenberger), DE 150 (Cuneo).) Defendants did not disclose or serve any affirmative expert reports on March 2, 2020. Fact discovery closed on March 27, 2020. On March 30, 2020, Defendants disclosed and served two rebuttal expert reports, which puported to be in rebuttal to two of Plaintiffs' disclosed experts.

### B. Thompson's Report

In a 32-paragraph report, Thompson issues four opinions in an attempt to discredit Cuneo's testimony: (1) "Cuneo failed to consider the accuracy and validity of the underlying data based upon the evidence found in the (sic) discovery to date," (2) "Cuneo did not consider the effect advertising had on sales as a possible alternative for the loss in sales and/or profits," (3) "Cuneo did not consider the impact of the loss of sales staff on the business," and (4) "Cuneo makes statements in his analysis that are misleading and without merit." (Ex. A at 11-17.) In forming the first three opinions, Thompson relied on his failure to see discussions of certain information, including Thompson's own opinions, in Cuneo's report. (Ex. B at 79:24-83:20, 94:3-15, 140:12-142:20, 142:23-144:4, 166:13-18, 198:3-18; Ex. C at 164:5-17, 207:12-19.) In drawing conclusions based on what wasn't in Cuneo's report, Thompson improperly relied upon his interpretation of what's required to be included in an expert report pursuant to Rule 26 of the Federal Rules of Civil Procedure. (Ex. B at 79:24-83:20, 86:23-87:3.)

### III.   ARGUMENT AND CITATION OF AUTHORITIES

#### A.  Legal Standard

The admission of expert testimony is governed by FRE 702, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). "Under this framework, district courts are charged with a gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury.'" *Incardone*, 2018 U.S. Dist. LEXIS 209109, at *7-8 (*quoting McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). The court's gatekeeping function "inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993).

"To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue." *Incardone*, 2018 U.S. Dist. LEXIS 209109, at *8 (*citing Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005)). In assessing the reliability of an expert's reasoning or methodology courts use four nonexclusive factors: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey*, 298 F.3d at 1256.

"While a rebuttal expert may appropriately criticize the methodology of an opposing expert, the expert should not be called simply to support arguments lawyers can draw from cross

4

examination of the opposing expert." *Wiand v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 63071, at *5-6 (M.D. Fla. May 6, 2014). Moreover, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert . . . [a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Owaki v. City of Miami*, 491 F.Supp.2d 1140, 1161 (S.D. Fla. 2007) (*quoting General Electric v. Joiner,* 522 U.S. 136, 146 (1997)) "[A] trial court may exclude testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id*.

### B. Thompson Has Been Deemed an Unreliable Witness by Courts Across the Country and is, For the Same Reasons Described by Other Courts, Unreliable Here As Well

Thompson's primary occupation is that of a testifying witness. He has testified by deposition or at trial in "probably more than 50 but less than 100" cases (Ex. B at 211:20-23) and spends "75 to 80 percent" of his time on litigation related work (*id*. at 48:1-9). Increasingly, Thompson is being seen by courts across the country as a party advocate that overreaches, and whose opinions warrant enhanced skepticism.

For example, in *Transupport, Inc. v. Commissioner of Internal Revenue*, Thompson was chastised in a scathing decision for ignoring relevant evidence, "simply endors[ing] petitioner's objectively discredited methodology," and offering "testimony tainted by overzealous advocacy." No. 12152-13, 2016 Tax Ct. Memo LEXIS 214, at *17-18, *37 (T.C. Nov. 23, 2016). The Court ruled that "[a]n expert who is merely an advocate of a party's position does not assist the trier of fact in understanding the evidence or in determining a fact in issue." *Id*. at *18. The court ruled that Thompson was "merely an advocate." Among other flaws, Thompson's original report "went far beyond admissible expert testimony when he argued that the IRS had not conducted a proper audit and that there were no badges of fraud." *Id*. at *36. "When pushed to refine his statistical analysis in a supplemental report and during his testimony, he omitted major 'large ticket' items, acknowledged data entry errors, and ended up with a small (15% of sales)

and unreliable sample." *Id*. The Court found that Thompson "adjusted his assumptions . . . without any rational objective evidence and apparently to justify his initial conclusions." *Id*. at \*36-37. Accordingly, the court "reject[ed] Michael Thompson's opinion as unreliable and not credible." (*Id*. at \*37.) This Court should do the same.

