**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 18-cv-61907-JMS

PLATINUM PROPERTIES INVESTOR
NETWORK, INC.; THE HARTMAN
MEDIA COMPANY, LLC; and JASON
HARTMAN,

        Plaintiffs,

   v.

CHARLES SELLS; STEPHANIE
PUTICH; YOUNG CHUNG; THE PIP-
GROUP, LLC; BLINDSPOT DIGITAL,
LLC; ELENA CEBOTARI SELLS; and
JOHN DOES 1-8,

        Defendants.

_____/

**<u>OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A</u>**
**<u>MATTER OF LAW AND MOTION FOR NEW TRIAL OR REMITTITUR (D.E. 398)</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

I.   INTRODUCTION ................................................................................................ 1

II.   DEFENDANTS' MOTION UNDER RULE 50 IS PROCEDURALLY AND
SUBSTANTIVELY DEFICIENT .................................................................................... 1

   A.   Defendants' Motion on the RICO Claims under Rule 50 Should be Rejected ............... 1

      1.   Defendants' Renewed JMOL Arguments are Too Vague ................................ 1

      2.   Defendants' Renewed JMOL Arguments are Untimely ................................. 2

      3.   Defendants' Renewed JMOL Arguments are Meritless ................................ 2

         a)   Plaintiffs Firmly Established Open-Ended Continuity ................................ 2

         b)   Defendants' Single-Scheme Theory Does Not Apply Here ......................... 2

         c)   Plaintiffs Firmly Established an Indefinite Threat of Repetition ................ 6

         d)   Defendants' Concealment Argument is Barred and Meritless .................... 8

      4.   Plaintiffs Firmly Established Participation and Intent ................................ 9

      5.   Plaintiffs Firmly Established Causation ................................................. 11

      6.   Lena Was Not an "Unwitting Participant" .............................................. 13

   B.   Significant Evidence Supported The Jury's Conclusion On Infringement And
   Counterfeiting Against Lena Sells ........................................................................ 17

   C.   Plaintiffs Established False Advertising And Invasion Of Privacy ............................ 17

III.   DEFENDANTS' MOTION FOR NEW TRIAL LACKS ANY LEGAL OR FACTUAL
MERIT ........................................................................................................................ 19

   A.   Defendants Cannot Establish the Verdict is Against the Great Weight of the Evidence 19

   B.   Reasonable Jurors Found Lena Liable for Her Misconduct ................................... 21

   C.   Defendants' Closing Statement Theories Are Baseless ......................................... 22

   D.   An Instruction on Prior Litigation Was Proper Rather than Prejudicial ..................... 24

   E.   The Prior Rebuttal Expert Ruling Was Correct and the Opinions Referenced Therein
   Were Irrelevant to Trial ..................................................................................... 25

F.     Defendants' Newly- Discovered "Evidence" Is Irrelevant ............................................. 26

IV.    DEFENDANTS' MOTION FOR A NEW TRIAL ON DAMAGES OFFERS NO VIABLE GROUNDS ......................................................................................................................... 26

A.    Damages Were Supported by Significant Evidence ....................................... 26

B.    The Statutory Damages Award Was Properly Supported ............................................. 28

C.    The Personal Animus Towards Hartman Justifies Significant Personal Damages ........ 29

D.    The Award of Punitive Damages Reflects the Malice Towards Plaintiffs .................... 30

V.    CONCLUSION ................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Access Now, Inc. v. Sw. Airlines Co.*,
　385 F.3d 1324 (11th Cir. 2004) ........................................................................... 22

*AIM Recycling of Fla., LLC v. Metals USA, Inc.*, No. 18-cv-60292,
　2020 U.S. Dist. LEXIS 5081 (S.D. Fla. Jan. 13, 2020) ............................................ 3

*Albunio v. Int'l Saf. Grp., Inc.*, No. 15-CV-152 (VEC),
　2016 U.S. Dist. LEXIS 42427 (S.D.N.Y. Mar. 30, 2016) ..................................... 7, 8

*Al-Rayes v. Willingham*,
　914 F.3d 1302 (11th Cir. 2019) ........................................................................... 21

*Anderson v. Brown Indus.*,
　614 F. App'x 415 (11th Cir. 2015) ....................................................................... 24

*Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*,
　660 F. Supp. 1362 (D. Conn. 1987) ..................................................................... 16

*Andrews v. United States*,
　634 F. App'x 259 (11th Cir. 2015) ....................................................................... 19

*Associated Indus. Ins. Co. v. Advanced Mgmt. Servs.*, No. 12-80393-CIV-MARRA,
　2014 U.S. Dist. LEXIS 40111 (S.D. Fla. Mar. 25, 2014) ......................................... 3

*Barker v. Niles Bolton Assocs.*,
　316 F. App'x 933 (11th Cir. 2009) ................................................................ 1, 2, 18

*Beck-Ford Constr., LLC v. TCA Glob. Credit Master Fund, LP*, No. 1:15-cv-61706-UU,
　2018 U.S. Dist. LEXIS 149336 (S.D. Fla. Aug. 30, 2018) ....................................... 5

*Bridge v. Phoenix Bond & Indemnity Company*,
　553 U.S. 639 (2008) ............................................................................... 8, 11, 16

*Castro v. United States*,
　248 F. Supp. 2d 1170 (S.D. Fla. 2003) ................................................................ 20

*Chanel, Inc. v. Italian Activewear of Fla., Inc.*,
　931 F.2d 1472 (11th Cir. 1991) ........................................................................... 17

*Cont'l Cas. Co. v. Cura Grp.*, Inc., No. 03-61846-CIV-ALTONAGA/Tur,
　2005 U.S. Dist. LEXIS 51116 (S.D. Fla. Apr. 5, 2005). ......................................... 16

*Corcel Corp. v. Ferguson Enters.*,
　551 F. App'x 571 (11th Cir. 2014) ..................................................................... 11

*Costa v. Sam's E., Inc*., No. 11-0297-WS-N,
　2012 U.S. Dist. LEXIS 156575 (S.D. Ala. Oct. 31, 2012) ........................................ 28

*Diaz v. Doctors Best Weight Loss & Wellness Ctr., LLC*,
　No. 21-cv-22386,
　2021 U.S. Dist. LEXIS 189512 (S.D. Fla. Sep. 30, 2021) ........................................ 17

*Edwards v. Sears, Roebuck and Company*,
　512 F.2d 276 (5th Cir. 1975) .......................................................................... 22

*Enviromental Servs. v. Recycle Green Servs.*,
　7 F. Supp. 3d 260  (E.D.N.Y. 2014) ................................................................... 7

*Gowski v. Peake*,
　682 F.3d 1299 (11th Cir. 2012) ....................................................................... 28

*Gucci Am., Inc. v. Borseonlineshop.com*, No. 12-24048-CIV-KING/MCALILEY,
　2013 U.S. Dist. LEXIS 201461 (S.D. Fla. Sep. 17, 2013) .................................... 28, 29

*H. J. Inc. v. Nw. Bell Tel. Co.*,
　492 U.S. 229 (1989) ............................................................................... 3, 6, 7

*Jackson v. BellSouth Telecomms.*,
　372 F.3d 1250 (11th Cir. 2004) ..................................................................... 3, 8

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
　2012 U.S. Dist. LEXIS 18503 (S.D.N.Y. Feb. 14, 2012) .......................................... 25

*Luxottica Grp., S.p.A. v. Airport Mini Mall, Ltd. Liab. Co.*,
　932 F.3d 1303 (11th Cir. 2019) ....................................................................... 21

*Maiz v. Virani*,
　253 F.3d 641 (11th Cir. 2001) .................................................................... 11, 13

*Marini v. Adamo*,
　812 F. Supp. 2d 243 (E.D.N.Y. 2011) ................................................................. 3

*Metro. Gov't v. BFI Waste Servs., LLC*, No. M2011-00586-COA-R3-CV,
　2012 Tenn. App. LEXIS 189 (Ct. App. Mar. 22, 2012) ............................................ 15

*Minn. Life Ins. Co. v. Philpot*, No. 11cv00812 BTM (POR),
　2012 U.S. Dist. LEXIS 139595 (S.D. Cal. Sep. 27, 2012) ........................................ 20

*National Beverage Sys., Inc. v. Leonard Found. Specialties, Inc.*,
　2012 WL 2389870 (E.D. Mich. June 25, 2012) ....................................................... 8

*Pace v. AMTRAK,*
    291 F. Supp. 2d 93 (D. Conn. 2003) ................................................................ 15

*PBM Prods., Inc. v. Mead Johnson & Co.,*
    174 F. Supp. 2d 417 (E.D. Va. 2001) ............................................................... 23

*Rajput v. City Trading*, LLC,
    476 F. App'x 177 (11th Cir. 2012) ................................................................... 19

*Reves v. Ernst & Young,*
    507 U.S. 170, 113 S. Ct. 1163 (1993) ....................................................... 20, 21

*SJ Advanced Tech. Mfg. Corp. v. Junkunc,*
    627 F. Supp. 572 (N.D. Ill. 1986) ...................................................................... 8

*Southern Intermodal Logistics, Inc. v. D.J. Powers Co., Inc.,*
    10 F.Supp.2d 1337 (S.D. Ga. 1998) ................................................................ 11

*Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.,*
    63 F.3d 516  (7th Cir. 1995) .............................................................................. 3

*United States v. Bui*, No. 21-10356,
    2022 U.S. App. LEXIS 4280 (11th Cir. Feb. 16, 2022) ................................... 15

*United States v. Delva,*
    922 F.3d 1228 (11th Cir. 2019) ....................................................................... 15

*United States v. Godwin,*
    765 F.3d 1306 (11th Cir. 2014) ................................................................. 14, 21

*United States v. Hobson,*
    893 F.2d 1267 (11th Cir. 1990) ......................................................................... 7

*United States v. Lynch,*
    287 F. App'x 66 (11th Cir. 2008) ...................................................................... 7

*United States v. Machado,*
    886 F.3d 1070 (11th Cir. 2018) ....................................................................... 10

*United States v. Starrett,*
    55 F.3d 1525 (11th Cir. 1995) ......................................................................... 21

*United States v. Winemiller,*
    679 F. App'x 759 (11th Cir. 2017) .................................................................. 15

*Wallace v. Mangiaracina,*
    745 F. App'x 356 (11th Cir. 2018) .................................................................. 22

*Wallace v. Mangiaracina*, No. 8:14-cv-3022-T-24AEP
  2017 U.S. Dist. LEXIS 93774 (M.D. Fla. June 19, 2017),
  *aff'd at Wallace*, 745 F. App'x at 360 .......................................................................... 25

*Wiand v. Wells Fargo Bank, N.A.*,
  2014 U.S. Dist. LEXIS 63071 (M.D. Fla. May 6, 2014) .......................................................... 25

*Wilbur v. Corr. Servs. Corp.*,
  393 F.3d 1192 (11th Cir. 2004) ................................................................................................... 21

**Statutes**

18 U.S.C. §1962 ........................................................................................................................ 19, 20

Plaintiffs Platinum Properties Investor Network, Inc., The Hartman Media Company, LLC, and Jason Hartman (collectively, "Plaintiffs"), hereby responds to Defendants' Renewed Motion for Judgment as a Matter of Law and Motion for New Trial or Remittitur (D.E. 398), and in opposition thereto state as follows:

## I.     <u>INTRODUCTION</u>

This case involved a targeted effort by Defendants to "destroy" Jason Hartman and his companies, who were competitors in the real estate investments market. As documented in his own emails, Charles Sells ("Sells") was obsessed with the belief that Hartman was behind numerous bad reviews of The PIP-Group, LLC ("PIP") and that disseminating fabricated information about Hartman to the industry would both crush Hartman as a competitor and increase the sales of PIP. The jury heard days of testimony and countless emails showing the pattern of harassment and abuse of Hartman and his companies through counterfeit domains and smear websites and emails. At the end of the case, the jury was asked to consider the unrebutted testimony of Plaintiffs, third party witnesses, multiple experts, along with Defendants' own admissions, and award damages to both Hartman and his companies. The overwhelming evidence of Defendants' willful misconduct and significant damages suffered by Plaintiffs is far beyond the threshold needed to reject Defendants' motions.

