## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-61907-CV-STRAUSS

PLATINUM PROPERTIES INVESTOR
NETWORK, INC.; THE HARTMAN
MEDIA COMPANY, LLC; and JASON
HARTMAN,

               Plaintiffs,

    v.

CHARLES SELLS; STEPHANIE
PUTICH; YOUNG CHUNG; THE PIP-
GROUP, LLC; BLINDSPOT DIGITAL,
LLC; ELENA CEBOTARI SELLS; and
JOHN DOES 1-8,

               Defendants.

_____/

## ORDER REGARDING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL OR REMITTITUR

THIS CAUSE is before the Court on Defendants' Renewed Motion for Judgment as a Matter of Law and Motion for New Trial or Remittitur ("the Motion").  [DE 398].  Plaintiffs filed a response in opposition to the Motion and Defendants filed a reply thereto.  [DE 415; DE 420].  I have carefully considered the parties' submissions, the record, and the applicable law.  For the reasons stated below, the Motion is **DENIED**.

### I.    BACKGROUND

This case stems from a dispute between Plaintiff Jason Hartman and Defendant Charles Sells.  Hartman was a former client of Sells's company, Defendant PIP-Group, LLC ("PIP").  Sells suspected Hartman posted negative information online about PIP, and Sells wanted to respond.  To do so, Sells enlisted the help of his employee, Defendant Stephanie Putich, his friend and

experienced commercial lead generator, Defendant Young Chung, and his wife and PIP's Director of Operations, Defendant Lena Sells ("Lena"). Eventually, in May 2018, Sells decided to create a website or "landing page" where he could not only share rebuttals to Hartman's negative posts about PIP, but also post negative information about Hartman and his companies — Plaintiffs the Hartman Media Company ("HMC") and Platinum Properties Investor Network ("PPIN"). Sells registered multiple domain names that were confusingly similar to Hartman's trademarks. Sells registered those domain names through N'Jalla, an offshore identity concealing agent. Chung helped build a website on the domain name "jasonhartmanproperties.com." Chung set up the "jasonhartmanproperties.com" website ("the Website") and redirected internet traffic from the other domain names Sells purchased to the Website. Putich also helped to set up the Website and redirect traffic from the other domain names that Sells purchased. Lena paid Chung for his services at least once using her credit card. Defendants also compiled a list of Hartman's contacts and sent emails to them informing them of the Website and sending other negative information about Hartman.

In July 2018, when HMC initiated a proceeding against the registrant of the Website, Sells instructed Putich and Chung to move the Website to a new domain name. By early August 2018, Chung and Putich had moved all the content on the Website to the domain name "thebrokeguru.com" ("the New Website"). On August 15, 2018, Hartman, along with his companies HMC and PPIN, filed a John Doe lawsuit. Sells, PIP, Chung, Chung's company – Blindspot Digital, LLC ("Blindspot"), Putich, and Lena, were ultimately identified and named as Defendants. In Plaintiffs Second Amended Complaint, they alleged the following twenty-three counts against Defendants:

- Count I – Service Mark Counterfeiting – against all Defendants
- Count II – Contributory Service Mark Counterfeiting – against all Defendants

- Count III – Federal Service Mark Infringement – against all Defendants
- Count IV – Contributory Service Mark Infringement – against all Defendants
- Count V – Cybersquatting – against all Defendants
- Count VI – Federal Unfair Competition – against all Defendants
- Count VII – Federal False Advertising – against all Defendants
- Count VIII – Federal RICO – against Sells, Lena, Putich, and Chung
- Count IX – Federal RICO Conspiracy – against Lena, Putich, and Chung
- Count X – Florida RICO – against Sells, Lena, Putich, and Chung
- Count XI – Florida RICO Conspiracy – against Lena, Putich, and Chung
- Count XII – Florida Statutory False Advertising – against all Defendants
- Count XIII – Florida Civil Conspiracy – against all Defendants
- Count XIV – Common Law Unfair Competition – against all Defendants
- Count XV – Common Law Tortious Interference – against all Defendants
- Count XVI – Common Law Injurious Falsehood – against all Defendants
- Count XVII – Defamation Per Se – against all Defendants
- Count XVIII – Defamation – against all Defendants
- Count XIX – Defamation by Implication -against all Defendants
- Count XX – Common Law Fraud – against all Defendants
- Count XXI – Negligent Misrepresentation – against all Defendants
- Count XXII – Common Law Invasion of Privacy for Commercial Misappropriation of a Person's Likeness – against all Defendants
- Count XXIII – Florida Statutory Invasion of Privacy for Commercial Misappropriation of a Person's Likeness – against all Defendants

Various counts were disposed after several orders on Defendants' motions to dismiss and a stipulation by the parties.  The Court's Order on the parties' cross motions for summary judgment also found Defendants liable on several other counts.  At summary judgment, the Court found that Sells, Putich, and PIP, were liable for service mark counterfeiting (Count I); Chung and Blindspot were liable for contributory service mark counterfeiting (Count II); Sells was liable for violating the Anticybersquatting Consumer Protection Act ("ACPA") (Count V); and Sells, Putich, and PIP were liable for Federal Unfair Competition (Count VI) and Florida Common Law Unfair Competition violations (Count XIV).  The Court granted summary judgment in favor of Chung, Blindspot, Putich, and Lena on the ACPA claim (Count V) and granted summary judgment in favor of all Defendants on the tortious interference claims (Count XV).  The Court denied both parties' summary judgment motions in all other respects.

On August 22, 2022, the case proceeded to trial on the remaining twelve counts (on liability and damages).  Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, Defendants moved for judgment as a matter of law at the conclusion of the evidence and witness testimony.  Ultimately, I denied the motions and submitted the case to the jury.  On September 1, 2022, after an eight-day trial, the jury rendered a verdict in favor of Plaintiffs on all the remaining counts and awarded Plaintiffs both compensatory and punitive damages.  On September 29, 2022, the Court entered a Final Judgment memorializing the Verdict.  Under the Final Judgment, Plaintiffs were awarded the following in damages:

- HMC was awarded $600,000 in statutory damages for the cybersquatting claims
- HMC and PPIN were awarded $9,000,000 in actual damages for the RICO claims[1]
- HMC and PPIN were awarded $4,500,000 in actual damages for the Florida Statutory False Advertising claims
- Hartman was awarded $3,000,000 in actual damages for the Invasion of Privacy claims,
- HMC and PPIN were awarded $5,500,000 in punitive damages for the Unfair Competition claims
- Hartman was awarded $5,500,000 in punitive damages for the Invasion of Privacy claims.

Plaintiffs were also awarded attorney's fees, pre-judgment interest, and post-judgment interest. The Motion followed.

## II. DISCUSSION

### A. Renewed Motion for Judgment as a Matter of Law

"Federal Rule of Civil Procedure 50(a)(2) provides that a party may move for judgment as a matter of law 'before the case is submitted to the jury.'"  *McGinnis v. Am. Home Mortg.*

---

[1] Although the jury awarded Plaintiffs $3,000,000 in actual damages for the RICO claims, this amount was trebled pursuant to 18 U.S.C. § 1964(c) or, alternatively, § 772.104(1), Florida Statutes.  [DE 393 at 3].

*Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting Fed. R. Civ. P. 50(a)(2)).  "If a district court does not grant the motion, the movant may file 'a renewed motion,' under Rule 50(b), after trial."  *Id.* (quoting Fed. R. Civ. P. 50(b)).  "[I]n ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence."  *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir. 2007).  "In considering whether the verdict is supported by sufficient evidence, 'the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party.'"  *McGinnis*, 817 F.3d at 1254 (citation omitted).  "Judgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict."  *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1310–11 (11th Cir. 2019); *Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 830 (11th Cir. 2004) ("We affirm the jury verdict unless there is no legal basis upon which the jury could have found for Siemens.").  Thus, "if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury."  *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1425 (11th Cir. 1998); *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005) ("The court should deny [a defendant's motion for judgment as a matter of law] if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case.").

Additionally, "[f]or a court to be obligated to consider a post-trial motion for judgment as a matter of law, the moving party must have made a motion for such a judgment under Rule 50(a) at the close of all the evidence."  *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286,

1300 (11th Cir. 2002).  "[A]ny renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury."  *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004); *see also Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1363–64 (11th Cir. 2014) (stating that a court may only grant a motion under Rule 50(b) "on grounds advanced in the preverdict motion").  "If a party asserts new grounds in its renewed motion for judgment as a matter of law that it did not assert in its initial motion for judgment as a matter of law, a court 'may not rely on the new grounds to set aside the jury's verdict.'"  *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 717 n.3 (11th Cir. 2002) (quoting *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998)).

Defendants move for a judgment as a matter of law on the RICO claims, on the Trademark Infringement and Counterfeiting claims against Lena, and the False Advertising and Invasion of Privacy claims against Lena.

## 1. RICO

Under the Federal and Florida RICO statutes, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c); Fla. Stat. § 772.103; *see also Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (referring to Fla. Stat. § 772.103 as "Florida's RICO analog").  A private plaintiff pursuing a civil RICO claim "must plausibly allege six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the

6

plaintiff."  *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citing *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016)).  Defendants contend that they should be awarded judgment as a matter of law on the RICO claims because Plaintiffs failed to prove several of the above six elements and other requirements of those claims.

### a.  Threat of Continuing Activity

Defendants argue that Plaintiffs failed to establish a "pattern" because they failed to demonstrate "continuity."  In order to show a "pattern," the Plaintiffs had to prove that Defendants committed at least two predicate acts within a ten-year time span, that the predicate acts were related, and that the predicate acts demonstrate "criminal conduct of a *continuing* nature." *Jackson*, 372 F.3d at 1264 (emphasis added).  "The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address."  *Id.* at 1265.  "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989).  Here, Plaintiffs proceeded under a theory of open-ended (rather than closed-ended) continuity.  To prove open-ended continuity, a plaintiff must show that "'the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future,' or that 'the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" *Jackson*, 372 F.3d at 1265 (quoting *H.J. Inc.*, 492 U.S. at 242).  Ultimately, "whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case."  *H.J. Inc.*, 492 U.S. at 242.

I find that Plaintiffs presented sufficient evidence from which a reasonable jury could find that there was a threat of continuing activity.  In June 2018, just before the Website went public,

Sells indicated in an email that his goal was "to build [a] very documented, very exposing website with as much content as possible and then spend some time and money making it very public." [DE 345-1 at 46].  At the time, it was Sells's desire to "expose" Hartman for a "fraud" and to put him out of business once and for all.  *Id.*  Sells and the other Defendants sought to accomplish their goals by creating the Website, using Hartman's name and trademarks to entice those connected to Hartman to visit the Website.  [DE 413 at 141-44].  Defendants also sent links to the Website via email to individuals on Hartman's contact list, which Defendants obtained by "scraping" Hartman's LinkedIn page. *Id.* at 159, 162.  Like the Website, the email addresses Defendants used to disseminate the Website contained Hartman's name and trademarks to attract the recipients' attention and make the emails seem credible.  Once Defendants created the Website and sent emails regarding Hartman, they utilized a variety of methods to conceal their identities to both Plaintiffs and the recipients of the information they sent.[2]  These methods included, *inter alia*, using fake identities to create accounts on Hartman's website and various other platforms (MailChimp, Constant Contact, LinkedIn), using gift cards to pay for services, and using online platforms (ProtonMail, My-Zone.net, N'Jalla) to prevent their identity from being discovered.  [DE 368-1 at 44-51; DE 407 at 110].  Sells also falsely told a police officer investigating Hartman's allegations

---

[2] In the Motion, Defendants argue that Plaintiffs cannot rely on Sells's and the other Defendants' attempts to conceal their actions to establish open-ended continuity.  In response, Plaintiffs argue that the Court should not consider this argument from Defendants because it was not raised in Defendants' Rule 50 motion at trial.  Plaintiffs are correct.  Defendants never made an argument in their Rule 50 motion regarding Plaintiffs' use of Defendants' attempts to conceal their actions as evidence of open-ended continuity.  Because Defendants did not advance this argument in their pre-verdict motion, they cannot use it as a basis for their renewed motion now.  *See Connelly*, 764 F.3d at 1363-64.  In any event, Defendants' argument is wrong.  While acts done to conceal a completed wrongdoing may not suggest a likelihood of continued, future wrongdoing, *see Jackson*, 372 F.3d at 1268, Defendants' acts of concealment here occurred while their fraud was on-going, not complete.  Thus, the jury could reasonably view Defendants' acts of concealment, especially when combined with their establishing the New Website after the original Website was shut down, as evidence of intent to continue their wrongdoing indefinitely into the future.

he was not involved in creating the Website or sending emails regarding Hartman. [DE 408 at 100-01]. After receiving a cease-and-desist letter from Hartman's attorney in July 2018, Defendants did not take down the Website or stop spreading negative information about Hartman. *Id.* at 245. In fact, when the Website was shut down in August 2018, Sells enlisted the help of Putich and Chung to transfer the content to the New Website. *Id.* at 250, 253-54. At his deposition on March 11, 2020, Sells stated that he would continue circulating negative information about Hartman via the New Website or other means if he prevailed in this case. *Id.* at 230. At trial, Sells testified that his goal was not only to destroy Hartman's business, but also to destroy Hartman emotionally. *Id.* at 228, 234, 256, 262. Chung and Lena also expressed personal animus against Hartman. [DE 410 at 104-08; DE 413 at 146, 161, 172]. Thus, from the above conduct, the jury could infer that Defendants' goal of destroying Hartman's current and future business prospects was an indefinite goal. Furthermore, I find that the above conduct is sufficient evidence from which a jury could infer, particularly after observing Sells and weighing his credibility along with other evidence, that there was a threat of continuing activity.