And just two months ago, Thompson was criticized by the court in *Sonoco Products Company v. Clifford Paper, Inc.*, Case No. L-3015-17, pending in the Superior Court of New Jersey. (Ex. D at 3-5; Ex. B at 214:11-22.) In that case, the court struck Thompson's expert report because, *inter alia*, he sought to testify on matters that were directly contrary to the court's rulings. (Ex. D at 3.) The court stated, "Thompson is an accountant, not a lawyer, and cannot opine on the ownership rights, if any, of the account and the money in it, and certainly not after the court has ruled on that issue." On another issue, the court struck Thompson's opinions because "Thompson is an accountant, not a juror or fact finder who evaluates the credibility of witnesses or the credibility of record testimony on the issue of 'justification.'" (*Id*.) The Court also struck Thompson's opinions concerning alleged "financial irregularities" in discovery documents as irrelevant. (*Id*. at 3-4.) The court concluded "Thompson's opinions add nothing and are irrelevant . . . . The motion to bar Thompson's 'expert' report against CPI is GRANTED." (*Id*. at 5) (quotation marks around "expert" in original).

In *U.S. v. Greenhill*, Thompson's opinion was precluded because it "amount[ed] to nothing more than an opinion on [the Defendant's] *mens rea*" and was "not a proper expert opinion." (Ex. E at 7.) Like other courts, the *Greenhill* court held that Thompson was "invading the province of the jury and not offering any opinion for which he is uniquely qualified." (*Id*. at 9.) Quoting Eleventh Circuit precedent, the *Greenhill* court stated that "an accountant, even a forensic accountant, cannot offer testimony about the legal implications of evidence" and implied that Thompson was "offering a loosely veiled legal opinion that the Court must exclude." (*Id*. at 9-10; *see also* Ex. B at 216:1-221:16 (admitting to violating the *Greenhill* court's Order while on the stand).)

6

In *Firmani v DarCourt Builders LLC*, Thompson's testimony was disqualified by the trial court and that disqualification was affirmed by the Georgia Court of Appeals. (Ex. B at 224:5-225:22.) The Georgia Court of Appeals ruled that Thompson's methodology had a "flaw" and "misstate[d] the cause of the injury sustained by the [plaintiff]." (Ex. F at 20.) Thus, "Thompson's theory of causation was not supported by the evidence" and "the trial court did not err in excluding Thompson's testimony." (*Id*. at 21.)

In *United States v. Lulseged*, the trial court ruled that the defendant, who relied on Thompson's testimony and analysis, failed to rebut the opponent's total-loss calculation. 688 F. App'x 719, 721-722 (11th Cir. 2017). The Eleventh Circuit affirmed the trial court's ruling concerning Thompson's testimony. *Id*.; (*see* Ex. B at 234:6-236:6).

Thompson, here, repeats all of the same errors he has previously been criticized for by trial and appellate judges throughout the country. For example, in concluding that Cuneo "failed to consider the accuracy and validity of the underlying data," Thompson criticizes the format of PPIN's general ledgers and claims there are some "irregularities." (Ex. A at 11-13.) But Thompson does not point to any statutory or professional standard governing the format of general ledgers. (*Id*.) That is because there aren't any, and in fact there is no requirement that closely held companies even keep general ledgers. (Ex. B at 64:19-66:1.) Thompson's subjective opinion based on mere advocacy is unreliable, unscientific, and irrelevant. Indeed, Thompson testified that financial documents relied upon by experts in civil cases must be subjected to an IRS-like audit before they can be relied upon. (Ex. B at 53:6-57:11.) There is no basis in the professional or legal world for such rigors.

Moreover, as noted by other courts, Thompson is an accountant and not a lawyer, and cannot opine on "intervening causes" as he does in his report. (*See* Ex. A at 13.) Moreover, he cannot draw conclusions based on what he sees as Cuneo's compliance or lack thereof with Rule 26 of the Federal Rules of Civil Procedure. (*See* Ex. B at 79:24-83:20, 86:23-87:3.)