## II.    <u>DEFENDANTS' MOTION UNDER RULE 50 IS PROCEDURALLY AND SUBSTANTIVELY DEFICIENT</u>

Defendants claim to "renew" their motion under Rule 50 for judgment as a matter of law on Plaintiffs' RICO claims (Br. at 3-9), but their arguments fail for procedural and substantive reasons as set forth below. Defendants' narratives at trial were unequivocally rejected by eight finders of fact on detailed stipulated jury instructions and fare no better now. Defendants' blanket assertion that there was "no evidence" contradicts reality and the jury's verdict.

### A.     <u>Defendants' Motion on the RICO Claims under Rule 50 Should be Rejected</u>

#### 1.     <u>Defendants' Renewed JMOL Arguments are Too Vague</u>

"In making a Rule 50(a) motion, the moving party must specify both the law and facts which entitle it to judgment as a matter of law." *Barker v. Niles Bolton Assocs.*, 316 F. App'x 933, 940 (11th Cir. 2009). Defendants rely on the generic assertion of "no evidence" but fail to

specify relevant facts justifying their positions. In lieu of evidence, Defendants rely almost exclusively on counsel's closing arguments (Br. at 5, 9) but, as the jury was advised, " lawyers' statements and arguments aren't evidence. In their opening statements and closing arguments, the lawyers will discuss the case. Their remarks may help you follow each side's arguments and the presentation of evidence, but the remarks themselves aren't evidence and shouldn't play a role in your deliberation." (D1T[1] 89:15-20; DE 336 at 3, 62.[2]) Defendants' failure to cite to testimony, exhibits, or stipulations renders their Rule 50 motion fatally defective.

### 2. Defendants' Renewed JMOL Arguments are Untimely

Many of Defendants' arguments are also time-barred. "A party may renew [its] motion [for JMOL] after trial under Rule 50(b) but it may not raise new grounds." *Barker*, 316 F. App'x at 940. Defendants raise several new grounds on their "renewed" Rule 50 motion: (1) that "much of the purported wire fraud and other criminal activity was done to cover up Defendants' tracks" (Br. at 6), (2) there is no evidence that a "defendant agreed to participate in the enterprise" (Br. at 7), (3) Plaintiffs are "missing any evidence" tying "a specific predicate act" to "any injury" (Br. at 7-8), and (4) challenging issues with Counts XIV, XXII and XXIII not raised at trial (Br. p. 12). Defendants cannot reinvent the wheel at this juncture and are limited to the arguments they raised on their initial Rule 50 motion. (D7T 205:16-241:10; D8T 4:3-25:13.)

### 3. Defendants' Renewed JMOL Arguments are Meritless

#### a)   Plaintiffs Firmly Established Open-Ended Continuity

Defendants assert three theories for why "the RICO claims should not have reached the jury," each related to the concept of open-ended continuity: the (1) single-scheme theory, (2) no threat of repetition theory, and (3) concealment (or "covering their tracks") theory. (Br. at 4-6.) None justify JMOL.

#### b)   Defendants' Single-Scheme Theory Does Not Apply Here

Defendants argue that to satisfy the continuity element of RICO, Plaintiffs must prove the existence of multiple schemes that "affect[ed] other persons or entities, rather than only the

---

[1] Plaintiffs adopt the abbreviation D#T for Day # Transcript, as uploaded to ECF. Day 1 of trial commenced on August 22, 2022 (DE 406) and continued with Day 2 (DE 407), Day 3 (DE 413), Day 4 (DE 408), Day 5 (DE 409), Day 6 (DE 410), Day 7 (DE 411), Day 8 (DE 414), and ended on Day 9 on September 1, 2022 (DE 412).

[2] Notably, Defense counsel misstated the law in insinuating, *inter alia*, that only mobsters could be found liable under RICO. (D1T 131:5-9, 138:18-21; *see also* D7T 237:22-238:7). Again, the jury faithfully followed the Court's instructions on the law, not that of the lawyers.

plaintiff." (Br. at 4) Defendants rely on *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989). (*Id.*) The Court in *H. J. Inc.*, however, held the exact opposite: ruling that nothing in the RICO statute requires multiple schemes targeted at people other than the plaintiff. *See id.* at 256 (Scalia, J. concurring) ("the Court is correct in saying that nothing in the statute supports the proposition that predicate acts constituting part of a single scheme (or single episode) can never support a cause of action under RICO."); *id.* at 240 ("it is implausible to suppose that Congress thought continuity might be shown only by proof of multiple schemes."). Lower courts have also rejected the "single scheme" theory. *See, e.g.*, *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 524 (7th Cir. 1995) ("The repeated infliction of economic injury upon a single victim of a single scheme is sufficient"); *Associated Indus. Ins. Co. v. Advanced Mgmt. Servs.*, No. 12-80393-CIV-MARRA, 2014 U.S. Dist. LEXIS 40111, at *14 (S.D. Fla. Mar. 25, 2014); *see also AIM Recycling of Fla., LLC v. Metals USA, Inc.*, No. 18-cv-60292, 2020 U.S. Dist. LEXIS 5081, at *68 (S.D. Fla. Jan. 13, 2020) ("that Defendants' numerous predicate acts were committed pursuant to a single related theft scheme does not change the Court's analysis, given the scheme's expansive, multi-level nature"); *Marini v. Adamo*, 812 F. Supp. 2d 243, 262-63 (E.D.N.Y. 2011) (listing cases); DE 87 at p.11 n.5. To be sure, to the extent the Eleventh Circuit has mentioned the single scheme theory, it has only done so in the context of closed-ended continuity, which is irrelevant to this case, and at the pre-trial stage. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1267 (11th Cir. 2004).

Moreover, Defendants' "single-scheme, single goal, single victim" theory is factually inapposite. Defendants acknowledge their misconduct involved multiple party-victims. (*See* Br. at 4) ("Hartman—and his two companies—PPIN and HMC"). This alone is sufficient. (*See* D.E. 123 at p.10 n.5.) The jury heard testimony from numerous party and non-party witnesses, saw hundreds of exhibits, and received tens of pages of stipulated facts, which overwhelmingly proved numerous different schemes, multiple self-stated and actual purposes and goals, and a multitude of duped and defrauded victims. Defendants collaborated[3] on multiple schemes, including but not limited to the following:

- Creation and dissemination of two different fully functional websites created at different times on nine domain names (six of which were counterfeit), using two different hosting

---

[3] There was even evidence presented at trial that Defendants' scheme was part of a larger conspiracy as Defendants were "leading a charge of 6 other groups just like [them]." (*See, e.g.*, PTX 238 at 1.)

companies (one offshore and one domestic) (*see, e.g.*, PTX 603 at ¶¶7-14, 29-32, 100)[4];

- Creation and use of at least seven different fake identities for illicit purposes, including to fraudulently gain access to computer systems and contact lists (*see, e.g.*, PTX 165; D2T 110:19-113:23; D5T 61:5-62:4);

- Sign-up and use of at least three different digital marketing services using false information (often mimicking Plaintiffs' business information and addresses) to avoid payment for services, deceive as to association, avoid spam filters, and blast out fraudulent emails to hundreds, if not thousands, of recipients (*see, e.g.*, PTX 603 at ¶¶35-36, 39-74, 83-91, 99; PTX 102; PTX 301 at ¶6; PTX 320);

- Use of gift cards and false contact information to avoid detection and defraud service providers out of payment (some providers shut down accounts due to non-payment) (*see, e.g.*, PTX 603 at ¶¶68-70, 83, 88-89, 99; PTX 301 at ¶6);

- Use of at least eight different anonymous email addresses used to impersonate Hartman, remain anonymous, conceal and delete evidence, and feign a false association with Plaintiffs (*see, e.g.*, PTX 603 at ¶¶15, 33, 84-85; PTX 301 at ¶¶5, 9-10);

- Use of deception through affirmative misrepresentations and active concealment in numerous outlets to deceive as to their source and enhance credibility (*see, e.g.*, PTX 117 at 5 ("I would like to thank whomever compiled all of this detailed data and public record and organizing it in one place."); PTX 328 (PIP just a "contributor"); PTX 110 and 299 ("solely behind"); PTX 25 (Ray Douglas disclaimer); PTX 99 ("the names mentioned are only a fractional part of a much, much bigger picture."); D6T 42:1-43:1, 45:21-47:9, 48:4-22;

- Relentless dissemination of email blasts filled with false and misleading information that disparaged Plaintiffs and promoted PIP (*See, e.g.*, PTX 603 at ¶¶17-19, 21-22, 42-61, 71-74, 78, 85, 90-91; PTX 221, PTX 161; D5T 26:11-14);

- False statements to law enforcement to avoid liability and continue the schemes (*See, e.g.*, D4T 104:16-107:14);

- Employing SEO on PIP's website and on the unlawful websites to divert Internet traffic and those looking for Plaintiffs (*see, e.g.*, PTX 603 at ¶4; PTX 266; PTX 267; PTX 184 at 25; D3T 131:4-10, 132:7-133:9, 135:3-138:14, 142:11-143:20, 145:10-146:23, 153:5-

---

[4] The record in this case is voluminous, with hundreds of exhibits and nine days of transcripts. Due to time and space constraints, the material cited herein is exemplary and does not reflect all supportive evidence presented at trial.

155:4, 180:15-185:13);

- Use of hidden cookies and trackers to retarget website visitors and email recipients (*see, e.g.*, PTX 19 at 3-4; PTX 102; PTX 197; PTX 217; PTX 226; PTX 319; PTX 382 at 9, 15, 40, 47; PTX 473; PTX 503; PTX 518 at 3; D3T 179:8-13; D6T 48:23-53:3, 92:24-95:20);

- Creation of competing programs and companies, like The Guru Rescue Program and REI Facilitator, to increase market share and profit from their misconduct (*see, e.g.*, PTX 130; PTX 256; PTX 27; PTX 179; D4T 122:23-127:19); and

- Utilizing fake ("whipped") reviews to falsely promote themselves while bringing down Plaintiffs (*See, e.g.*, PTX 600).