Defendants argue that the jury could not have found open-ended continuity because the evidence produced at trial established that Defendants' "scheme" was a single scheme directed at Hartman and the companies he owned and operated (PPIN and HMC). However, contrary to Defendants' arguments, the existence of a "single scheme" does not automatically preclude a finding of continuity, and there is no requirement that Plaintiffs must show a threat of continuity through multiple schemes. *H.J. Inc.*, 492 U.S. at 240 ("[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes."). In fact, in *H.J.*, the United States Supreme Court confirmed that predicate acts that are a part of a single scheme can support a cause of action under RICO. *Id.* at 240-41, 256. Thus, as stated above, the inquiry of

9

whether there is a threat of continuity "depends on the specific facts of each case." *Id.* at 242.  In this case, I find that the jury could infer that there was a threat of continuing activity based on Defendants' statements and conduct.  As for Defendants' argument regarding the number victims, Hartman, PPIN, and HMC are separate parties in this case and can be viewed as three victims or, at the least, more than one victim.  And even if Plaintiffs are viewed as one victim, "the existence of a single victim does not preclude the existence of a pattern of racketeering activity." *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 523 (7th Cir. 1995).

Defendants additionally argue that Plaintiffs cannot prove a threat of continuing activity because their plan to destroy Hartman's business was "inherently terminable."  Defendants cite to *Albunio v. Int'l Safety Group, Inc.*, 15-CV-152 (VEC), 2016 WL 1267795 (S.D.N.Y. Mar. 30, 2016), to corroborate their position.  In *Albunio*, over a nine-month span, the defendant carried out a plan to terminate the plaintiff's company (a competitor) by inducing the plaintiff's company to merge into a shell company, stealing their assets, and diverting their business after the merger. *Albunio*, 15-CV-152 (VEC), 2016 WL 1267795 at *1-*3, *6.  Ultimately, the *Albunio* court granted the defendant's motion to dismiss, finding among other things that the plaintiff did not sufficiently allege open-ended continuity.  According to the *Albunio* court, the defendant's scheme was a single scheme with a clear starting and ending point.  Defendants here argue under *Albunio*, that because their goal was to destroy Hartman's business, their goal was inherently terminable.

However, the facts in this case did not necessarily point to a clear ending point for Defendants' conduct.  Unlike the defendant's nine-month fraudulent merger in *Albunio*, the facts in this case suggest that Sells and the other defendants had a personal animus against Hartman that would extend beyond HMC or PPIN.  Again, Sells's stated goal was to expose Hartman as a fraud, ensure that no one did business with him at all, and "crush" Hartman "emotionally [and]

10

personally."  The jury reasonably could infer that this was an indefinite goal that would extend to any of Hartman's current or future business ventures with no natural termination point.

As support for their argument that there was no threat of continuing activity, Defendants cite to testimony that "they would never engage in this type of conduct again."  However, the jury was free to evaluate Defendants' credibility and reject such testimony.  And, in any event, in its determination of continuity, the jury had to view Defendants' conduct at the time it occurred and not now, with the benefit of hindsight.  *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991).  Defendants cannot use the fact that that their conduct was interrupted or terminated by litigation.  *Cf. id.* ("The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict.").  Here, Defendants ceased their conduct only after Plaintiffs uncovered their identity and when the proceedings in this case were well underway.  *See Cont'l Cas. Co. v. Cura Group, Inc.*, 03-61846-CIV, 2005 WL 8155321, at *15 (S.D. Fla. Apr. 6, 2005) (stating that where the alleged criminal activity ceased only upon discovery, it is more likely that open-ended continuity has been met).  Sells also explicitly stated that he would continue the conduct if he succeeded in this case.  Thus, it is unknown for how long Defendants would have continued their scheme absent the litigation interrupting it, especially as their stated goals were, as yet, unmet.  In this way, this case is distinguishable from cases like *Jackson, Ferrell v. Durbin*, 311 F. App'x 253 (11th Cir. 2009), and *Daedalus Capital LLC v. Vinecombe*, 625 F. App'x 973, 976-77 (11th Cir. 2015) where the court rejected the existence of open-ended continuity due (at least in part) to the fact that the defendants in those cases had already accomplished their goals.  Accordingly, I find that Plaintiffs produced sufficient facts for the jury to conclude that there was a threat of continuing activity.

### b.  Participation and Intent

Defendants argue that Plaintiffs did not introduce enough evidence to show that Lena, Putich, Chung, or Blindspot participated in the RICO enterprise or committed two predicate acts with the requisite intent.  "A violation of RICO [Section 1962(c)] requires that the defendants 'participated, either directly or indirectly, in the conduct of the affairs of the enterprise . . . through a pattern of racketeering activity.'"  *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1156 (11th Cir. 2006) (quoting *United States v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995); 18 U.S.C. § 1962(c)).  As stated above, in order to show a "pattern" of racketeering activity, the defendants must have committed two predicate acts within a ten-year time span.  *Jackson*, 372 F.3d at 1264.  Section 1961(1) contains an exhaustive list of predicate acts that can underlie a RICO claim.  Here, Plaintiffs alleged that Defendants committed three types of predicate acts (under the Federal RICO counts): wire fraud; retaliating against a witness, victim, or an informant; and trafficking in counterfeit goods or services.

As the Court understands it, Defendants appear to be making two arguments as to why Plaintiffs failed to prove that they participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  For one, they argue that Lena, Putich, Chung, or Blindspot could not have "participated" in the conduct of the enterprise's affairs because they did not participate in the operation or management of the enterprise, relying on *Reves v. Ernst & Young,* 507 U.S. 170 (1993) and its progeny.[3]  Second, Defendants argue that Lena, Putich, Chung, or Blindspot could not have participated in the pattern of racketeering activity through the predicate offense of wire fraud because they lacked the specific intent to defraud necessary to commit that offense.

---

[3] Although Defendants cited *Reves* in their Motion, they did not fully articulate this argument in the Motion, and the contours of this argument were anything but clear until their reply.

In this section of their Motion, Defendants also "relatedly" argue that Plaintiffs failed to sufficiently prove their RICO conspiracy claim because they did not prove that Defendants agreed to participate in the enterprise for purposes of violating RICO or agreed to commit two predicate acts.  To violate Section 1962(d), defendants must agree to the overall objective of the enterprise or must agree to commit two predicate acts.  *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997); *see United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007).

As an initial matter, Plaintiffs contend that Defendants never made any argument regarding "an agreement to participate in the RICO enterprise" or section 1962(d) in their Rule 50 motion at trial.  I agree.  Similarly, Defendants did not previously make any argument, pursuant to *Reves* or related case law, that Lena, Putich, Chung, or Blindspot did not sufficiently participate in the operation or management of the enterprise.  In their Rule 50 motion, Defendants' arguments regarding the RICO counts were focused on the threat of continuing activity and the mental state required to satisfy the RICO predicates of mail fraud and wire fraud.  [DE 411 at 228-40; DE 414 at 4-22].[4]  Because Defendants did not argue in their Rule 50 motion at trial that Plaintiffs failed to provide sufficient evidence of their agreement to participate in the RICO enterprise, nor that Defendants did not participate in the "operation or management" of the enterprise, Defendants cannot make those arguments now.  Accordingly, Defendants' arguments regarding participation

---

[4] In their Rule 50 motion at trial, Defendants cited two cases to support their assertion that "people being an unwitting participant or having reckless disregard or being in a mere association with a particular scheme . . . being not sufficient to establish RICO liability."  One was *Cont'l Cas. Co. v. Cura Grp., Inc.*, 03-61846-CIV, 2005 WL 8155321, at *1 (S.D. Fla. Apr. 6, 2005); the other was *In Re Cascade Int'l Sec. Litig.*, 840 F. Supp. 1558 (S.D. Fla. 1993).  [DE 414 at 10-11].  The portions of both cases that Defendants cited addressed whether the defendants in those cases possessed sufficient knowledge and intent to commit the alleged predicate acts.

under *Reves* and regarding an "an agreement to participate in the RICO enterprise" and 1962(d) are waived. *Connelly*, 764 F.3d at 1363–64; *Doe v. Celebrity Cruises, Inc.*, 394 F.3d at 903.

Additionally, I find Defendants' remaining argument – that Plaintiffs did not prove participation because they failed to introduce sufficient evidence to show that Lena,[5] Putich, Chung, or Blindspot committed two predicate acts with the requisite intent – must fail. It is axiomatic that proof of wire fraud requires proof of an intent to defraud. *See United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011). With respect to, Chung, Blindspot, and Putich, Plaintiffs alleged that they committed the predicate act of wire fraud every time they sent false, deceptive, or misleading information to service providers or to Hartman's contacts, including (among other acts) communications from email addresses using Hartman's name and containing links to websites using his name and trademarks. Plaintiffs also alleged that Chung, Blindspot, and Putich committed the predicate act of trafficking in counterfeit goods and services when they helped Sells create websites with counterfeit marks with the intent to disseminate those websites to Hartman's contacts and followers.[6] In the Motion, Defendants argue that Plaintiffs generally pointed to an "undifferentiated group" of emails and did not specify how any of those emails

---

[5] Defendants' specific argument that "Lena was at best an unwitting participant" [DE 398 at 8-9] also fails. Defendants contend that Plaintiffs have not proven that Lena had the "requisite mental state." However, it is not entirely clear what mental state Defendants are referring to: the mental state required for the wire fraud predicate or the mental state required for the agreement to join the RICO enterprise. Regardless, while Defendants argue that Plaintiffs' argument solely involved Lena being copied on a "general group of" emails, Defendants do not meaningfully engage with the content of the emails Lena was copied on or Lena's testimony. As discussed further below, the jury had the opportunity to weigh and reject Lena's testimony that she did not read the messages on which she was copied and had no knowledge of or involvement in the schemes alleged in this case. Having rejected that testimony, the jury was entitled to consider it as substantive evidence to the contrary and conclude that Lena was aware of, and was a willing participant in, the alleged schemes. *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995).

[6] The predicate act of retaliating against a witness, victim or informant only applied to Sells, who was not included in this portion of Defendants' Rule 50 motion at trial.

constituted wire fraud as to each individual defendant.   According to Defendants, this undifferentiated group of emails is not sufficient to prove wire fraud, which requires proof of an intent to defraud.   Defendants make this argument in conclusory fashion, without meaningfully examining the evidence and testimony presented, providing any real analysis for why Defendants' actions could not amount to wire fraud, or explaining how no reasonable jury could infer Defendants had an intent to defraud from their conduct (even if Defendants believe the jury should have found otherwise).   *See Bradley*, 644 F.3d at 1239 ("A jury may infer an intent to defraud from the defendant's conduct.") (internal quotations omitted).   However, even assuming Defendants are correct that Plaintiffs did not sufficiently prove Defendants' intent to defraud, Defendants have left the predicate act of trafficking in counterfeit goods and services wholly unaddressed.   Thus, Defendants have not addressed why Plaintiffs' evidence as to this predicate act alone would not be sufficient to uphold the jury's verdict.   Accordingly, their arguments must fail.

### c.  Causation

Defendants contend that Plaintiffs failed to introduce evidence to show that any of the predicate acts Defendants committed were the proximate cause of Plaintiffs' injuries.   Specifically, Defendants argue that Plaintiffs did not prove proximate causation because "[n]o witness testified that he or she was defrauded or that there was any actual consequence to Hartman from receiving an email or visiting the websites."   [DE 398 at 8].   In response, in addition to attacking the merits of the argument, Plaintiffs argue that Defendants never raised this ground in their Rule 50 motion at trial.   Again, I agree.   In their reply, Defendants attempt to salvage this argument by stating that proximate causation "was explored during Rule 50 arguments at trial."   [DE 420 at 7].   This is simply not the case.