Moreover, as he did in *Sonoco Products*, Thompson here too improperly "evaluates the

7

credibility of witnesses or the credibility of record testimony." (Ex. A at 16-17.) Indeed, one of Thompson's opinions is based entirely on a misreading of Hartman's tentative testimony – read in rough copy – which he assumed the accuracy of. (*Id*.; Ex. C at 189:3-190:5) This is especially problematic in light of the fact that Hartman's testimony that Thompson relies on was a forced guess and objected to, and Hartman expressly stated during his deposition that he did not prepare financial documents for his companies, including the logging of revenue, which instead was handled by his accountant. (Ex. G at 9:3-22; Ex. H at 193:22-194:11, 200:2-9, 205:11-13.)

For these and the reasons discussed below, Plaintiffs respectfully request that this Court follow the growing trend to preclude Thompson from testifying.

### C. Thompson's Methodology is Flawed, Ignores Critical Evidence, and Is Unsupported

#### i. Thompson's Opinion 1

For Thompson's first opinion, in reference to general ledgers produced by Plaintiffs, he concludes that "[b]ecause the documentation currently presented in discovery and relied upon by Cuneo is so unusual, it is my professional opinion that it cannot be relied upon to provide a reliable damages calculation." (Ex. A at ¶19.) He further speculates about the amount of "due diligence" undertaken by Cuneo and concludes "such documentation should not be relied upon until further due diligence is performed." (*Id*.) In rendering his opinion, Thompson does not reference or discuss any professional or other standards, just his "professional opinion."

Thompson admitted at his deposition that PPIN's general ledgers did not violate any professional or other standard governing general ledgers. (Ex. B at 64:8-66:21, 72:14-76:8, 117:4-10.) Instead, Thompson opined that based on his subjective opinion he would need to see a slew of data for each transaction logged in the general ledger, akin to an IRS-audit, because that's what he would have reviewed if he were providing expert testimony. (*Id*. at 77:7-78:8, 79:24-83:20.) Yet, neither in his report nor at his deposition did Thompson explain why the general ledger is "highly irregular," he just concluded that it was. Even if Thompson's personal

8

standards governed the accounting profession – they do not – and one ignores Thompson's lack of analysis, Thompson could not determine if Cuneo met his subjective standard. Thompson did not see any of PPIN's subsidiary ledgers (*id*. at 84:13-14), did not know whether Cuneo discussed the ledgers with PPIN's tax preparer (*id*. at 85:4-7), did not speak to Cuneo (*id*. at 86:9-10), did not know what due diligence Cuneo conducted (*id*. at 86:11-22, 117:11-15), and did not know what due diligence PPIN's accountant conducted when creating the general ledger (Ex. C at 88:7-14). And when presented with the general ledgers at his deposition, Thompson agreed that they contained a litany of information. (Ex. C at 88:15-90:13.)

Additionally, given that general ledgers aren't even required for accurate bookkeeping, it was incumbent upon Thompson to elaborate or describe in some way how the perceived "irregulaties" in PPIN's general ledgers skewed Cuneo's analysis. He did not even attempt to do so. Rather, Thompson testified, "[a]ll I did is I analyzed the general ledger entries . . . and noted that they were – that there was significant amount of contributions and as a result, that should have given rise to questioning, as well as analyzing those activities." (Ex. B at 102:4-16.) Such a conclusion, devoid of analysis, is not proper expert opinion.

In sum, Thompson's unsupported, rudimentary and subjective opinion is not admissible. *See Frazier*, 387 F.3d at 1298 ("The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable."); *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1286 (11th Cir. 2015).

    ii.    Thompson's Opinion 2

Thompson's second opinion draws on his conclusion that there is a direct, causal relationship between advertising and sales on a monthly basis for PPIN and HMC.[1] (Ex. A at 13-15.) According to Thompson, because PPIN's advertising expenses decreased in 2019 "that is potentially one of the causes" of PPIN's revenue decline in 2018 *and* 2019. (*Id*.; Ex. C at 125:20-

---

[1] Despite conducting his analysis on a same-month basis for 2018, Thompson applied a "one-month lag" when analyzing the data for 2019. He did not provide any competent reason for doing so. (*See* Ex. A at 13 n.7; *see* Ex. B at 135:2-136:13.) Just like he did in *Transupport*,

9

127:17.) Thompson did not quantify the impact that the decrease in advertising had on PPIN's sales. (Ex. A at ¶22.) Thompson's second opinion is erroneous, speculative and baseless.