Indeed, far from the four isolated statements made directly to the plaintiff in *Beck-Ford Constr., LLC v. TCA Glob. Credit Master Fund, LP*, No. 1:15-cv-61706-UU, 2018 U.S. Dist. LEXIS 149336, at *6 (S.D. Fla. Aug. 30, 2018), Defendants here disseminated hundreds of false and deceptive statements via a multitude of methods to thousands of individuals and companies as part of a complex, multi-faceted, multi-channel campaign involving numerous schemes. Each Defendant offered multiple different reasons, purposes, and goals – both on the stand and in emails. The victims were not limited to three Plaintiffs; instead Plaintiffs' salespersons lost income, recipients of fraudulent information were duped into not doing business with Plaintiffs, digital service providers were tricked out of payment and into letting nefarious actors improperly use their services, and PIP's competitors were hurt by deceptive practices that let PIP realize record revenue. Through their deceptive conduct, Defendants intended to and did actually obtain credibility, business, services, visibility, cash payments, and praise. Based on the evidence, the jury determined that PIP pocketed at least $1.5 million in profits from Defendants' misconduct.

Defendants' reliance on remarks during closing argument that there was only a "single victim" of Defendants' misconduct is twice misguided. First, the Court repeatedly instructed the jury "anything the lawyers say is not evidence" (*see, e.g.*, D9T 38:25-39:2). Second, counsel did not say there was only one single victim of Defendants' scheme, rather that there was "only one victim **for whom you are addressing remedies today**, and that's my client." Naturally, counsel's three clients were referenced in a simplified manner (*i.e.*, "my client") for the jury. There were many victims but Plaintiffs only sought redress for their own injuries. *See* DE 87 at p.9 n.5. Finally, the jury was presented with stipulated jury instructions on RICO that were almost entirely drawn from Eleventh Circuit Pattern Jury Instructions. Defendants never sought

to add language related to their single scheme theory or have the jury consider it as a bar to recovery. Defendants waived the issue but would fail regardless.

### c)   Plaintiffs Firmly Established an Indefinite Threat of Repetition

The parties agree that continuity must be shown to establish a "pattern" under RICO. "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H. J. Inc.*, 492 U.S. at 242. The Supreme Court has recognized that "[o]ften a RICO action will be brought before continuity can be established [through long term criminal activity]. In such cases, liability depends on whether the *threat* of continuity is demonstrated." *Id*. The Court explained that "[w]hether the predicates proved establish a threat of continued racketeering activity depends on the specific **facts** of each case." *Id*. (emphasis added). Indeed, the Court recognized that the boundaries of continuity "cannot be fixed in advance." *Id*. at 243.

Defendants claim that their scheme was inherently terminable and could not pose a threat of repetition[5] because "[t]he evidence at trial established that according to Sells, the purported scheme had a clear goal and termination – to destroy Hartman's business." But Defendants' argument is contradicted by Sells' in-court testimony claiming he was <u>not</u> trying to affect Hartman's businesses, just Hartman "emotionally." (D4T 228:10-22, 234:14-17, 256:11-14, 262:5-6.) Such a goal, subject only to Sells' personal satiety, cannot have an inherent end-date. Moreover, Sells admitted at deposition and at trial that he is inclined to continue his misconduct. (D.E. 211 at 28; D5T 217:20-22). This admission alone created a factual question on continuity that was properly resolved by the jury.

Contrary to counsel argument, there were other goals/purposes as well, such as Sells' testimony that his "only goal" was to get Hartman to stop posting things online that were hurting PIP. (*See* D5T 170:7-9 ("my only goal was to stop the harassment"); D.E. 211 at 5; PTX 151 at 11-12.) Elsewhere Sells swore that Defendants' "MI-5" operation was "damage control" to rehabilitate PIP's reputation. (D5T 57:3-6.) Other Defendants stated additional goals: Putich to keep her job/do her job (D7T 123:8-18, 152:1, 157:10-11, 158:5-9, 172:17-20, 172:21-173:4),

---

[5] Defendants do not contest that their conduct must be viewed at the time of the unlawful activity, not after they were caught and stopped due to a fortuitous interruption. (Br. at 5.) Thus, Defendants' arguments that they would "never engage in this type of conduct again," made only after they were caught – even if believable – is irrelevant. (*Id*.) As the jury firmly found on stipulated joint jury instructions, Defendants' misconduct was "likely to be repeated into the future." (D.E. 336 at 23.) The evidence overwhelmingly supports the jury's verdict.

and Chung to make money while crushing Plaintiffs (D3T 185:3-13). Certainly those goals—just a few examples—cannot be deemed inherently terminable. Defendants' testimony and emails contained a dizzying array of stated goals, not just a "discrete goal."

That Defendants' misconduct threatened repetition into the future indefinitely (*i.e.*, lasting for an unknown or unstated length of time) is further supported by Defendants' continuation of their misconduct after litigation was commenced. Defendants boldly refused to cease their conduct after receiving the cease and desist letter from Plaintiffs' counsel. (PTX 601.) In September 2018, Defendants knew they were caught but kept Hartman "on the run." (PTX 227 at 1.) Defendants kept their Broke Guru website up until an agreement between counsel during the litigation led to its takedown. (PTX 603 at ¶100.) Defendants' fake review scheme that also promoted PIP through false endorsements (PTX 600) and their creation of REI Facilitator (PTX 256; PTX 603 at ¶¶80-81), which were both meant to capture market share, extended well into 2019. These facts prove threat of repetition. *See Enviromental Servs. v. Recycle Green Servs.*, 7 F. Supp. 3d 260, 273 (E.D.N.Y. 2014) (misconduct continuing after complaint was filed sufficient to show likelihood of repetition); *see also United States v. Hobson*, 893 F.2d 1267, 1269 (11th Cir. 1990) (finding "threat of repetition" where defendant showed no sign of letting up after being caught).[6] Accordingly, the jury correctly considered the issue of continuity on stipulated joint instructions.

Defendants rely on a single district court decision resolving a motion to dismiss to argue that a defendant's goal of destroying business competitors is not enough to find open-ended continuity.[7] (Br. at 5 (*citing Albunio v. Int'l Saf. Grp., Inc.*, No. 15-CV-152 (VEC), 2016 U.S. Dist. LEXIS 42427, at *2 (S.D.N.Y. Mar. 30, 2016)). Their reliance is misplaced. The court's analysis in *Albunio* addressed only the "regular way of doing business" prong of open-ended continuity, which is not at issue here. The court foreclosed further analysis based on inapplicable Second Circuit law.[8] Indeed, the RICO claim in *Albunio* failed on nearly every possible basis

---

[6] Defendants failed to present a single exhibit – because there is none – where the Defendants discussed ending their unlawful operation while it was ongoing. *See United States v. Lynch*, 287 F. App'x 66, 69 (11th Cir. 2008) (affirming RICO conviction where the conspirators "anticipated continuing the acts into the future indefinitely.")

[7] Defendants' supposition runs counter to the Supreme Court's guidance: "Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case." *H. J. Inc.*, 492 U.S. at 242.

[8] The *Albunio* court refused to analyze open-ended continuity to the extent "the nature of the predicate acts themselves implies a threat of continued criminal activity" because the theory, according to the court's interpretation of Second Circuit law, only applied to "inherently unlawful" conduct such as "murder." *Id*. at *22. Defendants have never argued this and the stipulated joint jury instructions said otherwise. Thus, Defendants' cited case is inapposite.

because it was a small, internal dispute over a botched merger. *See id*. at *1-*9. Supreme Court *dicta* in the seminal case on RICO, *Bridge v. Phoenix Bond & Indemnity Company*, contradicts Defendants' *per se* rule. 553 U.S. 639, 649 (2008). In *Bridge*, the Court contemplated liability in a situation eerily similar to the instant facts, where "an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves." *Id*. Defendants' attempt to categorically exclude misconduct to destroy competitors from RICO liability is directly contrary to the discussion in *Bridge*.[9]

### d)   <u>Defendants' Concealment Argument is Barred and Meritless</u>

Defendants also argue that "much of the purported wire fraud and other criminal activity was done to cover up Defendants' tracks." (Br. at 6.) This argument is untimely and waived. Open-ended continuity came up several times before the Court but this issue was never raised nor jury instructions on it proposed. Ultimately, the argument is hollow because it points to no actual conduct, nor does it discuss how any remaining conduct bears on the relevant inquiry.

Even if the argument is considered – it should not be – it is misplaced. The concealment efforts discussed in *Jackson* were premised on conduct that does "not threaten future harm or a repetition of [the defendants'] illegal acts, nor . . . impart any new injury upon the plaintiffs." *Jackson*, 372 F.3d at 1268. Indeed, in *Jackson*, "since the investigation did reveal and ultimately sanction the defendants' activities, it is virtually certain that they will not engage in similar conduct in the future." *Id*. at 1268-1269. Here, Sells lied to law enforcement and thus was not "ultimately sanction[ed]" like in *Jackson*. Moreover, Sells testified that neither an investigation nor sanctions would stop him. (D5T 217:20-22.) Even after being discovered, Sells and Putich wanted to keep Hartman "on the run until we destroy him." (PTX 227 at 1.) While Defendants' document and data destruction may have been an attempt to cover their tracks, it was designed to avoid detection so they could continue their misconduct unabated. Accordingly, Defendants'

---

[9] *See also National Beverage Sys., Inc. v. Leonard Found. Specialties, Inc.*, 2012 WL 2389870 (E.D. Mich. June 25, 2012) (denying motion to dismiss RICO claims where the defendant took "predatory steps to eliminate Plaintiff as a competitor through illegal means, including mail and wire fraud" and "a reasonable inference [could] be drawn that Defendant used mail and wire fraud as part of a connected scheme to exclude Plaintiff from the market, and intended for such scheme to continue until Plaintiff was excluded from the market"); *SJ Advanced Tech. Mfg. Corp. v. Junkunc*, 627 F. Supp.2d 572, 576 (N.D. Ill. 1986) (denying a motion to dismiss RICO claims and holding mail and wire fraud were sufficiently pled where the competitor (defendant) made knowingly false statements about the plaintiff to suppliers and customers, the defendant intended to induce the customers to refrain from doing business with the plaintiff, the defendant's misrepresentations caused at least one customer to cease discussions with the plaintiff, and there was a reasonable inference of injury, *i.e.*, the plaintiff lost sales to customers who could have purchased the product at a more competitive price).

concealment activities were specifically designed to cause "future harm"  by repeating their illegal acts and "impart[ing] new injury upon the plaintiffs."

### 4.  Plaintiffs Firmly Established Participation and Intent

Defendants argue that Plaintiffs "failed to produce sufficient evidence to support their claim that [Lena, Putich, Chung or Blindspot] actively participated in the purported enterprise through the requisite pattern." (Br. at 6.) Yet Defendants ignore hundreds of exhibits, a week of witness testimony, and many stipulated facts. Defendants fail to proffer any reason for the Court to depart from its previous prudent decision. (*See* D8T 10:14-22:9.)