The portion of the transcript Defendants point to in their reply is an excerpt of the discussion I had with Plaintiffs' counsel regarding whether Plaintiffs could prove a threat of continuing activity under a theory of open-ended continuity.  [DE 411 at 233-235].  For context, in response to Defense counsel's argument that there was no threat of continuing activity because this case involved a single scheme and a single victim, *see id.* at 228-30, Plaintiffs' counsel argued that there were hundreds of victims who received email communications from Defendants, *see id.* at 232-33.  After I asked Plaintiffs' counsel what RICO predicates the email recipients were victims of, *see id.* at 233, Plaintiffs' counsel stated that there were at least three victims (Hartman, HMC, and PPIN) and that Plaintiffs could seek damages because Defendants convinced some of the email recipients not to do business with Plaintiffs, *see id.* at 234.  At no point during or after this exchange did Defense counsel assert that he intended to make the issue of proximate causation, which concerns whether any of the Defendants' RICO violations caused an injury to Plaintiffs' business or property, a part of Defendants' Rule 50 motion.  Rather, after the above exchange I had with Plaintiffs' counsel, Defense counsel continued to focus on whether Plaintiffs could prove a threat of continuing activity through open-ended continuity.  *See id.* at 235-38.  And to be clear, the issue of proximate causation is separate and apart from the issue of whether Plaintiffs proved a threat of continuing activity.  Accordingly, because Defendants did not make an affirmative argument regarding proximate causation in their Rule 50 motion at trial, I find that they cannot do so now. *Connelly*, 764 F.3d at 1363–64; *Doe v. Celebrity Cruises, Inc.*, 394 F.3d at 903.

16

### 2. Trademark Infringement and Counterfeiting against Lena

Defendants also argue that the Court should grant judgment as a matter of law as to the contributory trademark infringement and counterfeiting claims against Lena.  In order to prove contributory trademark infringement and counterfeiting, Plaintiffs had to prove the following:

> (1) a person or entity commits direct trademark infringement under the Lanham Act; and (2) the defendant (a) "intentionally induces" the direct infringer to commit infringement, (b) supplies a "product" to the direct infringer whom it "knows" is directly infringing (actual knowledge), or (c) supplies a "product" to the direct infringer whom it "has reason to know" is directly infringing (constructive knowledge).

*Luxottica Group, S.p.A.*, 932 F.3d at 1312.  Case law also "suggests that a contributory infringement claim requires, at a minimum, both an allegation of a direct infringement by a third party, and an allegation of an intentional or knowing contribution to that infringement by the defendant." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1245 (11th Cir. 2007).  *See also Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir. 1991) ("A person who knowingly participates in furthering the trade dress infringement is liable as a contributing party.")*.*  Defendants argue that Lena did not provide a "product" or "service" to one of the direct infringers.  According to Defendants, because Lena was not in a third-party relationship with PIP (she was in an employee/employer relationship), Plaintiffs could not make a claim of contributory infringement.  However, Sells could be seen as a third party.  Defendants do not contest that Sells is individually liable as a direct infringer as he was the one who primarily orchestrated the infringement scheme.  *See Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) ("Natural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act.").  At trial, there was evidence adduced that Lena helped Sells with the infringement scheme.  She was included on various email chains where Sells, Chung, and Putich were discussing the scheme and she paid Chung for his work in helping to further the

17

scheme.  Moreover, as Plaintiff argues, the jury (having observed Lena's testimony denying knowledge of and involvement in the alleged schemes) was entitled to make a credibility finding and reject her testimony as not credible.  And, having made such a finding, the jury could have considered her testimony as substantive evidence of her liability.  *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt.") (emphasis in the original) (internal citations omitted); *Silva v. Dos Santos*, 68 F.4th 1247, 1256-57 (11th Cir. 2023) (finding that "a factfinder can use a witness's noncredible testimony as corroborating substantive evidence against the witness's interests, regardless of whether the case arises in the civil or criminal context"). Viewing the evidence in the light most favorable to the verdict, the jury could have inferred that Lena knowingly contributed towards the infringement by the other defendants.  Accordingly, I find that Defendants are not entitled to a renewed judgment as a matter of law on this score.

### 3.  False Advertising and Invasion of Privacy against Lena

Defendants raise a renewed motion for judgment as to several other claims against Lena. These claims are for Federal False Advertising (Count VII), Florida Statutory False Advertising (Count XII), Common Law Unfair Competition (Count XIV), Common Law Invasion of Privacy (Count XXII), and Florida Statutory Invasion of Privacy (Count XXIII).  Defendants state that Plaintiffs did not prove Lena made a false or misleading description or representation of fact in a commercial advertising or promotion.  According to Defendants, Plaintiffs' only evidence of Lena's participation in the infringement scheme is her inclusion on various email chains and the fact that her role in PIP requires her to have some oversight of the company's financial affairs. Defendants contend that because Counts VII, XII, XIV, XXII, and XXIII are coextensive and predicated on the same evidence, they are entitled to judgment as a matter of law.  In response,

Plaintiffs argue that Defendants did not make any arguments regarding Count XIV in their Rule 50 motion at trial.  Plaintiffs also contend that Defendants' arguments regarding Counts XXII and XXIII during their Rule 50 motion at trial were limited to damages, *see* [DE 414 at 22], and did not address the merits of those claims as Defendants attempt to do now.  Defendants agree that they did not explicitly include Count XIV in their Rule 50 motion at trial.[7]  However, Defendants contend the same arguments that apply to Counts VII and XII, which were included in their Rule 50 motion at trial, *see* [DE 411 at 214], should also apply to Count XIV.

I find that Plaintiff is correct regarding Counts XIV, XXII, and XXIII.  Because Defendants did not make any arguments regarding Count XIV or the merits of Counts XXII and XXIII in their Rule 50 motion at trial, Defendants cannot do so now in their "renewed" Motion.  *See Connelly*, 764 F.3d at 1363–64.  Therefore, the Motion should be denied as to those counts.  As for Counts VII and XII, the false advertising claims, I find that there was evidence to support the verdict against Lena regarding those counts.  Even though Lena did not author or explicitly respond to many of the emails proffered by Plaintiffs, she was copied on various email chains discussing the infringement scheme in depth.  For example, these emails discussed: the Broke Guru and "the Truth about Jason Hartman," moving contacts from the Website to the New Website, the results of Chung's efforts to gain the Website more internet traffic through search engine optimization, Hartman's email contacts, and how PIP would respond to a Better Business Bureau complaint (which Sells believed that Hartman was behind).  [DE 353-1 at 208; DE 355-1 at 1-4; DE 356-1 at 21-22, 244-45, DE 359-1 at 168-71; DE 368-1 at 21-32].  Lena also paid Chung for some of the services he performed for Sells and PIP, which included ensuring that the Website was live and

---

[7] Defendants did not address their failure to include merits arguments on Counts XXII and XXIII in their Rule 50 motion at trial.

running.  [DE 356-1 at 28].  Lena also listened to Hartman's podcasts to update the Website.  [DE 359-1 at 115-19].  Thus, there is sufficient evidence to show that Lena contributed to the Website and emails, which Sells (the third party for the sake of this analysis) directly orchestrated, and the Website and emails clearly injured Plaintiffs.  *See Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015).  And, again, the jury was free to reject Lena's testimony to the contrary (and subsequently consider such testimony as substantive evidence against her).  Thus, the jury could have reasonably concluded that Lena was involved in creating the Website and the content therein.

### B.  <u>Motion for New Trial or Remittitur</u>

Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  The United States Supreme Court has stated that a party may obtain a new trial by arguing that "the verdict is against the great weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'"  *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  "The Eleventh Circuit has set a high standard for granting a new trial for excessive damages."  *Kerrivan v. R.J. Reynolds Tobacco Co.*, 309CV13703WGYHTS, 2018 WL 6528415, at *3 (M.D. Fla. June 20, 2018), *aff'd*, 953 F.3d 1196 (11th Cir. 2020).  "The challenged award must be 'grossly excessive,' indicating that the 'jury's verdict was swayed by passion and prejudice,' and also 'so excessive as to shock the conscience of the court.'"  *Id.* (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1447 (11th Cir. 1985)).  "[W]hen considering a motion for new trial, the trial judge may weigh the evidence, but it is proper to grant the motion only if the verdict is against the great, not just the

greater, weight of the evidence." *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 520 (11th Cir. 1988);

*see also Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)

(stating that the "great weight of the evidence" standard exists "[b]ecause it is critical that a judge

does not merely substitute his judgment for that of the jury"). "Whether a new trial is required is

within the sound discretion of the district court." *Simon*, 895 F.2d at 1310 (quoting *Goldstein*, 758

F.2d at 1447).

      "Where the verdict does not 'shock the conscience of the court,' remittitur is the

appropriate remedy, if warranted." *Khoury v. Williams*, 16-20680-CIV, 2022 WL 2237320, at *4

(S.D. Fla. June 22, 2022). Remittitur "is the appropriate remedy where the jury's damage award

exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518

F.3d 1259, 1266 (11th Cir. 2008) (quoting *Goldstein*, 758 F.2d at 1448). "The Seventh

Amendment requires, however, that the plaintiff be given the option of a new trial in lieu of

remitting a portion of the jury's award." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320,

1329 (11th Cir. 1999). When considering a motion for remittitur, the trial court "must

independently determine the maximum possible award that is reasonably supported by the

evidence in the record." *Deakle v. John E. Graham & Sons*, 756 F.2d 821, 827 (11th Cir. 1985).

"To determine whether the jury's award is within the range dictated by the evidence, we view the

evidence in the light most favorable to the [plaintiff's] and apply the district court's instructions,

which were not objected to by either party." *Rodriguez*, 518 F.3d at 1266. The decision to grant

a remittitur on the ground of excessive damages is one that is, like the decision to grant a new trial,

within the sound discretion of the district court. *Brown v. Alabama Dep't of Transp.*, 597 F.3d

1160, 1173 (11th Cir. 2010) ("We review for a 'clear abuse of discretion' the district court's denial

of a motion for remittitur.").

Defendants move for a new trial on seven grounds.  First, they argue that the jurors should not have found the Defendants liable on Plaintiffs' RICO claims.  Second, they argue that Lena should not have been found liable on any of Plaintiffs' claims.  Third, they argue that several statements made by Plaintiffs' counsel during closing argument were improper and prejudiced them.  Fourth, Defendants argue that the instruction regarding prior litigation confused the jury and prejudiced them.  Fifth, Defendants argue that they were prejudiced by the District Court's exclusion of their rebuttal experts.  Sixth, they argue that newly discovered evidence combats Hartman's trial testimony about the state of his mental illness.  Seventh, and finally, Defendants argue that the damages awarded (including punitive damages) are speculative and shock the conscience.  Ultimately, I do not find that any of the alleged errors warrant a new trial or remittitur.

## 1. RICO

Defendants fail to demonstrate that a new trial on the federal and Florida RICO claims is warranted.  Specifically, they have failed to demonstrate that the jury's verdict was against the "great weight" of the evidence or that the trial was otherwise unfair.  Defendants make two primary arguments for why they are entitled to a new trial on the RICO claims: (1) that the jury "fundamentally misunderstood" the RICO claims, as evidenced by returning "inconsistent verdicts" of liability for both substantive RICO and RICO conspiracy and (2) that the jury's verdict was "hopelessly confused and unfair" because of inconsistency about what constituted the enterprise at issue.  Neither argument merits a new trial.

"A verdict is inconsistent when there is 'no rational, non-speculative way to reconcile . . . two essential jury findings.'"  *Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1259 (11th Cir. 2015) (quoting *Witt v. Norfe, Inc.*, 725 F.2d 1277, 1278 (11th Cir. 1984)).  The trial court "must make all reasonable efforts to reconcile an inconsistent jury verdict[.]"  *Id.* (quoting *Burger King*

*Corp. v. Mason*, 710 F.2d 1480, 1489 (11th Cir. 1983)).  If a certain view of the case makes the verdict consistent, then that view must be adopted; if the verdict cannot be reconciled, the court may order a new trial.  *Id.*  However, "[a] party must object to a verdict as inconsistent before the jury has been dismissed." *Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1259 (11th Cir. 2015). The "failure to object to an inconsistent verdict before the jury is excused forfeits the objection." *Id.*

Again, Defendant first argue that the jury must have misunderstood the RICO claims because they rendered an "inconsistent" verdict by holding Lena, Putich, and Chung liable under both the substantive RICO counts and the RICO Conspiracy counts.  Defendants cite to the jury instructions to demonstrate this supposed inconsistency.   The jury instructions on RICO Conspiracy read as follows:

> If you find that one or more, but not all, of Mr. Sells, Lena Sells, Ms. Putich, and/or Mr. Chung committed a violation of §1962(c), you must consider Plaintiffs' additional claim that Lena Sells, Ms. Putich and Mr. Chung violated RICO §1962(d) by conspiring with Mr. Sells to violate RICO §1962(c).

[DE 336 at 25].  Defendants also cite to the following portion of Plaintiffs' counsel's closing argument to corroborate their claim:

> And so you could very well – we believe you could very well find all four were active in RICO, but you could, also as I did here, find that two were active and two were part of the team but weren't involved in those predicate acts. The only thing you can't do is they can't be both. Answer question 9 and questions 10 [on the verdict form] – it can't be yes to both, if that makes sense. And to the extent that you find that there were damages – and we believe we've proven it – it's, again, that same number.

[DE 414 at 202].  Questions 9 and 10 on the verdict form read as follows:

> QUESTION NO. 9. Which, if any, Defendants have Plaintiffs proven by a preponderance of the evidence are liable for a violation of section 1962(c)? If the answer is no as to all of the Defendants, skip to Question 13.