First, PPIN's advertising expenditure in 2018 was higher than in previous years yet PPIN's revenue decreased. (DE 150 at Exhibit E (p.32)); *see* Ex. C at 153:12-155:1.) This *inverse* relationship is seen for other years as well. (*See* C at 155:2-24.) So the direct, causal relationship can be dismissed out-of-hand. Second, PPIN's advertising expenses did *not* decrease in 2019 compared to amounts spent in previous years. Instead, given the broad guidelines for classification of itemized expenses, PPIN's new accountant in 2019 classified some advertising expenses under "Legal and Professional" expenses. (*See* DE 150 at Exhibit E (p.32).) Thompson failed to consider this. (*See* Ex. C at 156:17-21.) Third, the advertising and consolidated sales data relied upon by Thompson showed an *inverse* relationship, rather than a direct, causal relationship, on a monthly basis. (*See, e.g.*, Ex. C at 129:20-132:15; Ex. I.)

Fourth, Thompson's theory lacks common sense. PPIN does not sell an immediately consumable widget-like commodity where an advertising blitz of "50% off" can result in revenue within the same month (or even the next month). PPIN sells investment properties that are subject to inspection, financing, and a closing. From the point of advertising to the point of revenue generation, which occurs *after* a property closing, takes many months, and even years at times.[2] (*See* Ex. H at 58:24-61:15.) Thompson failed to even consider the length of PPIN's or HMC's sales cycle claiming, "we did not have sufficient information." (Ex. C at 152:12-153:2.) Thompson is incorrect, however. Not only was all data concerning the date of sale and the date of revenue generation for each entity produced to Defendants but Cuneo relied on such data, referred to as "Pipeline Reports." (DE 150 at Exhibit I (p. 36).) Thompson failed to review this critical data. (Ex. B at 39:7-8.)

Fifth, Thompson failed to consider whether PPIN's purported decrease in advertising

---

[2] Among other things, HMC has advertising expenditures associated with its podcast year-round for which it doesn't recognize any revenue except through sporadic promotional and educational item sales. (*See* Ex. H at 60:1-3.)

expenditures in 2019 was caused by Defendants, either through lost opportunities for advertising or reduced cash-on-hand. (*See* Ex. C at 149:5-152:11.) Thus, he assumed his conclusion in claiming that a decrease in advertising was an "intervening cause."

Accordingly, Thompson's analysis purporting to support "Opinion 2" is illogical, speculative and contradicted by the evidence, and common sense.

      iii.    Thompson's Opinion 3

For his third opinion, Thompson erroneously claims that Cuneo did not consider the loss of a particular sales associate by PPIN at the very end of 2018 (the "**Associate**"). (Ex. A at 15-16.) Based on nothing more than a comparison of reported 1099 earnings between the Associate and a randomly selected remaining sales associate (the "**Comparator**"), Thompson concluded that "it is clear that sales personnel have different skillsets" and the loss of the Associate "more likely than not had a material effect on PPIN's sales and profitability." (*Id.*; Ex. C at 159:21-160:13) Thompson did not quantify the impact of the claimed loss to PPIN. (Ex. A at 15-16.)

First, Thompson's Opinion 3 is factually inaccurate. Cuneo considered, and his report analyzed, the effect of the Associate's departure during the relevant time period. (*See* DE 150 at ¶¶31-32; Ex. C at 164:5-165:13.) Cuneo determined, after discussions with PPIN's CEO and consideration of pipeline reports, containing sales data, and tax returns, that the "fact pattern . . . appears to be supportive rather than contrary to the causation assumption." (DE 150 at ¶32.) As Cuneo mentioned and PPIN testified to, sales personnel turnover is normal and sales leads belong to the company, not the sales associate. (*See id*. at ¶31; Ex. H at 96:4-97:16.) PPIN's CEO confirmed that Thompson could have determined whether the loss of the Associate made a difference to PPIN's revenue by looking at the pipeline reports. (Ex. H at 99:13-100:24.) Thompson failed to look at the pipeline reports. (Ex. B at 39:7-8.)