As the Court instructed the jury, participation can be direct or indirect, and commission of two predicate acts does not mean different types: for example, two acts of wire fraud are sufficient. (*Id*. at 221:23-223:15.) Lena's participation is addressed in Section II.A.6 below ("unwitting participant"). As it relates to Putich and Chung/Blindspot, the evidence of participation and intent was overwhelming. Putich and Chung both made affirmative misrepresentations about their identities to fraudulently gain access to leads for their "contact list." (*See, e.g.*, PTX 165; D2T 110:19-113:23; D5T 61:5-62:4; PTX 39 at 7; PTX 306 at 1.) Chung was the "technical side" of crushing Plaintiffs (PTX 45 at 2), so he picked out the counterfeit domain names (PTX 56 at 2-3), created a website and used a counterfeit mark on and in connection with that website with the intent to disseminate that website (PTX 603 at ¶¶9-11), set up the counterfeit domain names and website on hosting accounts (*id*. at ¶¶30-32, 123), used false information to do so (*id*. at ¶32), and published the counterfeit website filled with affirmative misrepresentations and omission of material facts (PTX 62), and then used SEO and PPC to ensure the websites were seen by the most people (*see, e.g.*, PTX 493; PTX 498). Thus, Chung participated in not one but two different types of predicates: trafficking in counterfeit domain names and wire fraud. Putich's was involved in the same predicates, but her participation was more significant as she was instrumental in effectuating Defendants' schemes. For example, she edited and orchestrated the counterfeit website content (D7T 74:3-86:14, 130:6-24; PTX 238; PTX 63), submitted PIP's takedown request to the Better Business Bureau with a false narrative and link to Defendants' counterfeit website to fraudulently obtain a pecuniary benefit (removal of a negative review that was affecting PIP's revenue) (the "BBB Takedown Request") (D7T 86:15-89:21), worked feverishly with Chung over an entire weekend to transfer all false representations and links from the counterfeit website over to Defendants' active brokeguru.com

website (*id*. at 89:22-95:11), redirected Internet traffic to the counterfeit domain names (PTX 75 at 2) and later from there to thebrokeguru.com (PTX 238), sent out hundreds of emails that used impersonation, links to the counterfeit website, and affirmative misrepresentations for months on end (D7T 99:11-19, 107:4-109:8, 118:20-120:7, 124:4-126:20, 134:25-136:4; PTX 113; PTX 114; PTX 115; PTX 603 at ¶¶15-22, 42-61, 65-74, 78-79, 86-91), provided material false identification and contact information to digital marketing providers to skirt payment and use the services for unlawful purposes without liability (PTX 102; D7T 100:5-102:1, 109:9-114:18, 116:10-118:19, 120:10-124:3, 126:21-130:3, 132:3-10; PTX 603 at ¶¶39-41), and created and published fake online Google reviews promoting PIP (PTX 50).[10] Not only did these facts show participation, but the intent to defraud can certainly be inferred from such conduct alone. *United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018); *see also* PTX 47 (Putich tracking Hartman); D7T 64:11-15.

The jury was presented with mountains of direct and circumstantial evidence from which they could have – and wisely did – determine each Defendant's direct or indirect participation, knowledge, and intent in Defendants' "operation." Importantly, each Defendant testified in person at trial and the jury carefully weighed their credibility. For example, after being shown emails where Putich was gleefully participating in Defendants' scheme (*see, e.g.*, PTX 307; PTX 598; PTX 64 at 2; PTX 74 at 1) and hearing her persistent "just following orders" excuse (*see, e.g.*, D7T 132:11-134:24, 136:6-138:6, 140:19-24), the jury asked her the following: "Despite the negative content and bad words used in Mr. Sells' emails, why were you so excited/happy to continue working for Mr. Sells after you resigned and/or moved?" (DE 337, 1.) The jury also heard and saw Lena's animus and paranoia towards Hartman (*see, e.g.*, D6T 103:10-104:1, 104:23-105:9, 160:1-164:6) and Chung's choice words when seeking to "crush" Hartman (*see, e.g.*, PTX 257 at 8). There was more than sufficient evidence from which a jury could determine that each Defendant intended to cause injury to Plaintiffs "by employing material falsehoods, concealing material facts, or omitting material facts." (D8T 232:4-233:5.) Defendants' self-serving mischaracterization of the evidence (Br. at 7) cannot replace a jury's unanimous verdict on such a voluminous record.[11]

---

[10] This was a practice continued by Putich's replacement, Dylan DeBellis. (PTX 600; D4T 196:1-197:20.)

[11] Defendants' arguments are also moot, as the jury separately found liability under RICO Conspiracy and Florida RICO, the latter of which Defendants do not now challenge or address.

**5.  Plaintiffs Firmly Established Causation**

Defendants assert that "Plaintiffs are missing any evidence that a specific predicate act by any Defendant . . . was tied to any injury" and "there must be no independent factors that account for the injury." (Br. at 7.) Defendants' arguments lack merit. First, this is a new ground not raised in Defendants' initial Rule 50 motion and is therefore barred. Second, Defendants misstate the law. "[A] plaintiff need not show that the injurious conduct was the sole cause of the injury asserted." *Corcel Corp. v. Ferguson Enters.*, 551 F. App'x 571, 576 (11th Cir. 2014). Indeed, the Eleventh Circuit has "explained in prior civil RICO opinions, a wrongful act is a proximate cause if it is a substantial factor in the sequence of responsible causation." *Maiz v. Virani*, 253 F.3d 641, 675 (11th Cir. 2001). Moreover, a plaintiff may show direct injury without plaintiff's reliance on any representation from Defendants. In *Bridge*, the Supreme Court held that proximate cause could be shown where a tax lien bidder (like PIP) made false representations to a county that hosted tax lien auctions, and had they not made such misrepresentations they may have not been allowed to bid, which may have resulted in the plaintiffs winning the auctions. 553 U.S. at 657-58. In that case, the Court expressly held, "Respondents' alleged injury – the loss of valuable liens – is the direct result of petitioners' fraud." *Id.* at 658; *see also Corcel Corp.*, 551 F. App'x 571, 577 (11th Cir. 2014).[12] Here, as detailed by several witnesses (and discussed in Section IV.A below), Plaintiffs' lost profits were the direct result of Defendants' fraud (*e.g.*, affirmative misrepresentations to clients and sponsors, omission of material context, deceitful conduct, false identification and use of impersonation).

Third, Defendants misstate the facts. Defendants aver "[n]o witness testified that he or she was defrauded or that there was any actual consequence to Hartman from receiving an email or visiting the websites." (Br. at 8.) That is simply untrue. Gary Pinkerton, a former nuclear submarine captain, described the impact of Defendants' misrepresentations, and that because of the misrepresentations he stopped sending referrals to Plaintiffs, instead sending referrals that would have gone to Plaintiffs to Plaintiffs' direct competitor, Norada. (D3T 56:14-63:9). Ample

---

[12] The Court in *Bridge* clarified that statutory mail fraud, like wire fraud, is not common law fraud. 553 U.S. at 648, 655. The "victim" wasn't injured but was still "defrauded" because it took action harmful to a third party (plaintiffs) that it wouldn't otherwise have taken. *Id.*; *see generally Southern Intermodal Logistics, Inc. v. D.J. Powers Co., Inc.*, 10 F.Supp.2d 1337 (S.D. Ga. 1998) (ruling that misleading statements violated the wire fraud statute because they were "reasonably calculated to deceive persons of ordinary prudence and comprehension."). This is the third-party reliance doctrine. A plaintiff can recover for its own injury, under RICO, caused by misrepresentations, concealment, or omissions in representations to third parties. The recipient of the representation does not need to be harmed or even rely on the statement (D8T 233:17-25) to be "defrauded."

testimony established the significant value of referrals (*i.e.*, leads). (*See, e.g.*, D2T 78:3-6; D3T 93:7-17, 163:17-19 (Defendants paid $9 per lead).) Pinkerton also testified that because of Defendants' fraudulent emails and websites, his company, Paradigm Life, refused to sponsor HMC's events despite being a $100,000 sponsor immediately prior to Defendants' misconduct. (D3T 56:6-57:8.) Kerry Lutz similarly testified that he stopped hosting Hartman on his podcast or sending Plaintiffs referrals due to Defendants' websites and emails. (D3T 79:18-80:5, 93:1-94:13) Lutz testified that he relied on Defendants' false representations in opening those emails (which was part of what led to the cessation of referrals). (D3T 81:15-83:17.) Witnesses also testified that the false statements disseminated by Defendants were exactly the type that would directly affect clients' decisions to purchase properties through Plaintiffs' network and sponsor events. (*See, e.g.*, D1T 181:10-14; D3T 60:16-19, 85:2-21; D6T 32:19-33:3.) Hartman testified about the blowback he received at industry events based on Defendants' unlawful conduct. (D2T 90:2-92:14.) Hartman also described the deterioration of his relationship with IMN, and others, as a direct result of Defendants' emails, which was corroborated by contemporaneous documentary evidence. (D2T 70:2-94:25.) For example, IMN specifically cited the emails as the reason they stopped doing business with Plaintiffs: "I'm really sorry but we can't have someone like Charles Sells emailing our clients and conference attendees who wouldn't know the truth about the situation." (*Id.*; PTX 327 at 1.) There was also testimony about lost clients who specifically cited Defendants' online disseminations, like Rala Brubaker and others. (*See, e.g.*, PTX 446; D1T 208:16-210:13.) Hartman also offered testimony about clients that ditched his company or sought to renegotiate contracts after receiving the emails and seeing the websites. (*See, e.g.*, D2T 68:10-69:20.) Ironically, even Sells testified to the fact that his conduct was hurting Plaintiffs, telling his co-conspirators that Hartman was almost broke thanks to the websites they built (PTX 309), and was hosting less events (PTX 262). At the same time, Sells believed Defendants' conduct was helping PIP. (*See, e.g.*, PTX 184 at 6.) In sum, there was significant testimony and evidence for the jury to rely on.

Plaintiffs' experts also addressed causation. Mr. Kronenberger discussed the reach and appeal of Defendants' content. (D5T 28:10-35:11, 40:14-50:7, 50:21-55:4, 57:5-58:21, 74:1-18, 87:22-89:3, 92:24-97:17.) Mr. Cuneo explained his causation analysis, including attribution of Plaintiffs' losses to Defendants' misconduct and eliminating any other possible explanation for Plaintiffs' sudden and historic losses. (D6T 201:3-205:16, 208:7-216:5; D7T 50:14-56:25; *see*

DE 171 at 5-11 (detailing causation analysis)). Finally, the jury could rely on common sense based on the evidence, especially considering the weak explanation for Plaintiffs' unprecedented decline in revenue offered by Defendants (D8T 205:17-18) with a corollary jump in Defendants' revenue (PTX 603, ¶¶108-109). "Viewing the record in the light most favorable to the Plaintiffs, there was ample basis for a reasonable jury to conclude that Defendants' [widespread and persistent wire fraud and trafficking] predicate acts were a substantial factor in perpetuating their scheme and in causing significant injury to these Plaintiffs." *Maiz*, 253 F.3d at 675.

### 6. Lena Was Not an "Unwitting Participant"

Defendants repeat their "participation and intent" argument with regard to Lena, claiming she had to be "a knowing participant in the purported scheme."[13] (Br. at 8.) Defendants' arguments are again misguided, as there was ample evidence (together with inferences drawn therefrom) for the jury to conclude that each defendant violated the claim asserted with the requisite intent.[14] Defendants assert that "Plaintiffs' evidence and argument boiled down to Lena being copied on emails." (Br. at 9.) This is wrong. The evidence showed that Lena was PIP's Director of Operations (D6T 110:25-111:1; PTX 140) who, among other things, (1) owned 49% of the company (D4T 120:6-14), (2) controlled the day-to-day operations of PIP (D6T 111:2-4), (3) controlled the company's finances (*see, e.g.*, PTX 140 at 2; PTX 144; PTX 276), (4) watched the company's bottom line very closely (PTX 53), (5) paid careful attention to even $0.50 (D6T 102:1-14), (6) directly supervised Putich, an active conspirator who was adjudicated to be a direct counterfeiter (D7T 62:18-20; 146:5-7, 172:3-5; PTX 140 at 2), (7) was the go-to person on the BBB Takedown Request (PTX 598), (8) made payments directly to Chung (*see, e.g.*, PTX 274; D6T 99:20-24, 100:13-21), (9) went "ballistic" when Defendants' counterfeit website was taken down (PTX 77 at 5), (10) was specifically added to key emails about the scheme, including related to maintenance of the contact list (PTX 161; PTX 226; PTX 249; DTX 92; *see also* DTX 91), (11) helped build the contact list by listening to HMC's podcasts and relaying information to the others (*see, e.g.*, PTX 237), (12) had scathing animus and paranoia toward Hartman (*see, e.g.*, D6T 103:10-104:1, 104:23-105:9, 160:1-164:6), (13) was part of Defendants' legal strategy to remain "untouchable" from the very outset (D6T 132:8-21, 142:24-146:9), and (14) was the lead

---

[13] Defendants' argument is moot since Lena is equally liable under Plaintiffs' RICO Conspiracy claim, which was not challenged by Defendants' Rule 50 motion.