> ____   Sells

23

             Putich
             Chung
____   Lena

QUESTION NO. 10. Which, if any, Defendants have Plaintiffs proven by a preponderance of the evidence are liable for conspiring to violate section 1962(c) in violation of section 1962(d)?

             Putich
____   Chung
____   Lena

[DE 312 at 5; DE 338 at 6].

Defendants' first argument fails to demonstrate that the jury's verdict was "inconsistent" or that the jury otherwise misunderstood or disobeyed the jury instructions. As an initial matter, Defendants failed to lodge an objection to the alleged inconsistent verdict before the jury was dismissed. Thus, Defendants forfeited this objection and may not use this argument as a basis to obtain a new trial. *Reider*, 793 F.3d at 1259. Furthermore, I find that the verdict is not inconsistent. Defendants have not cited any case suggesting that a finding of liability under both § 1962(c) and § 1962(d) is inconsistent. Indeed, criminal defendants can be convicted of both charges. *See, e.g., United States v. Starrett*, 55 F.3d 1525, 1547-48 (11th Cir. 1995) (finding sufficient evidence for convictions under both § 1962(c) and § 1962(d)).

Defendants also have not shown that the jury misunderstood the jury instructions. Defendants' highlight the portion of the jury instructions stating that if the jury finds that "one or more, **but not all** of" Sells, Lena, Putich, and Chung violated § 1962(c), then the jury "must consider" Plaintiffs' claim that Lena, Putich and Chung violated § 1962(d). However, the jury instruction does not state that the jury cannot, should not, or must not consider § 1962(d) if they find all Defendants liable under § 1962(c). Rather, the instruction says that if the jury finds some, but not all, Defendants liable under § 1962(c), then they *must* consider § 1962(d). Thus, as

Plaintiffs state in their response, a finding that all Defendants were liable under § 1962(c) may have rendered a finding under § 1962(d) unnecessary but did not prohibit it. Defendants also rely on a statement by Plaintiffs' counsel in closing argument that "it can't be both." However, the jury was instructed that "anything the lawyers say is not evidence and isn't binding on you." [DE 336 at 3]. The arguments of Plaintiffs' counsel are not a substitute for the Court's instructions. Therefore, the jury's verdicts on § 1962(c) and § 1962(d) are neither inconsistent nor do they indicate that the jury fundamentally misunderstood the Court's instructions.

Second, Defendants argue that the jury's verdict was "hopelessly confused and unfair" based on inconsistency regarding who or what constituted the "enterprise." In order to succeed on a RICO claim, a plaintiff must prove the existence of an "enterprise." *Cisneros*, 972 F.3d at 1211. "A RICO enterprise is 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Id.* (quoting 18 U.S.C. § 1961(4)). Here, Plaintiffs contended that PIP was the enterprise, but also, in the alternative, that at least two out of Sells, Lena, Putich, and/or Chung formed an enterprise an association-in-fact. [DE 336 at 21-22]. According to Defendants, if PIP was the enterprise, the jury erred in holding Putich and Chung liable under § 1962(c) because they did not have the ability to operate or manage PIP (making the same argument about what is required to "participate in the conduct of the affairs of the enterprise" under *Reves* raised in their Rule 50(b) motion, discussed above). Thus, the Defendants state that Putich and Chung's inclusion means that the jury must have determined that there was association-in-fact, which Defendants argue Plaintiffs did not sufficiently prove, particularly if that association-in-fact included Lena.

I find that Defendants' second argument does not merit a new trial. Contrary to Defendants' assertions, the jury's verdict does not evidence juror "confusion" about what

constituted the enterprise as much as the jury's rejection of Defendants' trial testimony and arguments.  Plaintiffs produced sufficient evidence for the jury to conclude that PIP was the enterprise, and Defendants do not appear to argue otherwise.  Rather they only contend that, if PIP was the enterprise, Putich and Chung did not sufficiently participate in the conduct of PIP's affairs because they did not participate in the operation or management of the company.    To the extent that Defendants are suggesting that a finding to the contrary is against the "great weight of the evidence," I disagree that a new trial is warranted.  Notably, Defendants not only failed to raise this argument in their Rule 50(a) motion (as discussed above), but they also failed to suggest that the Court's jury instructions – which stated on this element that "Plaintiffs must show that the defendant actively conducted or participated in conducting the affairs of the alleged enterprise" [DE 336 at 21] – did not adequately convey this concept of participating in "operation or management."  Moreover, again, the jury was free to reject Chung and Putich's assertions that they merely followed Sell's directions.  And even assuming, arguendo, that there was an issue with the extent to which Putich and Chung participated in the conduct of the enterprise's affairs, I find that Plaintiffs produced sufficient evidence for the jury to conclude that Putich and Chung were liable for RICO conspiracy under § 1962(d), to which the "operation or management" test does not apply. *See Starrett*, 55 F.3d at 1547.

To be found liable for RICO Conspiracy, a plaintiff must prove that the defendants "'objectively manifested, through words or actions, an agreement to participate in . . . the affairs of [an] enterprise through the commission of two or more predicate crimes.'"  *United States v. To*, 144 F.3d 737, 744 (11th Cir. 1998) (quoting *Starrett*, 55 F.3d at 1543).  This agreement can be shown by showing an agreement on the overall objective of the conspiracy.  *Browne*, 505 F.3d at 1264.  It is clear that Chung agreed to participate in the affairs of the enterprise and agreed with

the overall objective of the conspiracy.  Chung sent several emails to Sells indicating that he agreed with the objective of "crushing" Hartman, in addition to his efforts to build and optimize the websites.  [DE 356-1 at 15; DE 413 at 146] ("Your site is optimized, JH is getting crushed, and business is better so mission is accomplished."); [DE 360 at 8; DE 413 at 161].  As for Putich, the jury could have found that her agreement with Sells's plan to "crush" or sabotage Hartman was shown by her actions.  After the Website was shut down because it infringed on Hartman's trademark, Putich helped to transfer all the content on the Website to the New Website.  [DE 359 at 120-36; DE 408 at 253-56; DE 411 at 91-93].  Putich did this after Sells stated that he wanted to "get t[o] the bottom of this" because he was "paying way too much to crush [Hartman] and it all leads back to the site."  [DE 353 at 104; DE 411 at 91-92].  Thus, there is sufficient evidence such that the jury's finding of liability under § 1962(d) for RICO Conspiracy is not against the great weight of the evidence.  And if a new trial is not warranted on § 1962(d), any concerns under § 1962(c) are rendered moot.

### 2. Lena's Liability

In addition to generally referring to their arguments for judgment as a matter of law, here Defendants primarily attack the Florida Civil Conspiracy findings as to Lena.  Defendants argue that the evidence does not show that she committed an overt act in pursuance of the conspiracy, but rather that she got "lumped in" with the other Defendants.  However, Defendants are mistaken.  "There is no requirement that each co-conspirator commit acts in furtherance of the conspiracy; it is sufficient if each conspirator knows of the scheme and assists in some way."  *MP, LLC v. Sterling Holding, LLC*, 231 So. 3d 517, 522 (Fla. 3d DCA 2017).  The (unobjected to) jury instructions also confirmed that Plaintiffs only needed to prove that "one or more of the defendants engaged in an overt act in pursuance of the conspiracy."  [DE 336 at 55].  Thus, Lena did not have

to commit an overt act; she only needed to knowingly agree to the scheme to commit an unlawful act.  Therefore, Defendants' argument for a new trial fails.

Defendants also argue that "an actionable conspiracy requires an actionable underlying tort or wrong," thus apparently suggesting that no such actionable tort or wrong exists here.  *Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cnty.*, 616 So. 2d 562, 565 (Fla. 5th DCA 1993).  However, Defendants fail to develop this argument or demonstrate the absence of an actionable tort as an object of the conspiracy.  Here, Plaintiffs alleged (and the jury found) that Defendants committed various torts, including False Advertising, Unfair Competition, and Invasion of Privacy.  Defendants do not suggest which of these underlying torts were not actionable.  Although it is not clear what torts Plaintiffs were relying on for this count, the jury found in favor of Plaintiffs against all Defendants on the false advertising and invasion of privacy claims.  Accordingly, I cannot say that the jury's verdict finding Lena liable on the Florida Civil Conspiracy claim was against the great weight of the evidence.

Finally, Defendants generally re-raise their arguments for judgment as a matter of law as to Lena as grounds for a new trial.  For the same reasons discussed in rejecting Defendants' motion for judgment as a matter of law, I find that the jury's verdict was not against the "great weight of the evidence" and that Lena is not entitled to a new trial.

### 3. <u>Statements during Closing Argument</u>

A party may be able to obtain a new trial based on statements that opposing counsel makes during closing argument.  *See McWhorter v. City of Birmingham*, 906 F.2d 674, 677 (11th Cir. 1990 (affirming the district court's grant of a new trial based on counsel's reference to excluded evidence); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975) (granting new trial where plaintiff's counsel used damaging facts that were not in evidence).  However, "[t]o

justify a reversal based upon improper comments by counsel requires that the comments be of a nature to impair calm and dispassionate consideration by the jury." *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir. 1988).  The Eleventh Circuit has also stated that counsel's argument must be "plainly unwarranted and clearly injurious." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1282 (11th Cir. 2008).

      Defendants contend there were "at least two instances"[8] during Plaintiffs' closing argument "that were improper and tainted the jury's decision-making process."  According to Defendants, the first instance was when Plaintiffs' counsel made references in his closing argument to Lena's invocation of the spousal privilege during her deposition testimony.  For context, at Lena's deposition, when Plaintiffs' counsel asked her a question about how she felt when Sells (her husband) first told her about the lawsuit, defense counsel objected based on the spousal privilege and instructed Lena not to respond regarding communications between the spouses.  [DE 301-1 at 25].  This portion of her deposition was played at trial, without objection.  [DE 410 at 98-109].  During his closing argument when talking about Lena, Plaintiffs' counsel stated:

> Now, think about the curiosity of what [Lena] told you. . . . Well, some time, my husband told me something, but I'm not going to tell you anything about what he told me, because I have spousal privilege; so all of our discussions, all the things we talked about, I don't have to tell you about any of them. That's what she told you.

[DE 414 at 136].  Defendants did not object when Plaintiffs' counsel made this statement, nor did they seek any relief thereafter.  During deliberations, the jury asked the Court whether information Lena withheld based on spousal privilege "can be assumed to contain information beneficial to

---

[8] Defendants offer no indication of what other allegedly improper statements they are referring to other than Plaintiffs' reference to the spousal privilege and Plaintiffs' comment regarding duplicate damages, discussed herein.  The Court is unaware of any other statements that would merit a new trial and, without specific argument, declines to consider any other such arguments.

plaintiffs."[9]  [DE 334 at 4].  Defendants assert that Plaintiffs "harped on" the invocation of spousal

privilege in order to confuse the jury and suggest that Lena was hiding something.

        Plaintiffs' counsel's comments do not warrant a new trial.  This isolated comment

regarding the spousal privilege certainly does not amount to "harping" on the issue, as Defendants

suggest.  To the extent that counsel's argument was improper,[10] I find that it did not "impair calm

and dispassionate consideration by the jury" and was not "injurious."  Notably, furthermore,

defense counsel did not object to the comments during the closing argument.  *See Wallace v.*

*Mangiaracina*, 745 F. App'x 356, 359 (11th Cir. 2018) ("[Plaintiff's] failure to object to the

statements either during closing argument or right after argument ended undermines any claim that

those statements were so prejudicial as to warrant a new trial.").  Moreover, when the jury asked

about the inference Plaintiffs suggested, the Court answered the jury's question by: instructing

them that the presumption regarding missing data being favorable to the Plaintiffs was not

applicable to any other information; reminding them that the lawyers' statements, arguments,

questions, and objections are not evidence; reminding them that when a question is not answered

because of an objection, they could not speculate on what the answer may have been; and otherwise

referring them back to the Court's previous instructions.  [DE 412 at 38-39].  The Defendants

affirmatively agreed to (and even proposed) the answer the Court gave the jury.  *Id.* at 28.  The

---

[9] The Court had instructed the jury that, because of Defendants' failure to preserve certain evidence, the jury was allowed to presume that missing data was unfavorable to Defendants and Plaintiffs would have benefited from the use of that missing data.  [DE 336 at 11].  Thus, the jury asked if they were allowed to apply the same presumption to the information protected by spousal privilege.

[10] As the Court noted when attempting to address the jury's question, the wiser course would have been for Plaintiffs to clarify the permissible extent of commenting on the invocation of spousal privilege prior to trial.  [DE 412 at 20-22, 30].  Yet, Defendants bear some responsibility as well for the issue arising, having failed to object to the portion of testimony containing the invocation being introduced and having failed to seek any kind of jury instruction to address how the jury should or should not consider it.  *Id.* at 22.