Second, in rendering Opinion 3, Thompson ignored relevant evidence that undermined his conclusions. For example, Thompson ignored that PPIN lost multiple sales associates throughout the years but revenue generally went up after they left. (Ex. H at 105:3-108:18,

11

115:15-117:1, 128:8-9.) He also ignored that sales leads belong to PPIN and are re-assigned by the company to one or more remaining sales associates upon a sales associate's departure. (*See* Ex. H at 108:3-17, 110:14-21; 133:21-134:16.) Thompson ignored that the Associate did not have a history in sales but was actually a geologist before joining PPIN, undermining his unique "skillset" assumption. (*See* Ex. H at 130:2-11.) Thompson also ignored that PPIN hired ***multiple*** sales associates after losing the Associate. (Ex. H at 139:8-141:9, 146:5-25; Ex. C at 185:16-186:6.) And like he did for Opinion 2, Thompson failed to consider whether the loss of the Associate was due to Defendants' misconduct and thus, assumed his conclusion. (Ex. C at 167:18-168:18.) Moreover, Thompson ignored that investment counselors earn income based on the number of hours they work, not only through conversion of leads. (Ex. C at 172:19-24.) Indeed, Thompson erroneously assumed the opposite. (*Id.*) Thompson also ignored that PPIN's investment counselors experienced across-the-board decreases in revenue, which would not be expected if the loss of PPIN's revenue was solely due to the loss of the Associate. (Ex. C at 186:7-187:2.) Thompson also ignored that the Associate's commissions decreased in 2018, like all other investment counselors. (Ex. C at 187:3-18.) Moreover, Thompson acknowledged that he did not review all documents produced in the case, only what he was provided with by counsel. (Ex. B at 162:9-17.) In fact, Thompson testified that he lacked evidence that he requested, which was needed for his analysis. (Ex. C at 162:18-163:21.) Yet, he performed the "analysis" anyway.

<u>Third</u>, Thompson's Opinion 3 is also speculative. In assuming that the Associate was the second most skilled in the company based solely on earnings, Thompson made multiple logical leaps. Thompson failed to consider: (1) the number of hours each investment counselor spent working on PPIN business, (2) what the sales process is like for investment counselors, (3) whether the Associate was paid a higher commission percentage than the Comparator, (4) the number of deals closed by the Associate versus the Comparator, (5) the domestic obligations of the Comparator, (6) how many leads the Associate received versus the Comparator, (7) the level of experience of the Associate and the Comparator, (8) the amount of money the Associate's

leads had ready to invest versus the Comparator's leads, (9) whether the Associate received any high quality leads, (10) compensation received by investment counselors for non-sales related activities, (11) who the Associate's leads were re-assigned to after the Associate left, (12) whether the Associate's leads were re-assigned to the first most skilled salesperson under Thompson's analysis, or (13) whether PPIN hired highly skilled sales associates after the Associate's departure. (Ex. C at 168:19-179:24, 185:11-15.)

<u>Fourth</u>, Thompson overreached in defending Opinion 3. At his deposition, Thompson claimed that even if he was not aware of PPIN's business model he could still understand whether investment counselor turnover affected the business. (Ex. C at 165:23-166:3.) Thompson also gratuitously offered up unsolicited and baseless opinions about how COVID-19 made Cuneo's report "flawed." (Ex. C at 185:1-10.)

<u>Fifth</u>, Thompson is not a marketing or sales expert and is not qualified to opine on the impact or skill level of a former sales associate. (Ex. B at 123:13-16.)

Thompson's analysis purporting to support "Opinion 3" is factually inaccurate, baseless, speculative, and contradicted by the evidence and common sense.

    iv.   <u>Thompson's Opinion 4</u>

For his fourth and final opinion, Thompson relies on hesitant testimony provided by Hartman concerning sporadic payments made from PPIN to HMC. (Ex. A at 15-16; Ex. C at 187:20-190:5.) Thompson assumed for this analysis that HMC earned revenue in a particular year but did not deposit cash on those earnings until the next year, which would skew the lost-profits analysis, according to Thompson. (Ex. C at 190:13-194:17.) Importantly, Thompson also assumed that the only way HMC obtained revenue was through payments from PPIN. (Ex. C at 195:19-196:13.) Thompson also assumed that Hartman was knowledgeable about when payments were made from PPIN to HMC even though he did not prepare financial documents and expressly stated he was not knowledgeable on the matter. (Ex. B at 198:19-199:14.)

<u>First</u>, again, Thompson relies on a factually inaccurate and faulty assumption. Namely,

that HMC obtains all of its revenue from PPIN. It does not. HMC's revenue for the past 4 years came entirely from online consumer transactions, not from PPIN. These transactions are reflected on the merchant activity report that Cuneo reviewed and relied upon (DE 150 at Exhibit I (p.36)), and that Thompson failed to consider (Ex. C at 204:7-9). Thompson's analysis is moot.