[14] Notably, Defendants failed to present evidence from even a single disinterested witness to support their defense.

13

on creating entities and programs to convert Plaintiffs' lost clients (PTX 130; PTX 256; *see also* PTX 484 (suddenly communicating with IMN, a client Plaintiffs lost due to Defendants' conduct)).[15]

Ample documentary evidence also contradicted Lena's testimony, who suspiciously lied about her knowledge and participation in the scheme. For example, she claimed she only found out about the Counterfeit Website in August 2018 (D6T 116:19-22) but she was directly informed of the "MI-5" and "Hartman" website months before that (*see, e.g.*, DTX 92; PTX 597.) Lena also testified that she never responded to "one single email" about Hartman (D6T 103:13-17)[16] because she didn't want to be "dirtied" by his reputation and didn't read emails that she was merely copied on (D6T 117:4-118:8, 189:8-15). But documentary evidence revealed she responded to multiple emails about Hartman that she was copied on, and her responses showed she read the thread and knew Hartman was being discussed. (*See, e.g.*, DTX 91). Also, she claimed she wasn't reading emails around June 2018 because her daughter was just born (D6T 117:21-25) but evidence showed she not only read but responded to emails within two minutes during that exact time (PTX 598 at 2; *see* D8T 137:14-18). The "I wasn't reading emails" excuse was also used repeatedly during Putich's examination. This common thread looked rehearsed and suspicious. Indeed, Lena even lied about trivial matters to fit her narrative. For example, she claimed that PIP did not have any other lawsuits except one with Hartman, but when reminded that her husband said otherwise she changed her story. (D6T 144:7-23.) Lena's persistent dishonesty and abundant contradictions are substantive evidence of her guilt. *See United States v. Godwin*, 765 F.3d 1306, 1322 (11th Cir. 2014) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt. . . . [W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true.") The jury properly weighed her credibility.

Defendants argue Plaintiffs failed to offer smoking gun evidence of Lena's independent commission of two predicate acts. Yet it was undisputed that Defendants deleted evidence throughout their scheme (*see, e.g.*, PTX 23 at 2; PTX 229; PTX 230; PTX 73; PTX 210; PTX 603 at ¶¶92-93) and failed to preserve critical data (PTX 301). An expert testified and detailed the types of authorship, sender, and other data that could have been obtained by Plaintiffs. (*See*

---

[15] This is all in addition to the evidence the Court has already found sufficient to sustain Plaintiffs' claims against Lena. (D7T 227:11-228:7.)

[16] Lena denied testifying to this once it was proven that her testimony was untrue (*see* D6T 118:9-12).

D4T 15:25-95:16.) Thus, in addition to the significant evidence inculpating Lena directly, the jury was instructed on stipulated jury instructions that they were allowed to presume that any missing data they believe existed would have been harmful to Lena's (and all Defendants') case and helpful to Plaintiffs' case. It is hard to imagine a plaintiff failing to prove its case based on a lack of a "smoking gun" where such an adverse jury instruction is given. *See generally Metro. Gov't v. BFI Waste Servs., LLC*, No. M2011-00586-COA-R3-CV, 2012 Tenn. App. LEXIS 189, at *18 (Ct. App. Mar. 22, 2012) (jury verdict for plaintiff where adverse inference instruction was given); *Pace v. AMTRAK*, 291 F. Supp. 2d 93, 104 (D. Conn. 2003) (same). The premise of the adverse jury instruction is to remedy the absence of evidence resulting from spoliation.

Accordingly, the jury could have drawn a negative inference from the lack of substantive emails from the HartmanInvestigators@gmail.com account. Indeed, all Defendants denied using this account despite the parties stipulating that one or more Defendants used it (PTX 301 at 5). Given that Sells and Putich were quite candid about their use of certain email accounts, it would be reasonable for the jury to presume that it was Lena who was sending out emails from that account. Such emails would include the misleading emails to Lutz and dissemination of the counterfeit domain names. (PTX 352.) Similarly, the jury was walked through Defendants' concealment of evidence using Chung's Bananatag receipts. (PTX 265; D6T 156:3-159:8). Lena was clearly part of Defendants' discussions surrounding Hartman's plea to stop the counterfeiting and harassment. Lena claimed no recollection of these emails (*id*.) and they mysteriously vanished when it came time for production, meanwhile other emails in the same chain that did not involve Lena were produced. (*See, e.g.*, PTX 11; PTX 43; PTX 217.) The jury also heard about the mysterious disappearance of evidence in previous cases Defendants litigated, when somehow all company computers were on a new boat that crashed in the middle of the night. (D6T 159:15-160:1.) In sum, the striking absence of certain evidence speaks loudly, especially when spoliation was admitted. The jury heard from both sides, including from Lena herself, and made credibility decisions. When considering the direct and circumstantial evidence,[17] the applicable presumptions and inferences, and Lena's dishonest testimony, a

---

[17] The jury was instructed multiple times that there is no difference between direct and circumstantial evidence. (D1T 89:5-12; D8T 205:17-206:2.) Indeed, criminal convictions under the law's highest burden can be based solely on circumstantial evidence. *See United States v. Bui*, No. 21-10356, 2022 U.S. App. LEXIS 4280, at *9 (11th Cir. Feb. 16, 2022); *United States v. Delva*, 922 F.3d 1228, 1246 (11th Cir. 2019); *United States v. Winemiller*, 679 F. App'x 759, 761 (11th Cir. 2017) ("Mr. Winemiller's main basis for the sufficiency challenge is that the government only presented circumstantial evidence against him. We have repeatedly explained, however, that a conviction may

reasonable jury found that Lena was not just an "unwitting participant" but a substantive part of Defendants' scheme who participated through a pattern of racketeering activity.

To support their "unwitting participant" theory, Defendants also rely on cases decided at the motion to dismiss stage and concerning liability of general service providers, like telephone companies and law firms. (*See* Br. at 8.) As Defendants' cited case of *Cont'l Cas. Co. v. Cura Grp.*, *Inc.* makes clear, however, in those cases the RICO claims were dismissed because "the plaintiffs had not alleged any facts that the transactions involved were anything more than legitimate enterprises engaging in legitimate transactions." No. 03-61846-CIV-ALTONAGA/Tur, 2005 U.S. Dist. LEXIS 51116, at *72 (S.D. Fla. Apr. 5, 2005). In contrast, here, like in *Cont'l* and *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F. Supp. 1362, 1369 (D. Conn. 1987), Plaintiffs alleged and proved that Lena, the company that she co-owned and co-managed, the employee that she directly supervised and oversaw, and the contractor that she funded "worked together as a continuing unit" to fraudulently promote PIP and destroy Plaintiffs through dozens of predicate acts.

Finally, as a catchall, Defendants claim that there was no fraud "on any recipient" because "emails with erroneous information, by themselves, cannot be fraud." (Br. at 9.) But the emails Defendants sent out were calculated in every way to deceive recipients,[18] get "eyeballs" on them, divert clients and leads to PIP, help PIP earn revenue, and most importantly, deprive Plaintiffs of income.[19] This is precisely the type of RICO wire fraud liability envisioned by the statute. *See Bridge,* 553 U.S. at 649. Defendants then ignore the other schemes they carried out, whether posing as college students to fraudulently gain access to Hartman's and his colleagues' Linkedin accounts, using false identities, gift cards, and burner phones from Puerto Rico to misuse digital marketing platforms, trafficking in counterfeit domain names and websites, targeting fraudulently obtained leads with the "Guru Rescue Program," and many others.

---

be supported by circumstantial evidence so long as the jury could reasonably infer guilt from that evidence.").

[18] Defendants concede their emails contained "erroneous information," but the emails also sought to trick recipients through impersonation (Hartman's name), false association (Plaintiffs' business address), omission of material facts (containing negative facts but omitting positive facts or context), and dozens of affirmative misrepresentations (proven through unrebutted testimony from Hartman, and Sells' admission he "embellished" facts).

[19] Notably, the jury was instructed, "If, for example, a defendant made a false statement that was relied upon by the plaintiff's customer and caused the customer not to buy a product or service from the plaintiff, then the plaintiff is injured by the false statement." (D7T 225:9-14.)

B.      **Significant Evidence Supported The Jury's Conclusion On Infringement And Counterfeiting Against Lena Sells**

Defendants also challenge the trademark infringement and counterfeiting claims, though only as to Lena. There is no dispute as to the elements required to prove Lena's liability for infringement or counterfeiting, nor any dispute that Sells, PIP and Putich were direct infringers. The only argument advanced by Defendants is that Lena did not contribute any "product" or service to one of the direct infringers. There was ample evidence at trial of Lena's contribution towards direct infringement, including all the evidence recited in Section II.A.6 above.

Defendants argue that Lena's involvement is not sufficient because she is an "employee," but offer no legal authority supporting that theory. Courts have routinely recognized that directors, officers and employees of a company can be personally liable for infringement. *See, e.g., Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir. 1991) ("Natural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act."). Corporations act through individuals, therefore "if there was an infringement by the corporation, this infringement was caused by some one or more persons either officers or employees of the corporation who caused the acts to be done." *Id.*; *see also Diaz v. Doctors Best Weight Loss & Wellness Ctr., LLC,* No. 21-cv-22386, 2021 U.S. Dist. LEXIS 189512, at *18 (S.D. Fla. Sep. 30, 2021). As set forth above, the evidence established that Lena, the Director of Operations for PIP, was personally involved in the infringement, specifically contributing to the infringement of at least PIP and Putich. Defendants do not cite to any evidence to the contrary, much less sufficient evidence to overcome the jury's credibility determinations and the evidence in the light most favorable to Plaintiffs. The motion should be denied on this issue.

C.      **Plaintiffs Established False Advertising And Invasion Of Privacy**

Defendants assert Rule 50 arguments as to Federal and Florida False Advertising (Counts VII and XII), Unfair Competition (Count XIV), and Invasion of Privacy and Misappropriation of Likeness (Counts XXII and XXIII) in a single section of their motion. With respect to Counts XXII and XXIII, Defendants limited their original Rule 50 motion to the question of damages. (D8T 22:18-21.) Defendants fail to renew this issue, instead arguing whether Lena was involved in commercial advertising or promotion, which was not preserved for Counts XXII and XXIII. Defendants also failed to make <u>any</u> Rule 50 motion on the unfair competition claim in Count XIV. As such, Defendants' "renewed" motions under Counts XIV, XXII and XXIII cannot be

renewed because no challenge was made at trial and is barred. *See Barker*, 316 F. App'x at 940.