Court's answer was sufficient to cure any confusion among the jurors about what they could or could not infer from the invocation of spousal privilege or any answers they did not consequently hear.  Thus, the statements were not "injurious" in a way that requires a new trial.  Further, Plaintiffs' counsel's statement was also not the kind of comment that would inflame the jurors' passions or otherwise urge them to depart from "calm and dispassionate consideration" of the evidence.  Thus, the comments clearly do not meet that standard for a new trial.

Next Defendants cite to the following statement by Plaintiffs' counsel regarding the possibility of duplicative damages during closing argument:

> Now, next, if we look at the next instruction – the next instruction we have is at 14. Now, this relates specifically to counterfeiting remedies, but I want to give you and explanation for everything. When you are looking at this and trying to decide damages, the law does not allow for my client to recover duplicative damages, the same damages twice or three times or four times. So you just decide what you believe to be the appropriate measure of damages for each count, as to whomever you believe owes the damages, and the Court and the parties have to sort out afterwards, hey, this duplicative so this is not going to happen. That's not something you have to worry about during your analysis, so don't let that filter into how you're calculating the damages.

[DE 414 at 141-42].  Defendants contend the statements confused the jury when they were filling out the verdict form, evidenced by the "varying amounts" the jury awarded Plaintiffs for each of their claims, specifically the Federal and Florida False Advertising claims.  Defendants also contend that the Court should have included an explanation of duplicative damages in the jury instructions.

Again, I find that these comments do not meet the standard necessary to obtain a new trial. As Plaintiffs argue, the Court raised this issue of duplicative damages with the parties at a pre-trial status conference on August 15, 2023, and they agreed to delay addressing potentially duplicative damages until after trial.  Then, prior to the charge conference, Plaintiffs proposed the following instruction to address the potential for double recovery:

> For each claim where you find damages are awardable, you should enter an award for the full amount of damages you deem appropriate without regard to damages awarded for other claims. The law ensures the plaintiffs will not receive a double recovery and that the parties have consented to having these issues resolved by the Court after you deliver your verdict.

*Id.* at 87.  Defendants objected to this instruction because, according to them, the parties had previously agreed to address double recovery after the verdict came in.  *Id.* at 89.  Defendants also "felt that the verdict form was clear enough at the time."  *Id.*  I declined to insert Plaintiffs' proposed instruction because the parties had previously conferred and declined to fashion an instruction addressing duplicative damages.  *Id.* at 90.  Now Defendants claim that the Court should have included an explanation on duplicative damages in the jury instructions.  To the extent that there should have been an explanation on duplicative damages to avoid confusion, Defendants have clearly invited the error by their failure to authorize a jury instruction on the duplicative damages issue. *See Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d 1211, 1231 (11th Cir. 2012) ("A party that invites an error cannot complain when its invitation is accepted.") (quoting *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1293–94 (11th Cir. 2002)).  Regardless, I find that Defendants have not demonstrated that the jury was confused or made an award contrary to law because of the statement Plaintiffs' counsel made.[11]

### 4. Jury Instruction Regarding Prior Litigation

To obtain relief on a challenge to the court's jury instructions, a party must show "both error and prejudice."  *Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 979 F.2d 823, 824 (11th Cir.

---

[11] Furthermore, I find that Plaintiffs' election of remedies cured any perceived deficiencies. Pursuant to Plaintiffs' election and the Court's Final Judgment, Plaintiffs only received one damage award for their RICO claims, an award for their invasion of privacy claims, an award for their false advertising claims, and awards for statutory and punitive damages.

1992); *Sabal Trail Transmission, LLC v. 18.27 Acres of Land in Levy Cnty.*, 824 F. App'x 621, 626 (11th Cir. 2020).

Before and during trial, due to the history of litigation between the parties, the parties addressed the issue of whether and to what extent references to the previous litigation could be admitted at trial. *See* [DE 409 at 106-11]. Plaintiffs sought to prohibit or limit discussion into the parties' previous litigation history. Contrastingly, Defendants sought to bring the previous history to the forefront to provide context to the conduct at issue. During the final charge conference, Plaintiffs proposed to include an instruction informing the jury that the previous litigation between the parties should not bear on the issues they decided in this case. [DE 414 at 84]. Defendants objected stating that the instruction was self-serving and unnecessary. *Id.* at 85. The Court included the following instruction, which it altered from Plaintiffs' proposal, over Defendants' objection:

> **Other Litigation**
>
> You heard testimony that the parties are engaged or have engaged in other litigation. That litigation and any issues in that litigation are not before you in this case. And you should not consider the merits of any other litigation or issues in any other litigation in deciding the issues [in] this case.

[DE 336 at 10].

I find that the instruction was entirely proper. As I stated during trial, Hartman and Sells both testified about the parties' previous lawsuits against each other, *see* [DE 407 at 133, 140-41, 149; DE 409 at 55, 90], and it was appropriate to inform the jury that they should not consider the merits of the previous litigation in deciding this case.

To the extent Defendants contend they were "sabotaged" by the instruction, this is untrue. Plaintiffs expressed both before trial and on the fifth day of trial that a limiting instruction on the issue of prior litigation may be necessary. [DE 409 at 108]. The Court also indicated that the

parties may need to address the issue at the charge conference once it heard the extent to which

the parties' testimony (primarily, Hartman's and Sells' testimony) addressed the previous

litigation.  *Id.* at 110.  Thus, Defendants were well aware of the possibility that the Court might

give such an instruction.  Regardless, Defendants have failed to demonstrate that error or prejudice,

and this ground does not merit a new trial.

### 5. <u>Ruling on Defendant's Rebuttal Experts</u>

A trial court has the discretion to admit or exclude expert opinion evidence.  *See Hudgens*

*v. Bell Helicopters/Textron*, 328 F.3d 1329, 1333 (11th Cir. 2003).  A trial court abuses that

discretion if it "applies an incorrect legal standard, applies the law in an unreasonable or incorrect

manner, follows improper procedures in making a determination, or makes findings of fact that

are clearly erroneous."  *A. L. by & through D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 50

F.4th 1097, 1107 (11th Cir. 2022) (quoting *Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112,

1122 (11th Cir. 2020)).  In order to obtain relief on a trial court's evidentiary ruling, a party must

show that the ruling resulted in "a substantial prejudicial effect."  *A.L.*, 50 F.4th at 1107 (quoting

*Goulah v. Ford Motor Co.*, 118 F.3d 1478, 1483 (11th Cir. 1997)).

### a.   Expert Report/Testimony of Gregory Bond

Defendants submitted the expert report of Gregory Bond, [DE 162-1], as a rebuttal to the

report of Plaintiffs' expert, Oz Avenstein, [DE 112-6].  In Avenstein's report, he analyzed the

websites that Defendants maintained and reviewed the techniques Defendants employed to ensure

that their websites would attract internet traffic.  [DE 112-6 at 3-10].  Bond's report attempted to

rebut the claims in Avenstein's report and stated that Defendant's websites were unsophisticated.

However, Bond's report also heavily suggested that Avenstein's report did not support Plaintiffs'

claims.  In response, Plaintiffs filed a motion to exclude Avenstein's report, which Judge Smith

(who was presiding over the case at the time) ultimately granted.  [DE 162; DE 216].  In its order granting Plaintiffs' motion, Judge Smith found that Avenstein's report was not rebuttal testimony because it did not "directly rebut anything in Avenstein's Report" and instead "opine[d] on other aspects of Plaintiffs' case, not addressed by Avenstein."  [DE 216 at 3].

I find that Judge Smith did not err in excluding Bond as a witness.  Bond did not "solely . . . contradict or rebut evidence on the same subject matter identified" by Avenstein as required by Federal Rule of Civil Procedure 26(a)(2)(D)(ii).  Judge Smith appropriately exercised the Court's discretion in finding that Bond's report addressed some different subject matter than Avenstein and that Bond agreed with Avenstein's opinion at some points.  Defendants' attempts to argue otherwise are inapposite and do not consider that the Court has "broad discretion in deciding what constitutes proper rebuttal evidence."  *Papasan v. Dometic Corp.*, 16-22482-CIV, 2019 WL 7376716, at *3 (S.D. Fla. Apr. 10, 2019).

Furthermore, Plaintiffs never called Avenstein as a witness at trial.  Therefore, as Plaintiffs argue, Defendants suffered no prejudice from Bond's exclusion because (as a rebuttal expert) Bond would not have been permitted to testify absent testimony from the expert he was meant to rebut.  Defendants contend, in their reply, that Bond could have provided rebuttal testimony to Nick Ferrara, Plaintiffs' expert witness who testified about the capabilities of websites created on WordPress, or otherwise addressed the permissive negative inference jury instruction regarding failure to preserve data.  However, Defendants did not raise the idea that Bond would testify regarding the negative inference in their response to Plaintiff's motion to exclude, *see* [DE 174], never sought clarification from Judge Smith as to whether his order would preclude Bond from testifying regarding that area, and never attempted to clarify or re-raise the issue once the case was

transferred to me.   Therefore, to the extent that Defendants contend Bond should have been allowed to testify to rebut the negative inference instruction, they have waived that argument.

### b.   Expert Report/Testimony of Michael Thompson

Thompson was retained by Defendants to rebut the report and testimony of Plaintiffs' financial expert Jose Cuneo.  [DE 176].  Plaintiff moved to exclude Thompson's testimony on the grounds that he was unreliable as a witness, used flawed methodology, ignored critical evidence, and did not properly support his opinions.  [DE 163].  After Plaintiffs' motion to exclude was fully briefed, Judge Smith granted the motion and excluded Thompson's testimony.  [DE 219].

I find that Judge Smith did not err in excluding Thompson's testimony.  Defendants argue that Judge Smith improperly weighed evidence and simply chose to believe Cuneo.   But Defendants' argument is so brief and lacking in detail that it is essentially conclusory.  Regardless, a review of Judge Smith's order shows that he conducted the analysis required under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Notably, Judge Smith considered the reliability of the methodology that Thompson employed and found many of Thompson's opinions unreliable.   For example, he found that while Thompson critiqued the information Cuneo relied on to make his conclusions about Plaintiffs' monetary damages, Thompson did not reference any professional accounting standards in his critique.  Elsewhere, Judge Smith pointed to Thompson's lack of explanation to determine that his opinions were not reliable.  For instance, Thompson concluded that Plaintiffs' loss of an experienced sales associate (and not Defendants' negative website and email messages) led to a drop in revenue for Plaintiffs by comparing that associate's 1099 to that of another sales associate.  But Thompson did not explain why he chose the latter sales associate as a comparator, why comparing 1099s was a valid method of comparison, or how he determined that the loss of the first sales associate (as opposed

to another variable) caused Plaintiffs' drop in revenue. Thus, Judge Smith did not simply "choose to believe" Cuneo over Thompson. Rather, he evaluated the methodology (or lack thereof) Thompson used and found that it was not reliable. Additionally, as stated by Plaintiffs, Defendants addressed many, if not all, of the concerns listed by Thompson in their cross-examination of Cuneo. [DE 411 at 35-40].

### 6. Evidence Regarding Hartman's Mental Anguish

Defendants contend they have uncovered new evidence that undermines Hartman's claims of mental anguish. Shortly after the Court rendered its final judgment awarding Plaintiffs damages, Hartman recorded a podcast about the results of the trial. *1903: Justice Served: Unanimous Jury awards Jason $62,874,494 in Malicious False Advertising & RICO Case*. JasonHartman.com (Oct. 3, 2022), https://www.jasonhartman.com/1903-justice-served-unanimous-jury-awards-jason-62847494-in-malicious-false-advertising-rico-case/ (hereinafter, "Podcast"). Defendants claim that the following statement from the podcast contradicts the claims he made at trial about being in extreme mental distress as the result of Defendants' conduct:

> I had to just stop reading this stuff and engaging with it . . . and let you [counsel] engage with it . . . . Some of this stuff I really didn't remember or maybe I hadn't seen before we got to trial. I just had to zone out. I would . . . would have taken my own life had I looked at all this stuff.

Podcast at 46:10. According to Defendants, these statements suggest that the verdict resulted in manifest injustice.

I find that Defendants' claims are meritless. Defendants' "newly discovered evidence" hardly contradicts Hartman's trial testimony to an extent that renders the trial "unfair." Indeed, Hartman's statements on the podcast do not contradict or "fl[y] directly in the face of" his trial testimony in any material way. Hartman made a very similar statement during his trial testimony. [DE 407 at 183] ("I mean, even seeing those e-mails that were presented in the opening statement

today, I just couldn't read this stuff. I would have definitely committed suicide had I actually read

all this stuff.").   Additionally, Hartman's statements on the podcast do not negate his claims.

Hartman's statement that he "would have taken [his] own life had [he] looked at all this stuff"

corroborates that he thought about committing suicide.  Hartman maintained at trial that, with their

advertising and email campaign, Defendants were trying to "destroy" him and get him to commit

suicide.  *Id.* at 44.   Although Hartman did not commit suicide, he confirmed both at trial and on

his podcast that Defendants' advertising campaign caused him to entertain the thought of suicide.