Second, Thompson admitted that he did not know whether Hartman's testimony was accurate. (Ex. C at 200:4-10.) And when reviewing the evidence at his deposition, Thompson confirmed that no payments were made from PPIN to HMC since 2016. (Ex. C at 201:16-202:2.) Thus, Thompson operated on a false premise.

Third, Cuneo considered both HMC and PPIN in his lost profits analysis, and offered, *inter alia*, a consolidated lost profits figure that combined the two entities. (DE 150 at ¶33.) In this closed universe, inter-company transfers are mooted. If PPIN withheld payment from HMC in a particular year, PPIN's profits would increase and HMC's would decrease. Higher PPIN profits means lower lost-profits for PPIN but vice versa for HMC. So even if Thompson is correct about the timing of payments – he is not – it is irrelevant for purposes of the lost-profits analysis in this case because it all evens out in Cuneo's analysis.

Fourth, Thompson fails to provide any testimony on how Cuneo's calculations are faulty and avers bald criticisms without offering an analysis or alternative. For example, Thompson faults Cuneo for not complying with GAAP (Ex. A at ¶28) but acknowledged himself that closely held corporations do not follow GAAP (Ex. B at 64:4-10). Thompson's opinions are not proper rebuttal opinions and are not helpful. Indeed, even ignoring all of the flaws in Thompson's methodology, Thompson's criticisms without analysis amount to nothing more than cross-examination material, which is improper expert opinion.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion to exclude the testimony of Michael W. Thompson.

Dated: July 31, 2020

Respectfully submitted,

*/s/ Steven Pollack*
Steven Pollack, Esq.
(*Admitted Pro Hac Vice*)
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

*/s/ Kenneth E. Chase*
Kenneth E. Chase
Florida Bar No. 017661
kchase@chaselaw.com
CHASE LAW & ASSOCIATES, P.A.
700 71st Street
Miami Beach, FL 33141
Telephone: (305) 402-9800
Facsimile: (305) 402-2725

*Attorneys for Plaintiffs*

## **RULE 7.1(A)(3) CERTIFICATION**

Counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

                                                          */s/ Steven Pollack*
                                                          Steven Pollack

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on July 31, 2020 on all counsel or parties of record on the Service List below.

By:  /s/ Kenneth E. Chase
      Kenneth E. Chase

**SERVICE LIST**

Jeffrey M. Partlow, Esq.
jeffrey.partlow@csklegal.com
natasha.acevedo@csklegal.com
COLE, SCOTT & KISSANE, P.A.
Tower Place, Suite 4001
900 Summit Tower Boulevard
Orlando, FL 32810
Telephone: (321) 972-0025
Facsimile: (321) 972-0099

EDWARD S. POLK
Florida Bar No.: 239860 Emails:
edward.polk@csklegal.com
danise.townsend@csklegal.com
COLE, SCOTT & KISSANE, P.A.
9150 South Dadeland Boulevard, Suite 1400
Miami, Florida 33156
Telephone (786) 268-6763
Facsimile (321) 972-0099

Alexandra M. Dishun, Esq.
David S. Klein, Esq.
(*Admitted Pro Hac Vice*)
adishun@rlklawfirm.com
dklein@rlklawfirm.com
ROUNTREE, LEITMAN & KLEIN, LLC
Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, GA 30329
Telephone: (404) 856-0540
Facsimile: (404) 704-0246

*Attorneys for Defendants*

Ava K. Doppelt, Esq.
adoppelt@allendyer.com
ALLEN, DYER, DOPPELT
& GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

Steven Pollack, Esq.
(*Admitted Pro Hac Vice*)
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

Jeffrey E. Grell, Esq.
(*Admitted Pro Hac Vice*)
jgrell@grellfeist.com
GRELL FEIST PLC
825 Nicollet Mall, Suite 625,
Minneapolis, MN 55402
Telephone: (612) 353-5530

Kenneth E. Chase, Esq.
kchase@chaselaw.com
CHASE LAW & ASSOCIATES, P.A.
700 71st Street
Miami Beach, Fl 33141
Telephone: (305) 402-9800
Facsimile: (305) 402-2725

*Attorneys for Plaintiffs*