With regard to the false advertising claims, the jury was free to conclude that Lena was heavily involved in the counterfeit websites and claims thereon for various reasons. As noted in sections above, the jury watched the video deposition of Lena, the Director of Operations for PIP, in which she admitted to telling clients and prospective clients that Hartman is a "scumbag" and explained that the lawsuit itself was because of Hartman's "false stories"/"fake news" versus "documented facts." (D6T 105:1-9, 164:2-6.) The fake news versus Defendants' "documented facts" was a common thread in Defendants' counterfeit websites and in emails to Plaintiffs' clients and prospective clients, and Lena parroted the same false narrative while disavowing knowledge of the websites. (Compare *id.* to PTX 66, PTX 69, PTX 100, PTX 318, PTX 518.) Sells and Putich exchanged emails about reviewing Plaintiffs' podcasts for material to use for the counterfeit "website updates," and Sells stated that he forwarded it to Lena and she listened to Plaintiffs' podcasts. (PTX 237.) Lena was also on an "Eblast" email discussing modifying the contact list used to reach Plaintiffs' clients. (PTX 249.) A reasonable jury could conclude that Lena was actively involved in reviewing materials for use on the counterfeit websites and assisting with the Eblast list for the client emails based on these emails. Lena testified in deposition that with PIP she expensed even the smallest amounts ($0.50) and her online profile touts her review of financial information and adjusting operational budgets of PIP for profitability (PTX 140 at 2). Meanwhile, Sells stated that PIP spent more than $10,000 building the counterfeit websites. (DE 301-1, 42:25-43:7; PTX 40 at 3.) Indeed, Sells stated in an email that when the Hartman websites were shut down "Lena has gone ballistic that this has happened and I am spending more time and money on it." (PTX 238 at 10.) The jury could reasonably infer that Lena, the Director of Operations for PIP and someone who watched every penny and went "ballistic" when the websites went down and more money was required, had complete knowledge and involvement in such a significant undertaking as the counterfeit websites.

The jury also saw that Lena, who oversaw PIP operations, was copied on multiple emails discussing the counterfeit websites as they were built and maintained. (*See, e.g.*, PTX 111, 142, 161, 597, 598.) The jury even saw evidence that Lena was copied on others emails about the websites, yet those emails themselves were not produced, supporting the negative inference that those emails were damaging. (*See, e.g.*, PTX 42.) As discussed in Section II.A.6 above, while Lena stated she did not read any of the numerous damaging emails, there was significant

evidence to the contrary, and the credibility of her testimony was squarely in the hands of the jury. Sufficient evidence supports the reasonable conclusion that Lena was involved in the advertising or promotion at issue in this case, including the counterfeit websites, false online posts and emails to clients and potential clients of Plaintiffs.[20] The motion should be denied.

## III.    DEFENDANTS' MOTION FOR NEW TRIAL LACKS ANY LEGAL OR FACTUAL MERIT

### A.    Defendants Cannot Establish the Verdict is Against the Great Weight of the Evidence

The jury understood the assignment. On stipulated jury instructions, the attentive members of the jury took their role seriously and listened carefully to the evidence. "[M]otions for a new trial are highly disfavored" and Defendants offer nothing close to the evidence needed to prevail. *Andrews v. United States*, 634 F. App'x 259, 262 (11th Cir. 2015). Instead, Defendants rely almost exclusively on counsel's closing argument, making much ado about the jury finding Putich, Chung, and Lena liable for both RICO (18 U.S.C. §1962(c)) and RICO conspiracy (1962(d)). (Br. at 14.) But this is a red herring. Although it is unnecessary to consider a RICO conspiracy claim if a defendant is liable for a direct RICO violation because the liability is the same, it certainly doesn't taint the verdict. Indeed, almost every direct RICO violation encompasses an agreement, by words or action, to commit that violation, and thus also is a RICO conspiracy violation. *See Rajput v. City Trading*, LLC, 476 F. App'x 177, 180 (11th Cir. 2012) (upholding complaint where allegations were sufficient to allow "the district court to draw the reasonable inference that Defendants committed the alleged RICO violations and engaged in a RICO conspiracy.") Here, the jury answered every question asked of it, coincidentally mooting Defendants' arguments that relate solely to the 1962(c) claims. Moreover, Defendants failed to raise this new objection before the jury was dismissed, or even shortly thereafter, and thus the argument should be deemed waived. Finally, Defendants did not object to the jointly proposed verdict form as phrased, and they do not claim that the jury was misled in any way or cite to any prejudice.

The bulk of Defendants' argument claims the "the RICO verdict is hopelessly confused and unfair" because Plaintiffs allegedly did not specify who the members of the RICO enterprise

---

[20] Although Defendants' Rule 50 motions on unfair competition, invasion of privacy and misappropriation of likeness are barred, much of the same evidence supporting false advertising necessarily supports the jury's determination that Lena participated in advertising or promotion necessary to establish these claims as well.

were. (Br. at 15 ("They provided no suggestions as to who these members might be.")) Defendants' argument can be summarily rejected. The jury was properly instructed on stipulated jury instructions the following:

> For the first element, the plaintiffs must prove the existence of an enterprise or, in other words, a vehicle through which racketeering acts are committed.
>
> An "enterprise" may consist of an individual, partnership, corporation, association, or other legal entity. In this case, plaintiffs allege that PIP, as a Limited Liability Company, was the enterprise. An enterprise doesn't have to be a legal entity. It can be an association of persons or entities.
>
> In this case, plaintiffs also allege, in the alternative, that at least two out of Mr. Sells, Lena Sells, Ms. Putich, and/or Mr. Chung formed an enterprise.
>
> The association between the enterprise's members might be loose or informal, but the enterprise must have at least a purpose, relationships among those associated with the enterprise, and a duration sufficient to permit those associates to pursue the enterprise's purpose. Plaintiffs may prove the existence of an enterprise under either theory, or both.

(D8T 220:12-221:5.) The alleged enterprise was specified in detail and the jury was advised that the association-in-fact enterprise was an alternative.

If Defendants argue that PIP could not be the enterprise because Putich and Chung did not manage PIP, they are misguided. "Following *Salinas*, the Ninth Circuit confirmed that Reves' "operation or management" test is no longer good law, and that §1962(c) applies to anyone who 'knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise.'" *Minn. Life Ins. Co. v. Philpot*, No. 11cv00812 BTM (POR), 2012 U.S. Dist. LEXIS 139595, at *29 (S.D. Cal. Sep. 27, 2012).[21] Nowhere in the Court's instructions or the Eleventh Circuit Pattern Jury Instructions is there a requirement that RICO defendants must operate or manage the RICO enterprise. (*See* D8T 219:14-225:14.) Defendants never requested any such language in the jury instructions, resulting in waiver of their argument. In any event, contrary to Defendants' contention, there was substantial evidence that Putich, a

---

[21] Moreover, *Reves* never applied to RICO conspiracy claims. *See Castro v. United States*, 248 F. Supp. 2d 1170, 1180 (S.D. Fla. 2003) ("Regarding the lack of substantive merit of ground 3, the Eleventh Circuit, and the majority of the other Circuits to consider the issue, have correctly ruled that the 'operation or management' test of *Reves* is inapplicable to prosecutions under § 1962(d).")

PIP employee, and Chung, a PIP contractor, indeed managed PIP's affairs *as it relates to the pattern of racketeering*. There was substantial evidence that everything they did was on behalf of PIP. They spent entire weekends without any input from Sells, *inter alia*, building up the counterfeit websites, "scraping" online profiles, and fraudulently gaining access to mailing lists (Putich) and Linkedin profiles (Chung). The RICO statute, whether pre- or post- *Reves* was never limited to CEOs. *See Reves v. Ernst & Young*, 507 U.S. 170, 184, 113 S. Ct. 1163, 1173 (1993) ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."); *see also United States v. Starrett*, 55 F.3d 1525, 1542 (11th Cir. 1995) (test is "not limited to those with a formal position in the enterprise."); *United States v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014).

Moreover, there was nothing preventing the jury from finding both that PIP was an enterprise through which Sells and Lena operated, and the existence of an association-in-fact enterprise through which Sells, Putich, and Chung operated (*see Al-Rayes v. Willingham*, 914 F.3d 1302, 1309 (11th Cir. 2019)). There were so many predicates and schemes estabilshed in this case the jury could have properly found RICO violations on multiple enterprises.

**B.**     **Reasonable Jurors Found Lena Liable for Her Misconduct**

Defendants merely repeat their argument on behalf of Lena, claiming generally "no evidence." (Br. at 16-17.) But as detailed *supra* in Sections II.A.6 and 0, Defendants simply choose to ignore the substantial evidence inculpating Lena. To the extent Defendants claim that Lena was simply "lumped in by the jury with the other Defendants," they strain credulity. Defendants made Lena a topic unto herself. She had her own separate special interrogatories on the verdict form with respect to Claims I-II at questions 3-4. (D.E. 338 at 2.) Consistent with the stipulated instructions addressing Lena specifically (DE 336 at 12-13), the jury found that Lena was contributorily liable for service mark counterfeiting and her conduct was willful (*i.e.*, intended to misappropriate the goodwill of Plaintiffs). (DE 338). "We presume that a jury follows the instructions given to it by the district court." *Luxottica Grp., S.p.A. v. Airport Mini Mall, Ltd. Liab. Co.*, 932 F.3d 1303, 1320 (11th Cir. 2019), quoting *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1201 (11th Cir. 2004). Defendants offer nothing to rebut this presumption.

Not only was the jury presented with considerable evidence and instructions focused on Lena, they clearly analyzed damages questions unique to each defendant, as they assessed different punitive damages awards against Lena compared to her husband, Sells, and PIP. (DE

336 at 12-13.) Finally, the jury specifically asked for clarification on what presumptions they were allowed to apply for Lena, meaning they were paying careful attention to the standards of liability for her. (D.E. 337 at 4.) And the Court charged the jury specifically on that issue. (D8T 210:25-212:7) Defendants' attacks on the jury are unwarranted and baseless.

### C.    Defendants' Closing Statement Theories Are Baseless

Defendants' next theory for a new trial is that statements during closing argument (for which no objections were made) were so outrageous as to require a new trial. Yet Defendants' characterization of the law and the closing statement itself are simply wrong. Defendants argue that although they did not object, a new trial is required nonetheless, citing to *Edwards v. Sears, Roebuck and Company*, 512 F.2d 276, 283 (5th Cir. 1975). The Eleventh Circuit has considered and distinguished *Edwards* on several occasions. For example, the *Edwards* Court "ordered a new trial because of statements made during closing argument. But in that case counsel used 'closing argument[] to bring before the jury damaging facts not in evidence and never established.'" *Wallace v. Mangiaracina*, 745 F. App'x 356, 359 n.3 (11th Cir. 2018), citing *Edwards*, 512 F.2d at 284. Similarly, in *Access Now, Inc. v. Sw. Airlines Co*., 385 F.3d 1324, 1334 (11th Cir. 2004), the Eleventh Circuit recognized there is a distinction between the failure to object "in the split-second pressure of argument in a jury trial" versus where the parties have the opportunity to address the issue with the district court. Neither of the statements raised by Defendants was false, unknown prior to closing, or prejudicial. Indeed, Defendants do not and cannot contend that Plaintiffs' counsel invoked "damaging facts not in evidence and never established." *Wallace*, 745 F. App'x at 359 n.3. The *Edwards* decision is inapposite. *See id*.