[DE 406 at 183; DE 407 at 47]; Podcast at 3:02 ("The competitor who did this . . . basically tried

to get me to commit suicide and it almost worked").  Relatedly, there are various other statements

Hartman makes during the podcast that also corroborate his claims.  Podcast at 2:09 ("I was going

through a very, very difficult time"); 2:56 ("It was ruining my life, it was ruining my business");

Podcast at 4:59 ("It involves suicidal thoughts and extreme depression" and "it involves complex

PTSD"); Podcast at 8:02 ("It affected every part of my life. It affected my relationships. It affected

. . . my mental health. It was terrible"); Podcast at 46:05 ("It was tragic"); Podcast at 46:28 ("It

was so awful and evil what these people did to me").  The excerpt Defendants highlighted takes

Hartman's podcast statements out of context and does not truly consider his statements in

comparison to his trial testimony.  Therefore, Defendants fail to demonstrate that they are entitled

to a new trial on this basis.

### 7. <u>Damages</u>

#### a.  **Actual Damages – Plaintiffs' Business Losses**

Plaintiffs HMC and PPIN were ultimately awarded $13.5 million under the final judgment

for their business losses.  This amount consisted of $9 million for their RICO claims (which

represents the trebled jury award of $3 million) and $4.5 million for their Florida Statutory False

Advertising claims.  In the Motion, Defendants argue that Plaintiffs did not adequately prove their actual damages during trial.  Defendants contend that Hartman's testimony was too vague to establish that he or any of his companies lost profits.  Specifically, Defendants contend that because Hartman could not identify any client that left his companies to do business with Defendants, Plaintiffs failed to link Defendants' conduct to Plaintiff's claimed damages.  Defendants also argue that Plaintiffs' claimed damages were highly speculative.  Defendants take issue with the testimony of Plaintiffs' expert witnesses – Cuneo and Craig Kronenberger – and attempt to poke holes in it.  Defendants claim that Cuneo had limited information because he only relied on documents that Hartman and Hartman's tax preparer gave him and did not speak to any of Hartman's employees.  According to Defendants, Cuneo's testimony was also limited because he did not review financial data from Plaintiffs after the middle of 2020.  As for Kronenberger, Defendants state that his testimony was limited because he did not testify about the actual damage done to Plaintiffs' reputation or what efforts Plaintiffs had already undertaken to repair their reputation.

"[L]ost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty." *Nebula Glass Intern., Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213 (11th Cir. 2006).  Specifically, to prove lost profit damages "[t]he party must prove that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." *Id.* at 1214.  Regarding the first element (causation), lost profits must be a "natural, proximate, probable or direct consequence of the [defendant's] act." *SMS Audio, LLC v. Belson*, 9:16-CV-81308, 2017 WL 11631378, at *2 (S.D. Fla. Apr. 25, 2017) (quoting *Taylor Imp. Motors, Inc. v. Smiley*, 143 So. 2d 66, 67-68 (Fla. 3d DCA 1962)).  Regarding the second element, there must be "a reasonable yardstick by which to estimate the damages."

39

*Nebula Glass*, 454 F.3d at 1217.   Under Florida law, "uncertainty as to the amount of damages or difficulty in proving the damages will not prevent recovery if it is clear that substantial damages were suffered as a result of the wrong." *Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1527 (11th Cir. 1988) (quoting *Conner v. Atlas Aircraft Corp.*, 310 So. 2d 352, 354 (Fla. 3d DCA 1975)). All that is required is "a reasonable basis in the evidence for the amount awarded." *Conner*, 310 So. 2d at 354.

I find that Defendants are not entitled to a new trial on these damages.   First, the evidence was sufficient for a reasonable jury to find that Defendants' actions caused a significant drop in revenue for Plaintiffs.   Cuneo's testimony primarily provided the evidence linking Defendant's actions to Plaintiffs' losses.   [DE 410 at 194-216; DE 411 at 8-60].   Cuneo was a forensic accountant retained by Plaintiffs to offer an expert opinion on their economic damages and lost profits. [DE 410 at 195, 198-99].   To help analyze economic damages and lost profits, Cuneo was generally asked to review Plaintiffs' tax returns, financial statements, accounting records, and other financial information. *Id.* at 199.   After reviewing Plaintiffs' financial information, Cuneo prepared a report summarizing his opinions. *Id.*; [DE 150-1].   In that report, Cuneo opined that Plaintiffs suffered a loss of $3,815,620 in economic damages.   [DE 410 at 216].   This number consisted of $1,380,240 in lost profits from 2018 to September of 2020, $184,528 spent in corrective advertising, and $2,250,852 in future lost profits. *Id.* at 215-16; [DE 150-1 at 12]. Cuneo showed that Plaintiffs experienced a thirty-four percent drop in sales in the second half of 2018, which was right after the conduct at issue occurred.   [DE 410 at 203].   This decrease in sales continued to 2019. *Id.* at 203-05.   Cuneo also evaluated several factors that were specifically designed to address causation and exclude other potential explanations for the drop in Plaintiffs' sales. *Id.* at 209.   Cuneo looked at how competitors – with whom Plaintiffs were "on pace" in

2016 and 2017 – performed in comparison to Plaintiffs in 2018 and 2019, the U.S. Census Report in comparison with Plaintiffs' pipeline reports,[12] the IBIS World Report (showing growth in real estate investment in the U.S.), and finally, Plaintiffs' businesses (PPIN and HMC).  *Id.* at 209-14.  Cuneo also specifically looked at the performance of sales associates to see if the decline was attributed to any associates that left Plaintiffs' employment.  *Id.* at 213.  These analyses combatted Defendants' assertion that the decline in profits was due to a high-achieving associate who left PPIN in December 2018.

Kronenberger, whose testimony should be viewed alongside Cuneo's, also provided valuable testimony regarding damages.  Kronenberger was tendered as an expert in reputation and crisis management, digital marketing, and remediation campaigns.  *Id.* at 26-27.  He testified about what made Defendants' campaign against Plaintiffs effective and assessed the costs of remediating Hartman's brand.  *Id.* at 27.  As to the effectiveness of Defendants' campaign against Plaintiffs, Kronenberger found that there were at least 6,000 visitors to Defendants' websites.  *Id.* 52.  According to Kronenberger, Defendants' emails were also effective; Defendants sent multiple emails from different email addresses and thirty percent of the recipients opened the emails.  *Id.* at 31, 42-43, 51.  Some recipients of Defendants' emails also responded.  *Id.* at 52-53.  In order to combat Defendants' negative information campaign, Kronenberger contemplated Plaintiffs undertaking a multi-channel campaign of their own, including hiring an expert agency.  *Id.*  Cuneo and Kronenberger also both testified about the effect of negative and positive advertising and noted that Plaintiffs would have to incur substantial costs in repairing their reputation.  Ultimately,

---

[12] Pipeline reports are reports that PPIN's sales associates created and maintained to keep track of deals.  [DE 410 at 201].  These reports contained, *inter alia*, the name of the client, the address of the client's real estate investment, date of first contact, when the deal closed, and the referral fee Plaintiffs' companies were collecting.  *Id.*

Kronenberger opined that it would cost approximately $1.6 to $1.8 million dollars to conduct a corrective advertising campaign.[13]   Cuneo and Kronenberger's testimony underscored Plaintiffs' need for the type of reputational repair campaign Kronenberger suggested and, thus, the non-speculative nature of Kronenberger's estimate.  *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012) (upholding damages award based on "the great value of Skydive Arizona's original reputation, the costly harm of SKYRIDE's customer confusion, and the geographic extent of potential customer grievances"); *ADT LLC v. Safe Home Sec. Inc.*, 20-23918-CIV, 2022 WL 2805252, at *3 (S.D. Fla. May 18, 2022) ("Expenditures on advertising and marketing are well known to be relevant to a damages determination of loss of goodwill and reputational damages.").

Hartman's testimony further established causation.   According to Hartman, he lost opportunities to appear on podcasts, he lost speaker opportunities at conferences, PPIN lost event sponsors, PPIN was disinvited from conferences, PPIN lost vendor relationships and seller clients, and buyer clients stopped buying properties through PPIN.  [DE 407 at 31-32, 49, 66-67, 72-74]. Specifically, Hartman testified that he was not allowed to speak at the Information Management Network ("IMN") conference, which is an important conference in his industry that he was previously invited to speak at and received many leads from.  *Id.* at 71-77.  Various individuals stopped returning Hartman's calls, emails, and stopped doing business with him because of Defendants' actions; some clients even refused to pay Hartman.  *Id.* at 31-32, 49, 64-66, 69, 101, 104, 107.   Hartman also testified that people took advantage of his maligned reputation to renegotiate lower rates and referral fees.  *Id.* at 68; [DE 410 at 214].

---

[13] Defendants argue that Kronenberger's damages estimate did not account for the corrective advertising that Plaintiffs already performed.  But Kronenberger stated that Hartman did not undertake the methods he contemplated as a part of his damages calculation.  *Id.* at 71.

Gary Pinkerton and Kerry Lutz also provided valuable testimony linking Defendants' actions to Plaintiffs' losses. [DE 413 at 51-77, 78-106]. Pinkerton was a real estate investor in Florida and a former client of Hartman and PPIN. *Id.* at 52-53. Lutz was also a real estate investor in Florida and a former investment counselor for PPIN. *Id.* at 78-79. Hartman also served as a sponsor of and frequently appeared on Lutz's podcast. *Id.* at 79, 93. Both Pinkerton and Lutz received some of Defendants' negative messages about Plaintiffs, and their testimony showed the effect Defendants' negative advertising campaign had on them and other recipients of the messages. Pinkerton affirmatively stated that he stopped referring real estate investors to Hartman in 2018 because of Defendants' negative advertising campaign. *Id.* at 60-62. Pinkerton stated that even if the information on Defendants' websites and emails was not true, he did not want to refer business to Hartman because of the way that Defendants talked about and portrayed Hartman. *Id.* at 61, 75. Defendants argue that Pinkerton's testimony was somehow less reliable because he ceased doing business with Hartman for other reasons (reaching his intended limit) and because his wife served as an investment counselor for PPIN around the time Defendants started his negative information campaign. However, this does not change the fact that Pinkerton chose not to send leads to Hartman (and in fact sent them to at least one of Hartman's competitors) because of Defendants' actions. *Id.* at 62. Lutz stated that he put his business relationship with Hartman "on hold" because of Defendants' actions. *Id.* at 80. Hartman's appearances on Lutz's podcasts, which were monthly and earned Hartman business, were "sparse" after 2018 and Lutz no longer sponsored Hartman's podcast. *Id.* at 93-94, 105. Lutz likened Defendants' actions to a cyber assault or a digital battery. *Id.* at 84, 107. Like with Pinkerton, Defendants make much of the fact that Lutz maintained a business relationship with Hartman after their negative information campaign. *Id.* at 103. However, this does not change the fact that Lutz stopped regularly hosting

Hartman on his podcast.  Lutz's testimony also showed that recipients of Defendants' emails and advertisements were confused and led to believe that the information was coming from Hartman. *Id.* at 82.

Second, I also find that the evidence was sufficient for a reasonable jury to find that Plaintiffs quantified their past and future lost profits.  Cuneo explained that to calculate the $1,380,239 in lost profits from 2018 to September of 2020, he utilized Plaintiffs' internal financial data such as tax returns, financial statements, and general ledgers.  [DE 410 at 201-03, 207].  Cuneo did a historical analysis and used a conservative growth rate to make the necessary projections. *Id.* at 204, 214.  After getting the total of projected lost sales, Cuneo subtracted the costs associated with those sales.  *Id.* at 207.  Notably, Defendants do not challenge Cuneo's historical analysis of Plaintiffs' finances or his methodology in making the lost profit calculation.  Rather, Defendants argue that Cuneo solely relied on information provided to him by Hartman and his tax preparer and did not speak to Hartman's other employees.  However, Defendants provide no reason to doubt the accuracy of the documents Hartman and his tax preparer provided to Cuneo.  Defendants also fail to show that Cuneo's failure to speak to Hartman's other employees materially impacted the analysis.  Defendants additionally argue that Cuneo did not review information (Plaintiffs' financial data or U.S. Census reports) after mid-2020.  But I find that the information Cuneo relied on was at least "a reasonable yardstick by which to estimate the damages" after mid-2020.  At any rate, Defendants' criticisms of Cuneo's analysis all amount to arguments that the jury was able to consider and reasonably reject.

As for future lost profits, Cuneo explained that to calculate the $2,250,852 he arrived at, he looked at PPIN's pipeline reports and noticed that its referral fee went from $6,000 before the Defendants' conduct at issue to $4,000 after the conduct.  *Id.* at 214.  Cuneo took this $2,000

difference, which he termed an estimated lost referral fee, and multiplied that by 300 contracts per year. *Id.* This amount equaled $600,000 per year in lost referral fees that Plaintiffs would not be able to collect. *Id.* Because incremental costs were fifty-two percent of Plaintiffs' sales, Cuneo estimated that the amount of lost profits per year (from lost referral fees) would be approximately $291,000. *Id.* at 214-15. Finally, Cuneo multiplied $291,000 by ten years (amount of time he deemed necessary for Plaintiffs to mitigate their damages) to get $2,910,000, which is $2,200,000 when adjusted to today's value. *Id.* at 215. Cuneo stated that he used a similar historical analysis when evaluating Plaintiffs' past lost profits. *Id.* at 214. This similarity in Cuneo's past and future lost profit analyses is important because I have already found Cuneo's estimate of Plaintiffs damages from 2018 to 2020 to be reliable. While Cuneo's calculation of future lost profits necessarily required making assumptions, the assumptions he made and the methodology he used were sufficiently reasonable for the jury to accept.