First, Defendants argue a reference to spousal privilege was an "improper use of the privilege as a sword by Plaintiffs and caused confusion with the jury." (Br. at 18.) This is false. First, Defendants were well aware of the issue long before trial. Defendants knew the deposition testimony would be played more than a year before trial because it was in deposition designations exchanged and then filed (without objections on this issue) with the Pretrial Statement on August 9, 2021. (DE 242-2.) The transcripts were filed on July 5, 2022, again with no objection on this issue. (DE 301). Similarly, Defendants did not object when the deposition played at trial, to questions at trial, or during closing. A year's notice is not the "split-second pressure" the Eleventh Circuit considers for preserving objections during closing argument. Moreover, unlike *Edwards*, where damaging facts not in evidence or ever established were

argued, closing argument here made one reference to "spousal privilege" in passing. This did not somehow prejudice the Defendants. The jury asked whether they could assume information based on spousal privilege like with spoliated information, but Plaintiffs never suggested that Lena did not preserve information under spousal privilege. Subsequently, the Court offered a response based on the suggestion from Defendants, for which Defendants (again) had no objection (D9T pp. 18, 28, 35.) Even at that time Defendants never suggested that the single reference to spousal privilege tainted the jury or the verdict. Such does not merit a new trial.

The second statement in closing related to damages and whether the jurors needed to worry about duplication. Again, this is an issue addressed multiple times to Defendants' satisfaction prior to trial. The Court previously raised the issue in pretrial and as trial neared an end. Plaintiffs proposed an instruction on duplicative damages prior to the charge conference and Defendants objected at the conference to giving any such instruction. (D8T p. 87.) Indeed, Defendants argued the parties had a "deep discussion" and "all agreed that we would address double recovery after the verdict came in, and felt that the verdict form was clear enough at the time." (*Id.*, p. 89.) Defendants also expressly agreed it was "fine" to tell the jury not to worry about cumulative damages. (D8T 96:4-20.) This was a strategy call by Defendants. Ultimately Defendants are unhappy with the outcome, but Defendants cannot make an informed and reasoned strategy decision before and during trial, only to claim that decision forms a basis for a new trial afterwards. Notably, the parties and the Court significantly reduced the total damages number to eliminate any duplicative damages.

Defendants also seem to challenge the instructions on damages, arguing there were instructions on federal false advertising but not Florida false advertising, allegedly leading to jury confusion on whether profits could be awarded. (Br. at 19.) The only support Defendants can muster is the argument that theoretically the jury could have included lost profits in the damages award (though they offer no legal basis that this would be improper). (Br. at 19, n. 6.) Of course, there is no actual evidence from Defendants and we presume the jury followed the jury instructions. It is at least as likely that the jury calculated actual damages based on testimony of Cuneo and Kronenberger,[22] which exceeded the actual award of $4.5MM, as set forth in more detail below. Moreover, the portion of the jury instructions on Florida false advertising specific

---

[22] Corrective advertising is a type of "actual" damages (*see, e.g., PBM Prods., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 421 (E.D. Va. 2001)) and as such are undoubtedly a remedy the jury was instructed to award.

to damages given to the jury was identical to Defendants' proposed instruction and did not reference profits. (DE 313-1 at 69-70.) Defendants never objected on the grounds asserted now or offered any alternative instruction on false advertising damages. "When a party fails to object to a jury instruction prior to jury deliberations, that party waives its right to challenge the instruction on appeal, unless the party made its position clear to the court previously and further objection would be futile, or it is necessary to correct a fundamental error." *Anderson v. Brown Indus.*, 614 F. App'x 415, 419 (11th Cir. 2015). The motion should be denied.

### D.   <u>An Instruction on Prior Litigation Was Proper Rather than Prejudicial</u>

During the pretrial conference, the Court and the parties addressed limiting the amount of discussion of other litigation between the parties. During trial, Plaintiffs again raised the issue when Sells continued to interject references to other litigation, and the Court reminded the parties of his admonition at pretrial that "we weren't going to litigate those issues, what was true or what was not in any of those issues." (D5T 107:3-5.) At that time the Court acknowledged a limiting instruction may be "appropriate for the final instructions" and asked the parties to confer. (*Id.*, 110:6-10.) In the final charge conference, the Court settled on a very generic instruction that is entirely consistent with the law—the jury heard about other litigation but can only analyze the merits of claims before it. (DE 336 at 10.) Indeed, how could the jury possibly weigh the merits of claims not presented to them and for which they would not be instructed on the law. Defendants had the opportunity to bring counterclaims in this action—indeed, Defendants initially did so but dismissed them to pursue them in a separate action. (DE 125.) This is yet another strategic decision made by Defendants during the litigation that they now seek to exploit in their motion for a new trial. The theory is baseless.

Defendants offer no legal argument suggesting any impropriety of an instruction to the jury that it only consider the merits of claims before them. Instead, Defendants veer off into a discussion of scienter and willfulness.[23] (Br. at 19-20.) None of this provides any basis to suggest the Court's instruction was an improper statement of law or somehow prejudicial. The jury was free to consider the other litigation in the context of intent and willfulness, regardless of the merit

---

[23] Defendants also complain again about closing, this time regarding counsel's reference to the fact that the jury was not being asked to resolve claims not asserted in this case. (Br. at 20-21.) Not only was there no objection at the time, but there was no basis to do so because these statements were true and based on the Court's instruction. Defendants themselves suggested at the charge conference the issue could be referenced in closing. (D8T 86:17-21.)

(or lack thereof[24]) of other litigation not before them. Defendants' motion should be denied.

**E.      The Prior Rebuttal Expert Ruling Was Correct and the Opinions Referenced Therein Were Irrelevant to Trial**

Defendants insinuate that Judge Smith erred by excluding Defendants' two rebuttal experts. (Br. at 21.) Judge Smith addressed all parties' motions to exclude. (*See* D.E. 159, 162, 163, 167.) For good reasons and on full briefing, Judge Smith excluded both of Defendants' improper and unqualified rebuttal experts. (DE 216; DE 219.) Defendants' challenge as it relates to Mr. Bond is moot because, as Defendants acknowledge, he was a rebuttal expert to Mr. Avenstein. (Br. at 21.) Avenstein did not testify at trial and therefore Bond would have been precluded from testifying at trial regardless of Judge Smith's decision. *See LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 U.S. Dist. LEXIS 18503, at *58 (S.D.N.Y. Feb. 14, 2012) (rebuttal opinions are "necessarily irrelevant" where affirmative expert he was rebutting was withdrawn).

As it relates to Mr. Thompson, Judge Smith relied on FRE 702 and Eleventh Circuit precedent to carefully analyze each of his four opinions. (DE 219 at 1-4.) Judge Smith reached the sound decision that Thompson's opinions were unreliable for numerous reasons, including that he failed to cite any methodology, failed to consider critical elements necessary to reach his conclusions, and rendered opinions based on "incorrect information." (*Id.*) Judge Smith did not "choos[e] to believe the Plaintiffs' expert" (Br. at 21) and indeed barely mentioned Cuneo's opinions, instead focusing on Thompson's. Anyway, Defendants addressed all of Thompson's arguments on cross-examination of Cuneo. (*Compare, e.g.*, D7T 35:15-40:15 (discussing alleged connection between advertising and revenue) and DE 176 at 13 (same).) Thompson's "expert" opinion, in addition to being methodologically and substantively unreliable, was mere cross-examination material and therefore unnecessary to present through an expert. *See Wiand v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 63071, at *5-6 (M.D. Fla. May 6, 2014).

As for Defendants' complaint about closing argument, again, the argument is waived. *See Wallace v. Mangiaracina*, No. 8:14-cv-3022-T-24AEP, 2017 U.S. Dist. LEXIS 93774, at *9 (M.D. Fla. June 19, 2017), *aff'd at Wallace*, 745 F. App'x at 360 (collecting cases and explaining that failure to object to closing argument during the argument or shortly thereafter prevents the Court from taking remedial action and amounts to waiver). Defendants cannot rely on their silence to be a basis for new trial, especially where the statement in closing was undoubtedly a

---

[24] Since that time PIP's counterclaims in Georgia (Case No. 2017-cv-294502) were dismissed with prejudice and summary judgment was entered in favor of Hartman.

correct observation of the evidence. Moreover, the jury was instructed multiple times that counsel's remarks were not evidence and should not play a role in their deliberations. There is no indication at all that the jury was confused regarding the parties' experts and, notably, the jury did not simply adopt the experts' numbers, instead awarding less.

### F. Defendants' Newly- Discovered "Evidence" Is Irrelevant

Defendants claim that Hartman's statements during one of his post-trial podcasts contradicts his in-court statements and warrant a new trial. (Br. at 22.) Defendants' argument distastefully begins by mocking Hartman as a "prolific podcaster" who "of course made a podcast about this trial," before discussing his testimony. First, Defendants offer no legal basis for a new trial based on public statements of parties after trial is over, and Plaintiffs are likewise unaware of any such legal basis. Second, Defendants' argument is factually frivolous. At trial, Hartman testified: "I would have definitely committed suicide had I actually read all this stuff. I knew it was bad. I knew what he was doing, but I just couldn't read it anymore after awhile." (D2T 183:10-12.) Defendants allege that Hartman said on his podcast, "I had to just stop reading this stuff and engaging with it… I just had to zone out. I would … would have taken my own life had I looked at all this stuff…." (Br. at 22.) Hartman's unsworn comments are exactly the same as his in-court statements in different words, and Defendants' arguments are simply false.

Self-harm and contemplation of suicide is no joking matter. The jury not only saw the effect Defendants' misconduct had on Hartman but that such effect was exactly what Sells intended, by his own words. (See, e.g., PTX 275 at 1 ("This douche is going to want me dead if he doesn't kill himself first."); D5T 104:9-23.) Indeed, the jury saw that Defendants routinely joked about Hartman's suffering. (See, e.g., PTX 11; D3T 171:22-173:14.) Again, Defendants' argument is inappropriate and frivolous. They should be admonished and their motion denied.

## IV. DEFENDANTS' MOTION FOR A NEW TRIAL ON DAMAGES OFFERS NO VIABLE GROUNDS

### A. Damages Were Supported by Significant Evidence

Defendants argue that Plaintiffs did not identify clients that headed to Defendants, and therefore Plaintiffs' damages were speculative. This is not true but also not the test of anything. There was ample additional evidence of damages. Hartman provided considerable testimony on the impact to himself and his businesses. (See, e.g., D1T 181:4-14; D2T 32:1-17, 44:6-48:22, 53:10-23, 66:1-8, 66:24-70:1, 72:17-74:24, 76:21-78:23.) For example, Hartman testified about

the importance of conference appearances such as IMN to his business generation (D2T 76:21-78:6) and submitted evidence of numerous leads from IMN and other conferences prior to Defendants' unlawful acts (D2T 78:7-81:21, 84:7-87:16; PTX 365-372, PTX 374-379). The jury saw that IMN expressly told Hartman that as a result of Defendants' misconduct Hartman was precluded from presenting at IMN, cutting off opportunities for the lead generation he previously enjoyed, and later IMN just ignored him. (D2T 88:24-91:25, 94:5-95:6; PTX 327.) Hartman also specifically referenced multiple business relationships that were damaged or destroyed by Defendants' conduct. (D2T 98:13-107:17, 108:19-109:24.) Moreover, Sells himself confirmed he had several clients that were clients of Plaintiffs.[25] (D4T 216:3-217:2.)