Even assuming arguendo that Cuneo's future lost profits calculation was too speculative, I find that the jury's award can still stand. The jury awarded Plaintiffs $3 million for many of Plaintiffs' business-related claims (Unfair Competition, Federal RICO, Florida RICO, Florida Civil Conspiracy). [DE 338]. This number is almost exactly what Cuneo estimated in lost profits from 2018 to September of 2020 ($1,380,239) in combination with Kronenberger's estimate of damages ($1.6 million to $1.8 million). Thus, the jury could have arrived at their damages award even if they did not consider Plaintiffs' damages after 2020, which Defendants contend are speculative. Defendants even tacitly acknowledge this in the Motion, when stating that "the jury's note shows they were not taking into consideration Plaintiffs' financials after 2020." [DE 398 at 25]. Accordingly, I find that there is a reasonable basis in evidence (the testimony of Hartman,

Cuneo, Kronenberger, Pinkerton, and Lutz) for the amount that the jury awarded, and a new trial is not warranted.

### b. Actual Damages - Hartman's Personal Claims

In addition to damages for their economic losses, Plaintiffs also sought damages for Hartman's mental and emotional suffering.  At trial, Hartman testified about the effects of Defendants' conduct on his mental health.  Hartman contended that Defendants' actions drove him to contemplate suicide.  [DE 406 at 183].  The jury ultimately awarded Hartman $3 million for his emotional harm under counts XXII (Florida Common Law Invasion of Privacy) and count XXIII (Florida Statutory Invasion of Privacy).  [DE 338-1 at 10].  In the Motion, Defendants argue that this award is "outrageous" and shocks the conscience.  Defendants propose that an award between $50,000 and $100,000 is reasonable as it is "more in line" with other emotional damage awards in this District and Florida.

"Federal law governs the decision whether or not to grant a new trial, but an issue of the sufficiency of damages awarded for a state claim is decided under state law."  *Collins v. Marriott Intern., Inc.*, 749 F.3d 951, 960 (11th Cir. 2014).  In Florida, when "determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact," courts consider the following:

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
> (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
> (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
> (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

§ 768.74(5), Fla. Stat.

However, section 768.74 does not "alter the 'longstanding principles' governing a trial court's deference to a jury's assessment of damages.'" *Aurbach v. Gallina*, 721 So. 2d 756, 758 (Fla. 4th DCA 1998) (quoting *Poole v. Veterans Auto Sales and Leasing Co.*, 668 So. 2d 189, 191 (Fla. 1996). Furthermore, when the damages at issue are personal in nature, Florida courts give even more deference "to the jury's verdict, trusting in the jurors' 'ability to assess the amount of these damages.'" *Eghnayem v. Boston Sci. Corp.*, 1:14-CV-024061, 2016 WL 4051311, at *15 (S.D. Fla. Mar. 17, 2016) (quoting *R.J. Reynolds Tobacco Co. v. Townsend*, 90 So. 3d 307, 310 (Fla. 1st DCA 2012)). Notably, the Supreme Court of Florida has stated that the jury's verdict "should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Bould v. Touchette*, 349 So. 2d 1181, 1184–85 (Fla. 1977). The Eleventh Circuit has also stated that it is "particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so 'subjective and evaluating it depends considerably on the demeanor of the witnesses.'" *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1315 (11th Cir. 2001) (quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999)).

"The party claiming an excessive verdict bears the burden to prove that the amount is not supported by the evidence or that the jury was influenced by matters beyond the bounds of the record." *Luis Medina & Evatech, Inc. v. Wright*, 8:10-CV-2134-MSS-AEP, 2014 WL 12618175, at *5 (M.D. Fla. Dec. 4, 2014) (quoting *Subaqueous Servs., Inc. v. Corbin*, 25 So. 3d 1260, 1268 (Fla. 1st DCA 2010)); *AM Grand Court Lakes LLC v. Rockhill Ins. Co.*, 18-23576-CIV, 2022 WL 4226400, at *12 (S.D. Fla. Apr. 4, 2022) ("In a motion for a new trial based on excessive damages, the moving party bears the burden of showing that damages are excessive under state substantive

law.").  I find that Defendants have not met their burden to show that the award was excessive.  *See Luis Medina*, 8:10-CV-2134-MSS-AEP, 2014 WL 12618175, at *5.  Defendants make one reference to section 768.74(5), Florida Statutes, stating that it is a "generic" list of considerations courts use to consider the size of a damages award.  Defendants do nothing to analyze the five factors in section 768.74(5) and do not even cite to or mention any of the factors.  As to the first factor, Defendants have not identified support in the record to show that the jury's award was motivated by "prejudice, passion, or corruption."   Fla. Stat. § 768.74(5)(a).   For example, Defendants do not point to any overly prejudicial photos or comments made by the parties or their counsel[14] that would have swayed or influenced the jury's assessment of damages.  Regarding the second factor, the record does not support a claim that the jury "ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable."  Fla. Stat. § 768.74(5)(b).

As to the third factor – "whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture" – Defendants appear to argue that the jury conflated Plaintiffs' business damages with Hartman's personal damages, although they do not explicitly put this argument in the context of the statute, Fla. Stat. § 768.74(5)(c).  Indeed, the jury awarded Hartman $3 million in damages for his Invasion of Privacy claims, while also awarding Plaintiffs $3 million in damages for each of their business-related claims (Unfair Competition, Federal RICO, Florida RICO, Florida Civil Conspiracy).   The similarity of Plaintiffs' business-related and emotional damages awards could suggest that the jury

---

[14] Defendants argued that two comments made by Plaintiffs' counsel during closing argument warranted a new trial.  However, Defendants did not argue that Plaintiffs' counsel's comments indicated that the jury was motivated by "prejudice, passion, or corruption."  Rather, Defendants argued that the comments made by Plaintiffs' counsel during closing argument confused the jury.

improperly considered Plaintiffs' business losses when fashioning the emotional damages award. *See Scarborough v. Nat'l Ass'n of Sur. Bond Producers*, 8:05-CV-1544-T-30TBM, 2008 WL 11439379, at *4 (M.D. Fla. Apr. 25, 2008) (stating that false light invasion of privacy are designed to protect emotional harms and not business-related harms). However, such a conclusion is ultimately speculative. Aside from Defendants' suggestion that the jury considered some of Plaintiffs business-related losses when they fashioned Hartman's invasion of privacy damages award, Defendants do not offer any other evidence to show that the jury took improper elements of damages into account.

To evaluate the fourth factor in section 768.74(5), "whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered," courts look to previous jury awards in similar cases as well as Florida appellate decisions upholding jury awards against excessiveness challenges in similar scenarios. *Simmons v. Bradshaw*, 14-80425-CIV, 2016 WL 4718410, at *7-8 (S.D. Fla. May 4, 2016). Florida courts reviewing jury awards of non-economic damages must also evaluate previous jury awards and Florida appellate decisions regarding jury awards to ensure that the jury award they are reviewing "bear[s] a reasonable relation to the philosophy and general trend of prior decisions in such cases." *Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008). However, the Eleventh Circuit has acknowledged that "reviewing 'amounts awarded in similar cases has at least a limited value' in determining whether an award is excessive." *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1206 (11th Cir. 2020) (quoting *Loftin v. Wilson*, 67 So. 2d 185, 189 (Fla. 1953)). And, "as the Florida Supreme Court has warned, these comparisons are 'sometimes fraught with danger because, of course, each case is different and must of necessity be measured in the light of the circumstances peculiar to it.'" *Id.* (quoting *Loftin*, 67 So. 2d at 189). Furthermore, Florida's Fourth District Court

of Appeal has cautioned that comparative awards in cases more than five years old are of "limited value" in reflecting the upward trend in money judgments. *Simmons*, 2016 WL 4718410 at *8 (citing *Hyundai Motor Co. v. Feravorni*, 842 So. 2d 905, 909 (Fla. 4th DCA 2003)).

In the Motion, Defendants identify a handful of cases in which plaintiffs were awarded much less than Hartman was for what Defendants contend was "far more egregious" conduct than theirs. However, Defendants have failed to show that these cases are factually or procedurally similar to this one. In fact, a review of the cases cited by Defendants shows that only one of those cases involves an award of compensatory damages for emotional distress stemming from an invasion of privacy claim. *See Stockett v. Tolin*, 791 F. Supp. 1536, 1560 (S.D. Fla. 1992) (awarding damages of $250,000 in case involving battery, invasion of privacy, false imprisonment, and intentional infliction of emotional distress). But the invasion of privacy claim in that case (*Stockett*) was not related to commercial misappropriation of image and likeness, the theory of recovery at issue here. *See Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003) (stating the four theories of recovery for invasion of privacy claims). The rest of Defendants' cited cases involve claims of false arrest or intentional infliction of emotional distress – serious claims, indeed, but ones that bear little resemblance to (and thus are of limited value in evaluating) the claim Hartman brought in this action. *See Edman v. Marano*, 177 F. App'x 884, 888 (11th Cir. 2006) (upholding a $225,000 damage award against an excessiveness challenge in the case of a false arrest); *Chase v. Orkin Exterminating Co.*, 12 F. Supp. 2d 1315, 1317 (M.D. Fla. 1998) (awarding the plaintiff a total of $169,000 in damages for her discrimination and intentional infliction of emotional distress claims), *rev'd and vacated sub nom. Chase v. Orkin Exterminating Co.*, 180 F.3d 273 (11th Cir. 1999); *Rivera, et al. v. Miami-Dade Cnty., et al.*, 07 FJVR 3-41, 2006 WL 4468139 (Fla. Cir. Ct. 11th Oct. 4, 2006) (awarding damages of $83,432, $94,800, and $128,910

to three plaintiffs who were falsely arrested).  Notably, all of Defendants' cited examples are from more than fifteen – and in one instance nearly thirty – years ago.  The age and factual dissimilarity of Defendants' cited cases provide little guidance to this Court in assessing whether the award here bears "reasonable relation" to the injury suffered here or fit the "general trend" of similar cases.  Indeed, they underscore the Florida Supreme Court's concern that comparisons are "fraught with danger."  *Loftin*, 67 So. 2d at 189.

As to the fifth, and final, factor I find that "the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons."  Fla. Stat. § 768.74(5)(e).  The supporting evidence was Hartman's testimony recounting Defendants' use of his name and likeness and the mental and emotional suffering that resulted.  After viewing the allegations Defendants made against him, considering the reach, duration, and persistence of Defendants' campaign against him, and hearing Hartman describe the effect Defendants' attacks had on him, the jury could have decided that $3 million was proper to compensate Hartman.

Hartman first learned of Defendants' emails in 2018 when one of the emails, which was originally sent by JasonHartman@protonmail.com, was forwarded to him by his public relations specialist.  [DE 406 at 178-79].  The email provided a link to the Website, which also used Hartman's name.  *Id.* at 182.  After seeing one of the emails and the Website for the first time, Hartman was "horrified" because they were "full of lies and false accusations and ridiculous spin" and "set out to ruin [his] very good reputation."  *Id.* at 181-82.  Clients and employees would continuously forward Hartman the emails and ask him about the allegations therein.  [DE 406 at 178-79, 208-10; DE 407 at 71].  Hartman testified that after a while, he could not look at everything Defendants were sharing about him via email and the Website; he just knew that what they were sharing was "bad," "false," and "horrific."  [DE 406 at 183; DE 407 at 44, 48].

Hartman testified that because of Defendants' disparaging use of his name and likeness, he was ostracized by his professional community. Many clients and colleagues "ghosted" him and stopped returning his calls and emails. [DE 407 at 69, 95, 98, 104]. People did not want to have anything to do with Hartman or his companies and his personal efforts "to explain things to people" fell on deaf ears. *Id.* at 95, 221. Some people used the negative information Defendants were spreading about Hartman as leverage to re-negotiate deals. *Id.* at 68. Others simply did not pay Hartman and PPIN what they were owed. *Id.* at 69. Hartman described the 2018 IMN conference as a telling example of how was treated by the real estate community after Defendants' actions. After previously being invited to speak at the IMN conference months prior to Defendants' actions, Hartman was "uninvited" as a speaker and given a free pass to attend. *Id.* at 88-89. At the conference, people were talking about Hartman behind his back and snickering. *Id.* at 90. One well-respected industry professional even told Hartman: "What are you doing here? You don't belong here." *Id.* at 91. The next year, Hartman was not even offered a free pass and was told he would have to pay to attend the conference. *Id.* at 92.