The jury also heard extensive testimony from Kronenberger on how pervasive and damaging campaigns like those run by Defendants can be on businesses and the significant costs to repair the damage. (*See, e.g*., D6T 30:17-34:3, 40:17-46:47, 55:11-61:14.) Defendants argue Kronenberger "did not support any finding of harm to plaintiffs," but this is simply untrue, as Kronenberger provided detailed testimony on how campaigns like that launched by Defendants would severely damage Plaintiffs. (*See id*.) This was coupled with the testimony of Hartman and documents showing the actual feedback from IMN and others who indicated how toxic his brand was as a result of the Defendants' unlawful efforts. For example, former navy officer Pinkerton mentioned that Plaintiffs no longer received a six-figure sponsorship as a result of Defendants' actions and Pinkerton ceased making referrals to Plaintiffs and sent those referrals elsewhere. (D3T 55:24-57:8, 60:20-62:3, 62:20-23; *see also* D2T 96:21-98:12.) Lutz testified that Hartman was previously a regular guest on Lutz's podcast and received business from Lutz, but because of Defendants' actions Hartman's appearances were greatly reduced and Lutz was unaware of any new business from his listeners. (D3T 84:25-85:9, 92:4-7, 93:2-24, 94:10-13, 107:4-14; *see also* D1T 190:2-19.)

The jury also head from Cuneo, who had expertise in forensic accounting and investigation. Cuneo combed through tax returns, financial statements, general ledgers and numerous other documents to calculate damages to Plaintiffs. (D6T 199:2-9, 201:18-202:10.) Cuneo provided a thorough breakdown of his analysis and opinions on damages of approximately $3.8MM for the jury. (*See generally*, D6T pp. 200-216.) Defendants offer

---

[25] Defendants' documents were marked attorneys' eyes only and Hartman therefore had no opportunity to do a comparison during the litigation or before trial.

numerous meaningless and irrelevant complaints, many of which were offered through cross-examination and which the jury considered. For example, Defendants complain Cuneo did not look at documents beyond what were provided to him or speak to others beyond Hartman and his accountant (Br. at 25), but they fail to identify any documents or information Cuneo needed but to which he was denied access. Instead, Cuneo explained that he was able to review and confirm which documents were required to prepare his analysis based on his experience, including various financial documents signed under oath. (D7T 48:8-49:1.) Defendants complain that Cuneo did not analyze documents after 2020, but Plaintiffs sought damages calculated through 2020, which is what Cuneo prepared opinions on in his expert reports and at trial. In contrast, Defendants offered no testimony or other evidence to suggest that information after 2020, upon which Plaintiffs did not rely to calculate damages, would have had any impact on Cuneo's analysis. Defendants also argue that a jury question on advertising and legal fees somehow undermines his testimony. (Br. at 25.) However, Cuneo explained in response to the question that advertising expenses were "kept the same" and legal expenses "grow about two percent of the costs." (D7T 59:15-25.) Many of the same complaints resolved by the Court on the parties' *Daubert* challenges are reiterated by Defendants and are equally deficient. (DE 217.) The motion offers no basis for a new trial on damages and should be denied.

### B.   The Statutory Damages Award Was Properly Supported

Defendants next argue that a new trial on damages or remittitur[26] is appropriate on statutory damages. First, while the jury awarded statutory damages on counterfeiting, Plaintiffs elected a different remedy and therefore the question on the counterfeiting damages is moot. Defendants also challenge the award of $600,000 in statutory damages based on Sells' cyberpiracy. There was ample evidence to support this verdict.

In determining statutory damages, the finder of fact may consider: "(1) the expenses saved and profits reaped by the infringer; (2) revenues lost by the mark holder as a result of the infringement; and (3) the infringer's state of mind, whether willful, knowing or innocent." *Gucci Am., Inc. v. Borseonlineshop.com*, No. 12-24048-CIV-KING/MCALILEY, 2013 U.S. Dist.

---

[26] "The standard for remittitur is not whether the losing party can invent outlandish scenarios that might have infected the jury's decision-making process. That's not how remittitur works. Rather, the legal standard is whether the verdict actually awarded exceeds the amount established by the evidence." *Costa v. Sam's E., Inc.*, No. 11-0297-WS-N, 2012 U.S. Dist. LEXIS 156575, at *63 (S.D. Ala. Oct. 31, 2012), *citing Gowski v. Peake*, 682 F.3d 1299, 1310 n.10 (11th Cir. 2012).

LEXIS 201461, at *7 (S.D. Fla. Sep. 17, 2013). Here, the jury heard considerable evidence regarding the revenues lost by Plaintiffs, as detailed in the discussion of evidence supporting damages in Section IV.A above. Indeed, the jury heard that Plaintiffs' revenue and profits were trending upwards until they took a nose dive after Defendants' misconduct (D6T 204:9-206:22), while Defendants' revenues had been flat but doubled at that time and Defendants celebrated the positive impact on their business. (PTX 603, ¶¶107-109; PTX 169 at 2 ("Hartman is making our SEO skyrocket (in a good way)"); PTX 296 ("I know this isn't a very savory project, but he deserves it and it is already helping us tremendously"); PTX 489 ("getting us some real positive traction already and has morphed a bit into marketing, rather than just flat out crushing his credibility").) Moreover, there was voluminous evidence of Defendants' willfulness and bad intent. For example, the jury saw Defendants, in their own words, declare their goal of "destroying" Plaintiffs and putting them out of business. (PTX 66 ("It is our desire to put this scumbag out of business once and for all"); PTX 227 ("Just want to keep him on the run until we destroy him"); PTX 234 ("I want to build a page that puts him out of business completely"); PTX 291 ("He is CRAZY and I want him out of business"); PTX 305 ("we are certainly happy to help anyway we can to put people like him out of business").) Defendants' goal was to "crush" and "blackball" Plaintiffs generally and Hartman individually. (PTX 88 at 2; PTX 123 at 2; PTX 258 at 2; *see also* PTX 262; PTX 309.) Sells admitted he was enjoying the damage being done to Hartman and ruining his weekend. (D5T 103:19-23; PTX 211.) For Sells in particular this crusade was personal, with him suggesting he wanted to crucify Hartman and he hoped Hartman would kill himself, even referencing Hartman's service dog. (D5T 103:24-104:23; PTX 238; PTX 275; PTX 285.) Statutory damages also serve to "deter wrongful conduct in the future." (*See* DE 338 at 2-3.) It is hard to imagine a better case for awarding the maximum damages, and there can be no doubt there was sufficient evidence to support every dollar awarded by the jury.

### C.   The Personal Animus Towards Hartman Justifies Significant Personal Damages

Defendants' next contend the damages awarded to Hartman personally were "outrageous." (Br. at 27.) The only thing outrageous was Defendants' conduct and their personal campaign to destroy Hartman. This was not simply a business dispute amongst reasonable companies with differing positions. As shown in the evidence cited above, this was a personal attack on Hartman himself. Hartman acknowledged how poorly he was received in the

community after these attacks and he was shunned from industry events where he had been welcomed. (D2T 88:24-91:25.) Hartman testified openly about how these unrelenting attacks had him considering suicide. (D1T 183:4-12; D2T 44:6-14.) Meanwhile Sells and other Defendants openly discussed their intention of destroying Hartman. Lena openly expressed animus towards him as a "scumbag." Chung knew the goal was to crush Hartman and continued to help because he wanted to get paid. (D3T 156:2-25, 164:19-22, 185:3-13.) Chung thought it was funny when Hartman was begging them to stop. (D3T 173:1-14; PTX 11.) As shown in countless emails referenced above, Chung and Putich were on numerous emails declaring the goal of destroying Hartman. Sells openly told Putich the goal was to crush Hartman (D7T 137:9-11), even acknowledging their efforts were not "savory" and asked if she felt "dirty." (PTX 83, PTX 223.) Putich acknowledged she would not want someone to do the same to her (D7T 140:8-10), and yet she claimed to enjoy her work with PIP, including "attacks" on Hartman (PTX 64 at 2; PTX 74 (smiley face).) These facts unquestionably provided the jury with sufficient evidence of the damages to Hartman personally.

### D.     The Award of Punitive Damages Reflects the Malice Towards Plaintiffs

Defendants' final argument is that the punitive damages award "shocks the conscience." The phrase is ironic given the malice shown by these Defendants. As chronicled herein, Defendants showed no mercy. Instead, their efforts were designed to destroy Plaintiffs while concealing their identities and activities as long as possible to avoid cessation and prolong Plaintiffs' pain. Even when Plaintiffs scored a minor victory by getting one website shut down Defendants worked tirelessly to transition the content to another website. Efforts to promote the counterfeit websites were strung across multiple mass email campaigns, the full scope of which cannot be determined because Defendants spoliated evidence. In one year alone PIP's revenues went up by $1.7MM with these attacks. (PTX 603, ¶¶108-109.) Defendants cry poverty now but admitted no evidence on their assets, their personal tax returns, or any other information to suggest the award of the jury was inappropriate. Defendants' motion is unsupported and should be denied.

## V.     CONCLUSION

Based on the arguments and evidence above, Defendants' motion should be denied in all respects.

Dated:  February 10, 2023

/s/ Ryan T. Santurri
Ryan T. Santurri
rsanturri@allendyer.com
ALLEN, DYER, DOPPELT
& GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

Steven Pollack, Esq.
(*Admitted Pro Hac Vice*)
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

*Counsel for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on February 10, 2023 on all counsel or parties of record on the Service List below.

By:      /s/ Ryan T. Santurri
         Ryan T. Santurri

## SERVICE LIST

Jeffrey M. Partlow, Esq.
jeffrey.partlow@csklegal.com
COLE, SCOTT & KISSANE, P.A.
Tower Place, Suite 4001
900 Summit Tower Boulevard
Orlando, FL 32810
Telephone: (321) 972-0025

Edward S. Polk
edward.polk@csklegal.com
danise.townsend@csklegal.com
COLE, SCOTT & KISSANE, P.A.
9150 South Dadeland Boulevard, Suite 1400
Miami, Florida 33156
Telephone: (786) 268-6763

Alexandra M. Dishun, Esq.
David S. Klein, Esq.
(*Admitted Pro Hac Vice*)
adishun@rlklawfirm.com
dklein@rlklawfirm.com
ROUNTREE, LEITMAN, KLEIN & GEER, LLC
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, GA 30329
Telephone: (404) 856-0540

*Attorneys for Defendants*

Ava K. Doppelt, Esq.
adoppelt@allendyer.com
Ryan Santurri
rsanturri@allendyer.com
ALLEN, DYER, DOPPELT
& GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

Steven Pollack, Esq.
(*Admitted Pro Hac Vice*)
steve@stevepollacklaw.com
POLLACK LAW, P.C.
225 Broadway, Suite 850
New York, NY 10007
Telephone: (212) 765-5225

Jeffrey E. Grell, Esq.
(*Admitted Pro Hac Vice*)
jgrell@grellfeist.com
GRELL FEIST PLC
825 Nicollet Mall, Suite 625,
Minneapolis, MN 55402
Telephone: (612) 353-5530

*Attorneys for Plaintiffs*