Hartman testified about the lengths he went through to combat Defendants' use of his name. He started a personal investigation online to get more proof of who was behind the emails and the Website, hired cyber investigators, contacted ProtonMail through his attorneys, initiated a Uniform Domain Name Dispute-Resolution Policy ("UDRP") proceeding to have the domain name transferred to him, offered to pay Defendants money to take down the Website, reported Defendants' conduct to state and federal law enforcement, then ultimately, filed a John Doe lawsuit. [DE 406 at 185-88]. However, Hartman's efforts did not get Defendants to stop immediately. Defendants initially masked their identity when fighting the John Doe lawsuit and made fun of Hartman when he offered them money to take the Website down. *Id.* at 191, 194.

Then after the UDRP proceeding and some of Hartman's other efforts proved successful, Defendants transferred the content on the Website to the New Website and sent emails from "TheBrokeGuru@email.tg" and "BrokeGuru@protonmail.com."  *Id.* at 228; [DE 407 at 31-33, 52-53].  When Hartman realized Sells was behind the emails, the Website and the New Website, he had his attorney send Sells a cease-and-desist letter.  [DE 407 at 46].  In response to the letter, Sells emailed Hartman's attorney and verbally attacked him.  *Id.* at 46.

Hartman also provided specific testimony about the emotional damage that he suffered as a result of Defendants' actions.  According to Hartman, what Defendants were doing to him was unfair and, at points, he did not know what to do about it.  *Id.* at 60.  If he brought up the fact that Defendants were spreading negative information about him, he could draw attention to it and make matters worse and if he did not bring up the negative information they were sharing, he had no way of knowing how people would react.  *Id.* at 69.  Hartman knew that Defendants were trying to destroy him and trying to get him to commit suicide.  *Id.* at 44, 47.  Defendants' tactics apparently worked as Hartman stated that he "just wanted to crawl in a hole and die."  *Id.* at 47.

Defendants argue that there was no tangible evidence to support this damages award, such as medical evidence of the emotional harm that he suffered.  However, in Florida, plaintiffs bringing invasion of privacy claims are not required to show that their emotional distress manifests "in the form of a discernible physical injury or illness."  *Gracey v. Eaker*, 837 So. 2d 348, 355-56 (Fla. 2002).  The Eleventh Circuit also states that a plaintiff need not prove compensatory damages for its mental and emotional suffering "with a high degree specificity," and that such damages "may be inferred from the circumstances or proven through testimony."  *Akouri v. State of Fla. Dep't. of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005).  Therefore, I find that Hartman's testimony recounting Defendants' conduct and his resultant mental and emotional suffering was

sufficient to support the jury's award.  Moreover, while the award of $3 million is extensive, given the highly subjective nature of determining intangible damages, I decline to substitute my judgment for that of the jury and "sit as a seventh juror."  *See Poole*, 668 So. 2d at 191.

### c.  Statutory Damages

The trial court has "broad discretion for determining statutory damages."  *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 852 (11th Cir. 1990).  Here, the jury exercised that discretion.  "When exercising this discretion, the Court may consider: (1) the expenses saved and profits reaped by the infringer; (2) revenues lost by the mark holder as a result of the infringement; and (3) the infringer's state of mind, whether willful, knowing or innocent."  *Gucci Am., Inc v. Borseonlineshop.com*, 12-24048-CIV, 2013 WL 12112489, at *3 (S.D. Fla. Sept. 17, 2013).  The court's discretion is "constrained only by the specified maxima and minima."  *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984) (cited with approval by *Cable/Home Commc'n Corp.*, 902 F.2d at 852); *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001).

The Anti-cybersquatting Consumer Protection Act ("ACPA") is a specific provision of the Lanham Act targeted at cybersquatting.  *See Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 549 (9th Cir. 2013) ("In 1999, Congress passed the ACPA, which amended the Lanham Act by adding two new causes of action aimed at cybersquatting.").  Under the ACPA, plaintiffs are entitled to elect an award of statutory damages instead of actual damages.  15 U.S.C. § 1117(c), (d).  Statutory damages are "intended to compensate losses, and also to deter wrongful conduct."  *Omega Psi Phi Fraternity, Inc. v. Edden*, 11-CV-80479, 2013 WL 12249660, at *2 (S.D. Fla. Apr. 11, 2013); *see also St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1205 (11th Cir. 2009) (construing ACPA's statutory damages provision as a means to deter

wrongful, willful conduct).  Under the ACPA, a court may award statutory damages "of not less than $1,000 and not more than $100,000 per domain name."  15 U.S.C. § 1117(d).

Here, the jury awarded Plaintiffs the maximum amount of damages per domain name ($100,000) for Sells's six ACPA violations and the maximum amount of damages per trademark ($2 million) for Defendants' two Lanham Act violations.  [DE 338 at 3].  Ultimately, in the Final Judgment, Plaintiffs were awarded $600,000 in statutory damages under the ACPA for Sells's use of the six domain names at issue.  [DE 393 at 3].  Now, in the Motion, Defendants contend that the award of statutory damages to Plaintiffs under the Lanham Act "shocks the conscience."

As an initial matter, Defendants neglect to note that Plaintiffs did not receive statutory or actual damages under the Lanham Act for Defendants' trademark violations.  Instead, prior to the Final Judgment, Plaintiffs elected to receive damages for Defendants' RICO violations.  As stated above, in the Final Judgment, Plaintiffs were only awarded $600,000 in statutory damages under the ACPA for Defendants' creation and use of the six domain names at issue.  Accordingly, Defendants' arguments regarding the $2,000,000 awards for non-ACPA trademark violations are moot.

Regarding the statutory damages awarded under the ACPA, I decline to disturb the jury's award.  There is no doubt that Defendants' use of the six counterfeit domain names at issue was willful.  Sells admitted that he purchased the domain names so that individuals attempting to search for Hartman would be led to the Website.  [DE 354 at 14-17; DE 408 at 200, 205; DE 413 at 141-43]; *see Pelc v. Nowak*, 596 F. App'x 768, 770 (11th Cir. 2015) (finding willful infringement where "Defendant admitted that he used Plaintiffs trademarks for the purpose of attracting Internet Users searching on the Internet for information regarding the corporate Plaintiff's business" (internal quotations omitted)).  Sells purchased the domain names through N'Jalla, an identity

concealing agent, to keep his identity a secret.  [DE 408 at 200; DE 413 at 139].  Sells's purpose in purchasing these domain names and creating the Website was to exact revenge on Hartman, put him out of business, and crush him "personally and emotionally."  [DE 354-1 at 47; DE 408 at 199, 234; DE 409 at 167-68, 200].  This is exactly the type of willful conduct that the ACPA was created to deter.  *See Broadbandone, Inc. v. Host.net, Inc.*, 12-80604-CIV, 2013 WL 12096359, at *7 (S.D. Fla. Oct. 16, 2013) (statutory damages awarded under ACPA where Defendant infringed on plaintiff's trademarks "as a means of exacting revenge"), *report and recommendation adopted*, 12-80604-CIV, 2013 WL 12095593 (S.D. Fla. Nov. 18, 2013); *see also Romag Fasteners, Inc v. Fossil, Inc.*, 206 L. Ed. 2d 672 (2020) ("The Lanham Act speaks often and expressly about mental states.").  Sells also stated that while he started the negative information campaign as damage control, the Website was "getting [PIP] some real positive traction" and "morphed a bit into marketing."  [DE 354-1 at 32; DE 411 at 73].  Additionally, testimony from Hartman and Cuneo shows that Defendants' Website caused Plaintiffs to lose a significant amount of revenue.  Thus, under these circumstances, I find that the jury was entitled to award Plaintiffs $600,000 in statutory damages for Sells's ACPA violations.  *See Korean Air Lines Co., Ltd. v. Skypass, LLC*, 13-CV-24268, 2014 WL 12862754, at *7 (S.D. Fla. Oct. 22, 2014) (awarding $100,000 in statutory damages where the defendant admitted that it attempted to hide its identity when it registered a counterfeit domain name and collecting cases where the trial court similarly awarded $100,000 in statutory damages), *report and recommendation adopted*, 13-24268-CIV, 2014 WL 12862759 (S.D. Fla. Dec. 2, 2014).[15]

---

[15] In asserting that the jury's award "shocks the conscience," Defendants cite two cases that awarded more modest amounts of statutory damages while stating that, "Other than default judgments, Defendants could not locate a case in this Circuit awarding maximum statutory damages under the Lanham Act."  [DE 398 at 26].  It is unclear why Defendants imply that that the Court should discount statutory damages awarded on default judgment, such as those in *Korean*

### d.  Punitive Damages

Plaintiffs were awarded a total of $11 million in punitive damages under the Final Judgment.  This consisted of awards of $5.5 million against Sells (for Unfair Competition, Florida Civil Conspiracy, and Invasion of Privacy), $3 million against PIP (for Unfair Competition, Florida Civil Conspiracy, and Invasion of Privacy), $1 million against Putich (for Unfair Competition, Florida Civil Conspiracy, and Invasion of Privacy), and $500,000 against Chung (for Florida Civil Conspiracy, and Invasion of Privacy), $500,000 against Blindspot (for Florida Civil Conspiracy, and Invasion of Privacy), and $500,000 against Lena.  Defendants argue that these punitive damages are "excessive and shocking" and contend that the award will effectively destroy them financially.  Defendants request that the Court grant them a new trial or remittitur, in the alternative.  If the Court grants remittitur, Defendants suggest that I remit the awards to a more reasonable $150,000 against Sells, $100,000 against PIP, $10,000 against Chung, Blindspot, and Putich, and $2,500 against Lena.

Here, I find that Defendants have not shown that the punitive damages award was "excessive."  As with a verdict on compensatory damages, under Florida law "a court should not declare a verdict excessive merely because it is higher than the amount that the court itself considers the jury should have awarded."  *Normius v. Eckerd Corp.*, 813 So. 2d 985, 988 (Fla. 2d DCA 2002) (citing *Bould v. Touchette*, 349 So.2d 1181, 1184 (Fla. 1977)).  Rather, a verdict on punitive damages "should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."  *Id.*  In

---

*Air Lines* and the cases it cites, as points of comparison.  Those cases at least demonstrate that reasonable jurists in this district have found a maximum award of statutory damages to be reasonable based on (admitted-by-default) allegations of willful, wrongful conduct, even without the opportunity that the jury had here – to evaluate a defendant's explanations and assess that defendant's demeanor in determining the appropriate award to deter future willful conduct.

arguing that the punitive damages award is "excessive," Defendants solely rely on the following

three-factor test for what constitutes a permissible award:

> (1) 'the manifest weight of the evidence does not render the amount of punitive damages assessed out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct;' (2) the award 'bears some relationship to the defendant's ability to pay and does not result in economic castigation or bankruptcy to the defendant;' and (3) a reasonable relationship exists between the compensatory and punitive amounts awarded.

*Young v. Becker & Poliakoff, P.A.*, 88 So. 3d 1002, 1006 (Fla. 4th DCA 2012) (quoting *R.J.*

*Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1072 (Fla. 1st DCA 2010)).  Within this three-

factor test, Defendants solely address the second factor, which reasons that the award must bear a

reasonable relationship to the defendant's ability to pay and should not result in economic

castigation.

Regarding ability to pay, Defendants contend that "Plaintiffs failed to ask any questions or

provide any documentary evidence about virtually all the Defendants' ability to pay."  However,

Plaintiffs had no burden to do so.  As the party claiming that the punitive damages award was

excessive, "[D]efendants had the burden of establishing what their net worth was in order to later

make an 'economic castigation' claim." *Rety v. Green*, 546 So. 2d 410, 421 (Fla. 3d DCA 1989).

While Defendants provided some details at trial and in the Motion about their yearly income, they

provided no evidence regarding their "net worth."  In the absence of evidence of Defendants' net

worth, I cannot say that the punitive damages award is excessive. *See Brooks v. Rios*, 707 So. 2d

374, 376 (Fla. 3d DCA 1998); *Albritton v. Gandy*, 531 So. 2d 381, 390 (Fla. 1st DCA 1988).

Defendants also did nothing to address the first or third factors of this three-factor test.  For

example, they provide no comparative cases or any other evidence to show how the punitive

damages award here is "out of all reasonable proportion" to the conduct in this case.  Defendants

also fail to show how the award does or does not "bear some reasonable relation to compensatory

damages." I have also considered the factors in section 768.74(5), and I do not find that Defendants have made a compelling argument that those factors dictate a finding that the punitive damages award here was excessive. Therefore, particularly in light of the "wide latitude" afforded to the jury in determining the amount of a punitive damages award, *see Rety v. Green*, 546 So. 2d at 417, I find that Defendants have not met their burden to show that the punitive damages award was excessive.

### III.    Conclusion

In summation, I find that Defendants not shown that they are entitled to judgment as a matter of law or a new trial (or remittitur). Therefore, the Motion [DE 398] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 18th day of September 2023.

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished to:

Counsel of Record